**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

McCONNELL DORCE, CECILIA JONES, and
SHERLIVIA THOMAS-MURCHINSON,
individually and on behalf of all others similarly
situated,

                             Plaintiffs,

        v.

CITY OF NEW YORK, NEIGHBORHOOD
RESTORE HOUSING DEVELOPMENT FUND
CO. INC., BSDC KINGS COVENANT HOUSING
DEVELOPMENT FUND COMPANY, INC.,
MARIA TORRES-SPRINGER (Commissioner of the
New York City Department of Housing Preservation
and Development); JOHN DOE #1 to #10, and JANE
DOE #1 to #10,

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs MCCONNELL DORCE, CECILIA JONES and SHERLIVIA THOMAS

MURCHINSON ("**Plaintiffs**"), on behalf of themselves and all others similarly situated, by and

through their attorneys, VALLI KANE & VAGNINI LLP, bring this action for damages and

other legal and equitable relief against defendants THE CITY OF NEW YORK (the "**City**"),

MARIA TORRES-SPRINGER, Commissioner of the New York City Department of Housing

Preservation and Development ("**HPD**"); JACQUES JIHA, Commissioner of the New York City

Department of Finance ("**DOF**", and together with the City and HPD, at times referred to herein

as the "**City Defendants**"); NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT

FUND CO. INC, in ("**Neighborhood Restore**"), BSDC KINGS COVENANT HOUSING

DEVELOPMENT FUND COMPANY, INC. ("Bridge Street"); JOHN DOE #1 to #10 and JANE

DOE #1 to #10 (collectively, "**Defendants**") for violation of: (i) the United States Constitution;

(ii) the New York State Constitution; (iii) 42 U.S.C. Section 1983 ("**Section 1983**"); and (iv)

New York General Business Law §349 ("GBL §349") through their deprivation of Plaintiffs'

rights by means of their use of the Third Party Transfer Program (hereinafter the "**Third Party**

**Transfer Program**," or "**Program**"), codified as Title 11, Chapter 4 of the New York City

Administrative Code (the "**Code**"), as amended by Local Law 37 of 1996 and Title 28, Chapter 8

of the Rules of the City of New York; and pursuant to any other cause(s) of action that can be

inferred from the facts set forth herein.

## INTRODUCTION

1.      This is a putative class action brought by Plaintiffs challenging certain seizures of

Plaintiffs' property, committed by Defendants against Plaintiffs and those similarly situated

persons under a program that the City describes and advances as its Third Party Transfer

Program, the specifics of which are described and presented *infra*.  The property seized includes

real property, personal property and other tangible and intangible property appurtenant thereto

(collectively, "**properties**").

2.      The Third Party Transfer Program constitutes *ultra vires* activity by Defendants

outside of the authority granted to municipalities under New York law for tax collection, and

violates the due process, equal protection, and "takings" provisions of the United States

Constitution, the New York State Constitution, and other provisions of federal and state law.

Moreover, in implementing, administering and advancing the Third Party Transfer Program,

Defendants fail to faithfully adhere to the letter and spirit of the law under which the program

was authorized by the New York City Council.

3.      The City's Third Party Transfer Program was created by defendant HPD in 1996,

for the purpose of the taking of the ownership of properties generally referred to Class 1 and

Class 2 properties away from private individuals, and family-owned or resident-owned

2

cooperative corporations, for example, for the transfer of the ownership of such properties to non-profit organizations such as defendants Neighborhood Restore and Bridge Street. Legislation towards this end was presented to the New York City Council by HPD in 1996 as amendments to the *in rem* tax-lien collection provisions of New York City local law that exist solely by virtue of tax collection powers made available to New York City by the New York State Legislature.

4.      Such specific *in rem* powers were granted to tax districts across New York State, by the New York State Legislature, for the collection of Tax Liens, starting on or about June 3, 1939, under the newly adopted Section 165 of Title 3 of Article VII-A of Chapter 692 of the 1939 Laws of New York State (referred to herein as "**Tax Law § 165**").  Tax Law § 165  was as further amended from time to time through to Chapter 602 of the 1993 Laws of New York State, and as presently codified as Section 1120 of the Real Property Tax Law of New York Consolidated Laws or  **"NY State's In Rem Grant to Municipalities[1]"**).

5.      *In rem* foreclosure proceedings are considered summary proceedings.  NY State's In Rem Grant to Municipalities expressly confines the use of *in rem* foreclosure procedures to actions for the purpose of collecting "Tax Liens."   "**Tax Liens**" are amounts owed to what are referred to under New York state law as "**Tax Districts**" for real property and other amounts that are classified as taxes over the period of time prescribed in state and local law, at the end of which period such amounts age to be classified as a lien for collection by such Tax District.

---

[1] Tax Districts are defined in the applicable law as "a county, city, town, village or school district, having power to enforce the collection of taxes on real property by tax sale.

6.      By virtue of, and pursuant to, NY State's In Rem Grant to Municipalities, starting in 1948, and from time to time, New York City Council enacted *in rem* foreclosure provisions to collect Tax Liens.  Those provisions are now codified in Chapter 4 of Title 11 of the Code, and more particularly in Section 404 of Chapter 4 of Title 11 of the Code .  These local, New York City laws are hereinafter collectively referred to herein as **"NY City's In Rem Laws."[2]**.

7.      On May 2, 1996, New York City Council enacted Local Law No. 37 to codify and facilitate the City's Third Party Transfer Program, purportedly as a part of NYC's In Rem Laws. Upon approval by New York City's Mayor on May 14, 1996, the provisions of Local Law No. 37 went into effect.  HPD's proposal and Local Law No. 37 were effectively an extension by the City of NY State's In Rem Grant to Municipalities*;* in other words, an extension of the summary foreclosure powers granted by to Tax Districts across New York State by the New York State Legislature for the collection of Tax Liens under Tax Law § 165, as amended from time to time.

8.      With Local Law No. 37, the New York City Council expanded the purpose of NY State's In Rem Grant to Municipalities by and through its adoption of Local Law No. 37.  On information and belief, the expansion of the NYS in Rem Grant to Municipalities, as applied by New York City, was executed without any actual, express or implied grant of authority from the New York State Law Legislature therefor.

9.      Pursuant to the provisions of Local Law No. 37, as codified in Chapter 4 of Title 11 of the New York City Administrative Code, the City developed and currently advances what it and the general public refer to as **the "City's Third Party Transfer Program."**  Under the

---

[2] Under the NYC In Rem Law, pursuant to the authority granted to the City under NY State's In Rem Grant to Municipalities, jurisdiction of actions commenced and pursued thereunder was granted to the Supreme Court of the State of New York.

City's Third Party Transfer Program, DOF and HPD identify properties that these agencies conclude are experiencing financial and physical distress, invoke NY City's In Rem Laws, secure *in rem* foreclosure judgments, extinguish the ownership and equity of the private owners, and then transfer the properties to defendant Neighborhood Restore or a similarly organized and situated entity.

10.     New York City's Third Party Transfer Program was enacted and is currently being utilized for purposes other than the collection of Tax Liens owed to the City.

11.     The City's Third Party Transfer Program was enacted and is currently being utilized outside of the authority granted to the City under NY State's In Rem Grant to Municipalities.

12.     The City's Third Party Transfer Program is currently being utilized outside of the authority granted to Defendants under Local Law No. 37.

13.     The City's Third Party Transfer Program amounts to the foreclosure of private property without due process of law, in violation of the United States Constitution, the New York State Constitution, 42 U.S.C. §§ 1983 *et seq*. of the United States Code ("**Section 1983**"), Section 349 of New York State's General Business Law ("**GBL §349**"), and other provisions of United States and New York State law.

14.     The City's Third Party Transfer Program  amounts to the "taking" of property without "just compensation," in violation of: the United States Constitution, the New York State Constitution, Section 1983, GBL §349, and other provisions of United States and New York State law.

15.     The City's Third Party Transfer Program is otherwise unconstitutional under the United States Constitution and the New York State Constitution.

16.     New York City's In Rem Laws are currently being utilized for, purposes other than the collection of Tax Liens.

17.     The law under which the City purports to advance its Third Party Transfer Program – New York City Council Local Law No. 37 of the City of New York, as amended from time to time – and each and every rule and regulation promulgated thereby or thereunder, and each and every program development or advanced thereby or thereunder, is void as a matter of law.

**RELEVANT BACKGROUND**

18.     New York City experienced urban property blight in certain outer borough communities in the 1970s and 1980s.  During this period, and in a significant number of instances, owners of large multiple dwelling residential buildings in the Bronx, Upper Manhattan, and Brooklyn simply walked away from their buildings, after falling behind on their tax obligations to the City, and after neglecting property maintenance and health and safety issues at the buildings.  In other words, these owners abandoned their buildings, leaving behind unpaid real property taxes that were owed to the City, leaving behind tenants without any building-wide property, maintenance, health and safety services, and leaving behind buildings that were experiencing and at risk of continuing to experience physical decline.

19.     Initially, and prior to 1996, New York City invoked the specific *in rem* powers granted to it by NY State's In Rem Grant to Municipalities to take ownership of these types of buildings.  New York City Housing, Preservation and Development Corporation (HPD) considered the buildings or properties that were taken through *in rem* proceedings, and owned and managed by them over time, to be distressed.  Distressed buildings were those upon which taxes were outstanding and in which tenants were experiencing the conditions that resulted from

general neglect by their owners.  HPD's policy prior to 1996 with respect to distressed buildings was twofold: it had one program under the New York State Housing Finance Law, and another program where the City directly managed the properties, as set forth below.

20.     *First*, in certain instances, HPD would transfer of management and ownership of the distressed buildings to non-profit cooperative corporations, the shareholders of which are the prior tenants who resided in the apartment units of the distressed buildings.  In those instances, title to the distressed buildings were transferred to not-for-profit or charitable corporations organized pursuant to Section 573 of Article XI of the New York State Housing Finance Law (generally referred to herein as "**HDFCs**").  Generally, HDFCs are organized under New York State Law as cooperative corporations for the overall purpose of housing improvement and homeownership, and primarily to keep the apartment units owned thereby affordable over time to the working families residing therein (in the buildings owned by the HDFCs).

21.     With the HDFC model, tenants of distressed buildings were given the opportunity or option to become shareholders in the cooperative corporations.  As shareholders in the HDFCs, tenants became owners of their particular apartment units by virtue of their pro-rata share ownership in the cooperative corporation; each of their shares afforded each of them the right to a proprietary lease to an appurtenant apartment, by virtue of which each of them was provided with the right to reside therein long term without the risk of displacement, and to have an equity interest in the particular HDFC and//or the HDFC-owned building and its related tangible and intangible assets (such as the value of commercial leases held by the HDFC).

22.     *Second*, in other instances, where ownership and management of the buildings taken *in rem* were under the control and direction of HPD, HPD advanced a policy of City management of these distressed buildings, and at times utilized what was commonly referred to

as an "Article 7A Administrator" to manage the buildings, generally speaking.  By the mid

1990s, according to testimony provided to the New York City Council by the then commissioner

of HPD (Deborah Wright) on or about January 29, 1996, New York City found itself owning a

substantial portfolio of properties taken through *in rem* proceedings, at great expense to the City.

As Commissioner Wright described in her January 29, 1996 testimony, the costs of maintaining

and operating these buildings were "magnified by the hardships to tenants, the devastating

impact on local real estate markets and on neighborhood quality of life."

      23.    Thus, in April 1996, the City (under the Guliani Administration and acting by and

through the then HPD Commissioner [Lilliam Barrios-Paoli]) sought from and was granted the

right by the New York City Council – but not by the New York State Legislature – to broaden

and utilize the *in rem* foreclosure powers granted to it by New York State, in order to "permit the

DOF Commissioner to transfer title to a tax foreclosed [distressed] building either to the City or

a third party designated by the Commissioner of HPD."  In seeking this authority, the City also

sought and was granted the authority to broaden the classification of properties that could be

taken through *in rem* proceedings, and also sought to change the purpose for that taking.

      24.    The City thus proposed, and New York City Council enacted, a broadened

statutory definition of "distressed property" under its 1996 Local Law No. 37, to wit:

> "Distressed property."  Any parcel of class one or class two real property that is
> subject to a tax lien or liens with a lien or liens to value ratio, as determined by
> the commissioner of finance, equal to or greater than fifteen percent and that
> meets one of the following two criteria:
>
> i. such parcel has an average of five or more hazardous or immediately hazardous
> violations of record of the housing maintenance code per dwelling unit; or
>
> ii. such parcel is subject to a lien or liens for any expenses incurred by the
> department of housing preservation and development for the repair or the
> elimination of any dangerous or unlawful conditions therein, pursuant to section
> 27-2144 of this code, in an amount equal to or greater than one thousand dollars.

See NYC Administrative Code § 11-401.4, *et seq.*

25.     The dual purposes of Local Law 37 were, as specified in the testimony of HPD's Commissioner at the time:  To "improve tax collection" and "to more effectively address the risk of abandonment of New York City's housing stock."  These purposes are memorialized in the testimony of then HPD Commissioners Deborah Wright and Lilliam Barrios-Paoli before the New York City Council in January 1996 and April 1996 --  and were intended to designate, seize and transfer private properties that DOF and/or HPD designate as "distressed properties" pursuant to Code § 11-401.4.

26.     The legislative intent of the New York City Local Law pursuant to which the program was adopted was set forth in the transcript of the hearing before the Housing & Buildings Committee of the New York City Council on April 22, 1996.  Plaintiffs respectfully request that this Court take judicial notice of the hearing transcript at New York City Council's legislation portal.[3]  As a result of the expansive definition of "distressed property," Local Law 37 became defendant HPD and the City's tool under which the City advanced its Third Party Transfer Program (or TPT Program), even though Local Law No. 37 was adopted in 1996 as an amendment to the New York City tax collection laws (which latter laws were enacted, starting in 1948, by virtue of New York State Tax Law § 165, as amended).  Thus, and for the purpose of advancing the Third Party Transfer Program,  the City and HPD utilized or invoked the in *rem powers* granted to New York City and other municipalities by New York State in 1939 (that is,

---

[3] Available at: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=2506428&GUID=28382A28-26F2-4C11-BB4F-79B9AAD9BFF7&Options=ID|Text|&Search=

NY State's In Rem Grant to Municipalities). Local Law No. 37 is codified in Chapter 4 of Title 11 of the Code.

27.     The taking of properties designated as "distressed" is effectuated pursuant to via Section 11-401.1(c), Section 11-404(a) and the additional provisions of Chapter 4 of Title 11 of the New York City Administrative Code enacted under Local Law No. 37, and the rules and regulations promulgated thereunder, hereinafter collectively referred to as "**NYC Admin. Code § 11-404(a), *et seq.***"  Specifically NYC Admin. Code § 11-404(a) provides that:

> a. Whenever it shall appear that a tax lien or tax liens has or have been due and unpaid for a period of at least one year from the date on which the tax, assessment or other legal charge represented thereby became a lien, such tax lien or tax liens, except as provided in subdivision b of this section or otherwise provided by this chapter, may be summarily foreclosed in the manner provided in this chapter, notwithstanding the provisions of any general, special or local law and notwithstanding any omission to hold a sale of a tax lien or tax liens prior to such foreclosure. A bill of arrears or any other instrument evidencing such tax lien or tax liens shall be evidence of the fact that the tax lien or tax liens represented thereby has not or have not been paid to the city or sold by it.

28.     Thus, the proceedings adopted by New York City Council in 1996 via Local Law No. 37 for the taking of and transfer of by HPD of properties designated as "distressed," pursuant thereto, in order to advance the City's Third Party Transfer Program, were adopted under the Tax Lien summary proceedings of Tax Law § 165, pursuant to NY State's In Rem Grant to Municipalities.  However, Local Law No. 37 is not a tool used by the City for the collection of Tax Liens owed to the City.

29.     By 2015, HPD expanded the bases on which it would invoke Local Law No. 37 to take and nullify the title of private-property owners, or the title of HDFC-cooperative owners, utilizing NYC Admin. Code 11-404(a), *et seq.*.  HPD currently invokes Code § 11-404(a), as adopted pursuant to Tax Law § 165, and the provisions of Chapter 4 of Title 11 as amended by

Local Law No. 37 to extinguish the title of buildings owned by private individuals and HDFCs that HPD determines to <u>not</u> be viable properties to be auctioned to the highest bidder in a regular tax lien or foreclosure sale, on the basis of its (HPD's) conclusion that the properties are in generally poor condition and thus less marketable at the time of the taking or seizure.

30.     This expanded basis for invoking *in rem* powers to foreclose was asserted by HPD's commissioner Maria Torres-Springer, in affidavits submitted in 2017 in *in rem* foreclosure proceedings before New York State Supreme Courts, and in support of the City's application to such courts for the award of *in rem* foreclosure judgments against certain listed properties. This expanded purpose for invoking *in rem* powers was not granted to the City or HPD under any state or city law.

31.     In recent years, the City Defendants thus commenced *in rem* proceedings under NYC Admin. Code § 11-404(a) against properties targeted for seizure by the City, and sought default judgments, and judgments of foreclosure and sale, under the color of authority that such defendants assert is provided by Local Law No. 37, in order to advance the Third Party Transfer Program. Indeed, the City, through HPD and/or DOF, made and is making arbitrary and capricious internal determinations to seize property utilizing the "*in rem*" powers granted to the City by the New York State Legislature for purposes other than the collection of Tax Liens.

32.     Upon obtaining a judgment of foreclosure and sale under the TPT Program, the City transferred (and transfers) ownership of the properties to certain entities, organizations and companies which became authorized participants in the TPT by HPD, and which were designated by HPD or the City as its "**Third Party Transfer Partners**." These included defendants Neighborhood Restore and Bridge Street, under the auspices of, for example, provisions of Code §§ 11-401.1, 11-405, 11-412.1(b) and, overall, 11-404(a) *et seq.* . Section

11-412.1(c) provides that the City or the Third Party Transfer Partner receives title or ownership of the property seized by *in rem* judgment in fee simple absolute after the expiration of a statutory four-month redemption period (following the award of judgment in foreclosure).

33.     The City receives no tax revenue when it utilizes this method.  New York City Council Local Law No. 37 permits the City Defendants, upon being awarded title to each particular property via the *in rem* grant of a judgment of foreclosure pursuant to NYC Admin. Code § 11-404 (a) *et seq*., to then transfer title to each Third Party Transfer Partner without requiring any of them to make any amount in payment towards the Tax Lien or the amount that served as the basis for the City's exercise of its purported powers under Code § 11-401, et seq., and in particular § 11-401.1 and § 11.404(a).   Instead, the City, upon gaining ownership, *extinguishes* any and all outstanding tax liens and then conveys the property to the Third Party Transfer Partner (such as defendant Neighborhood Restore or defendant Bridge Street) for $1 or a similar nominal amount which bears no correlation to the amount that the City defendants asserted to designate the property as "distressed" under the Code or to the amount that the City Defendants asserted as a Tax Lien as the basis for commencing the *in rem* proceeding in the first place. [4]

34.     Thus, the City Defendants are pursuing an award of fee title ownership and absolute possession of private property, utilizing NYC Admin. Code § 11-404(a) for purposes other than the collection of Tax Liens.  On information and belief, neither the City, HPD nor

---

[4] The Third Party Transfer Partner receiving ownership obtains the benefit of ownership without making any material payment to the City – it receives the property at a *zero-cost basis*.  The Third Party Transfer Partner that received (and receives) title to each property was purportedly authorized to enter into management agreements with additional partners designated by HPD and/or the City.

DOF sought or secured authority from the New York State Legislature to broaden or expand the purpose for which it could utilize NY State's In Rem Grant to Municipalities. On information and belief, neither the City, HPD nor DOF sought or secured authority from the New York State Legislature to utilize *in rem* foreclosure powers for purposes other than collection of Tax Liens.

35.     Under the Third-Party Transfer Program that has been and is being pursued, prosecuted, executed and administered by the City Defendants -- utilizing *in rem* foreclosure proceedings pursuant to NYC Admin. Code § 11-404(a) -- the City and HPD in particular are obviously asserting that they are not required to undertake the judicial foreclosure proceedings, and attend to the due process protections required by New York State Constitution and law before extinguishing the private ownership of properties targeted for the Third Party Transfer Program. These judicial foreclosure proceedings and due process protections include, but are not limited to, those laws and protections embodied in, and proceedings adopted pursuant to, New York State's Real Property Tax Law, New York State's Real Property Actions & Proceedings Law, New York State's Real Property Law, and New York State's Civil Practice Law & Rules, among others, and as applicable to the "foreclosing on," or the "seizure of," or the "taking of" real property in New York State by a governmental entity or Tax District or any other person, and also include the foreclosure public-auction provisions that are designed to preserve rights and surplus of the original title owner, as the "owner of the equity of redemption," following the grant of a judgment of foreclosure and sale and the conduct of an auction  (collectively "**NY State's Judicial Foreclosure Proceedings and Protections" or the "Judicial Foreclosure Protections"**).

36.     The City, HPD and DOF obviously take the position that they are not required to commence or prosecute their foreclosure actions action against properties targeted or designated

for the Third Party Transfer Program pursuant to NY State's Judicial Foreclosure Proceedings and Protections.  The City, HPD and DOF obviously take the position that they have the power or authority seize properties targeted or designated for the Third Party Transfer Program without attending to NY State's Judicial Foreclosure Proceedings and Protections.  The City, HPD and DOF obviously take the position that they are permitted to bypass many if not all of the due process and evidentiary standards embodied in New York State statutory and case law in seizing properties for the Third Party Transfer Program.

37.     The City, HPD and DOF also obviously take the position that they are permitted to bypass even the due process protections embodied in New York State law for summary proceedings for the collection of actual Tax Liens.  Section 11-402.1 of the New York City Administrative Code states that Article 11 of the New York State Real Property Tax law is not applicable to the City as to the powers the City invokes under Chapter 4 of Title 11 of the Code to seize distressed properties or additional properties otherwise seized or taken pursuant to Section 11-404(a), *et se*q. .  However, contrary to this assertion, there is no grant of actual, express or even implied authority from the New York State Legislature which supports the contention contained in Code § 11-402.1 (that Article 11 of New York State Real Property Law is inapplicable).

38.     In each *in rem* action, the City Defendants pursue an award of fee title ownership and absolute possession utilizing NYC Admin. Code § 11.404(a) *et seq*. to effectively extinguish all rights of the owner to the property.  When the City uses a summary proceeding to secure an *in rem* foreclosure judgment in rem, the original property owner also loses all of his or her (or its, in the case of an HDFC) surplus or equity value in the property.  This surplus or equity value is the

difference between a foreclosure-public-auction-bid amount on (or the market value of) the property <u>and</u> the amount of the foreclosure judgment premised on a valid Tax Lien, if any).

39.     There is no method pursuant to which the former owner of the property may claim the "surplus" value (the amount in excess of the amount claimed as a Tax Lien by the City, as exists with Tax Lien foreclosure sales resulting from judicial foreclosure proceedings). *See* Code, §§11-401 – 428.  The City Defendants utilize the summary *in rem* foreclosure proceeding in NYC Admin. Code § 11-404(a) to effectively extinguish *all* rights of the owner to the title and value of the property.  In addition, the City Defendants bypass NY State's Judicial Foreclosure Proceedings and Protections for such takings.

**The City Defendants Also Violate NYC Local Laws, While Circumventing Other Laws**

40.     Section 11-404 *et seq.* of the NYC Admin. Code specifies the conditions governing DOF and HPD's designation of taxes owed to the City, by a property owner, as a lien, before the summary *in rem* foreclosure proceeding of NYC Admin. Code § 11-404(a) can be utilized.  However, even in the instances where amounts owed to the City for taxes do not yet have lien status under the Code, the City Defendants utilize the NYC Admin. Code § 11-404(a) to seize or otherwise take private property.

41.     Subsection 4 of the Definitions section of NYC Admin. Code § 11.401 specifies the bases on which DOF and HPD are required to designate a property as a "Distressed property," before the summary *in rem* foreclosure proceeding of the Code can be utilized. However, even in the instances where properties included in the *in rem* proceedings commenced by the City Defendants do not meet the bases or requirements for being designated as "distressed" by DOF and HPD under Code § 11-401.4, the City Defendants utilize the summary *in rem* foreclosure proceedings in Code § 11-404(a) *et seq*. to effectively extinguish *all* rights of

the owner to the property.  In addition, the City Defendants bypass NY State's Judicial Foreclosure Proceedings and Protections in such instances.  Moreover, the City Defendants utilize Code §§ 11-405 *et seq.*, 11-412 *et. seq.* and 11-412.1 *et seq.*, for example, to advance the Third Party Transfer Program in such instances.

42.     Section 11-401.1 of the Code mandates that DOF and HPD follow the procedures specified therein for "distressed" properties, presumably before the summary *in rem* foreclosure proceeding of Code § 11-404 *et seq.* can be utilized.  See NYC Administrative Code 11-401.1, *et seq.* (including but not limited to those subsections thereof that were included to advance the intent to New York State Legislature to preserve the ownership of private properties, by private individuals, who may have fallen behind on their taxes or owe the City for repairs conducted at their property).  However, even in instances where the DOF and HPD defendants fail to demonstrate compliance with the procedures set forth in Code § 11-401.1, the City Defendants utilize summary *in rem* proceedings in Code § 11-404(a) *et seq.* to effectively extinguish all rights of the owner to the property.  In addition, the City Defendants bypass NY State's Judicial Foreclosure Proceedings and Protections in such instances.  Moreover, the City Defendants utilize Code §§ 11-405 *et seq.*, 11-412 *et. seq.* and 11-412.1 *et seq.*, for example, to advance the Third Party Transfer Program in such instances.

43.     Even in the instances where the amount of the tax lien asserted by the City in the *in rem* proceeding pursuant to Code § 11-404(a) is or may be a small fraction of the value of the property being taken, the City Defendants utilize summary *in rem* proceedings in Code § 11-404(a) *et seq.* to effectively extinguish all rights of the owner to the property.  In addition, the City Defendants bypass the Judicial Foreclosure Proceedings and Protections in such instances.

Moreover, the City Defendants utilize Code §§ 11-405 *et seq.*, 11-412 *et. seq.* and 11-412.1 *et seq.*, for example, to advance the Third Party Transfer Program in such instances.

44.     The City Defendants currently utilize Code § 11-404 *et seq.* for the purpose of advancing the City's (and its current Mayor's) affordable housing program.   The City's affordable housing plan was unveiled by Mayor Bill De Blasio in May, 2014, as New York's "Housing New York Plan" (the "**Plan**") and has been spearheaded by Maria Torres-Springer in her capacity as Commissioner of HPD.   The Plan, as initially conceived, sought to "create and preserve 200,000 high-quality, affordable homes over ten years," spanning all five boroughs.[5]

45.     Margaret DeVoe, Esq., assistant Corporation Counsel in the office of Zachary W. Carter, Corporation Counsel of the City of New York, averred in an affirmation made and dated October 11, 2018, submitted to the Supreme Court of the State of New York, Bronx County, that "the purposes [sic] of the [City's Third Party Transfer] Program is to create and maintain affordable housing."   Ms. Devoe, in that affirmation (at ¶18-21 in page 7), further described that the City, HPD and DOF are utilizing the provisions of Local Law No. 37 and the *in rem* authority granted to the City by New York State Legislature for purposes other than tax collection, and to otherwise advance a public purpose of the current Mayor (affordable housing).

46.     On November 15, 2018, at a Town Hall meeting convened by New York City Council Member Robert E. Cornegy, Jr., in his position as the Chair of the City Council's Committee on Housing and Buildings, and in response to public outcry resulting from the City's seizures of private property (in primarily minority communities) under its Third-Party Transfer Program, a HPD representative admitted that the purpose of the City's Third Party Transfer

---

[5] https://www1.nyc.gov/site/hpd/about/housing-plan.page

Program is to "keep the housing affordable for the residents of those buildings." This dovetails with other public statements by City officials that the TPT Program is being utilized to advance the City's (and its current Mayor's) affordable housing agenda.

47.     In 2018, HPD asserted that the City is authorized to include in the Program all properties designated under the New York City building code as Tax Class 1 and Class 2 properties with municipal charges that are outstanding for one year or more that start as low as $1,000, and buildings owned by HDFCs and other coops and condos with municipal charges that are outstanding for three years or more that start as low as $1,000.  There is no statutory authority for this taking in New York State or City law.  Additionally, and once again, the City defendants expanded the bases on which HPD or DOF or the City can invoke *in rem* foreclosure powers, to take properties for amounts that may very well be significantly lower than the then-current market value of the subject properties.

48.     Under the Third-Party Transfer Program that has been and still is pursued, prosecuted, executed and administered by the City, DOF and HPD defendants, --  utilizing an *in rem* foreclosure procedures pursuant to Section 11.404 *et. seq.* of the Code --  the City asserts that it is not limited to only seizing properties that meet the definition of "distressed property" under Section 11-401.4 of the Code, in order to advance the Plan set by Mayor DeBlasio. However, neither the City (as a Taxing District), nor HPD or DOF (as an agency thereof) sought or secured authority from the New York Council to broaden or expand the purpose for which it currently utilizes Local Law No. 37.  Nor has the City sought authority from the New York State Legislature to expand the NY State In Rem Grant to Municipalities to advance the Plan.

49.     On or about January 10, 2019, New York Mayor Bill de Blasio doubled down on his affordable housing initiative, and stated that he intends to expand the Third Party Transfer

Program to seize upwards of forty (40) additional dwellings annually, in order to transition them to "responsible, mission driven ownership."  The Mayor stated: "We will seize their buildings, and we will put them in the hands of a community nonprofit that will treat tenants with the respect they deserve."  Mayor DeBlasio has made it clear in public statements that he intends to expand the application and reach of the Third Party Transfer Program, and of the City Defendants' current seizure of privately-owned or -controlled properties.  Mayor DeBlaso's intent is to use Chapter 11 of Title 4 of the NYC Admin. Code, and in particular NYC Admin. Code § 11-404(a) *et seq.*, to advance the Plan.  Once again, in the instance where the City does not intend to collect and does not actually collect any taxes owed to the City, the City Defendants have utilized, and intend to continue utilizing, the summary *in rem* foreclosure proceeding of NYC Admin. Code § 11-404(a) and the additional provisions of Local Law No. 37 to effectively extinguish all rights of certain owners of private property in New York City.

50.    In addition to the fact that the City Defendants' Third Party Transfer Program utilizes the NY State In Rem Grant to Municipalities for a purpose other than tax collection (which is the sole authorized purpose), and constitutes an *ultra vires* expansion of the reach of *in rem* authority granted to the City by the New York State Legislature, the Third Party Transfer Program also constitutes a "taking" in violation of: (1) the United States Constitution; and (2) the New York State Constitution.

51.    The Third Party Transfer Program amounts to an unconstitutional "taking" because it seizes private property for a public purpose (affordable housing), and does not provide "just compensation" to the owners of the property seized.  .  In addition, as set forth below, the Program violates the due process and equal protection clauses of the United States Constitution and New York Constitution, and also violates Section 1983.

52.     Moreover, as implemented, the Third Party Transfer Program constitutes a deceptive practice under New York GBL § 349, because after the City seizes property under the Program, it still continues to solicit and accept payments from former owners of property, without disclosing to those former owners that their ownership rights have been extinguished through an *in rem* foreclosure judgment to advance the Third Party Transfer Program.  In other instances, the City accepts into installment repayment plans for amounts delineated as Tax Liens (incorrectly or incorrectly) after the commencement of the *in rem* proceeding on the affected, without removing such property from the *in rem* proceedings (even though such removal is also required by the letter and spirit of Local Law No. 37).

## JURISDICTION AND VENUE

53.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief: (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201;  and (iii) under 42 U.S.C. §§1983 *et seq*.

54.     Venue is proper in this Court pursuant to 42 U.S.C. §§ 19831 *et seq*., in as much as this judicial district lies in a State in which the unlawful practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain facilities, conduct business and reside in this district.

55.     The Court's supplemental jurisdiction is invoked to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of

operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

## THE PARTIES

56.     At all relevant times, Plaintiff McConnell Dorce has been a resident of Kings County in New York State.  Plaintiff McConnell Dorce was the owner of private real property the title of which was extinguished or otherwise taken by the City Defendants and transferred to Neighborhood Restore under the City's Third Party Transfer Program (in 2017 and 2018 respectively), utilizing the summary *in rem* foreclosure proceedings of the Code § 11-404 *et seq.*

57.     At all relevant times, Plaintiff Cecilia Jones has been a resident of Kings County, in New York State.  Plaintiff Cecilia Jones was the shareholder in an HDFC and had the right to reside in her apartment unit in that HDFC as a cooperative shareholder, which shareholder title was extinguished or otherwise taken by the City Defendants and transferred to Bridge Street under the City's Third Party Transfer Program (in 2017 and 2018 respectively), utilizing the summary *in rem* foreclosure proceedings of the Code § 11-404 *et seq.*

58.     At all relevant times, Plaintiff Sherlivia Thomas-Murchinson has been a resident of Kings County, in New York State.  Plaintiff Thomas-Murchinson was the shareholder in an HDFC and had the right to reside in her apartment unit in that HDFC as a cooperative shareholder, which shareholder title was extinguished or otherwise taken by the City Defendants and transferred to Bridge Street under the City's Third Party Transfer Program, utilizing the summary *in rem* foreclosure proceedings of the Code § 11-404 *et seq.*  Plaintiff Thomas-Murchinson was, as a result, dispossessed from her residency at such cooperative apartment, and was, along with her family, dispossessed of inheritance rights to the shares of the cooperative

21

which had been owned by her deceased parents prior to it being conveyed to Bridge Street through the Program.

59.     Defendant City of New York (the "City") is a government and municipal entity existing within the boundaries of the five boroughs of the City of New York, State of New York, and lies within this judicial district.

60.     Defendant Neighborhood Restore Housing Development Fund Corporation is a New York not-for-profit corporation organized and existing under the laws of the State of New York, including but not limited to Article XI of the New York Private Housing Finance Law (Neighborhood Restore).  Neighborhood Restore operates within the State of New York and within this judicial district, and maintains its primary place of business at 150 Broadway, Suite 2101, New York NY 10038.

61.     Defendant BSDC KINGS COVENANT HOUSING DEVELOPMENT FUND COMPANY, INC., is a New York not-for-profit corporation organized and existing under the laws of the State of New York, including but not limited to Article XI of the New York Private Housing Finance Law (Bridge Street).  Bridge Street is an affiliate or subsidiary or otherwise controlled or directed by Bridge Street Development Corporation, a New York not-for-profit corporation organized and existing under the laws of the State of New York.   Bridge Street operates within the State of New York and within this judicial district, and maintains its primary place of business at 460 Nostrand Avenue, Brooklyn, New York 11216.

62.     Defendant Maria Torres-Springer is the Commissioner of the New York City Department of Housing Preservation and Development and the person who, in that capacity, is designated to act under and in accordance with Sections 11.401, *et seq*, and 11.404 *et seq*, of the New York City Administrative Code.

63.     Defendant JACQUES JIHA is the Commissioner of the New York City Department of Finance and the person, in that capacity, who is designated to act under and in accordance with Sections 11.401, *et seq*, and 11.404 *et seq*, of the New York City Administrative

64.     Defendants JOHN DOE #1 to #10 being each and every entity or person designated by HPD pursuant to Section 11.412.1(b)(2) of Chapter 4 of Title 11 of the New York City Administrative Code as a third-party transfer program partner from 1996 to the present.

## STATEMENT OF THE FACTS

### Facts Common to All Plaintiffs

65.     During the relevant period, Defendants seized numerous properties pursuant to *in rem* foreclosure proceedings brought under the Third Party Transfer program.   By way of example, in 2017 alone, the City Defendants were awarded *in rem* title to sixty-six (66) properties in Kings County believed to be worth, in the aggregate, in excess of sixty million dollars ($60,000,000.00).   The 2017 *in rem* proceeding brought by the City was the ninth such proceeding to seize property *en masse* brought by the City, with a tenth proceeding filed by the City in 2018.   A number of the properties seized in the 2017 proceeding were transferred to defendants Neighborhood Restore, Bridge Street, and/or similarly situated entities that are designated as Third Party Transfer Partners pursuant to the City's Third Party Transfer Program.

66.     The City Defendants engaged in the act of taking properties utilizing *in rem* foreclosure proceedings, and the additional defendants engaged in the act of accepting title to such properties on the basis of *in rem* foreclosure judgments, even though each of them had actual knowledge that the properties did not meet the definition of a "distressed property" under the Code.

67.     The City Defendants engaged in the act of taking properties utilizing *in rem* foreclosure proceedings, and the additional defendants engaged in the act of accepting title to such properties on the basis of *in rem* foreclosure judgments, even though each of them had actual knowledge that the owners of such properties had entered into installment agreements with the City to pay their outstanding tax and/or lien amounts.

68.     The City Defendants engaged in the act of taking properties utilizing *in rem* foreclosure proceedings, and the additional defendants engaged in the act of accepting title to such properties on the basis of *in rem* foreclosure judgments, without providing sufficient notice to the owners of such properties, and/or without issuing notice(s) that reasonably calculated to reach the owners of the property in time for them to oppose the proceedings, and with actual knowledge that, in fact, many of the owners would not (and did not) receive any notice.

69.     The City Defendants engaged in the act of taking properties utilizing *in rem* foreclosure proceedings, and the additional defendants engaged in the act of accepting title to such properties on the basis of *in rem* foreclosure judgments, with actual knowledge that the value of the property seized was worth many times the amount of any tax liens alleged to be owed on the subject property, and without any effort to compensate the property owners for the value taken in excess of the value of the tax liens.

70.     The City Defendants failed to provide each of the plaintiffs with notice of the commencement of foreclosure proceedings against the property in which he or she had an ownership interest, either in fee simple or as a shareholder, and failed to provide each of the plaintiffs with notice of the award of an *in rem* judgment of foreclosure that effectively extinguished each of their ownership interests in their particular property.

71.     The City Defendants failed to provide each of the plaintiffs with notice that the property in which he or she had an ownership interest, either in fee simple or as a shareholder, had been designated as a distressed property under Section 11.401 of the Code, or that the property was targeted for transfer to a third party pursuant to the City's Third Party Transfer Program.

72.     Defendants had a policy and practice of intentionally utilizing *in rem* foreclosure proceedings in a manner that was inconsistent with the purpose for which the City was given *in rem* powers by the New York State Legislature decades ago.

73.     Instead of using *in rem* proceedings in furtherance of a legitimate public purpose expressly authorized by the New York State Legislature, Defendants utilized these proceedings as a means of improperly taking private property, or for other improper purposes, in violation of the United States Constitution and New York State Constitution.

74.     Further, the City Defendants engage in such improper takings, for improper purposes, without providing sufficient notice to the private property owners that being divested of their ownership and equity in their properties.

75.     In addition, the City Defendants improperly engaged in acts and transactions that intended to, or that resulted in, a redistribution of property ownership and wealth away from individuals that are of African-American and/or Hispanic American descent, or buildings that are owned predominantly by individuals that of African-American or Hispanic American descent, to private companies and partners of the City defendants such as defendant Neighborhood Restore and Bridge Street, utilizing the Third Party Transfer Program, in a manner that violates the equal protection laws of the United States.

76.     In addition, the City Defendants are well aware that, in many instances, the buildings subjected to *in rem* proceedings under the Third Party Transfer Program -- or taken in *in rem* foreclosure judgments thereunder -- are long-standing, family-owned, and/or affordable housing HDFC cooperative properties, with affordable housing tenants residing therein on the date of entry of the *in rem* judgement dispossessing the owner of the property.

77.     In addition, the City Defendants are well aware that, in many instances, the buildings that are targeted for *in rem* proceedings under the Third Party Transfer Program -- or taken in *in rem* foreclosure judgments thereunder -- are held free and clear of any mortgage lien recorded against the property on the date of entry of the *in rem* foreclosure judgment divesting the owners of the property.

78.     In addition, the City Defendants are well aware that, in many instances, the buildings that are targeted for *in rem* proceedings under the Third Party Transfer Program -- or taken in *in rem* foreclosure judgments thereunder – are predominantly in communities of color in New York City.

**Facts Concerning the Named Plaintiffs**

**Plaintiff McConnell Dorce**

79.     Since 1977, and at all relevant times, McConnell Dorce owned the property located at 373 Rockaway Boulevard, Brooklyn, New York (Kings County Block #4672, Lot #56), in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans and Middle Eastern Americans  (in other words, in a community of color).

80.     Since 2012, Mr. Dorce owned the subject property free and clear of any mortgage.

81.     Because he owned it free and clear of any mortgage, Mr. Dorce thus had substantial equity in the subject property.

82.     Up until at least that time, all real property taxes and related charges to the property were paid to the City.

83.     Sometime after 2012, Mr. Dorce incurred water and sewage charges in connection with the subject property.  Mr. Dorce entered into a written installment agreement with the City's Department of Environmental Protection ("**DEP**") to pay the outstanding water and sewage charges, and made each of the installment payments by appearing in person at the DEP office located on Livingston Street in Brooklyn, New York.

84.     On or about September 24, 2018, Mr. Dorce learned that his property had been transferred to one of the City's Third Party Transfer Partners as a result of an *in rem* proceeding commenced by the City Defendants on or about July 2015 to advance the Program.

85.     At no time leading up to the taking of his property did Mr. Dorce receive actual or constructive notice of the July 2015 *in rem* proceeding, notice reasonably calculated to inform him thereof, or such other notice as is required under applicable law.

86.     At no time leading up to the taking of his property did the property meet the definition of "distressed" under the Code.

87.     Upon information and belief, the City knew that it had not provided proper notice to Mr. Dorce of the *in rem* proceeding.

88.     Upon information and belief, Mr. Dorce was deprived of an opportunity to redeem the property as the owner of the "equity of redemption."

89.     Upon information and belief, the property was transferred by the City to one of its Third Party Transfer Partners for nominal consideration.

90.     Upon information and belief, the City collected no tax revenue as a result of taking Mr. Dorce's property.

91.     Ms. Dorce's property was taken by the City, utilizing in rem proceedings under Code 11-404 for a purpose other than the collection of taxes or Tax Liens.

92.     Mr. Dorce's property was taken by the City, through the Third Party Transfer Program, for the public purpose of preserving "affordable housing."

93.     At no time did Mr. Dorce receive any compensation by the City for the taking of his property.

94.     As a result of the taking of the property by the City, Mr. Dorce's rights to, and value and equity in the subject property were s extinguished in the entirety.

95.     Following the "taking" of his property by the City, which he was unaware of due to the lack of notice identified above, Mr. Dorce tendered payments to DOF pursuant to invoices issued by the City in connection with charges to the subject property.  The City accepted those payments without telling Mr. Dorce that his property had been taken, even though the City had actual knowledge that it had taken the property.

**Plaintiff Cecilia Jones**

96.     At all relevant times, Cecelia Jones owned shares in an HDFC cooperative that, in turn, owned property located at 1197 Dean Street in Brooklyn, New York  11216, also known as 585 Nostrand Avenue (Kings County Block #1207, Lot #72), in a community predominantly populated by African Americans, Caribbean Americans,  Hispanic Americans and Middle Eastern Americans (in other words, in a "community of color")  Ms. Jones lived in an apartment unit pursuant to a proprietary lease appurtenant to her shares in the HDFC.

97.     The HDFC had substantial equity in the subject property and, thus, the HDFC shares owned by Ms. Jones, and the appurtenant lease, had substantial value.

98.     At all relevant times, HDFC shareholders and residents at the subject property paid maintenance fees to the HDFC, which were used to pay real estate taxes and water/sewage charges assessed by the City.

99.     Sometime on or about October 2017, Ms. Jones learned that ownership of the subject property had been transferred from the HFDC to Bridge Street through an *in rem* proceeding filed by the City pursuant to the Program.

100.    On or about October, 2018, Bridge Street's managing agent informed Ms. Jones that she was being converted into a renter, and her maintenance payments converted into rental payments.

101.    As a result of the Program, the HDFC's ownership rights to the subject property were extinguished, as was all of the value of Ms. Jones' shares and the proprietary lease appurtenant thereto.

102.    At no time leading up to the taking of her property did Ms. Jones receive actual or constructive notice of 2015 *in rem* proceeding, notice reasonably calculated to inform her thereof, or such other notice as is required under applicable law.

103.    At no time leading up to the taking of her property did the property meet the definition of "distressed" under the Code.

104.    Upon information and belief, the City knew that it had not provided proper notice to Ms. Jones of the *in rem* proceeding.

105.    Upon information and belief, Ms. Jones and the HDFC were deprived of an opportunity to redeem the property as the owners of the "equity of redemption."

106.   Upon information and belief, the property was transferred by the City to one of its Third Party Transfer Partners, defendant Bridge Street, for nominal consideration.

107.   Upon information and belief, the City collected no tax revenue as a result of taking Ms. Jones' and the HDFC's property.

108.   Ms. Jones' property was taken by the City, utilizing in rem proceedings under Code 11-404 for a purpose other than the collection of taxes or Tax Liens.

109.   Ms. Jones' property was taken by the City, through the Third Party Transfer Program, for the public purpose of preserving "affordable housing."

110.   At no time did Ms. Jones or the HDFC receive any compensation by the City for the taking of her property.

111.   Upon information and belief, the City's taking of the sole asset of an HDFC violated New York State law insofar as it is unlawful to deplete the sole asset of a nonprofit institution without first providing notice to the Attorney General of the State of New York. Upon information and belief, the City provided no such notice.

112.   As a result of the taking of the property by the City, the HDFC and Ms. Jones 'rights to, and value and equity in, the subject property, the related HDFC shares, and the proprietary leases appurtenant thereto were extinguished in the entirety.

**Plaintiff Sherlivia Thomas-Murchinson**

113.   At all relevant times, Sherlivia Thomas-Murchison owned shares in an HDFC cooperative that, in turn, owned property located at 248 Madison Dean Street, in Brooklyn, New York (Kings County Block #1823, Lot #29), in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans and Middle Eastern Americans

(in other words, in a community of color).  Ms. Thomas-Murchison's extended family lived in an apartment unit pursuant to a proprietary lease appurtenant to her shares in the HDFC.

114.    The HDFC had substantial equity in the subject property and, thus, the HDFC shares owned by Ms. Thomas-Murchison, and the appurtenant lease, had substantial value.

115.    At all relevant times, Ms. Thomas-Murchinson's parents (now deceased) also owned shares in an HDFC cooperative that, in turn, owned property located at 248 Madison Dean Street, in Brooklyn, New York, in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans and Middle Eastern Americans  (in other words, in a community of color).  Ms. Thomas-Murchison lived in an apartment unit pursuant to a proprietary lease appurtenant to the shares in the HDFC owned by her parents, along with her parents, before their demise.

116.    At all relevant times, HDFC shareholders and residents at the subject property paid maintenance fees to the HDFC, which were used to pay real estate taxes and water/sewage charges assessed by the City.

117.    Sometime on or about April 2016, Ms. Thomas-Murchison learned that ownership of the subject property had been transferred from the HFDC to Bridge Street through an *in rem* proceeding filed by the City pursuant to the Program.

118.    On or about May 2016, Bridge Street's managing agent informed Ms. Thomas-Murchison that she was being converted into a renter, and her maintenance payments converted into rental payments.

119.    As a result of the Program, the HDFC's ownership rights to the subject property were extinguished, as was all of the value of Ms. Thomas-Murchison's shares and the proprietary lease appurtenant thereto.

120.    At no time leading up to the taking of her property did Ms. Thomas-Murchinson receive actual or constructive notice of *in rem* proceedings or foreclosure judgment pursuant to which the HDFC's ownership was extinguished, notice reasonably calculated to inform her thereof, or such other notice as is required under applicable law.

121.    At no time leading up to the taking of her property did the property meet the definition of "distressed" under the Code.

122.    Upon information and belief, the City knew that it had not provided proper notice to Ms. Thomas-Murchison of the *in rem* proceeding.

123.    Upon information and belief, Ms. Thomas-Murchinson and the HDFC were deprived of an opportunity to redeem the property as the owners of the "equity of redemption."

124.    Upon information and belief, the property was transferred by the City to one or more of its Third Party Transfer Partners, defendant Neighborhood Restore, for nominal consideration. Upon information and belief, the property was transferred to defendant Bridge Street.

125.    Upon information and belief, the City collected no tax revenue as a result of taking Ms. Thomas-Murchinson's and the HDFC's property.

126.    Ms. Thomas-Murchinson's property was taken by the City, utilizing in rem proceedings under Code 11-404 for a purpose other than the collection of taxes or Tax Liens.

127.    Ms. Thomas-Murchinson's property was taken by the City, through the Third Party Transfer Program, for the public purpose of creating "affordable housing."

128.    At no time did Ms. Thomas-Murchinson or the HDFC receive any compensation by the City for the taking of her property.

129.     Upon information and belief, the City's taking of the sole asset of an HDFC violated New York State law insofar as it is unlawful to deplete the sole asset of a nonprofit institution without first providing notice to the Attorney General of the State of New York. Upon information and belief, the City provided no such notice.

130.     As a result of the taking of the property by the City, the HDFC and Ms. Thomas-Murchinson's rights to, and value and equity in, the subject property, the related HDFC shares, and the proprietary leases appurtenant thereto were extinguished in the entirety.

## FED. R. CIV. P. 23 CLASS ALLEGATIONS

131.     Plaintiffs seek to maintain this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of those property owners dispossessed of their properties in connection with an *in rem* foreclosure proceeding filed by the City pursuant Section 11-401 *et seq.* of the Code.

132.     The "*In Rem* Class" which Plaintiffs seek to define includes:

> All current or former owners of property within the five (5) boroughs of New York City who, since 1996 through the final date of disposition of this action, had their properties subjected to *in rem* foreclosure proceedings initiated by the City of New York under Code § 11-401.1 *et seq*.

133.     The number of class members who have suffered as a result of Defendants' violation of the law, as set forth herein, are too numerous to join in a single action, necessitating class recognition.

134.     None of the aforementioned claims are specific to Plaintiffs or any proposed *In Rem* Class member(s) and the claims of Plaintiff are typical of those asserted by the proposed *In Rem* Class.

135.     Plaintiffs will fairly and adequately represent the interests of all members of the proposed *In Rem* Class.

136.     A class action is superior to all other methods of adjudication and is necessary in order to fairly and completely litigate the *In Rem* Class's allegations that Defendants violated the United States Constitution, New York State Constitution, Section 1983, and the Code by instituting *in rem* proceedings against their real properties and taking their equity interest in such property without sufficient notice and without just compensation.

137.     The class members of the proposed *In Rem* Class are readily discernable and ascertainable.  Contact information for all members of the proposed *In Rem* Class is readily available from Defendants since such information is likely to be contained in their *In Rem* files, which they are required to maintain pursuant to sections 11-416 and 11-417 of the Code.  Notice of this class action can be provided by any means permissible under the Fed. R. Civ. P. 23 requirements.

138.     Plaintiffs assert these claims on their own behalf as well as on behalf of the *In Rem* Class through their attorneys who are experienced in class action litigation as well as real property and foreclosure defense litigation.

139.     Plaintiffs are able to fairly represent and properly protect the interests of the absent members of the proposed *In Rem* Class and have no interests conflicting with those of the *In Rem* Class.

140.     The public will benefit from this case being brought as a class action because it serves the interests of judicial economy by saving the Court's time and effort and by reducing a multitude of claims to a single litigation.  Prosecution of separate actions by individual *In Rem*

Class members creates a risk of varying results based on identical fact patterns as well as disposition of the Class's interests without their knowledge or contribution.

141.    The questions of law and fact that are nearly identical for all class members make proceeding as a class action ideal.  Without judicial resolution of the claims asserted on behalf of the proposed *In Rem* Class, continued violations of the United States Constitution, New York State Constitution, Section 1983 and the Code will undoubtedly continue.

142.    Whether Plaintiffs and members of the *In Rem* Class were provided sufficient notice and received just compensation for the real property taken from them by Defendants are common questions, which can readily be resolved through the class action process.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### FOR VIOLATION OF THE DUE PROCESS CLAUSE
### OF THE UNITED STATES CONSTITUTION

143.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

144.    As set forth above, the City has instituted its *in rem* proceedings against property owners without issuing them notice reasonably calculated to inform them of the proceeding.

145.    Moreover, on information and belief, the City instituted *in rem* proceedings with actual knowledge that it was not providing notice reasonably calculated to inform property owners of the proceeding.

146.    Further, both as codified and as implemented, the notice provisions of the City's Third Party Transfer Program fall short of those required under the Due Process Clause of the 14th Amendment to the United States Constitution.

147. Defendants, by their actions, have accordingly violated the civil rights of, and denied constitutional liberties to, Plaintiffs and those similarly situated.

148. Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

149. Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR VIOLATION OF THE DUE PROCESS CLAUSE
## OF THE NEW YORK STATE CONSTITUTION

150. Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

151. As set forth above, the City has instituted its *in rem* proceedings against property owners without issuing them notice reasonably calculated to inform them of the proceeding.

152. Moreover, on information and belief, the City instituted *in rem* proceedings with actual knowledge that it was not providing notice reasonably calculated to inform property owners of the proceeding.

153. Further, both as codified and as implemented, the notice provisions of the City's Third Party Transfer Program fall short of those required under the Due Process Clause of the 14th Amendment to the New York State Constitution.

154. Defendants, by their actions, have accordingly violated the civil rights of, and denied constitutional liberties to, Plaintiffs and those similarly situated.

155. Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

156.    Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION
## FOR A VIOLATION OF RIGHTS UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

157.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

158.    During the time period discussed, Defendants had actual knowledge they had not taken steps reasonably calculated to provide Plaintiffs, and others similarly situated, with notice of the *in rem* proceedings being instituted against their properties.

159.    Further, during the relevant time period, Defendants had actual knowledge that Plaintiffs, and others similarly situated, did not receive actual notice that the City had instituted *in rem* proceedings against their properties.

160.    During the relevant period, Defendants had actual knowledge that the properties that they subjected to *in rem* proceedings were not "distressed" within the meaning of section 11-401 of the Code.

161.    During the relevant period, Defendants had actual knowledge that the properties they subjected to *in rem* proceedings did not meet the requirements of section 11-405(a) of the Code, insofar as the City instituted *in rem* proceedings against parcels smaller than a "block" in contravention of the requirements of the Code.

162.    During the relevant period, Defendants had actual knowledge that Plaintiffs, and others similarly situated, had substantial equity in their properties which was being taken by Defendants without any compensation, let alone "just compensation."

37

163.     Accordingly, the actions of Defendants constitute an unconstitutional deprivation of the rights of Plaintiffs and those similarly situated and are a violation of the Fifth Amendment to the Constitution of the United States of America.

164.     Defendants, by their actions, have accordingly violated the civil rights of, and denied constitutional liberties to, Plaintiffs and those similarly situated.

165.     Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

166.     Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
## FOR A VIOLATION OF RIGHTS TO THE FIFTH AMENDMENT OF THE CONSTITUTION OF THE STATE OF NEW YORK

167.     Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

168.     Defendants had actual knowledge they had not taken steps reasonably calculated to provide Plaintiffs, and others similarly situated, with notice of the *in rem* proceedings being instituted against their properties.

169.     Further, during the relevant time period, Defendants had actual knowledge that Plaintiffs, and others similarly situated, did not receive actual notice that the City had instituted *in rem* proceedings against their properties.

170.     During the relevant period, Defendants had actual knowledge that the properties that they subjected to *in rem* proceedings were not "distressed" within the meaning of section 11-401 of the Code.

38

171.    During the relevant period, Defendants had actual knowledge that the properties they subjected to *in rem* proceedings did not meet the requirements of section 11-405(a) of the Code, insofar as the City instituted *in rem* proceedings against parcels smaller than a "block" in contravention of the requirements of the Code.

172.    During the relevant period, Defendants had actual knowledge that Plaintiffs, and others similarly situated, had substantial equity in their properties which was being taken by Defendants without any compensation, let alone "just compensation."

173.    Accordingly, the actions of Defendants constitute an unconstitutional deprivation of the rights of Plaintiffs and those similarly situated and are a violation of the Fifth Amendment to the Constitution of the United States of America.

174.    Defendants, by their actions, have accordingly violated the civil rights of, and denied constitutional liberties to, Plaintiffs and those similarly situated.

175.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

176.    Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR VIOLATION OF 42 U.S.C. § 1983

177.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

178.    As a consequence of Defendants' conduct, described above, Plaintiffs and those similarly situated have been deprived of their civil rights by the Defendants acting under color of state law in violation of 42 U.S.C. §1983.

179.    Defendants, by their actions, acting under the color of state law have accordingly violated the civil rights , and denied the rights and privileges secured by the Constitution, of Plaintiffs and those similarly situated.

180.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

181.    Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FOR VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

182.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

183.    Defendants, by their actions, have accordingly violated the civil rights of, and denied constitutional liberties to, Plaintiffs and those similarly situated.

184.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

185.    Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## FOR VIOLATION OF ARTICLE II SECTIONS 10-11 OF THE NEW YORK STATE MUNICIPAL HOME RULE LAW

186.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

187.    As set forth herein, the City Defendants' conduct constitutes *ultra vires* activity

exceeding the lawful authority expressly, actually, or implicitly granted to the City by New York State's Legislature.

188.    Further, as set forth herein, the City Defendants' conduct constitutes *ultra vires* activity because the City failed to adhere to the letter and spirit of the Code when it instituted *in rem* proceedings against properties that did not meet the statutory definition of "distressed" under the Code, and by otherwise deviating from the requirements of the Code and other applicable law in their execution and administration of the Third Party Transfer Program.

189.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated, and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

190.    Plaintiffs, and those similarly situated, have accordingly been damaged in the minimal sum of $66,000,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## FOR VIOLATION OF NY GBL § 349

191.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

192.    As a consequence of Defendants' conduct, described above, Plaintiffs and those similarly situated have been entreated to pay water, sewage, gas and other charges owed to the City as if they were property owners, while at the same time, the City had actual knowledge that it had deprived Plaintiffs of their property and had already transferred Plaintiffs' title to third parties pursuant to the Program.

193.    Defendants' conduct, in so entreating plaintiffs, constitutes a deceptive act and practice in provision of the City's services, in violation of GBL 349, and should be enjoined.

## AS AND FOR A TENTH CAUSE OF ACTION
## FOR DECLARATORY JUDGMENT

194.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

195.    Defendants have undertaken a widespread systematic policy and practice against Plaintiffs, and those similarly situated, throughout New York City – by carrying out practices pursuant to the Third Party Transfer Program in which they are depriving property owners of their property without sufficient notice and without just compensation.

196.    Defendants' policy and practice results in a deprivation of the rights of Plaintiffs, and those similarly situated, under the Fifth Amendment to the Constitution of the United States, the Fifth Amendment to the Constitution of the State of New York, and violates 42 U.S.C. §1983.

197.    Defendants' application of the Third Party Transfer Program is unconstitutional and ought to be deemed violative of the rights and liberties of Plaintiffs and those similarly situated.

198.    Moreover, with the anticipated expansion of the Program, as reflected in Mayor de Blasio's State of the City Address, further deprivation of the rights of Plaintiffs and those similarly situated will undoubtedly take place.

199.    Plaintiffs are accordingly entitled to a declaratory order pursuant to 28 U.S.C. §2201 by reason that their rights, as well as those of persons similarly situated, should no longer be subjected to the unconstitutional actions of Defendants.  It is accordingly submitted that a *declaratory order* be issued:

(a) Declaring that the use of the Third Party Transfer Program is inherently in violation of federally protected rights of all citizens who have a right to their real property;

(b) Declaring that Defendants can no longer undertake *in rem* foreclosure actions pursuant to the Third Party Transfer Program;

(c) Declaring that New York City Administrative Code §11-401 – 412 be deemed unconstitutional under the United States Constitution and be deemed violative of the rights and liberties of all citizens;

(d) Declaring that New York City Administrative Code §11-401 – 412 be deemed unconstitutional under the New York State Constitution and be deemed violative of the rights and liberties of all citizens;

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## FOR AN INJUNCTION

200.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

201.    If Defendants are allowed to continue their unlawful practices, permanent irreparable harm will occur.

202.    Plaintiffs have no adequate remedy at law which will duly compensate them for the above-mentioned conduct by Defendants.

203.    The relief sought will not impair Defendants' ability to conduct its legitimate government functions and equity favors the Plaintiffs in this case.

204.    Accordingly, based on the aforementioned facts, Plaintiffs' right to the relief sought is clearly appropriate and Plaintiffs will likely succeed on the merits of this case.

205.    As a consequence, Defendants should be permanently enjoined from initiating *in rem* proceedings pursuant to the Third Party Transfer Program.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## FOR ATTORNEY'S FEES

206.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

207.    42 U.S.C. §1983 is a specified civil rights statute of the United States.

208.    The Civil Rights Attorney's Fees Awards Act of 1976 provides that prevailing parties in actions brought pursuant to civil rights statutes shall be entitled to a full award of attorneys' fees as part of the costs of litigation.

209.    Plaintiffs have already expended significant sums for legal costs and expenses in being compelled to challenge Defendants' unlawful actions herein.

210.    Accordingly, Plaintiffs have been subjected to such expenses for legal representation and will continue to do so – as a consequence of Defendants' unlawful actions – and Plaintiffs require remuneration.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and those similarly situated demand judgment against Defendants as follows:

A.    A finding that Plaintiffs have been deprived of their civil rights by the Defendants in violation of the Constitution of the United States of America;

B.    A finding that Plaintiffs have been deprived of their civil rights by Defendants in violation of the Constitution of the State of New York;

44

C.      A finding that Plaintiffs have been deprived of their civil rights by Defendants acting under color of state law in violation of 42 U.S.C. §1983;

D.      A finding that, at the earliest possible time, Plaintiffs should be allowed to give notice of this putative Class Action, or the Court should issue such notice, to all members of the purported class defined herein.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to opt out of this lawsuit;

E.      Designation of Plaintiffs as representatives of the Rule 23 Class defined herein, and Plaintiffs' counsel as Class Counsel;

F.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23 for the purposes of the claims brought on behalf of all proposed Class members;

G.      Granting Plaintiffs a jury trial on all issues so triable, including to determine liability and damages;

H.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

I.      A judgment declaring that the practices complained of herein are unlawful and in violation of the United States Constitution, New York State Constitution, and 42 U.S.C. §1983.

J.      All damages which Plaintiffs and all Class Plaintiffs have sustained as a result of Defendants' conduct, compensatory damages, punitive damages, penalties, general and special damages caused by Defendants' unlawful practices;

K.      An award to Plaintiffs, and all Class members, of pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action;

L.      An award to Plaintiffs, and all Class members, of post-judgment interest at the highest statutory rate;

M.      Awarding Plaintiffs, and all Class members, their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

N.      An award of any and all other pre-judgment and post-judgment interest, as provided by law; and

O.      Granting Plaintiff, and all Class members, such other and further relief as this Court finds necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable, including liability and damages.

Dated:  March 11, 2019
         Garden City, New York

                                              Respectfully submitted,


                                              /s/ *Matthew L. Berman*
                                              Matthew L. Berman, Esq.
                                              Robert J. Valli, Jr., Esq.
                                              Sara Wyn Kane, Esq.
                                              Yolande Nicholson, Esq. (of counsel)
                                              **VALLI KANE & VAGNINI LLP**
                                              600 Old Country Road, Suite 519
                                              Garden City, New York 11530
                                              (516) 203-7180 (phone)
                                              (516) 706-0248 (fax)

                                              *Attorneys for Plaintiff*