At an IAS Term, Part FRP2 of the Supreme Court of
the State of New York, held in and for the County of
Kings, at the Courthouse, at Civic Center, Brooklyn,
New York, on the 28ᵗʰ day of March, 2019.

PRESENT:

HON. MARK I. PARTNOW,

                                  Justice.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN REM TAX FORECLOSURE ACTION NO . 53
BOROUGH OF BROOKLYN
SECTIONS 3, 4, 5, 6, 7, 8, 9, 10, 11, 13
14, 15, 16 AND 21
TAX CLASSES 1 AND 2

Index No. 8700/15

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

The following papers numbered 1 to 141 read herein:   Motion Sequence Numbers: 9, 10, 11, 12, 13, 14

Papers Numbered

| Notice of Motion/Order to Show Cause/ Petition/Cross Motion and Affidavits (Affirmations) Annexed | 1-3 | 19-24 | 46-48 | 67-69 | 98-103 | 123-125 |
|---|---|---|---|---|---|---|
| Opposing Affidavits (Affirmations) | 4-16 | 25-39, 40 | 49-63, 64 | 70-84, 85 | 104-118, 119 | 126-139 |
| Reply Affidavits (Affirmations) | 17 | 41 | 65 | 86 | 120-121 | 140 |
| Affidavits (Affirmations) in Further Opposition | | | | 87, 88, 89, 90 | | |
| Supplemental Affirmations in Further Support | | | | 91, 92-93 | | |
| Surreply Affirmations | | 42, 43 | | | | |
| Reply to Surreply | | 44 | | | | |
| Memoranda of Law | 18 | 45 | 66 | 94, 95, 96, 97 | 122 | 141 |

Upon the foregoing papers, this is an in rem foreclosure action commenced by the City

of New York (the City) on July 14, 2015, pursuant to title 11, chapter 4 of the Administrative

Code of the City of New York, to simultaneously foreclose on numerous tax delinquent

properties. The City commenced this foreclosure action by filing two duplicate original

verified lists of delinquent taxes (*see* Administrative Code § 11-405 [d]). These lists

included tax class one and tax class two properties designated on the Kings County tax map, sections 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, and 21, which were encumbered by unpaid tax liens held and owned by the City. These tax liens were allegedly due and unpaid for a period of at least one year from the date on which the tax, assessment, or other legal charge represented thereby became a lien, as required by Administrative Code § 11-404. Among these properties were the six properties that are the subject of the six instant motions, filed under motion sequence numbers 9, 10, 11, 12, 13, and 14.

The owners of the six separate properties now at issue failed to interpose answers, and, thus, were in default in this foreclosure action. The owners claim that they did not receive actual notice of this action. With respect to each of the six properties, the taxes owed represent only a small fraction of the value of the land.

On November 27, 2017, this court signed a Judgment of Foreclosure, which was entered on December 14, 2017. The Judgment of Foreclosure provided that the Commissioner of Finance was authorized to prepare and execute a deed conveying either to the City or a qualified third party designated by the Commissioner of Housing Preservation and Development full and complete title to each of the properties included in the in rem foreclosure action, and that, upon the execution of such a deed, the grantee would have possession and be seized of an estate in fee simple absolute in such land, and the owner would be foreclosed of its right, title, interest, or equity of redemption in the property as provided in Administrative Code § 11-412 and § 11-412.1, except as otherwise provided in

Administrative Code § 11-424 and § 11-424.1. The Judgment of Foreclosure further provided that unless and until the Commissioner of Finance executed a deed conveying the parcels of real property pursuant to Administrative Code § 11-412 to the City or to a third party deemed qualified and designated by the Commissioner of Housing Preservation and Development, the owners of the land would continue to have all of the rights of an owner.

The City brought this in rem tax lien foreclosure action on the basis that the properties at issue were distressed properties. The ability of the City to institute in rem tax lien foreclosure actions on the basis that parcels constituted distressed properties originated in 1996, when the Administrative Code was amended by Local Law No. 37. Under Local Law No. 37, Administrative Code § 11-401 was amended to, among other things, add the definition of "distressed property." Local Law No. 37 added Administrative Code § 11-401.1, which provides for in rem foreclosure procedures for distressed properties. Pursuant to Administrative Code § 11-401.1 (c), any parcel determined to be a distressed property is subject to an in rem foreclosure action. Administrative Code § 11-412.1 was also added, which provides special procedures relating to the final judgment and the release of class one and class two real properties. Other sections of the Administrative Code were also amended to incorporate the changes reflected by these new modified in rem foreclosure procedures which pertain to distressed properties.

In 1997, Local Law No. 69 further amended Administrative Code § 11-405. The memorandum in support of this amendment noted that Local Law 37 of 1996 "was of critical

3

importance to the City's Anti-Abandonment program, because it enabled troubled properties to be placed in the hands of responsible private owners for rehabilitation and maintenance." It noted that "[t]he rehabilitation of many of these distressed properties would probably be economically feasible only with loans received from . . . HPD . . . 8A and Participation Loan programs."

The Commissioner of Finance transferred four of the six properties now at issue pursuant to the Third Party Transfer Program. The Third Party Transfer Program is a program jointly administered by the New York City Department of Housing Preservation and Development (HPD) and the New York City Department of Finance (the DOF), which is used for tax delinquent, distressed residential properties in the City. The Third Party Transfer Program derives its authority from the City's discretion to convey eligible tax-foreclosed property to qualified third parties designated by the Commissioner of Housing Preservation and Development, pursuant to Administrative Code § 11-412.1 (b) (1). Administrative Code § 11-412.1 (b) (1) provides that the court is to "make a final judgment authorizing the award of possession of any parcel of class one or class two real property described in the list of delinquent taxes not redeemed or withdrawn as provided in . . . chapter [four] and as to which no answer is interposed." Administrative Code § 11-412.1 (b) (1) authorizes the Commissioner of Finance to "prepare, execute and cause to be recorded a deed conveying either to the city or to a third party deemed qualified and designated by the commissioner of housing preservation and development full and complete title to such lands."

4

According to the City, the purpose of the Third Party Transfer Program is to encourage prompt payment of tax arrears, and, if the arrears are not paid, to transfer distressed residential buildings, which have unpaid tax arrears, quickly to new owners, who have the expertise to address problems and to complete prompt rehabilitation of the properties. Under the Third Party Transfer Program, the City initiates in rem foreclosure actions against tax delinquent buildings in poor condition and obtains foreclosure judgments. After review by the City Council, HPD then oversees the conveyance of the properties to responsible new owners found to be qualified to rehabilitate and manage the properties.

Under the Third Party Transfer Program, the Commissioner of Finance may execute a deed to pre-qualified third parties, pursuant to rules promulgated by HPD (28 RCNY ch 8), without an intervening period of City ownership, or to the City itself (*see* Administrative Code § 11-412.1 [b]). The rules (28 RCNY § 8-03) establish standards that may be considered for qualification and selection of third parties for third-party transfer. According to the City, the aim of the Third Party Transfer Program is to preserve affordable housing. The Third Party Transfer Program is intended to target only distressed properties that need substantial rehabilitation.

The in rem foreclosure procedure for distressed properties is in contrast to the procedure used by the City to handle most tax delinquencies affecting buildings in fair or good condition, which is to sell the tax lien to a trust, which, in turn, uses the liens as collateral to issue bonds, whose proceeds pay off the City's liens (*see* Administrative Code

§ 11-319). Under the Third Party Transfer Program, the Commissioner of Housing Preservation and Development is authorized to remove distressed property from this tax lien disposition process (*see* Administrative Code § 11-401.1). Here, the City did not proceed by way of a sale of tax liens with respect to the subject properties, but, rather, claiming that the properties were distressed, it utilized the Third Party Transfer Program to obtain the properties by foreclosing upon them in rem.

Neighborhood Restore Housing Development Fund Corporation (Neighborhood Restore) is a third-party transferee under the Third Party Transfer Program. By foreclosing in rem and transferring title to Neighborhood Restore pursuant to the Third Party Transfer Program, the owners are completely divested of their property ownership, and after crediting the tax deficiency, there are no proceeds of sales of the properties paid to the owners (*see* Administrative Code § 11-428). The owners are completely stripped of all of their equity in their properties.

## Motion Sequence Number 13

Gilmer Holding Corp. (Gilmer) moves, by order to show cause, under motion sequence number 13, for an order: (1) preliminarily enjoining the City and its agencies and/or Neighborhood Restore from encumbering or transferring real property located at 23 MacDonough Street, Brooklyn, New York 11216, designated on the Kings County tax map as Block 1851, Lot 63 (the MacDonough Street property); (2) vacating its default; (3) extending the redemption period to allow it an opportunity to redeem the MacDonough Street

6

property; (4) vacating the Judgment of Foreclosure as it related to the MacDonough Street property; and (5) restoring its title to the MacDonough Street property.

### Factual and Procedural Background

Gilmer is a corporation whose sole asset was the MacDonough Street property. The MacDonough Street property is a 19-family, rent-stabilized apartment building, with an estimated value of over three million dollars. Gilmer is owned by the Callender family, and the MacDonough Street property has been in the Callender family since 1968 when Ronald Callender (who is now deceased), the father of the present board members of Gilmer, purchased it.

The MacDonough Street property was formerly managed and controlled by Michael Callender, who was the president of Gilmer. Michael Callender was removed as the president of Gilmer at a shareholders' meeting held on August 27, 2018. Michael Callender is the brother of Lynne Callender and Marcia Callender, who are the board members of Gilmer. LaMarr Jones is the second cousin of these board members.

At the time that this in rem tax foreclosure action was commenced by the filing of the list of delinquent taxes on July 14, 2015, the MacDonough Street property had an outstanding tax bill of $100,688.20, plus a water and sewer lien in the amount of $20,061.14, for a total amount of $120,749.34. LaMarr Jones, in a sworn affidavit by him, attests that in December 2017, all mail addressed to Gilmer was mailed to 627 Bainbridge Street, Brooklyn, New York, the Department of State process address on file with the Secretary of State, and was

7

forwarded to his office located at 17 State Street, Suite 4000, New York, New York. He states that since that time, the Department of State process address for Gilmer was changed with the Secretary of State to be his office address. He attests that he had access to Gilmer's mail and was aware of the mail that Gilmer received, and that Gilmer had not received any notice relating to the instant in rem foreclosure action, which was commenced against the MacDonough Street property. He asserts that this action was improperly commenced as against the MacDonough Street property since it was not a distressed property.

Administrative Code § 11-401 (4) defines "distressed property" as follows:

> "'Distressed property.' Any parcel of class one or class two real property that is subject to a tax lien or liens with a lien or liens to value ratio, as determined by the commissioner of finance, equal to or greater than fifteen percent and that meets one of the following two criteria:
> i. such parcel has an average of five or more hazardous or immediately hazardous violations of record of the housing maintenance code per dwelling unit; or
> ii. such parcel is subject to a lien or liens for any expenses incurred by the department of housing preservation and development for the repair or the elimination of any dangerous or unlawful conditions therein, pursuant to section 27-2144 of this code, in an amount equal to or greater than one thousand dollars."

The City concedes that the MacDonough Street property was not distressed according to the statutory definition of Administrative Code § 11-401 (4) since the total category B and C code housing violations on the MacDonough Street property was 45, or 2.4 per dwelling unit, and there were no HPD Emergency Repair Program charges totaling over $1,000. Nevertheless, the City proceeded with this in rem foreclosure action as if the MacDonough

8

Street was a distressed property and included it in its Third Party Transfer Program.

Subsequent to the July 14, 2015 commencement of this action, Gilmer and the Department of Environmental Protection (the DEP) entered into a Payment Agreement, dated May 12, 2016 (the DEP Agreement), with respect to an open balance of $42,042.47 in water and sewer charges for the service period of July 1, 2014 to June 30, 2016.  Under the DEP Agreement, Gilmer agreed to make 120 monthly payments of $258.69 for unpaid water and sewer charges, with the total amount to equal $31,042.80 in principal and $14,085.37 in interest.  The DEP Agreement provided that the failure to satisfy this debt may result in the inclusion of the property in a City tax lien sale.  Gilmer made a down payment of $11,000 and 23 installment payments under the DEP Agreement, each in the sum of $258.69.  The last installment payment was made by Gilmer on June 21, 2018.

On November 2, 2017, Gilmer, by Michael Callender, entered into a Property Collection Installment Agreement (the Installment Agreement) with the DOF, which provided for an installment payment plan to pay all of the then outstanding property taxes. The total amount due under the Installment Agreement was $169,948.18.  The amount of the down payment was $25,492.23, which was paid by Gilmer, as evidenced by a copy of the check annexed to this motion.  The Installment Agreement start date was November 2, 2017, and it provided for 40 installments in the amount of $7,843.96 each, to be paid quarterly by Gilmer with the first installment date beginning on January 1, 2018.  The down payment included the sum of $500 for a foreclosure penalty and $35 for a foreclosure search fee.

9

These payments were made by Gilmer to remove the MacDonough Street property from the in rem foreclosure action.

The Installment Agreement provided as follows:

> "I understand that if any payment that I am required to make under this Installment Agreement is unpaid for six months, the agreement will be in default and may be cancelled and my property may be included in the next tax lien sale conducted by the City of New York. The property may also become eligible for in rem foreclosure . . . I understand that such consequence of default may be avoided if I pay all outstanding installments and current taxes and charges, including interest, prior to the date of the next tax lien sale following such default."

Despite the City's entry into the Installment Agreement with Gilmer, the City did not remove the MacDonough Street property from the list of delinquent parcels or request a severance of it when submitting the in rem judgment roll in this in rem foreclosure action (*see* Administrative Code § 11-405 [c]; § 11-409 [g]). Instead, on November 27, 2017, approximately three weeks after the November 2, 2017 Installment Agreement was executed and the $25,492.23 down payment was paid by Gilmer, and before the first installment was due, this court signed the Judgment of Foreclosure, which was entered on December 14, 2017.

LaMarr Jones asserts that Gilmer relied on the DOF's representations in the Installment Agreement and assumed the MacDonough Street property had been removed from the in rem action. He attests that Gilmer did not receive any notices relating to this action, nor was Gilmer told that the MacDonough Street property was being placed in the

10

Third Party Transfer Program. He specifically attests that Gilmer did not receive a copy of the Judgment of Foreclosure, dated November 27, 2017.

According to Mr. Jones, it was not until late Spring 2018 that Gilmer became aware of the Judgment of Foreclosure due to estate litigation with respect to the estate of Ronald Callender, the father of Michael, Lynne, and Marcia Callender. Mr. Jones asserts that on or about July 2, 2018, an attorney named Phillip Mahony, Esq., acting on Gilmer's behalf, spoke with CayMarie Ogarro, who was from the Corporation Counsel's office and assured Gilmer that Gilmer had until the end of September 2018 in which to pay all outstanding taxes and water charges.

An email from Mr. Jones to Sh'ron Hatcher of the DOF attached a payment confirmation for a payment by Gilmer of $770.54 on June 29, 2018 for HPD Alternative Enforcement Program Charges for the MacDonough Street property which had a due date of January 1, 2019. By an email dated July 11, 2018, Sh'ron Hatcher informed Mr. Jones that the Installment Agreement was then in default, but could be brought up-to-date by making a payment of $71,966.69. Ms. Hatcher explained that there were three installments of $7,843.96 required, which totaled $23,531.88 for January, April, and July 2018, and $48,434.81 due for current taxes in addition to the installments. In an email dated July 12, 2018 to Mr. Mahony and Mr. Jones, Sh'ron Hatcher stated that HPD's approval was not required to bring the Installment Agreement up-to-date.

11

Gilmer made 11 payments, totaling $7,468.02 for emergency repair liens and HPD registration fees from June 15, 2018 to October 13, 2018. On June 5, 2018, the City submitted the proposed conveyance of the MacDonough Street property for approval to the City Council (*see* Administrative Code § 11-412.2). The Commissioner of Finance signed a deed dated September 6, 2018, transferring the MacDonough Street property to Neighborhood Restore. The City approved the transfer by Resolution No. 525 on September 12, 2018.

On September 10, 2018, Gilmer became aware that a Notice to Residents of Property Transfer had been sent to the tenants of the MacDonough Street property. This notice stated that the ownership of the MacDonough Street property had been transferred to Neighborhood Restore on September 6, 2018 as part of the City's Third Party Transfer Program. Consequently, Gilmer filed the instant motion, by order to show cause dated September 28, 2018.

Grace Wong, the director of the refunds unit of the DOF, states that after Gilmer filed its instant motion, the DOF issued a refund check in the sum of $3,348.74 and a refund check in the sum of $3,335.74, which were mailed to Gilmer on December 27, 2018. Ms. Wong also states that a refund check for $770.54 was mailed to Gilmer in July 2018 and a refund check for $13 was issued in January 2018. Ms. Wong asserts that these sums were refunded because they were paid by Gilmer after the expiration of the mandatory four-month

12

redemption period from the date of the entry of the Judgment of Foreclosure. Gilmer claims that it only received the check for $3,348.74.

## Discussion

Initially, the court notes that Gilmer's claims that its property is being improperly taken by the City, by means of in rem tax foreclosure action and the Third Party Transfer Program, is not an isolated occurrence, but, rather, is a widespread occurrence being experienced by many other property owners, who are being inequitably stripped of their valuable property rights. The City has particularly targeted properties that are owned by minorities. The court recognizes that home ownership is an important means for families to build intergenerational wealth. While the Third Party Transfer Program was intended to be a beneficial program, an overly broad and improper application of it that results in the unfair divestiture of equity in one's property cannot be permitted.

As pointed out by Gilmer, the Third Party Transfer Program has been the subject of recent articles, which have been annexed by Gilmer, noting that Brooklyn Borough President Eric Adams is looking into the use of the Third Party Transfer Program by the City to seize properties under the veil of foreclosure and whether the due process rights of the owners of the properties are being violated. In this regard, it is noted that the taxes owed on the MacDonough Street property is minuscule compared to its market or assessed value, and the use of the Third Party Transfer Program to transfer the MacDonough Street property would result in the complete loss of Gilmer's equity in the MacDonough Street property above the

13

amount of taxes owed.  As discussed above, Gilmer claims that it was not properly given notice of the in rem foreclosure action, and that the MacDonough Street property was not distressed and was improperly made a subject of the Third Party Transfer Program. Moreover, Gilmer has expressed its willingness and demonstrated its ability to pay the outstanding monies owed, but the City has steadfastly refused to permit it to make such payment.

With respect to the issue of notice, the City argues that the Commissioner of Finance complied with Administrative Code § 11-406 by mailing a notice of foreclosure for the MacDonough Street property to the name and address on the assessment roll, as of May 25, 2015, to Gilmer at the property address of 25 MacDonough Street, and by complying with the publication and posting requirements of this section.  The City contends that it sent proper notice at the time of its commencement of this action on July 14, 2015.

Gilmer does not dispute that it eventually obtained actual notice of this foreclosure action through other means around the time that it entered into the Installment Agreement on November 2, 2017.  However, the City does not dispute that it never informed Gilmer of the Judgment of Foreclosure, nor did it inform Gilmer that it did not intend to honor the Installment Agreement.  The City could have easily ascertained Gilmer's correct address due to its filing of this address with the Secretary of State.  At the time that the Judgment of Foreclosure was signed on November 27, 2017, Gilmer was not in default of the Installment Agreement and had paid the $25,492.23 down payment.  The City, however, improperly

14

failed to remove the MacDonough Street property from the Judgment of Foreclosure, pursuant to Administrative Code § 11-409.  Instead, upon no notice, the City foreclosed on the tax lien shortly after Gilmer had entered into the Installment Agreement, whereby the City agreed to allow Gilmer to make installment payments to satisfy the tax lien and accepted the $25,492.23 down payment. The City permitted the Judgment of Foreclosure to be signed by the court while aware that the MacDonough Street property was supposed to be removed from the in rem foreclosure process due to its entry into the Installment Agreement.  The MacDonough Street property should not have been included in the Judgment of Foreclosure since the Installment Agreement was in place at that time.

Furthermore, while the City contends that the mandatory redemption period for the MacDonough Street property expired on April 16, 2018,[1] four months from the date of the entry of the Judgment of Foreclosure, in July 2018, the City, by its representatives, as evidenced by the emails discussed above, continued to represent that Gilmer could catch up on its missed payments and bring the Installment Agreement up-to-date.  The City also continued to accept payments from Gilmer and only tendered a partial refund after Gilmer filed its instant motion.  Gilmer was misled by the City into believing that the Installment Agreement was in effect and that the MacDonough Street property would not be foreclosed.

The City's failure to contact Gilmer once it determined that the Installment Agreement would not be honored constitutes misleading conduct (see *Matter of Emporium Mgt. Corp.*

---

[1] April 14, 2018 was Good Friday; April 16, 2018 was the next business day.

*v City of New York*, 121 AD3d 981, 984 [2d Dept 2014]).  Gilmer relied on the Installment Agreement and the City's assurances, which resulted in its failure to act within the four-month period, when it had an absolute right to redemption pursuant to Administrative Code § 11-407 (a) (*see id.*; *Matter of Vanech v City of New York*, 285 AD2d 367, 368 [1st Dept 2001]).  Based on the representations by the City and the City's breach of the Installment Agreement by obtaining the Judgment of Foreclosure while the Installment Agreement was in effect, Gilmer was denied its due process rights and its opportunity to exercise its right of redemption with respect to the MacDonough Street property.

Furthermore, the City improperly included the MacDonough Street property in the Third Party Transfer Program despite the fact that it was not distressed.  Pursuant to Administrative Code § 11-401.1 (c), "[a]ny parcel . . . determined to be a distressed property shall be subject to an in rem foreclosure action."  The City argues that even though the MacDonough Street property was not distressed within the meaning of Administrative Code § 11-401 (4), it was required to include it in the in rem tax foreclosure action based on its tax delinquent status pursuant to Administrative Code § 11-405 (a) once another property on the same tax block was identified for inclusion.  Specifically, the City asserts that the MacDonough Street property was required to be included because another property, Lot 73, which was on the same Block 1851 as the MacDonough Street property, was a distressed property although it was later withdrawn from this action as a result of full payment.

16

Administrative Code § 11-405 (a) provides that "[t]he commissioner of finance from time to time shall prepare a list, to be known as a 'list of delinquent taxes', of all parcels, or all parcels within a particular class or classes, that are within a particular borough or section of a tax map or portion of a section of a tax map of the city and on which there are tax liens subject to foreclosure pursuant to this chapter," and that "no such portion shall be smaller than a block." Tax liens subject to foreclosure are generally tax liens that have been due and unpaid for a period of at least one year pursuant to Administrative Code § 11-404 (a) or where the property is distressed pursuant to Administrative Code § 11-401.1 (c) . Notably, the City included in the tax lien a payment of $17,806.66, which was not due until July 1, 2015, and payments of $19,849.16 and $175.97, which were due on January 1, 2015, and, thus, were not liens on the McDonough Street property for more than one year pursuant to Administrative Code § 11-404 (a).

Moreover, the inclusion of a property which is not distressed in an in rem foreclosure action that is subject to the Third Party Transfer Program based upon the mere fact that it is on the same block as another property unrelated to it is completely arbitrary and could not possibly have been the intent of Administrative Code § 11-405 (a), considering the dire ramifications of loss of the property without any recovery of surplus monies as would be obtained in a tax lien sale. Furthermore, it would result in disparate treatment for property owners based upon what block they lived without regard to whether or not their own property was distressed. Such unequal treatment raises equal protection concerns (*see* US Const 14th

17

Amend, § 1 [providing that "(n)o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws"]; NY Const, art I, § 11 [providing that "(n)o person shall be denied the equal protection of the laws of this state or any subdivision thereof"]).

The court is cognizant that in *Nelson v City of New York* (352 US 103, 109 [1956]), the United States Supreme Court rejected an equal protection challenge of an earlier Administrative Code provision, Title D, Chapter 17, which provided that when its strict foreclosure provisions were invoked, they were required to be used against all parcels in a section of the City on which charges were outstanding for four years. That holding, however, did not address and does not encompass the situation here, where the MacDonough Street property was included in the Third Party Transfer Program, pursuant to Administrative Code § 11-401.1, despite not being a distressed property and where the provisions of the Administrative Code pertaining specifically to distressed properties were applied to it.

In any event, the Commissioner of Finance may exclude or thereafter remove from such list a property where there is an Installment Agreement in place. As previously discussed, Gilmer entered into the Installment Agreement with the City, but the MacDonough Street property was not excluded or removed from the list (*see* Administrative Code § 11-409). Moreover, there was no basis for the City to transfer the MacDonough Street property pursuant to the Third Party Transfer Program to Neighborhood Restore since it was not a distressed property (*see* Administrative Code § 11-401 [4]).

18

The transfer of the MacDonough Street property to Neighborhood Restore was improper, and was also unconscionable and shocking to the conscience of the court based on the amount of the lien versus the value of the MacDonough Street property (*see Alben Affiliates v Astoria Term.*, 34 Misc 2d 246, 248 [Sup Ct, Queens County 1962] [setting aside a foreclosure sale where the purchase price was grossly inadequate]). To permit this transfer to stand, where the Judgment of Foreclosure was improperly obtained against the MacDonough Street property and the MacDonough Street property was not a distressed property, would unfairly deprive Gilmer of its equity in the MacDonough Street property since Gilmer cannot recover any surplus monies above the taxes owed (*see Matthew v Thompson*, 65 AD3d 1095, 1097 [2d Dept 2009]).

Pursuant to CPLR 5015 (a) (1), "[t]he court which rendered a judgment . . . may relieve a party from it upon such terms as may be just," on the ground of excusable default where the party's motion for such relief "is made within one year after service of a copy of the judgment or order with written notice of its entry upon the moving party." Gilmer claims that it was not served with a copy of the Judgment of Foreclosure, and it is less than one year since the entry of the Judgment of Foreclosure. "A defendant seeking to vacate a default must demonstrate both a reasonable excuse for the default and the existence of a meritorious defense" (*NYCTL 1997-1 Trust v Vila*, 19 AD3d 382, 382 [2d Dept 2005]). Gilmer has shown that it had entered into an Installment Agreement with the City, which was in effect at the time that the City obtained the Judgment of Foreclosure. Gilmer has thus shown that

19

it was deprived of the opportunity to exercise its right of redemption since it was unaware of the Judgment of Foreclosure during the four months after its entry.  Furthermore, the transfer under the Third Party Transfer Program was improper since the MacDonough Street property was not a distressed property. Therefore, Gilmer has demonstrated a reasonable excuse and a meritorious defense.

In addition to the grounds set forth in CPLR 5015 (a), a court has the inherent authority to vacate a default judgment granted by it "'"for sufficient reason and in the interests of substantial justice'" (*Matter of County of Ontario [Middlebrook]*, 59 AD3d 1065, 1065 [4th Dept 2009], quoting *Woodson v Mendon Leasing Corp.*, 100 NY2d 62, 68 [2003]; *see also Matter of County of Ontario [Lundquist 1996 Living Trust]*, 155 AD3d 1567, 1568 [4th Dept 2017], *lv denied* 30 NY3d 912 [2018]; *Matter of County of Genesee [Spicola]*, 125 AD3d 1477, 1477 [4th Dept 2015], *lv denied* 25 NY3d 904 [2015]; *Matter of County of Genesee [Butlak]*, 124 AD3d 1330, 1331 [4th Dept 2015], *lv denied* 25 NY3d 904 [2015]). Here, there is sufficient reason to vacate the default judgment, and the interests of substantial justice mandate its vacatur.  Gilmer has established that it fully intends and is able to pay the taxes, and there is an absence of any prejudice to Neighborhood Restore.  While the court is mindful of the important interest that the City has in efficiently collecting delinquent taxes, the court cannot permit Gilmer's rights in the MacDonough Street property to be improperly extinguished.

### Conclusion

Accordingly, Gilmer's motion is granted to the extent that the Judgment of Foreclosure is vacated with respect to the MacDonough Street property, the transfer of the MacDonough Street property to Neighborhood Restore is vacated and set aside, and Gilmer's title to the MacDonough Street property is restored.

### Motion Sequence Number 14

1055 Bergen Street Housing Development Fund Corporation Board (Bergen HDFC) moves, by order to show cause, under motion sequence number 14, for an order: (1) amending the caption to include Neighborhood Restore as a defendant; (2) preliminarily enjoining Neighborhood Restore and/or its agents from conveying or transferring the deed to real property located at 1055 Bergen Street, Brooklyn, New York 11216, designated on the Kings County tax map as Block 1212, Lot 56 (the Bergen Street property); (3) tolling the redemption period to allow it, as the equity owner, an opportunity to redeem the Bergen Street property; (4) vacating its default; and (5) pursuant to CPLR 5015 and CPLR 317, vacating that portion of the Judgment of Foreclosure as it pertains to the Bergen Street property.

### Facts and Procedural Background

Bergen HDFC has been the owner of the Bergen Street property since June 25, 1997, over 21 years ago, when it acquired it from HPD. The Bergen Street property was included in this in rem foreclosure action and foreclosed upon pursuant to the City's Third Party

21

Transfer Program. The inclusion of the Bergen Street property in this in rem foreclosure action was based upon $250,482.98 in delinquent real property taxes and other charges, including emergency repair liens and water and sewer liens, dating back to 2007. The City did not make any specific allegations as to whether the Bergen Street property met the definition of a distressed property pursuant to Administrative Code § 11-401 (4). Bergen HDFC did not interpose an answer, and, as noted above, the Judgment of Foreclosure with respect to the Bergen Street property, along with the other properties that were the subject of this action, was entered on December 14, 2017.

Shawn Maldon is the newly elected president of Bergen HDFC. Mr. Maldon has submitted his sworn affidavit, in which he explains that in the past, the Bergen Street property was being managed by an illegal board who incurred a substantial amount of debt in such management. Specifically, Mr. Maldon asserts that Syvera Pass and Allan McGuire installed themselves as officers of the board and made numerous decisions on behalf of the Bergen Street property without the consent of any of the shareholders of Bergen HDFC. According to Mr. Maldon, there are questions of whether Ms. Pass and/or Mr. McGuire were even legitimate shareholders of Bergen HDFC, and whether, as a result, qualified to have even served on the board.

At a special shareholder meeting held on September 4, 2018, Bergen HDFC elected a new board, and elected Mr. Maldon as president. Mr. Maldon sets forth that the newly elected board has devised a plan to eliminate the debts of the Bergen Street property and

provide proper management of Bergen HDFC in the future. The new board has been able to secure funding to pay off the Bergen Street property's current debts and arrange for a third party to manage the Bergen Street property on Bergen HDFC's behalf to assure that the Bergen Street property does not fall into this situation in the future. Bergen HDFC was unable to rectify this situation earlier due to the fact that the previous improperly elected board refused to hold elections.

The Bergen Street property is now worth millions of dollars, and the debt owed to the City is nowhere near its value. Bergen HDFC asserts that it was never afforded the requisite notice and due process associated with an in rem tax foreclosure. Bergen HDFC states that while it is the shareholders who stand to lose their interests in the Bergen Street property, no shareholder of Bergen HDFC was served with notice of the in rem foreclosure, the summons and complaint, the notice of delinquent taxes or any other notice required under the Administrative Code. It asserts that it has secured funding to satisfy the open liens on the Bergen Street property and seeks to avoid forfeiture of its property interest.

The Bergen Street property was transferred, pursuant to Administrative Code § 11-412.1 and § 11-412.2, on September 6, 2018 to Neighborhood Restore, as an interim owner. Bergen HDFC contends that the City's transfer of the Bergen Street property to Neighborhood Restore, without paying it the difference between the debt owed and the millions of dollars that the Bergen Street property is now worth, is "tantamount to robbery."

Bergen HDFC stands ready, willing, and able to pay all of the monies owed. Nevertheless, the City refuses to accept payment, and, instead, wishes to completely strip Bergen HDFC of its equitable interest in the Bergen Street property on the basis that redemption is now untimely. Consequently, Bergen HDFC filed its order to show cause, dated October 15, 2018.

## Discussion

With respect to Bergen HDFC's claim of a lack of actual notice, it is noted that pursuant to Administrative Code § 11-406 (c), the Commissioner of Finance was required to have a copy of the notice of foreclosure "mailed to all owners . . ., who may be entitled to receive such notice by virtue of any owner's registration or in rem card filed in the office of the city collector pursuant to [Administrative Code §] 11-416 or [§] 11-417 of . . . chapter [4]." Where there is no owner's registration or in rem card filed in the office of the city collector, then the notice is to be "mailed to the name and address, if any, appearing in the latest annual record of assessed valuations" (Administrative Code § 11-406 [c]). The Commissioner of Finance is also required to comply with filing, posting and publication requirements set forth in Administrative Code § 11-406.

The City has submitted the affidavit of regularity of Jacques Jiha, the Commissioner of Finance, dated October 23, 2017, which states that the notice of foreclosure was mailed by certified mail and regular mail on July 24, 2015 and July 27, 2015, respectively. The affirmation of regularity of Andrea B. Feller, an assistant corporation counsel, dated October

24

24, 2018, sets forth that since there was no record of Bergen HDFC having requested a particular address for notice of foreclosure, the Commissioner of Finance mailed the notice of foreclosure to Bergen HDFC at the property address, which was the name and address appearing on the assessment roll for May 2015. Ms. Feller sets forth that in addition, the Commissioner of Finance sent a notice of foreclosure to the real estate billing name and address that appeared on the assessment roll, at the property address Apt. 4D, as well as to C. Harkless, a shareholder of Bergen HDFC and to Shawn Maldon at 1274 48th Street, Brooklyn NY 11210. The affidavit of regularity also sets forth that publication and posting requirements were met.

Bergen HDFC asserts that the City did not comply with the jurisdictional requirements of Administrative Code § 11-406. It asserts that there is no proof of mailing as to the notices for the owners who may be entitled to receive such notice as per Administrative Code § 11-406 (c) . While the affirmation of Andrea Feller states that the DOF sent notices of foreclosure to Shawn Maldon at 1274 48th Street, Brooklyn, NY 11219, Mr. Maldon states, in his affidavit, that he has no association with that address and has no idea of how that address was attributed to him. Bergen HDFC maintains that it did not have actual notice of this in rem foreclosure action. If the City did, in fact, fail to comply with Administrative Code § 11-406 (c) , then the foreclosure would be a nullity and ineffective to divest Bergen HDFC of its title (*see Oclassen v City of New York*, 42 Misc 2d 1040, 1042 [Sup Ct, Queens County 1964]).

25

The City argues that whether or not Bergen HDFC actually received the notice of foreclosure is irrelevant because in *Matter of ISCA Enters. v City of New York* (77 NY2d 688, 701-702 [1991], *rearg denied* 78 NY2d 952 [1991], *cert denied* 503 US 906 [1992]), the Court of Appeals held that the notice provision of Administrative Code § 11-406 (c) in in rem tax foreclosure actions satisfies "the minimum requirements of due process." It is well established that "'due process is satisfied by 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'" (*Matter of County of Seneca [Maxim Dev. Group]*, 151 AD3d 1611, 1612 [4th Dept 2017], quoting *Matter of City of Rochester [Duvall]*, 92 AD3d 1297, 1298 [4th Dept 2012], *appeal withdrawn* 21 NY3d 910 [2013], quoting *Mullane v Central Hanover Bank & Trust Co.*, 339 US 306, 314 [1950]).

The City heavily relies upon the presumption of regularity favoring the City upon the granting of an in rem Judgment of Foreclosure (*see* Administrative Code § 11-411; § 11-412.1 [h]). Pursuant to Administrative Code § 11-412.1 (h), with respect to class one and class two properties, "[e]very deed given pursuant to the provisions of this section" constitutes "presumptive evidence that the action and all proceedings therein and all proceedings prior thereto from and including the assessment of the lands affected and all notices required by law were regular and in accordance with all provisions of law relating thereto." Administrative Code § 11-412 (h) further provides that "[a]fter four months from the date of entry of the final judgment authorizing the award of possession of any parcel of

26

class one or class two real property pursuant to the provisions of this section, the presumption shall be conclusive." It also states that an action to set aside a deed may not be maintained "unless the action is commenced and a notice of pendency of the action is filed in the office of the property county clerk prior to the time that the presumption becomes conclusive as aforesaid."

The court is cognizant of cases which have held that where an action is brought more than four months after a judgment of foreclosure was entered and the four-month mandatory redemption period under Administrative Code § 11-412.1 (d) has expired, it is time-barred pursuant to Administrative Code § 11-412.1 (h) (see e.g. *Wilson v Neighborhood Restore Hous.*, 129 AD3d 948, 949 [2d Dept 2015]; *O'Bryan v Stark*, 77 AD3d 494, 495 [1st Dept 2010], *lv denied* 17 NY3d 704 [2011]; *In Rem Tax Foreclosure Action No. 47*, 29 AD3d 955, 956 [2d Dept 2006]; *In Rem Tax Foreclosure Action No. 44*, 23 AD3d 290, 291 [1st Dept 2005]; *Matter of Tax Foreclosure Action No. 44, Borough of Bronx*, 2 AD3d 241, 242 [1st Dept 2003]). Administrative Code § 11-412.1 (h), however, cannot properly be construed as a statute of limitations that precludes the vacating of a default judgment in these circumstances. Indeed, the City concedes that following the four-month mandatory redemption period, a property subject to a foreclosure judgment may still be redeemed in its discretion in accordance with Administrative Code § 11-424. Notably, the City did not acquire title by the Judgment of Foreclosure, and only transferred title pursuant to the Third Party Transfer Program more than four months following the Judgment of Foreclosure.

27

Moreover, an unjustified taking and deprivation of property rights constitutes a constitutional challenge which is not subject to a statute of limitations. Due regard for property ownership is a fundamental tenet of the United States Constitution and the New York Constitution. Since the right to property is a fundamental right in New York, all subsequent grants of power, including the taxing power, are limited as to how they adversely affect it. While the City has an interest in tax collection, the countervailing interest of preserving property ownership is paramount and must be protected.

Here, the transfer of the Bergen Street property, pursuant to the Third Party Transfer Program, would constitute an unlawful taking of private property without just compensation in violation of Bergen HDFC's constitutional rights under the Takings Clause of the Fifth Amendment to the United States Constitution and article I, section 7, of the New York State Constitution. The Bergen Street property has a value substantially in excess of the tax lien, and its taking by the City in this in rem foreclosure action and its transfer pursuant to the Third Party Transfer Program will not permit Bergen HDFC to recoup that excess. "Unquestionably, a taking of property of a value far in excess of a tax lien in satisfaction of the lien without affording the owner an opportunity to recover the excess value would constitute a violation of constitutional rights" (*Matter of In Rem Tax Foreclosure Action No. 37, Borough of Queens*, 118 Misc 2d 1081, 1083 [Sup Ct, Queens County 1983]). "The Constitution . . . mandates that [Bergen HDFC] not be deprived of the surplus without an opportunity to recoup it" (*id.*).

In *Nelson* (352 US at 110), it was held that it is constitutionally permissible for the City to retain property or the entire proceeds of its sale, in the absence of a timely action to redeem it or to seek recovery of any surplus where the record shows that adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings. Here, however, while no answer was interposed by Bergen HDFC alleging a substantial equity over the City's lien for taxes pursuant to Administrative Code § 11-409 (d), Bergen HDFC maintains that it had no actual notice of this action, and it has been denied the right to any surplus above the amount due to the City. In any event, there is no showing that the underlying default judgment was properly obtained by the City since the City has not attempted to make any showing that the Bergen Street property met the statutory definition of a distressed property.

Moreover, this is not a case where a landlord has made no effort to maintain the property. Rather, the shareholders and board of Bergen HDFC are desperately seeking to maintain and rehabilitate the Bergen Street property and to pay all outstanding sums due, obviating the need for any transfer under the Third Party Transfer Program. Thus, to permit such a transfer, in the face of these facts, would work a grave injustice to the shareholders of Bergen HDFC for no reason and result in an unjustified windfall to the City (*see* Administrative Code § 11-428).

The Bergen Street property is not a dilapidated, abandoned building that the in rem foreclosure process was intended to target pursuant to Administrative Code § 11-401.1 et seq.

29

The intent of the Third Party Transfer Program was to protect tenants by stabilizing buildings that are actually distressed and abandoned, and it was designed to encourage the rehabilitation and preservation of existing housing. This intent is not furthered by depriving property owners of their property rights where they are actively seeking to preserve their property. The court cannot countenance a result where a property owner unfairly and unjustly incurs the loss of his or her property and his or her equity and investment in such property.

Bergen HDFC has demonstrated a meritorious defense and a reasonable excuse, warranting the vacatur of its default (*see* CPLR 5015 [a] [1]). Bergen HDFC has established its ability to pay the taxes after the redemption period ended and the lack of any prejudice to the City or Neighborhood Restore (*see Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Considering the facts and circumstances of this case, the court concludes that "the entry of a default judgment based on the failure to pay [the taxes] would result in a disproportionately harsh result" and that "this is an appropriate case in which to exercise [the court's] broad equity power to vacate [the] default judgment" (*Matter of County of Ontario [Lundquist 1996 Living Trust]*, 155 AD3d at 1568 [internal quotation marks omitted]; *see also Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065). As discussed above, the court has the inherent authority to vacate the Judgment of Foreclosure, obtained on Bergen HDFC's default, "'for sufficient reason and in the interests of substantial justice'" (*Matter of County of Ontario*

30

[Middlebrook], 59 AD3d at 1065, quoting *Woodson*, 100 NY2d at 68; *see also Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Here, there is sufficient reason to vacate the default judgment in the interests of substantial justice. Indeed, to hold otherwise would result in a perversion of the intent and purpose of the relevant Administrative Code provisions, defy principles of equity, and impose an unduly harsh penalty upon Bergen HDFC.

### Conclusion

Accordingly, Bergen HDFC's motion is granted to the extent that the Judgment of Foreclosure is vacated with respect to the Bergen Street property, the transfer of the Bergen Street property to Neighborhood Restore is vacated and set aside, and Bergen HDFC's title to the Bergen Street property is restored.

### Motion Sequence Number 12

Marcia Lewis moves, by order to show cause, under motion sequence number 12, for an order: (1) vacating the Judgment of Foreclosure with respect to real property located at 972 Rutland Road, Brooklyn, New York 11212, designated on the Kings County tax map as Block 4611, Lot 4 (the Rutland Road property); (2) requiring the DOF and HPD to allow her to pay the taxes and fines assessed; and (3) directing the City to transfer the Rutland Road property back to her.

31

## Facts and Procedural Background

By a deed dated December 6, 1979, over 39 years ago, Ms. Lewis became the owner of the Rutland Road property, which is a four-family dwelling. The Rutland Road property was included in this in rem foreclosure action as a result of outstanding real property taxes and other assessments, dating back to 2009, in the amount of $139,369.25. The Rutland Road property was foreclosed upon pursuant to the City's Third Party Transfer Program. Ms. Lewis did not interpose an answer in this action. As discussed above, the Judgment of Foreclosure was signed on November 27, 2017 and was entered on December 14, 2017.

Ms. Lewis sets forth that she wanted to enter into an agreement with the City to pay the taxes and violations until she could secure a loan to completely pay off the monies that were owed. Ms. Lewis asserts that she was prevented from redeeming the Rutland Road property or entering into an installment agreement within the four-month mandatory redemption period, pursuant to Administrative Code § 11-412.1 (d), because she was unable to obtain a loan due to an error by the City. Specifically, the owner's name on the final assessment roll is listed as Phillistia Nicholls Realty Corp., which was the prior owner of the Rutland Road property. Despite the fact that Ms. Lewis had a deed to the Rutland Road property, traditional banks would not advance Ms. Lewis a loan because the property assessment roll and the DOF documents listed the owner of the Rutland Road property as Phillistia Nicholls Realty Corp.

32

Ms. Lewis states that she was told by the DOF that she did not own the Rutland Road property because the true owner was Phillistia Nicholls Realty Corp., and that it could not provide her with any information. Only the City had the power to correct the name on the assessment rolls.

In an attempt to resolve the debt, Ms. Lewis, in May 2018, visited both the DOF and HPD. She was informed by HPD that the Rutland Road property was not registered, and, as such, it was unable to assist her unless she registered it. In response, she registered the Rutland Road property with HPD on May 23, 2018, which was subsequent to the entry of the Judgment of Foreclosure on December 5, 2017.

Ms. Lewis, in an attempt to save the Rutland Road property, sought monies from a hard money lender, Columbia Capital Co., in order to secure funding to pay off the assessed taxes and liens placed on the Rutland Road property. A term sheet from Columbia Capital Co. shows that it has proposed terms to her for a commercial loan for the Rutland Road property in the amount of $500,000.

By a deed dated September 6, 2018, the Rutland Road property was transferred to Neighborhood Restore, pursuant to the Judgment of Foreclosure and Administrative Code § 11-412.1 and § 11-412.2. Ms. Lewis states that she first learned that she no longer owned the Rutland Road property when she was sent a copy of a flyer that was posted at the Rutland Road property, which stated that on September 6, 2018, the Rutland Road property was transferred to Neighborhood Restore as part of the City's Third Party Transfer Program. The

33

Rutland Road property is worth significantly more than the taxes that are owed to the City. Ms. Lewis has sought to pay the outstanding taxes, but the City has refused to accept any payment by Ms. Lewis. The City contends that Ms. Lewis' mere willingness to pay arrears at this late stage is insufficient to vacate the Judgment of Foreclosure and allow her to redeem the Rutland Road property. Consequently, Ms. Lewis filed her instant order to show cause, dated September 26, 2018.

### Discussion

The City contends that the transfer of the Rutland Road property to Neighborhood Restore cannot be set aside because, pursuant to Administrative Code § 11-412.1 (h), the deed to Neighborhood Restore is presumptive evidence that this action and all proceedings therein were regular and in accordance with all provisions of law, and since four months have passed from the date of entry of the final judgment authorizing the award of possession of the Rutland Road property, this presumption has become conclusive. The City asserts that no action to set aside a deed may be maintained where the presumption has already become conclusive. However, as previously noted, even where the four-month period for mandatory release of property has expired, the City has the discretion to grant or deny an application for release of real property taken in rem (*see* Administrative Code § 11-424 [g]; *Hecht v City of New York*, 19 Misc 3d 1102[A], 2008 NY Slip Op 50476[U], *7 [Sup Ct, Queens County 2008]). The City does not dispute that Ms. Lewis contacted the DOF by at least May 2018,

34

prior to the September 6, 2018 deed to Neighborhood Restore, in an effort to redeem the Rutland Road property, but her efforts were rebuffed.

The City relies upon *King Holding Corp. v City of N.Y. Dept. of Hous. Preserv. & Dev.* (24 AD3d 395, 396 [1st Dept 2005], *lv denied* 6 NY3d 712 [2006]), which held that "[a]bsent a showing of fraud or illegality," its "discretion to grant or deny a release of property pursuant to Administrative Code of the City of New York § 11-424 (g) is 'absolute,' and thus it need not state reasons for refusing such a release." It contends that it was, therefore, within its discretion to transfer the Rutland Road property to Neighborhood Restore, as a qualified third party, rather than allowing Ms. Lewis to redeem the Rutland Road property, because the mandatory four-month redemption period had expired.

Administrative Code § 11-424 governs an application to the City for the release of property acquired by in rem tax foreclosure. In order to seek the release of such property, an applicant must establish that he or she is a party who had an interest in the subject real property as "either owner, mortgagee, lienor, or encumbrancer at the time of the city's acquisition thereof." Due to the City's error, Ms. Lewis was unable to establish that she was an owner of the Rutland Road property (*see* Administrative Code § 11-424 [a] [1]). Ms. Lewis asserts that her efforts to redeem the Rutland Road property after the Judgment of Foreclosure was issued, but prior to the end of the four-month mandatory redemption period, were hampered because the DOF would not provide her with information because she was not listed on its records as the owner of the Rutland Road property. She attests that the DOF

told her to rectify this error with HPD, while HPD informed her to resolve this error with the DOF.

After making numerous attempts to resolve the issue of ownership, Ms. Lewis, upon advice from the City, paid fees to register the Rutland Road property with HPD, in order to preserve her ownership, without knowing or being informed that she no longer had title to the Rutland Road property due to the Judgment of Foreclosure. The City, instead, accepted Ms. Lewis' registration fees, thereby acknowledging and representing to her that she continued to retain her ownership interest in the Rutland Road property. Significantly, this took place prior to the time the deed was executed transferring title to the Rutland Road property to Neighborhood Restore. The City never returned Ms. Lewis' registration fees. The City thereby misled and misrepresented to Ms. Lewis that she continued to own the Rutland Road property.

"[W]here a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his [or her] position to his [or her] detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised" (*Bender v New York City Health & Hosps. Corp.*, 38 NY2d 662, 668 [1976]; *see also Hill v City of New York*, 151 AD3d 1032, 1033 [2d Dept 2017]). If the City had notified Ms. Lewis that she could not register the Rutland Road property because she no longer owned it, she would have had the opportunity up until September 6, 2018, the date on which the Commissioner of Finance

deeded the Rutland Road property to Neighborhood Restore, to seek discretionary relief from the City, notwithstanding the fact that more than four months had passed from the date of entry of the Judgment of Foreclosure (*see* Administrative Code § 11-424 [g]). If such relief had been granted, Ms. Lewis could have redeemed the Rutland Road property upon payment in full of the tax arrears and other fees (*see id.*). Thus, there is an issue of equitable estoppel raised here (*see Matter of Emporium Mgt. Corp.*, 121 AD3d at 984). Ms. Lewis has also asserted that the City's failure to correct its error of listing the prior owner as the owner of the Rutland Road property caused her to have a problem in obtaining a loan to aid her in redeeming the Rutland Road property.

The City argues that the fact that Ms. Lewis has substantial equity in the Rutland Road property over its lien is irrelevant and does not provide a reason for vacating the Judgment of Foreclosure. It contends that Ms. Lewis forfeited all of her equity in the Rutland Road property because of her failure to interpose an answer in this in rem foreclosure action pursuant to Administrative Code § 11-409 (d). This argument is rejected. The loss of Ms. Lewis' entire equity in the Rutland Road property where she never abandoned it, sought to satisfy her arrears, and was ready, willing, and able to redeem it, was never the intention of the Third Party Transfer Program. The Third Party Transfer Program is an anti-abandonment program which has the ameliorative purpose of enabling troubled properties to be placed in the hands of responsible private owners for rehabilitation and maintenance, and was not intended to permit the City to strip a property owner of all of the surplus monies above its

37

lien by its unjustified refusal to accept payments from a property owner who has not abandoned his or her property and is seeking to pay all arrears and maintain and rehabilitate the property himself or herself. The City's application of the Third Party Transfer Program to strip Ms. Lewis of her property rights in the Rutland Road property undermines the Third Party Transfer Program's beneficial intent and distorts its purpose so as to work a grave injustice upon Ms. Lewis.

In any event, the court has inherent authority to vacate its own Judgment of Foreclosure, which was obtained on Ms. Lewis' default, "'for sufficient reason and in the interests of substantial justice'" (*Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065, quoting *Woodson*, 100 NY2d at 68; *see also Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Here, there is sufficient reason to vacate the default judgment in the interests of substantial justice. The blatant infirmities in the procedure employed by the City to divest Ms. Lewis of her equity in the Rutland Road property, and the City's flagrant disregard of Ms. Lewis' rights and equity in the Rutland Road property, warrant an order vacating the Judgment of Foreclosure with respect to the Rutland Road property.

### Conclusion

Accordingly, Ms. Lewis' motion is granted to the extent that the Judgment of Foreclosure is vacated with respect to the Rutland Road property, the transfer of the Rutland

Road property to Neighborhood Restore is vacated and set aside, and Ms. Lewis' title to the Rutland Road property is restored.

### Motion Sequence Number 9

Shurma 1 Corp. (Shurma) moves, by order to show cause, under motion sequence number 9, for an order: (1) dismissing this action with respect to real property located at 315 Harman Street, Brooklyn, New York 11237, which is designated on the Kings County tax map as Block 3219, Lot 41 (the Harman Street property); or, in the alternative, (2) vacating that portion of the Judgment of Foreclosure in this action, dated November 27, 2017, pertaining to the Harman Street property; (3) restraining any future sale or transfer of title of the Harman Street property until further order of the court; and (4) tolling the redemption period to allow it, as the equity owner of the Harman Street property, an opportunity to pay off the liens and/or contest the amount claimed to be due.

### Facts and Procedural Background

The Harman Street property was foreclosed upon in this action, which, as noted above, was commenced on July 14, 2015, pursuant to the City's Third Party Transfer Program. Shurma did not interpose an answer in this action. As discussed above, the Judgment of Foreclosure was signed on November 27, 2017 and was entered on December 14, 2017. Shurma filed its instant order to show cause, dated August 31, 2018.

Shurma asserts that the charges which became liens on the Harman Street property originated from an action which was commenced against the Harman Street property by HPD

under index number 332/08 in the Civil Court, Kings County (the Civil Court action). The

Civil Court action resulted in an order, dated September 10, 2009, requiring Shurma to pay

$9,000 by October 31, 2009 to get out of the 7A program. Shurma paid the funds as directed

by the order. The Harman Street property was released from the 7A program on October 21,

2009. According to Shurma, even though the Harman Street property was removed from 7A

administration, HPD continued to add charges and interest to the Harman Street property.

Shurma also asserts the allegations used to include the Harman Street property in the 7A

administration program were inconsistent with the violation records. Specifically, Shurma

claims that the City undertook renovations that had nothing to do with the violations alleged.

Shurma further claims that it was never given any notice prior to these renovations being

completed despite its multiple dwelling registration with HPD. Shurma has submitted an

engineer's report, prepared in October 2008, which showed that the necessary repairs were

significantly less than the charges assessed by the City. Shurma also has submitted an

estimate from a licensed contracting company, Trizon, Inc., dated May 20, 2008, which

showed that the cost to correct all existing violations and perform cosmetic work would be

$41,561.

Shurma retained Bruce Goldstein, Esq., to sue the City regarding the liens on the

Harman Street property that were a result of being in the 7A program. However, Mr.

Goldstein failed to move quickly, and Shurma changed attorneys. By the time that Shurma

retained a new attorney, Tarik Davis, Esq., Mr. Davis informed Shurma that it could only dispute the tax lien after the tax lien was sold and foreclosure commenced.

In 2012, Shurma was given a 60-day notice of intention to sell tax liens, dated March 12, 2012. Shurma waited for a tax lien foreclosure to be commenced, but none was commenced and no tax lien sale was held. Shurma contends that it never received any notice of the instant in rem foreclosure action. Shurma asserts that it first learned of this action when it received a notice, nearly six years later, directed towards its tenants, dated July 19, 2018, which stated that if the owner does not resolve its payment of delinquent taxes and other municipal charges within the next few months, the building may be transferred to a new owner selected by HPD through the Third Party Transfer Program. Shurma retained an attorney, who informed it of the default judgment that had been entered on December 14, 2017 in the instant in rem foreclosure action and recorded on the Automatic City Register Information System.

Shurma notes that most of the bills are from the 2008 to 2009 year, when the Harman Street property was in the 7A program. However, the City failed to take any collection action until it brought this in rem foreclosure action on July 14, 2015, almost seven years later. The City assessed over seven years of interest and fees. It is undisputed that Shurma is current with all of the property taxes for the Harman Street property. The City concedes that nearly all of the Harman Street property's tax liens resulted from emergency repair liens and other repair and maintenance charges placed on the Harman Street property by HPD, as well as

41

financial aid liens for City funds given for repairs made by the former 7A administrator of the Harman Street property. These are the charges that Shurma claims were improperly imposed on the Harman Street property. Shurma maintains that it was not given an opportunity to dispute the charges despite being given a right to do so in an order in the Civil Court action, dated September 10, 2009. Shurma also asserts that it has not been given proper credit for many of the charges that it paid. The City claims that Shurma's right to challenge the underlying tax liens is now untimely, and that it was entitled to foreclose on these liens by bringing this action in rem against the Harman Street property, pursuant to the Third Party Transfer Program.

### Discussion

Shurma denies receiving notice of this foreclosure action. The City attaches a printout with tracking numbers and a notice of foreclosure dated July 24, 2017. On line five of the printout, it states, under addressee, Shurma-1 Corp., 315 Harman Street, Brooklyn, NY 11237-6924. However, this is a multi-unit building, and this address has no apartment number, and it is unclear who received the document. The City argues that actual notice is immaterial, claiming that it complied with the in rem notice procedures set forth in Administrative Code § 11-406, which, as discussed above, have been upheld as satisfying constitutional due process requirements in *Matter of ISCA Enters.* (77 NY2d at 701-702).

As pointed out by Shurma, however, it defies logic that Shurma would willfully ignore notice of an in rem foreclosure action based on emergency repair liens while consistently

42

paying all of its real estate taxes. Significantly, the City alleges that there were numerous violations, and attaches, as exhibit 6 to its opposition, a printout of the violations claimed to be on the Harman Street property, which spans over 10 pages. However, the violations are for a property located at 463 Classon Avenue (another property named in this foreclosure action) and not for the Harman Street property.

While Shurma argues that it was expecting a tax lien sale pursuant to Administrative Code § 11-301 et seq., the constitutionality of bringing an in rem foreclosure action proceeding, as opposed to a foreclosure and sale has been sustained by the United States Supreme Court (see Nelson, 352 US at 109; Oclassen v City of New York, 42 Misc 2d 1040, 1041 [Sup Ct, Queens County 1964]). However, it has been held that this does not preclude a property owner from seeking to open a default judgment when the City has arbitrarily proceeded under an in rem foreclosure, instead of a tax lien sale, and the property owner may request that the property be sold and seek the recovery of sale proceeds (see Oclassen, 42 Misc 2d at 1041).

As discussed above, pursuant to CPLR 5015 (a), a default judgment may be vacated where the property owner has a meritorious defense and a reasonable excuse for its default. Moreover, the court may exercise its broad equity power to vacate the default judgment, and it has inherent authority to vacate the Judgment of Foreclosure, obtained on Shurma's default, "'for sufficient reason and in the interests of substantial justice'" (Matter of County of Ontario [Middlebrook], 59 AD3d at 1065, quoting Woodson, 100 NY2d at 68; see also

43

*Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Here, Shurma's default must be vacated in the interests of substantial justice. Shurma seeks to redeem the Harman Street property, and the Third Party Transfer Program was not intended to strip a property owner of its property rights under the circumstances presented here.

The City relies upon Administrative Code § 11-412 (h), which, as previously discussed, provides that "[e]very deed given pursuant to the provisions of this section shall be presumptive evidence that the action and all proceedings therein and all proceedings prior thereto . . . were regular and in accordance with all provisions of law relating thereto," and that "[a]fter four months from the date of entry of the final judgment authorizing the award of possession of any parcel of class one or class two real property pursuant to the provisions of this section, the presumption shall be conclusive." Here, however, no deed has yet been given to the City or to a third party. It is noted that in the cases relied upon by the City, there were deeds given to third parties (*see e.g. Wilson*, 129 AD3d at 948 [2d Dept 2015] [where the property was transferred by the City to Neighborhood Restore]; *O'Bryan*, 77 AD3d at 495 [where the property was transferred by a deed from the DOF to Neighborhood Restore]; *In Rem Tax Foreclosure Action No. 47*, 29 AD3d at 955] [where the property was sold to Neighborhood Restore]; *In Rem Tax Foreclosure Action No. 44*, 23 AD3d 290, 291 [where the deed conveyed title to the City]; *Matter of Tax Foreclosure Action No. 44, Borough of Bronx*, 2 AD3d at 241 [where the deed conveyed title to the City]).

44

As set forth above, the Judgment of Foreclosure stated that "unless and until the Commissioner of Finance executes a deed conveying parcels of real property pursuant to Administrative Code § 11-412 to the City of New York or, for class one and class two properties, pursuant to §§ 11-412.1 and 11-412.2 to the City of New York or to a third party deemed qualified and designated by the Commissioner of Housing Preservation and Development, the owners of such lands shall continue to have all of the rights . . . of an owner . . ." Here, no deed has yet been executed and, thus, Shurma continues to have all of its rights as an owner.

Moreover, Administrative Code § 11-412.1 (i) provides as follows:

> "If the commissioner of finance does not execute a deed conveying to the city or to a third party a parcel of class one or class two real property within eight months after the entry of final judgment authorizing the award of possession of such parcel pursuant to subdivision b of this section, the commissioner of finance shall direct the corporation counsel to prepare and cause to be entered an order discontinuing the in rem foreclosure action as to said property, canceling the notice of pendency of such action as to said property and vacating and setting aside said final judgment. The entry of such order shall restore all parties, including owners, mortgagees and any and all lienors, receivers and administrators and encumbrancers, to the status they held immediately before such final judgment was entered."

Here, the Commissioner of Finance did not execute a deed conveying the Harman Street property to the City or to a third party within eight months after the entry of final judgment on December 14, 2017. The court notes that the City was unable to proceed with effectuating any transfer of the Harman Street property due to the pendency of Shurma's

motion. However, since the court finds that a vacatur of the Judgment of Foreclosure is warranted in the interests of substantial justice and Shurma seeks to redeem the Harman Street property, the City must be permanently enjoined from transferring the Harman Street property. Under these circumstances, the Judgment of Foreclosure must be vacated and set aside as to the Harman Street property and Shurma's status as the owner of the Harman Street property must be restored.

### Conclusion

Accordingly, Shurma's motion is granted to the extent that the Judgment of Foreclosure is vacated with respect to the Harman Street property, and Shurma's title to the Harman Street property is restored.

### Motion Sequence Number 11

19 Kingsland Avenue Housing Development Fund Corporation (Kingsland HDFC) moves, by order to show cause, under motion sequence number 11, for an order: (1) vacating the Judgment of Foreclosure in this action as it pertains to real property located at 19 Kingsland Avenue, Brooklyn, New York 11211, designated on the Kings County tax map as Block 2884, Lot 26 (the Kingsland property); and (2) dismissing this action; or, in the alternative, (3) entering an order, pursuant to CPLR 3211 (f), granting it leave to interpose an answer; and (4) joining Neighborhood Restore as a defendant, pursuant to CPLR 1001.

## Facts and Procedural Background

The Kingsland property is a six-family cooperative building formed under the provisions of article XI of the Private Housing Finance Law. Kingsland HDFC acquired the Kingsland property from the City almost 35 years ago, by a deed dated April 3, 1984. Kingsland HDFC was organized exclusively for the purpose of developing a housing project for people having low incomes, and, when it acquired the Kingsland property, there were significant repairs and renovations which had to be performed. The Kingsland property was in desperate need of capital improvements at that time, and the initial shareholders purchased their apartments for $250 and had the renovations performed. The shareholders of Kingsland HDFC reside at the Kingsland property.

As discussed above, this in rem foreclosure action was commenced by the City on July 14, 2015. The Kingsland property was included in this in rem foreclosure action, pursuant to the Third Party Transfer Program, based upon its having delinquent real property taxes, which dated back to October 2007. Yudy Ventura, the president of Kingsland HDFC, attests that he receives the mail for the Kingsland property, and at no time did he receive any mail from the City or HPD regarding tax foreclosure, nor did he ever see any posting anywhere near, in, or around the Kingsland property regarding a tax foreclosure action.

Subsequent to the July 14, 2015 commencement of this foreclosure action, Kingsland HDFC entered into an In Rem Installment Agreement with the DOF with a starting date of August 24, 2015, to pay the $77,769.81 then outstanding in real estate taxes and charges.

47

The In Rem Installment Agreement provided for a down payment of $11,665.47 and 32 quarterly installments of $3,933.21 plus current taxes. The first installment was due on October 1, 2015. The In Rem Installment Agreement provided that if any of the required payments were made after the in rem tax foreclosure action was commenced, but were insufficient to cause withdrawal from such action, the property would remain in the action and would be severed from the final Judgment of Foreclosure. It further provided that the failure to pay current or delinquent taxes as agreed would result in the cancellation of the agreement and the Kingsland property would become eligible for foreclosure or the lien for the unpaid real estate taxes and other charges may be sold by the City.

Subsequently, Kingsland HDFC fell behind in its installment payments because one of the six shareholders died, leaving substantial maintenance arrears. Kingsland HDFC sought the assistance of St. Nicholas Alliance and Brooklyn Legal Services Corp. By an email dated October 27, 2017, Samuel Chiera, Esq. from Brooklyn Legal Services Corp. confirmed that Kingsland HDFC was delinquent in its payments under the In Rem Installment Agreement and could not enter into another one, but the DOF would accept partial payment for the back taxes. He explained that Kingsland HDFC had to pay off $41,472.04 and an additional quarterly payment of $3,933.21 due in January 2018 by May 2018, and if Kingsland HDFC could pay the DOF $10,000 up front, and then $5,900 through May 2018, the Kingsland property would be removed from a lien sale. He further stated that

Kingsland HDFC needed to enter into an agreement with the DEP regarding monies owed for water/sewer charges.

Mr. Ventura states that he also had a conversation with Sharon Hatcher of HPD, and that she informed him that Kingsland HDFC was current with the In Rem Installment Agreement, and that he only had to make a payment arrangement regarding the water charges which were not the subject of this action. Kingsland HDFC claims that it paid in excess of $61,000 of a $77,769.81 debt.

Kingsland HDFC entered into a Payment Agreement with the DEP, dated November 2, 2015, with a payment agreement amount of $95,798.76. The DEP Payment Agreement provided for a monthly installment payment of $798.32 for 120 months for a total payment of $124,777.99 with the first payment due on December 8, 2015. This was the second installment plan entered into by Kingsland HDFC with the DEP.

It is undisputed that the DEP water/sewer charges were not the subject of this foreclosure action, as originally filed on July 14, 2015. Rather, the original debt was the $77,769.81 owed to the DOF, which Kingsland HDFC had agreed to pay, pursuant to the In Rem Installment Agreement dated August 24, 2015. The City asserts that it tacked on these water/sewer charges by stating, in an in rem tax foreclosure final warning notice dated October 6, 2017, that the foreclosure action was "due to unpaid property taxes and/or water and sewer charges and/or other charges." This final notice stated that the total amount due by November 2, 2017, including interest through that date, was $201,619.93, which consisted

of a DOF lien amount of $81,642.67, a water/wastewater lien amount of $119,477.26, and a penalty of $500. Kingsland HDFC, by Mr. Ventura, as well as its secretary and treasurer, assert that Kingsland HDFC never received any such notice.

With respect to the issue of notice to Kingsland HDFC, the City has submitted an affirmation of regularity by Andrea B. Feller (who, as noted above, is an assistant corporation counsel), who recites that notices of foreclosure were mailed to the owner of each property for which the DOF had a mailing address, and refers to the affidavits of Pamela Parker-Cortijo, an employee of the DOF, and Donald O'Connell, the executive vice-president of Vanguard Direct, Inc., a bulk mailing vendor that provides mailing services to the DOF. The affidavits refer to computers having generated the names and addresses for mailing. The certificates of bulk mailing from the United States Postal Service state that certain numbers of items were mailed. While the City claims that it complied with the requirements of Administrative Code § 11-406, Kingsland HDFC maintains that it never actually received any of these notices.

As noted above, on November 27, 2017, the Judgment of Foreclosure was signed, and on December 14, 2017, the Judgment of Foreclosure was entered in the Office of the Kings County Clerk. Mr. Ventura attests that Kingsland HDFC was never served with the Judgment of Foreclosure. The City does not claim that it served the Judgment of Foreclosure on Kingsland HDFC or otherwise provided Kingsland HDFC with notice of the Judgment of Foreclosure.

By a letter dated July 20, 2018, directed to the tenants of the Kingsland property (who are actually the shareholders of Kingsland HDFC), the City informed them that if the owner does not resolve a tax problem within the next few months, the Kingsland property may be transferred to a new owner pursuant to the Third Party Transfer Program. The City, in this letter, invited them to a pre-transfer tenant meeting to be held on August 21, 2018. Mr. Ventura attests that by the time that he received this letter, the City had already cut off the time for the redemption of the Kingsland property.

By a deed dated September 6, 2018, title to the Kingsland property was transferred to Neighborhood Restore pursuant to the Third Party Transfer Program. Kingsland HDFC has expressed its intention to pay all of the monies owed in full, which it will be able to obtain from the sale of a vacant unit. The City has refused to allow Kingsland HDFC to redeem the Kingsland property, asserting that it is too late for it to do so. Consequently, Kingsland HDFC brought its instant order to show cause, dated September 14, 2018.

## Discussion

The Kingsland property does not meet the statutory definition of a distressed property (see Administrative Code § 11-401 [4]). It has a total of three violations of record consisting of two class B violations and one class A violation. It has been fully renovated with the funds from Kingsland HDFC's shareholders, who stand to lose their homes by this foreclosure action. All of the building-wide systems of the Kingsland property have been upgraded and replaced by Kingsland HDFC's shareholders. The Kingsland property is

51

located in the Bushwick/Williamsburg area, and it is worth approximately five million dollars. Pursuant to Administrative Code § 11-401.1 (c), "[a]ny parcel ... determined to be a distressed property shall be subject to an in rem foreclosure action." Since the Kingsland property was not a distressed property, the City improperly included the Kingsland property in this in rem foreclosure action and the Third Party Transfer Program.

The City argues that in rem foreclosure is not limited to distressed properties. However, there was no basis for the City to transfer the Kingsland property, pursuant to the Third Party Transfer Program, to Neighborhood Restore since it was not a distressed property. Administrative Code § 11-401.1 (b) expressly provides that if the Commissioner of Finance determines that a parcel is not a distressed property, as defined in Administrative Code § 11-401 (4), then the parcel shall not be subject to Administrative Code § 11-401.1 (c) or § 11-412.1 (j). A finding that the property meets the statutory definition of a distressed property is a mandatory prerequisite for subjecting it to the in rem foreclosure procedure pursuant to Administrative Code § 11-401.1 (see Administrative Code § 11-401.1 [c]).

The intention to include only distressed properties in this in rem foreclosure procedure and the Third Party Transfer Program is further evidenced by the testimony before the New York City Council Committee on Housing and Buildings in support of Intro No. 679, the bill which became Local Law No. 37 and amended the relevant provisions of Administrative Code § 11-401 et seq. The March 22, 1996 testimony of the then New York City HPD Commissioner Deborah C. Wright and the April 22, 1996 testimony of former New York

52

City Human Resources Administration Commissioner Lilliam Barrios-Paoli set forth that the goals of this legislation was to identify "troubled buildings" and "prevent abandonment." This testimony also set forth that the legislation providing for the Third Party Transfer Program was a "tough provision," which "would be utilized where owners are irresponsible," and "tenants are being harassed and not provided with essential services," or "where buildings are unlikely to become economically viable without complete tax and mortgage restructuring." This is not the situation with the Kingsland property where such property is not distressed, where the shareholders are the owners of the cooperative units who have rehabilitated the Kingsland property and have essential services, and where Kingsland HDFC has not abandoned the Kingsland property, but is actively seeking to pay off the tax liens.

Thus, to permit a transfer of the Kingsland property under the Third Party Transfer Program, where such a transfer runs contrary to the legislative intent of the Third Party Transfer Program, would work a grave injustice to the shareholders of Kingsland HDFC, who stand to lose their homes as a result of the City's improper application of the Third Party Transfer Program to the Kingsland property. "[A]n adverse judgment in rem directly affects the property owner by divesting him [or her] of his [or her] rights in the property before the court" (*Matter of Foreclosure of Tax Liens*, 165 AD3d 1112, 1120 [2d Dept 2018] [internal quotation marks omitted]).

Furthermore, since the Kingsland property was not a distressed property, its transfer, under the Third Party Transfer Program, would unfairly and completely deprive Kingsland

HDFC of all of its equity in the Kingsland property since, under the Third Party Transfer Program, Kingsland HDFC cannot recover any surplus monies above the taxes owed (*see Matthew*, 65 AD3d at 1097). The transfer of the Kingsland property to Neighborhood Restore is also unconscionable and shocking to the conscience of the court based on the amount of the City's lien versus the substantial value of the Kingsland property. In addition, since the Kingsland property is not a distressed property, the taking of it through the Third Party Transfer Program would constitute an unlawful taking of private property without just compensation in violation of Kingsland HDFC's constitutional rights under the Takings Clause of the Fifth Amendment to the United States Constitution and article I, section 7, of the New York State Constitution.

Moreover, the City asserts that an October 14, 2015 payment by Kingsland HDFC in the amount of $3,933.21 was returned for insufficient funds, but it admits that Kingsland HDFC made payments on December 28, 2017, February 7, 2018, and March 1, 2018, under the In Rem Installment Agreement, which amounted to approximately $51,345. These payments were accepted by the City subsequent to the entry of the Judgment of Foreclosure on December 14, 2017. The City asserts that these funds paid a total of approximately $36,000 for the real property taxes out of the $77,769.81 due pursuant to the In Rem Installment Agreement.

Significantly, the City concedes that after the expiration of the four-month mandatory redemption period, it continued to accept further payments from Kingsland HDFC from April

54

16, 2018 through August 2018, totaling approximately $21,000, but it asserts that it did not credit these payments to Kingsland HDFC's account. The City did not reject these payments or notify Kingsland HDFC in any way that it could no longer redeem the Kingsland property. Instead, the City retained these payments. The City claims that it held these monies "in suspense," and that if Kingsland HDFC had completely redeemed the Kingsland property, it would have then posted these payments to Kingsland HDFC's account and removed the Kingsland property from this foreclosure action. This is inconsistent with the City's present position that Kingsland HDFC could not redeem the Kingsland property after the mandatory four-month redemption period expired. Moreover, by the retention of these monies, the City misled Kingsland HDFC into believing that it could still make payments under the In Rem Installment Agreement and that the In Rem Installment Agreement was still in effect. Kingsland HDFC asserts that if it would have known that the City was no longer honoring the In Rem Installment Agreement and that it was planning to transfer the Kingsland property, it would have sought to redeem the Kingsland property pursuant to Administrative Code § 11-412.1 (d). Thus, the City's misleading nonfeasance would result in a manifest injustice here (*see Matter of Emporium Mgt. Corp.*, 121 AD3d at 983).

Kingsland HDFC has demonstrated a meritorious defense and a reasonable excuse, warranting the vacatur of its default (*see* CPLR 5015 [a] [1]). Kingsland HDFC has established its ability to pay the taxes by selling off one of the units in the Kingsland property, and there is no prejudice to the City or Neighborhood Restore by permitting

Kingsland HDFC to redeem its property at this time (see *Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Based upon the facts and circumstances here, the court finds that "the entry of a default judgment based on the failure to pay [the taxes] would result in a disproportionately harsh result" and that "this is an appropriate case in which to exercise [the court's] broad equity power to vacate [the] default judgment" (*Matter of County of Ontario [Lundquist 1996 Living Trust]*, 155 AD3d at 1568 [internal quotation marks omitted]; *see also Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065).

As discussed above, the court has inherent authority to vacate the Judgment of Foreclosure, obtained on Kingsland HDFC's default, "'for sufficient reason and in the interests of substantial justice'" (*Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065, quoting *Woodson*, 100 NY2d at 68; *see also Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Here, there is sufficient reason to vacate the default judgment in the interests of substantial justice. Indeed, to hold otherwise would result in a grave injustice to Kingsland HDFC, grossly distort the intent and purpose of the relevant Administrative Code provisions, run counter to the express language of the Administrative Code pertaining to distressed properties, and defy principles of equity.

56

## Conclusion

Accordingly, Kingsland HDFC's motion is granted to the extent that the Judgment of Foreclosure is vacated with respect to the Kingsland property, the transfer of the Kingsland property to Neighborhood Restore is vacated and set aside, and Kingsland HDFC's title to the Kingsland property is restored.

### Motion Sequence Number 10

463 Classon Avenue Housing Development Fund Corporation (Classon HDFC) moves, by order to show cause, under motion sequence number 10, for an order: (1) pursuant to the court's inherent authority, the United States Constitution, the New York Constitution, and CPLR 6301, preliminarily and permanently restraining the City and/or their attorneys, employees, agents, representatives, third-party agents, affiliates, subsidiaries, successors, assigns, principals, consultants, and all those acting in concert with them from conveying, transferring, or in any way affecting, altering, or modifying the rights, title, and interest in and to real property located at 463 Classon Avenue, Brooklyn, New York 11238, designated on the Kings County tax map as Block 1985, Lot 5 (the Classon Avenue property); and (2) compelling the City to accept the funds necessary to remove the Classon Avenue property from the effects of the Judgment of Foreclosure dated November 27, 2017 and to discontinue this action as it relates to the Classon Avenue property.

## Facts and Procedural Background

Classon HDFC became the record owner of the Classon Avenue property by a deed dated March 26, 1992, and has owned the Classon Avenue property for approximately 27 years. Classon HDFC is a low-income housing corporation organized under article XI of the Private Housing Finance Law. The Classon Avenue property has 10 units, in which several low-income residents live.

As previously discussed, this in rem foreclosure action was commenced by the City on July 14, 2015. The Classon Avenue property was included in this in rem foreclosure action, pursuant to the Third Party Transfer Program, based upon its having municipal arrears at the time of the commencement of this action in the amount of $79,463.67, dating back to December 2001. These arrears were comprised of a DOF lien for real property taxes and other charges in the amount of $63,086.57 and a DEP lien for water and sewer charges in the amount of $16,377.10.

Classon HDFC defaulted in this foreclosure action. It claims that the reason for its default was that it never received notice of this action. The City states that no request had been made by Classon HDFC as to where it wanted notice of foreclosure to be sent. It asserts that, therefore, the DOF, pursuant to Administrative Code § 11-406, mailed notice to the name and address in the assessment roll, namely, Classon HDFC at the Classon Avenue property, and to the real estate billing name and address in the assessment roll, namely, Classon HDFC at the Classon Avenue property at Apartment 7. It maintains that whether

or not Classon HDFC actually received notice of this foreclosure action is immaterial since the DOF complied with statutory notice requirements.

As discussed above, the Judgment of Foreclosure was signed on November 27, 2017 and was entered on December 14, 2017. Classon HDFC claims that it was first notified of the Judgment of Foreclosure in late August 2018 when the City invited it to a town hall meeting. It asserts that until that time, it had no idea of the existence of this foreclosure action. Classon HDFC has submitted the affidavit of one of its shareholders, Willie Richardson, attesting to this.

Classon HDFC notes that the City has taken the position that the four-month mandatory redemption period already expired on April 16, 2018, four months from the date of the entry of the Judgment of Foreclosure, and prior to this August 2018 notification. On August 31, 2018, the City informed Classon HDFC that it intended to convey the Classon Avenue property to Neighborhood Restore, pursuant to the Third Party Transfer Program, that week. HPD scheduled a closing for September 6, 2018 to transfer properties included in the Judgment of Foreclosure to Neighborhood Restore, including the Classon Avenue property.

It is undisputed that the Classon Avenue property is worth considerably more than the tax liability that Classon HDFC owes the City. Classon HDFC contends that the City's attempt to take the Classon Avenue property from it and transfer it to Neighborhood Restore

amounts to an unremunerated taking in violation of the United States Constitution and the New York State Constitution.

Classon HDFC has produced certified checks, totaling $500,000, which it has sought to pay the City. This $500,000 amount is well above the sum required to fully satisfy the outstanding arrears on the Classon Avenue property. Classon HDFC asserts that it is ready, willing, and able to pay all taxes and charges owed, and that there is no moral or legal justification for the City to be permitted to take away and transfer the Classon Avenue property, resulting in Classon HDFC's loss and forfeiture of the Classon Avenue property.

Classon HDFC filed its order to show cause, dated September 4, 2018. Since the order to show cause, signed by the court, included a temporary restraining order, preventing the City from transferring the Classon Avenue property, pending the determination of Classon HDFC's motion, the City did not transfer the Classon Avenue property to Neighborhood Restore.

On September 7, 2018, Classon HDFC contacted HPD, seeking HPD's approval to allow its late redemption of the Classon Avenue property. An email dated September 7, 2018 from Caymary O'Garro from HPD noted that Classon HDFC had requested to pay all DOF charges. This email set forth that the total charges owed were then $115,526 for the DOF's total lien and $69,529 for the DEP's total charges, together totaling $185,055. This email further set forth the list of items that HPD needed in order to review Classon HDFC's request, which included: confirmation of ownership/ID, a copy of the deed, a certificate of

incorporation, a copy of the property registration, an attempt and/or detailed plans to clear violations on the Classon Avenue property, and the source of funds to satisfy arrears with supporting documentation. Classon HDFC submitted a late redemption application to pay the outstanding tax arrears for the Classon Avenue property, along with these listed items.

Nevertheless, by a letter dated February 4, 2019, HPD denied Classon HDFC's late redemption application. In this letter, HPD acknowledged that it had received a copy of Classon HDFC's ID, the deed, the certificate of incorporation, a copy of the property registration, and a letter setting forth Classon HDFC's plans to clear the Classon Avenue property's Housing Maintenance Code violations. HPD further acknowledged that on December 4, 2018, it confirmed the filing of the Dismissal Request Form by Classon HDFC.

HPD claimed, however, in this February 4, 2019 letter, that the late redemption application did not include sufficient proof of Classon HDFC's source of funds to satisfy the outstanding arrears or proof that the Housing Maintenance Code violations were sufficiently cleared. Specifically, HPD stated that it had requested from Classon HDFC proof of funds to pay the Classon Avenue property's outstanding tax arrears, and Classon HDFC had provided the first page of an online printout of a Chase Bank IOLTA account that did not show the name of the account holder or any reference to Classon HDFC. HPD further stated that it subsequently requested an official bank statement from an account of Classon HDFC, and Classon HDFC provided a letter from Signature Bank stating that this letter served as a confirmation that "Classon HDFC, a sub account under Jeffrey Zwick and Associates as

61

Escrow Agent," had a "relationship balance" of $500,000. HPD claimed that it was unable to verify these purported funds due to Signature Bank's protocol. HPD set forth that although Classon HDFC was given several extensions of time, it never submitted adequate proof of funds showing that it was able to pay the tax arrears.

HPD, in this February 4, 2019 letter, further stated that Classon HDFC failed to meet the housing code violation clearance threshold that it requires of late redemption applicants. It set forth that as of November 2018, the Classon Avenue property had 172 violations (45 class A violations, 83 class B violations, and 44 class C violations). It stated that in order to meet its violations clearance threshold, Classon HDFC was required to either: (1) clear 80% of the total violations, i.e., clear 138 violations, bringing the total remaining violations down to 34; or (2) bring the total number of class B and class C violations down to two per dwelling unit. HPD claimed that after granting Classon HDFC several extensions of time to clear these violations, it conducted two inspections of the Classon Avenue property in December 2018 and determined that the threshold was not met, as the Classon Avenue property had a total violation count of 109 (25 class A violations, 42 class B violations, and 42 class C violations) and 8.4 class B violations and class C violations per dwelling unit.

## Discussion

Administrative Code § 11-424 governs a late redemption application to the City for the release of property acquired by in rem tax foreclosure. In order to seek the release of such property, an applicant must establish that he or she is a party who had an interest in the

subject real property as "either owner, mortgagee, lienor, or encumbrancer at the time of the city's acquisition thereof" (Administrative Code § 11-424 [a] [1]). An applicant is also required to file an application with the Department of Citywide Administrative Services, pay the required fees, and submit specific supporting documentation, including a certified search of the City Register, stating the recording date of the City's deed and the basis of the applicant's interest in the real property (*see* Administrative Code § 11-424 [a] [2]; [c]).

There is no requirement in Administrative Code § 11-424 that an applicant provide proof of its source of funds to satisfy outstanding arrears or proof that Housing Maintenance Code violations are sufficiently cleared. The City cites no section of the Administrative Code, which sets forth any such requirements. The City relies upon 19 RCNY 13-02 (b) (2). 19 RCNY 13-02 (b) (2), however, does not address the late redemption of property acquired in rem, but only addresses the entry into an installment agreement to pay a property's arrears "during the period commencing on the date judgment is entered pursuant to Administrative Code § 11-412.1(b) authorizing the award of possession of the property, and ending upon the expiration of four months immediately following such date," i.e., the four-month mandatory redemption period.

19 RCNY 13-02 (b) (2) provides that when the DOF "receives a request for an installment agreement for a class one or class two property against which an in rem foreclosure judgment has been entered, the [DOF] may refer such application to [HPD] for a recommendation as to whether such installment agreement should be granted." The City

asserts that here, it referred Classon HDFC's application to HPD, and that the factors listed in 19 RCNY 13-02 (b) (2) for evaluating whether HPD should recommend that an installment agreement be granted should also be used in determining whether a late redemption should be permitted.   19 RCNY 13-02 (b) (2) lists, among the factors to be included as the basis for such recommendation, the record of Housing Maintenance Code violations, including but not limited to, class B violations and class C violations (19 RCNY 13-02 [b] [2] [ii]).  However, 19 RCNY 13-02 (b) (2) does not state that an owner is required to clear 80% of the total violations, or bring the total number of class B and class C violations down to two per dwelling unit.  In fact, there is no requirement that the owner clear these violations prior to the entry into an installment agreement.  The City concedes that Classon HDFC submitted a letter setting forth its plans to clear the Classon Avenue property's Housing Maintenance Code violations.  In view of Classon HDFC's plan to correct its Housing Maintenance Code violations, the fact that some Housing Maintenance Code violations may not have yet been cleared did not provide a valid basis for the City to have denied Classon HDFC's late redemption application.

Another factor listed in 19 RCNY 13-02 (b) (2) for evaluating whether an installment agreement should be granted, which HPD invoked in deciding Classon HDFC's application for late redemption is the "[f]inancial capacity of the owner" (19 RCNY 13-02 [b] [2] [v]).  The City claims that although Classon HDFC made numerous assertions that it had the funds to pay all arrears, it did not provide sufficient documentation to support this contention.  The

City acknowledges that Classon HDFC submitted a letter from Signature Bank, which stated that Classon HDFC had a balance of $500,000 as of the close of business on November 8, 2018. However, the City states that HPD rejected this proof because it was not "an official bank statement." The City does not comment on the series of official bank checks, adding up to $500,000, drawn on Classon HDFC's Signature Bank account, dated September 4, 2018, and made payable to the DOF, which demonstrate Classon HDFC's financial capacity to pay the arrears owed.

Moreover, 19 RCNY 13-02 (b) (2) is only applicable where the owner seeks to enter into an installment agreement with the City. There is no basis to require the owner to demonstrate its financial capacity to make future payments if there is no installment agreement and the amount of arrears has been paid in full. Under Administrative Code § 11-424, there is no reason to require that an owner submit proof of financial capacity in a late redemption application because the owner either pays the amount owed and the property is redeemed, or it does not and the property is not redeemed.

19 RCNY 13-01, entitled "Late Payments," governs late redemption payments. It provides as follows:

> "(a) Application for release of property by the City. Receipt and deposit by the New York City Department of Finance of a payment made with respect to a property that was acquired by the City through in rem foreclosure shall not cause the release of the City's interest in the property unless such payment has been made in compliance with the provisions of § 11-424 of the Administrative Code of the City of New York.

(b) Application to vacate and set aside final judgment for class one and class two properties. If a payment of arrears of real property taxes and other real property related charges is tendered for a property classified as class one or class two under § 1802 of the Real Property Tax Law with respect to which a final judgment in foreclosure has been entered pursuant to § 11-412.1 (b) of the Administrative Code of the City of New York more than four months after the date of entry of such final judgment, receipt and deposit by the New York City Department of Finance of any such payment shall not constitute receipt of the payment required to vacate and set aside such final judgment."

Thus, 19 RCNY 13-01 (a) makes clear that the release of the City's interest in property acquired through in rem foreclosure requires nothing more than compliance with Administrative Code § 11-424. While 19 RCNY 13-01 (b), which pertains to class one and class two properties that are distressed and subject to the Third Party Transfer Program, states that the receipt and deposit by the DOF of all arrears after the four-month mandatory redemption period has passed will not constitute receipt of the payment required to vacate and set aside such final judgment, the City concedes that it grants discretionary redemption to class one and class two properties (to which the special procedures of Administrative Code § 11-412.1 applies) after the four-month mandatory redemption period has passed.

The City argues that it has broad discretion to grant or deny an application to redeem property after the mandatory four-month redemption period has expired. However, even where the City has broad discretion, such discretion is not completely unfettered and cannot be abused. Here, HPD's denial of Classon HDFC's application had no reasonable basis in law, and was arbitrary and capricious.

66

While the City relies upon the fact that some Housing Maintenance Code violations remain on the Classon Avenue property, a person's real property cannot be taken from them merely because of the existence of Housing Maintenance Code violations on the property. Classon HDFC has not abandoned the Classon Avenue property, but, as acknowledged by HPD, in its February 4, 2019 letter, has submitted a letter setting forth its plans to clear the Classon Avenue property's Housing Maintenance Code violations. As discussed above, the purpose of the Third Party Transfer Program is to prevent the abandonment of troubled buildings. It was intended to be utilized where owners are irresponsible and are unwilling or unable to correct violations and to pay off tax liens. It was not intended to cause the forfeiture of the valuable property rights of owners who are willing and able to correct violations and pay off tax liens.

Classon HDFC is actively attempting to pay off all of its arrears to the City, which has refused to accept its payments. The City, instead, seeks to transfer the Classon Avenue property to Neighborhood Restore, stripping Classon HDFC of all of its equity in the Classon Avenue property. The transfer of the Classon Avenue property, pursuant to the Third Party Transfer Program, would constitute an unlawful taking of private property without just compensation in violation of Classon HDFC's constitutional rights under the Takings Clause of the Fifth Amendment to the United States Constitution and article I, section 7, of the New York State Constitution. The Classon Avenue property has a value substantially in excess of the tax lien, and its taking by the City in this in rem foreclosure action and its transfer

pursuant to the Third Party Transfer Program will not permit Classon HDFC to recoup that excess. Moreover, such a transfer would take away the rights of Classon HDFC's shareholders in the Classon Avenue property, where they reside.

The court may exercise its broad equity power to vacate the default judgment, and it has inherent authority to vacate its own Judgment of Foreclosure, obtained on Classon HDFC's default, "'for sufficient reason and in the interests of substantial justice'" (*Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065, quoting *Woodson*, 100 NY2d at 68; *see also Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Here, Classon HDFC's default must be vacated in the interests of substantial justice. Classon HDFC has established its ability to pay the taxes after the redemption period ended and the lack of any prejudice to the City (*see Matter of County of Genesee [Spicola]*, 125 AD3d at 1477; *Matter of County of Genesee [Butlak]*, 124 AD3d at 1331). Moreover, Classon HDFC seeks to redeem the Classon Avenue property, and the Third Party Transfer Program was not intended to strip a property owner of its property rights under the circumstances presented here.

"[T]he entry of a default judgment based on the failure to pay [the taxes] would result in a disproportionately harsh result," and "this is an appropriate case in which to exercise [the court's] broad equity power to vacate [the] default judgment" (*Matter of County of Ontario [Lundquist 1996 Living Trust]*, 155 AD3d at 1568 [internal quotation marks omitted]; *see also Matter of County of Ontario [Middlebrook]*, 59 AD3d at 1065). To hold otherwise would defy principles of equity and fundamental fairness, and result in an unduly harsh and unjust result, which was not the purpose or intent of the Third Party Transfer Program.

Due to the temporary restraining order, the City has not yet transferred title of the

Classon Avenue property to Neighborhood Restore. Inasmuch as no deed has yet been

executed and the court finds that the vacatur of the Judgment of Foreclosure with respect to

the Classon Avenue property is warranted, Classon HDFC continues to have all of its rights

as an owner of the Classon Avenue property. Furthermore, since the Commissioner of

Finance did not execute a deed conveying the Classon Avenue property to the City or to a

third party within eight months after the entry of final judgment on December 14, 2017 and

the court finds that such a transfer cannot be permitted, this in rem foreclosure action must

be discontinued as against the Classon Avenue property (*see* Administrative Code § 11-412.1

[1]). Under these circumstances, the Judgment of Foreclosure must be vacated and set aside

as to the Classon Avenue property, and Classon HDFC's status as the owner of the Classon

Avenue property must be restored.

### Conclusion

Accordingly, Classon HDFC's motion is granted to the extent that the Judgment of

Foreclosure is vacated with respect to the Classon Avenue property, and Classon HDFC's

title to the Classon Avenue property is restored.

This constitutes the decision, order, and judgment of the court.

ENTER FORTHWITH,

J. S. C.