**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

McCONNELL DORCE, CECELIA JONES, and
SHERLIVIA THOMAS-MURCHISON,
individually and on behalf of all others similarly
situated,

                    Plaintiffs,

     v.

CITY OF NEW YORK, LOUISE CARROLL
(Commissioner of the New York City Department of
Housing Preservation and Development), SHERIF
SOLIMAN (Commissioner of the New York City
Department of Finance), NEIGHBORHOOD
RESTORE HOUSING DEVELOPMENT FUND
CORP., and BSDC KINGS COVENANT
HOUSING DEVELOPMENT FUND COMPANY,
INC.,

                    Defendants,

      -and-

585 NOSTRAND AVENUE HOUSING
DEVELOPMENT FUND CORPORATION and 248
MADISON STREET HOUSING DEVELOPMENT
FUND CORPORATION,

                    Nominal Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. 1:19-cv-02216-JGK

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs McConnell Dorce, Cecelia Jones, and Sherlivia Thomas-Murchison (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this action against defendants the City of New York (the "City"), Louise Carroll[1],

---

[1] The original complaint names Maria Torres-Springer as a defendant. As a result of Maria Torres-Springer's separation from office, Louise Carroll as her successor is "automatically substituted as

Commissioner of the New York City Department of Housing Preservation and Development ("HPD"); Sherif Soliman, Commissioner of the New York City Department of Finance ("DOF," and together with the City and HPD, referred to herein as the "Municipal Defendants"); Neighborhood Restore Housing Development Fund Corp. ("Neighborhood Restore"), and Bridge Street Kings Covenant Housing Development Fund Company, Inc. ("Bridge Street," together with Neighborhood Restore "TPT Defendants," and collectively with the Municipal Defendants, "Defendants"). Plaintiffs Cecelia Jones and Sherlivia Thomas-Murchison also name 585 Nostrand Avenue Housing Development Fund Corporation[2] ("585 Nostrand Avenue HDFC") and 248 Madison Street Housing Development Fund Corporation ("248 Madison Street HDFC"), respectively, as nominal parties ("Nominal Parties"), in the alternative, in the event that the Court rules that the claims asserted by Ms. Jones and Ms. Thomas-Murchison are not maintainable as direct actions.

---

a party," and later proceedings such as the instant amended complaint "should be in the substituted party's name." Fed. R. Civ. P. 25(d).

[2] A Housing Development Fund Corporation ("HDFC") is an entity organized pursuant to Section 573 of Article XI of the New York State Housing Finance Law as a cooperative corporation for the purpose of housing improvement and long-term homeownership for low-income individuals and families. Generally, an HDFC's sole asset is a multi-family residential building, and shareholders of the HDFC own and reside in cooperative apartment units in the building that are appurtenant to their shares and their share value. Each HDFC is customarily managed and operated by a board of directors that is made up of residents of the building owned by the HDFC. Under New York law, Defendant HPD is designated as the "supervising agency" of all HDFCs developed and operated within New York City, and owes various duties to HDFCs and their resident shareholders.

## INTRODUCTION

1.      The City's Third Party Transfer Program (the "TPT Program")[3] is an unconstitutional and fundamentally unfair process designed to seize property owned largely by elderly persons of color, divesting them of the value and long-term security, and of the opportunity for upward mobility, that is inherent in their ownership of a home.  Plaintiffs and members of the putative class had their homes taken by Defendants pursuant to the TPT Program.  Plaintiffs bring this putative class action to seek redress for this unconstitutional and discriminatory conduct.

2.      Pursuant to the TPT Program, the Municipal Defendants seize private property through *in rem* foreclosure proceedings and convey the property for free to real estate developers— such as Defendants Neighborhood Restore and Bridge Street—that are formed, guided, and/or hand-picked by the City for participation in the TPT Program.

3.      The purported basis for these seizures is overdue taxes.  Municipal Defendants have taken the position that they can take anybody's property so long as, allegedly, (i) the property owner owes taxes and (ii) the property is physically near a statutorily "distressed" property (*i.e.* a property that (a) has accrued at least 15% of its value in tax liens and (b) has five or more housing code violations or an unpaid lien of at least $1,000 in for work to repair or eliminate a dangerous or unlawful condition).

4.      Tax collection is merely a pretext for taking the properties because Municipal Defendants collect no taxes from the TPT Program's seizures.  For example, if Municipal Defendants seize a $2 million property with $3,000 in tax debt, under the TPT Program, the City receives no payment of the $3,000 tax debt and does not retain the property, while the TPT

---

[3] The TPT Program is codified at Title 11, Chapter 4 of the New York City Administrative Code (the "Code"), as amended by Local Law 37 of 1996 and Title 28, Chapter 8 of the Rules of the City of New York ("Local Law 37").

Defendants or other developers receive an unencumbered $2 million property in exchange for a promise to provide "affordable" housing. The property owner receives nothing.[4] There is no process or procedure for the property owner to reclaim the excess value in his property above the amount of tax liens on the property (the "Surplus Equity").

5.      Defendants' exploitation of the TPT Program has gotten worse in recent years. Defendants have seized dozens of properties at a time through mass *in rem* foreclosure proceedings directed against the properties themselves—where the property owners are not party to, and do not get notice of, the foreclosure proceedings or, at most, receive an opaque notice referencing dozens of properties subject to seizure. The homes Defendants have seized belong primarily to elderly and minority homeowners living in communities historically populated by persons of color.

6.      Plaintiffs seek redress for this unconstitutional and discriminatory conduct, including damages equal to their Surplus Equity in their properties.

## THE PARTIES

### *Plaintiffs*

7.      At all relevant times, Plaintiff McConnell Dorce has been a resident of Kings County, New York. Plaintiff Dorce is an elderly retired machinist and former ambulance driver. Mr. Dorce is a Caribbean American immigrant who came to the United States from Haiti over four decades ago. His property is located in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans. Mr.

---

[4] This is no mere hypothetical. *See* Sarissa Phillips-Singletary, *City Council Housing Chair Expresses Concern Over Mayor's Plan to Expand Seizure of Private Residential Properties*, New York City Council (Jan. 10, 2019), https://on.nyc.gov/33mIEG3 (Robert E. Cornegy, Jr., New York City Council Member and Chair of the Council's Committee on Housing and Buildings, acknowledging that "the home of a black senior in my community valued at over $2 million was transferred for outstanding municipal arrears of only $3,000, which turned out to be a record-keeping error on the part of the City.").

Dorce was the owner of 373 Rockaway Parkway, Brooklyn, New York (the "373 Rockaway Parkway Property"), which is an approximately 3,200 square foot multi-family home located in a community known as East New York, Brooklyn.

8.     Municipal Defendants took title to Mr. Dorce's property, which he owned free and clear of any mortgage, and transferred it to Neighborhood Restore under the TPT Program, utilizing the summary *in rem* foreclosure proceedings of Code § 11-404 *et seq*.  Pursuant to the TPT Program, on July 14, 2015, the City commenced the mass action *In Rem Tax Foreclosure Action No. 53, Borough of Brooklyn*, Index No. 8700/2015 (Sup. Ct. Kings Cty.) ("*In Rem 53*") against a list of over 180 properties that included the 373 Rockaway Parkway Property.  Mr. Dorce received no notice of this lawsuit.  On November 27, 2017, New York state court Justice Partnow signed a proposed judgment drafted by the City against the 373 Rockaway Parkway Property and 64 other properties.  The judgment was entered by the Kings County clerk on December 5, 2017.  Mr. Dorce received no notice of this judgment.  On February 7, 2018, the City recorded the judgment in the chain of title of the 373 Rockaway Parkway Property.  And the City, through the DOF, recorded a deed in the chain of title of the 373 Rockaway Parkway Property transferring the property to Defendant Neighborhood Restore on September 21, 2018.

9.     Through this process, Mr. Dorce lost title to his property and received no compensation for his Surplus Equity, even though the value of the 373 Rockaway Parkway Property far exceeded any putative tax liens.  According to DOF's notice of property value ("NOPV"), the value of the 373 Rockaway Parkway Property at the time Defendants took it from Mr. Dorce was approximately $226,000.  In reality, the true market value of the 373 Rockaway Parkway Property was substantially higher.  Municipal Defendants assert that as of June 30, 2015 the 373 Rockaway Parkway Property owed $45,132.73 in various tax and water charges.

10.     Mr. Dorce did not learn that Defendants had taken title to his property until approximately September 24, 2018, when agents for Defendant Neighborhood Restore posted signs in the hallway of the 373 Rockaway Parkway Property notifying Mr. Dorce's tenants that the building was under new ownership and management.  Mr. Dorce was not provided any opportunity to claim his Surplus Equity in his property.

11.     On or about August 3, 2018, eight months after the seizure judgment against the 373 Rockaway Property, HPD demanded and accepted a $8,610.86 payment from Mr. Dorce (by check made payable to the NYC Water Board) and an additional $8,306.73 (by check made payable to the Defendant DOF).  Even after the transfer of title of 373 Rockaway Parkway to Neighborhood Restore, the Municipal Defendants continued to demand and accept payments for 373 Rockaway Parkway Property from Mr. Dorce.

12.     At all relevant times, Plaintiff Cecelia Jones has been a resident of Kings County, New York.  Ms. Jones is an elderly, retired home health aide who worked in New York City for 26 years.  She is a Caribbean American immigrant from Guyana, and she moved to the United States in 1983.  Her home is in an HDFC cooperative apartment in Crown Heights in Brooklyn, where she has lived since 1996.  Ms. Jones's property is located in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans.

13.     Plaintiff Cecelia Jones is the holder of 250 shares in 585 Nostrand Avenue HDFC, which owned the property located at 1197 Dean Street, Brooklyn, New York, which is also known as 585 Nostrand Avenue (the "585 Nostrand Avenue Property").  The 585 Nostrand Avenue Property is a four-story multi-unit apartment building, and Ms. Jones had the right to reside in her

apartment unit 2A—which right is appurtenant to her right as a cooperative shareholder in the 585 Nostrand Avenue HDFC since 1997.

14.     Ms. Jones's ownership right was extinguished or otherwise taken by the Municipal Defendants and transferred to Neighborhood Restore under the TPT Program.  The 585 Nostrand Avenue Property was included in *In Rem 53*.  Ms. Jones received no notice of the *In Rem 53* lawsuit.  On November 27, 2017, New York state court Justice Partnow signed a proposed judgment drafted by the City against the 585 Nostrand Avenue Property and 64 other properties. Ms. Jones received no notice of this judgment.  The judgment was entered by the Kings County clerk on December 5, 2017.  On February 7, 2018, the City recorded the judgment from *In Rem 53* in the chain of title of the 585 Nostrand Avenue Property.  Ms. Jones received no notice of the *In Rem 53* judgment.  On September 21, 2018, the City through the DOF recorded a deed in the chain of title of the 585 Nostrand Avenue Property, effecting the taking and transferring the property to Defendant Neighborhood Restore.

15.     This post-judgment transfer divested 585 Nostrand Avenue HDFC of its sole asset, reduced the value of Plaintiff Jones' cooperative shares to zero, and converted Ms. Jones to a renter in her own home.  Neither 585 Nostrand Avenue HDFC nor Ms. Jones received any compensation for their Surplus Equity, even though the value of the 585 Nostrand Avenue Property far exceeded any putative tax liens.  According to DOF's NOPV, the value of the 585 Nostrand Avenue Property at the time Defendants took it was approximately $736,000.  In reality, the true market value of the 585 Nostrand Avenue Property was substantially higher.

16.     Municipal Defendants assert that as of June 30, 2015 the 585 Nostrand Avenue Property owed $160,760.20 in various tax and water charges.  Ms. Jones did not learn that

Defendants had taken her property until approximately October 2018, and she was not provided any opportunity to claim her Surplus Equity in her property.

17.    At all relevant times, Plaintiff Sherlivia Thomas-Murchison has been a resident of Kings County, New York.   Plaintiff Thomas-Murchison is an African American woman, a hardworking paralegal by training, and her property is located in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans.  Plaintiff Thomas-Murchison was a shareholder in 248 Madison Street HDFC, which owned the property located at 248 Madison Street, Brooklyn, New York (the "248 Madison Street Property").  The 248 Madison Street Property is a 4 story multi-unit apartment building and Ms. Thomas-Murchison had the right to reside in her apartment unit 4L as a cooperative shareholder.

18.    Ms. Thomas-Murchison is the daughter of Margaret Blow, the former treasurer of 248 Madison Street HDFC, and from whom Plaintiff Thomas-Murchison and her family inherited an equitable estate interest in unit 4R which was owned and occupied by her mother before her mother's death.  Plaintiff Thomas-Murchison's shareholder title and value was extinguished or otherwise taken by the Municipal Defendants under the TPT Program when the Municipal Defendants effected a seizure and transfer of the 248 Madison Street Property to Neighborhood Restore.

19.    On February 23, 2007, the City commenced the action *In Rem Tax Foreclosure Action No. 51*, Borough of Brooklyn, Index No. 8700/2007 (Sup. Ct. Kings Cty.) ("*In Rem 51*"), against scores of properties, including the 248 Madison Street Property.  Ms. Thomas-Murchison received no notice of this lawsuit.  On October 26, 2011, New York state court Justice Martin signed the proposed judgment, which the City drafted, as to the 248 Madison Street Property and

32 other properties.  The judgment was entered by the Kings County clerk on or around November 2, 2011.  Ms. Thomas-Murchison received no notice of this judgment.

20.     On December 19, 2011, the City recorded the judgment in *In Rem 51* in the chain of title of the 248 Madison Street Property.  On August 24, 2012, the City, acting through Defendant DOF and pursuant to the judgment, entered a deed in the chain of title of the 248 Madison Street Property, transferring the property to Defendant Neighborhood Restore.

21.     This post-judgment transfer divested 248 Madison Street HDFC of its sole asset, reduced the value of Plaintiff Thomas-Murchison's cooperative shares to zero, and deprived Ms. Thomas-Murchison of access to her home, rendering her homeless.  Neither 248 Madison Street HDFC nor Ms. Thomas-Murchison received any compensation for their Surplus Equity, even though the value of the 248 Madison Street Property far exceeded any putative tax liens. According to DOF's NOPV, the value of the 248 Madison Street Property at the time Defendants took it was approximately $398,000.  In reality, the true market value of the 248 Madison Street Property was substantially higher.  Municipal Defendants assert that as of January 10, 2007 the 248 Madison Street Property owed $110,352.44 in various charges asserted to be water charges, property tax charges, and emergency repair charges.  Ms. Thomas-Murchison did not learn that Defendants had taken her property until in or about April 2016, and she was not provided any opportunity to claim her Surplus Equity in her property.  Ms. Thomas-Murchison and her family were also dispossessed of inheritance rights to the shares of the cooperative which had been owned by her deceased parents, denying her of the Surplus Equity that she would have inherited.

***Defendants***

22.     Municipal Defendants are the City and its agents, including the Commissioner of the New York City Department of Housing Preservation and Development ("HPD") and the

Commissioner of the Department of Finance ("DOF"), that operate the TPT Program by selecting and seizing numerous properties pursuant to in rem foreclosure proceedings or otherwise contribute and participate in the scheme to take properties of Plaintiffs and those similarly situated—primarily elderly minority homeowners—without just compensation.

23.     Defendant City is a government and municipal entity existing within the boundaries of the five boroughs of the City of New York, State of New York, and lies within this judicial district.  The City is responsible for the illegal and unconstitutional application of the TPT Program to Plaintiffs' properties.

24.     Defendant HPD is a department of the Defendant City that, among other functions, selects properties to for the City to seize through the TPT Program and effectuates their seizures and transfers to favored third party real estate developers.

25.     Defendant DOF is a department of the Defendant City that selects properties for the City to seize through the TPT Program and effectuates their seizures and transfers to favored third party real estate developers.  DOF also administers installment plans for homeowners to pay overdue property taxes and other charges.

26.     TPT Defendants are real estate developers to whom the City conveys the properties it seizes through the TPT Program.  The City selects real estate developers such as the TPT Defendants to receive valuable properties for free through the TPT Program.  These fortunate real estate developers are selected by politicians in a non-competitive and conflicted process used to reward political allies.  For example, Neighborhood Restore's Board of Directors includes Elizabeth Oakley, Deputy Commissioner for HPD's Office of Development. *See Missions & Board*, Neighborhood Restore, http://www.neighborhoodrestore.org/about/ (last visited July 27, 2021).  On information and belief, the TPT Defendants consult with the Municipal Defendants

concerning the selection of properties for inclusion in the TPT Program and target properties generally owned by elderly persons of color.

27.     Defendant Neighborhood Restore is a New York corporation organized and existing under the laws of the State of New York, including but not limited to Article XI of the New York Private Housing Finance Law.  Neighborhood Restore operates within the State of New York and within this judicial district, and maintains its primary place of business at 150 Broadway, Suite 2101, New York NY 10038.  Neighborhood Restore, through coordination with the City, obtained title to the properties previously owned by Plaintiffs Dorce, Jones, and Thomas-Murchison when Municipal Defendants transferred those properties under the TPT Program.

28.     Defendant Bridge Street is a New York corporation organized and existing under the laws of the State of New York, including but not limited to Article XI of the New York Private Housing Finance Law.  Bridge Street is an affiliate or subsidiary or otherwise controlled or directed by Bridge Street Development Corporation, a New York corporation organized and existing under the laws of the State of New York.  Bridge Street operates within the State of New York and within this judicial district, and maintains its primary place of business at 460 Nostrand Avenue, Brooklyn, New York 11216.  Bridge Street, through coordination with the City and Neighborhood Restore, obtained title to Plaintiff Thomas-Murchison's property.

***Nominal Parties***

29.     585 Nostrand Avenue HDFC is named as a Nominal Party in the event that the Court concludes that the claims asserted by Plaintiff Cecelia Jones are not maintainable as direct claims, but must instead be brought derivatively.  585 Nostrand Avenue HDFC is a corporation organized under the laws of the State of New York.

30.     248 Madison Street HDFC is named as a Nominal Party in the event that the Court concludes that the claims asserted by Plaintiff Sherlivia Thomas-Murchison are not maintainable as direct claims, but instead must be brought derivatively.  248 Madison Street HDFC is a corporation organized under the laws of the State of New York.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights and under 42 U.S.C. §§ 1983 *et seq.*

32.     Venue is proper in this Court pursuant to 42 U.S.C. §§ 19831 *et seq.*, because this judicial district lies in a State in which the unlawful practices occurred.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), because Defendants maintain facilities, conduct business, and reside in this district.

33.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

## BACKGROUND AND FACTUAL ALLEGATIONS

### *New York State's In Rem Grant to Municipalities*

34.     Legislation creating the TPT Program was presented to the New York City Council by HPD in 1996 as amendments to the *in rem* tax-lien collection provisions of New York City local law, which provisions were previously promulgated pursuant to New York State's grant of

*in rem* tax collection powers to municipalities across New York State following the Great Depression of the 1930s.

35.     These specific *in rem* powers were granted to tax districts across New York State by the New York State Legislature for the collection of tax liens, starting on or about June 3, 1939, under Section 165 of Title 3 of Article VII A of Chapter 692 of the 1939 Laws of New York State (referred to herein as "Tax Law § 165").  Tax Law § 165 was further amended from time to time, including through Chapter 602 of the 1993 Laws of New York State.  It is now codified as Section 1120 of the Real Property Tax Law of New York Consolidated Laws ("New York State's In Rem Grant to Municipalities").

36.     *In rem* foreclosure proceedings are considered summary proceedings.  New York State's In Rem Grant to Municipalities expressly confines the use of *in rem* foreclosure procedures to actions for the purpose of collecting "Tax Liens."  "Tax Liens" consist of unpaid municipal charges owed to "Tax Districts"[5] that are classified as taxes over the period of time prescribed in state and local law, and at the end of this period these charges, if still unpaid, are classified as liens for collection by the Tax District.

37.     Pursuant to New York State's In Rem Grant to Municipalities, starting in 1948, New York City Council enacted *in rem* foreclosure provisions to collect Tax Liens.  Those provisions are now codified in Section 404 of Chapter 4, Title 11 of the Code.  These local New York City laws are hereinafter collectively referred to herein as "New York City's In Rem Laws."

---

[5] "Tax Districts" are defined in the applicable law as "a county, city, town, village or school district, having power to enforce the collection of taxes on real property by tax sale."

*The TPT Program*

38.     New York City experienced urban property blight in certain outer borough communities of color in the 1970s and 1980s.  During this period, largely in response to new rent stabilization laws, owners of large multiple dwelling residential buildings in the Bronx, Upper Manhattan, and Brooklyn simply abandoned their buildings, declined to pay their tax obligations to the City, and neglected property maintenance and health and safety issues at the buildings.  By abandoning their buildings, these owners left behind tenants without any building-wide property, maintenance, health and safety services, and buildings that were experiencing or at risk of experiencing physical decline.  For buildings against which Tax Liens accrued, New York City invoked the specific *in rem* powers granted to it by New York State's In Rem Grant to Municipalities, in many instances auctioning the buildings to pay of the City's debt, and in other cases taking ownership of multi-family of buildings in which tenants had been neglected and were left abandoned by the prior owners.

39.     Over time, HPD considered the buildings or properties that were taken through *in rem* proceedings, and owned and managed by them over time, to be distressed.  Distressed buildings were those upon which taxes were outstanding and in which tenants were experiencing the conditions that resulted from general neglect by their owners.  HPD's policy prior to 1996 with respect to distressed buildings was twofold:  it had one program under the New York State Housing Finance Law, and another program where the City directly managed the properties, as set forth below.

40.     *First*, in certain instances, HPD would transfer management and ownership of the distressed buildings to non-profit cooperative corporations, the shareholders of which are the prior tenants who resided in the apartment units of the distressed buildings.  In those instances, title to

14

the distressed buildings were transferred to not-for-profit or charitable corporations organized pursuant to Section 573 of Article XI of the New York State Housing Finance Law (referred to herein as "HDFCs"). Generally, HDFCs are organized under New York State Law as cooperative corporations for the overall purpose of housing improvement and homeownership, and primarily to keep the apartment units affordable over time to the working families residing in those units.

41. With the HDFC model, tenants of distressed buildings are given the option to become shareholders in the cooperative corporations. As shareholders in the HDFCs, tenants become owners of their particular apartment units by virtue of their pro-rata share ownership in the cooperative corporation. Each share affords an owner the right to a proprietary lease to an appurtenant apartment, and thus the right to reside in that apartment long-term without the risk of displacement. Each share also provides the owner with an equity interest in the particular HDFC and/or the HDFC-owned building and its related tangible and intangible assets (such as the value of commercial leases held by the HDFC).

42. *Second*, in other instances, where ownership and management of the buildings taken *in rem* were under the control and direction of HPD, HPD advanced a policy of City management of these distressed buildings, and at times utilized what was commonly referred to as an "Article 7A Administrator" to manage the buildings. By the mid 1990s—according to testimony provided to the New York City Council by the then commissioner of HPD (Deborah Wright) on or about January 29, 1996—New York City found itself owning a substantial portfolio of properties taken through *in rem* proceedings, at great expense to the City. As Commissioner Wright described in her January 29, 1996 testimony, the costs of maintaining and operating these buildings were "magnified by the hardships to tenants, the devastating impact on local real estate markets and on neighborhood quality of life."

43.     In April 1996, the City (through the then HPD Commissioner Lilliam Barrios-Paoli) sought from and was granted the right by the New York City Council—but not by the New York State Legislature—to broaden and utilize the *in rem* foreclosure powers purportedly granted to it by New York State, in order to "permit the DOF Commissioner to transfer title to a tax foreclosed [distressed] building either to the City or a third party designated by the Commissioner of HPD."   In seeking this authority, the City also sought and was granted the authority to broaden the classification of properties that could be taken through *in rem* proceedings, and also sought to change the purpose for those takings.

44.     The City thus proposed, and New York City Council enacted, a broadened statutory definition of "distressed property" under its 1996 Local Law No. 37:

> "Distressed property."   Any parcel of class one or class two real property that is subject to a tax lien or liens with a lien or liens to value ratio, as determined by the commissioner of finance, equal to or greater than fifteen percent and that meets one of the following two criteria:
>
>> i. such parcel has an average of five or more hazardous or immediately hazardous violations of record of the housing maintenance code per dwelling unit; or
>>
>> ii. such parcel is subject to a lien or liens for any expenses incurred by the department of housing preservation and development for the repair or the elimination of any dangerous or unlawful conditions therein, pursuant to section 27-2144 of this code, in an amount equal to or greater than one thousand dollars.

*See* Code § 11-401.4, *et seq*.

45.     According to the testimony of then HPD Commissioners Deborah Wright and Lilliam Barrios-Paoli before the New York City Council in January 1996 and April 1996, Local Law 37 was intended to allow the City to seize and transfer private properties that DOF and/or HPD designate as "distressed properties" pursuant to Code § 11-401.4.

46.     As a result of the expansive definition of "distressed property," Local Law 37 became HPD's and the City's tool under which the City advanced the TPT Program.

47.     The taking of properties designated as "distressed" is effectuated under Section 11-401.1(c), Section 11-404(a), and the additional provisions of Chapter 4 of Title 11 of the New York City Administrative Code enacted under Local Law No. 37, and the rules and regulations promulgated thereunder.  Specifically, Code § 11-404(a) provides that:

> Whenever it shall appear that a tax lien or tax liens has or have been due and unpaid for a period of at least one year from the date on which the tax, assessment or other legal charge represented thereby became a lien, such tax lien or tax liens, except as provided in subdivision b of this section or otherwise provided by this chapter, may be summarily foreclosed in the manner provided in this chapter, notwithstanding the provisions of any general, special or local law and notwithstanding any omission to hold a sale of a tax lien or tax liens prior to such foreclosure.  A bill of arrears or any other instrument evidencing such tax lien or tax liens shall be evidence of the fact that the tax lien or tax liens represented thereby has not or have not been paid to the city or sold by it.

48.     By 2015, HPD expanded the bases on which it would invoke Local Law No. 37 to take and nullify the title of private-property owners, or the title of HDFC-cooperative owners, utilizing Code 11-404(a), *et seq.*  HPD currently invokes Code § 11-404(a) to seize properties that HPD determines are not viable properties to be auctioned to the highest bidder in a regular Tax Lien or foreclosure sale, purportedly on the basis of HPD's unilateral conclusion that the properties are in generally poor condition and thus less marketable at the time of the taking or seizure.

49.     This expanded basis for invoking *in rem* powers to foreclose was asserted by HPD's commissioner Maria Torres-Springer, in affidavits submitted in 2017 in *in rem* foreclosure proceedings before New York State Supreme Courts, and in support of the City's application to such courts for the award of *in rem* foreclosure judgments against certain listed properties.  This expanded purpose for invoking *in rem* powers was not granted to the City or HPD under any state or city law.

50.     As discussed in more detail below, in December 2018, the City asserted an even more expansive view of its powers under the TPT Program, claiming that it was permitted to foreclosure upon properties that are ***not statutorily distressed*** if (1) the property has a Tax Lien that makes it subject to foreclosure, and (2) the property is located on the same tax block as another property selected for inclusion in the TPT Program.

51.     In recent years, the Municipal Defendants, in consultation and coordination with the TPT Defendants and other similarly situated real estate developers, make a list of properties they want to seize.  On information and belief, Defendants target properties owned by elder persons of color who are less likely to have a mortgage on their home (since a bank or other lender is likely to object to the Defendants' seizure of property that serves as collateral for a mortgage).  The City then commences *in rem* proceedings under Code § 11-404(a) against properties targeted for seizure by the City and the TPT Defendants, and seeks default judgments, and judgments of foreclosure, under the color of authority that such Defendants assert is provided by Local Law No. 37.  Indeed, the City, through HPD and DOF, made and is making at least arbitrary and capricious, if not outright discriminatory, internal determinations to seize property utilizing the *in rem* powers purportedly granted to the City by the New York State Legislature.

52.     Upon obtaining a judgment of foreclosure and sale under the TPT Program, the City transfers ownership of the properties to certain organizations selected by HPD to participate in the TPT Program, and which are designated by HPD or the City as its "Third Party Transfer Partners."  Code Section 11-412.1(c) provides that, after expiration of a statutory four-month redemption period following foreclosure, DOF is permitted to enter a deed transferring the property to a Third Party Transfer Partner, which receives title to the property in fee simple absolute.  If DOF fails to enter a deed transferring the property within eight months (plus a 45 day

tolling period for City Council review) following the award of judgment in foreclosure, then the property is not transferred.

53.    The City receives no tax revenue when it uses the TPT Program to foreclose upon and transfer properties.  After foreclosure of a property, the City transfers title to a Third Party Transfer Partner without requiring the Third Party Transfer Partner to make any payment towards the Tax Lien or other amount that served as the basis for the City's exercise of its purported powers under Code § 11-401.  Instead, the City simply transfers the property in fee simple absolute, which extinguishes any outstanding Tax Liens, and then conveys the property to the Third Party Transfer Partner for zero dollars.

54.    In each *in rem* action, the Municipal Defendants pursue an award of fee title ownership and absolute possession utilizing Code § 11.404(a) *et seq.* to effectively extinguish all rights of the owner to the property.  When the City uses a summary proceeding to secure an *in rem* foreclosure judgment *in rem*, the original property owner also loses all of his or her (or its, in the case of an HDFC) surplus or equity value in the property.  This surplus or equity value is the difference between a foreclosure-public-auction-bid amount on (or the market value of) the property and the amount of the foreclosure judgment premised on a valid Tax Lien, if any.

55.    There is no method pursuant to which the former owner of the property may claim the "surplus" value (the amount in excess of the amount claimed as a Tax Lien by the City, as exists with Tax Lien foreclosure sales resulting from judicial foreclosure proceedings).  *See* Code §§ 11-401 – 428.

56.    Section 11-404 *et seq.* of the Code specifies that amounts owed to the City do not provide a basis to use summary *in rem* foreclosure proceedings until the owed amounts may be designated as Tax Liens.  However, even in the instances where amounts owed to the City for taxes

do not yet have lien status under the Code, the Municipal Defendants utilize Code § 11-404(a) to seize or otherwise take private property.

57.     Subsection 4 of the Definitions section of Code § 11.401 specifies the bases on which DOF and HPD are required to designate a property as a distressed property, before the summary *in rem* foreclosure proceeding of the Code can be utilized.  But Municipal Defendants have used summary *in rem* foreclosure proceedings to seize properties even in the instances where properties did not meet the bases or requirements for being designated as "distressed" by DOF and HPD under Code § 11-401.4.

58.     Section 11-401.1 of the Code mandates that DOF and HPD follow certain procedures before commencing a summary *in rem* foreclosure proceedings.  *See* Code 11-401.1, *et seq*.  Municipal Defendants have used summary *in rem* foreclosure proceedings to seize properties even where they have failed to demonstrate compliance with these procedures.

59.     Moreover, Municipal Defendants regularly use summary *in rem* foreclosure proceedings to seize properties where the amount of the Tax Lien asserted by the City comprises a small fraction of the value of the property being taken.

60.     For example, in the latest round of the TPT Program (*In Rem 53*), **half** of the properties selected were not statutorily "distressed" and ***had an average tax to value ratio of 3%***.  For properties taken that were not distressed, by definition, Defendants took no less than 85% of the value of the property.  Additionally, numerous properties were neither statutorily distressed nor within the same tax block as a statutorily distressed property, calling into question why they were selected for inclusion in the TPT Program at all.

61.     The Municipal Defendants currently utilize Code § 11-404 *et seq.* for the purpose of advancing the City's (and its current Mayor's) affordable housing program.   The City's

affordable housing plan was unveiled by Mayor Bill de Blasio, in May 2014, as New York's "Housing New York Plan" (the "Plan").  The Plan has been spearheaded by Maria Torres-Springer in her capacity as Commissioner of HPD.  The Plan, as initially conceived, sought to "create and preserve 200,000 high-quality, affordable homes over ten years," spanning all five boroughs.[6]

62.     Margaret DeVoe, Esq., assistant Corporation Counsel in the office of Zachary W. Carter, Corporation Counsel of the City of New York, averred in an affirmation—dated October 11, 2018 and submitted to the Supreme Court of the State of New York, Bronx County—that "the purposes [sic] of the [TPT] Program is to create and maintain affordable housing."   In her affirmation, Ms. DeVoe further described that the City, HPD, and DOF are utilizing the provisions of Local Law No. 37 and the *in rem* authority granted to the City by New York State Legislature for purposes other than tax collection, and to otherwise advance a public purpose of the current Mayor (affordable housing).

63.     On November 15, 2018, at a Town Hall meeting convened by New York City Council Member Robert E. Cornegy, Jr., in his position as the Chair of the City Council's Committee on Housing and Buildings, and in response to public outcry resulting from the City's seizures of private property in primarily minority communities under the TPT Program, an HPD representative admitted that the purpose of the TPT Program is to "keep the housing affordable for the residents of those buildings."  This aligns with other public statements by City officials that the TPT Program is being utilized to advance the City's (and its current Mayor's) affordable housing agenda.

---

[6] *See* https://www1.nyc.gov/site/hpd/about/housing-plan.page

64.     In 2018, HPD asserted that the City is authorized to include in the TPT Program all Tax Class 1 and 2 properties[7] that have had municipal charges of $1,000 or more that have been outstanding for more than one year for non-cooperative and non-condominium properties, or for more than three years for cooperative and condominium properties, so long as those properties are on the same tax block as a statutorily distressed property.  There is no statutory authority for this taking under state or city law.  The Municipal Defendants expanded the bases on which they can invoke *in rem* foreclosure powers to take properties based on tax liabilities that may be significantly lower than the then-current market value of the subject properties.

65.     Under the TPT Program, the City asserts that it is not limited to only seizing properties that meet the definition of "distressed property" under Section 11-401.4 of the Code, in order to advance the Plan set by Mayor de Blasio.  However, neither the City nor HPD or DOF sought or obtained authority from the New York Council to broaden or expand the purpose for which it currently utilizes Local Law No. 37.  Nor has the City sought authority from the New York State Legislature to expand the New York State In Rem Grant to Municipalities to advance the Plan.

66.     On or about January 10, 2019, Mayor Bill de Blasio doubled down on his affordable housing initiative, and stated that he intended to expand the TPT Program to seize upwards of forty (40) additional dwellings annually, in order to transition them to "responsible, mission driven ownership."  The Mayor stated:  "We will seize their buildings, and we will put them in the hands of a community nonprofit that will treat tenants with the respect they deserve."  Mayor De Blasio's intent has been to use the TPT Program to advance the Plan.

---

[7] Tax Class 1 properties include one- to three-unit residential properties.  Tax Class 2 properties include buildings with more than four units, including cooperatives and condominiums.

67.     In some instances, even after the City seizes property under the TPT Program, it continues to solicit and accept payments from former owners of property, without disclosing to those former owners that their ownership rights have been extinguished through an *in rem* foreclosure judgment.   The City has even entered into installment repayment plans for amounts delineated as Tax Liens (correctly or incorrectly) after the commencement of the *in rem* proceeding on the affected property, without removing such property from the *in rem* proceedings (even though such removal is required by the letter and spirit of Local Law No. 37).

68.     Since the enactment of Local Law 37, the City has completed ten "rounds"—*i.e.*, mass foreclosure proceedings—under the TPT Program.   The most recent round ("Round X") ended in 2018.

69.     This lawsuit was filed in 2019.   Since then, the City has refrained from commencing another "round" of TPT Program seizures, although it has repeatedly threatened to do so.

***Alternative to TPT Program Foreclosures***

70.     The City has at its disposal an alternative process for enforcing Tax Liens that does not result in extinguishing the homeowners' Surplus Equity.   Specifically, the City can collect on Tax Liens through Tax Lien sales, whereby the City sells its Tax Lien to a third party who can collect the interest on the lien and foreclose in the event that the homeowner defaults.

71.     Specifically, NYC Administrative Code § 11-319(b)(4) provides that the City may sell a Tax Lien only in the amount of the lien, and the buyer of the lien does not receive title to the property.   While the purchaser of the Tax Lien holds it, the purchaser may collect interest on the lien in amounts prescribed in NYC Administrative Code § 11-319, plus a 5% surcharge on the lien amount.   If the homeowner defaults on these payments, then the lienholder can foreclose on the property pursuant to NYC Administrative Code § 11-332 and NYC Administrative Code § 11-335

to enforce their lien and have a court direct a sale.  But, per Code § 11-337, upon entry of judgment of the Tax Lien foreclosure, a judgment in favor of the lienholder is in the amount of the lien plus interest (not the full value of the property).  Additionally, because judgment also directs sale of the property, per Code § 11-338, the Tax Lien holder collects what is owed (not the full value of the sale), and pursuant to Code § 11-341, the money produced from the sale in excess of what is owed to the Tax Lien holder is paid to the court for persons "entitled thereto"—*i.e.*, any other creditors of the property, and then the homeowner.

72.     In sum, the City has two methods for enforcing Tax Liens.  One option—sale of a Tax Lien—provides the homeowner with all Surplus Equity in the property, even in the event that the lien sale ultimately leads to a foreclosure sale.  The other option—transfer under the TPT Program—does not provide the homeowner with any Surplus Equity.  Indeed, the TPT Program has no mechanism whatsoever for a homeowner to obtain the Surplus Equity of the property above the value of the Tax Liens.  Nor does the TPT Program provide any mechanism in which a court can direct a sale of the property to liquidate the property value such that the Tax Lien could be collected and that the Surplus Equity could be collected from whatever funds remain.  The (former) homeowner gets nothing.

### Named Plaintiffs and the Subject Properties

73.     Plaintiffs are former property owners residing in minority-majority communities whose properties were targeted for seizure by Defendants through the TPT Program.  Despite the fact that any amounts allegedly owed to the City constituted a fraction of the value of their properties, none of Plaintiffs received any compensation from Defendants for the Surplus Equity they owned in their properties.

### Plaintiff McConnell Dorce

74.     Since 1977, Plaintiff McConnell Dorce owned property located at 373 Rockaway Parkway, Brooklyn, New York (Kings County Block #4672, Lot #56).  Plaintiff Dorce is an elderly retired machinist and former ambulance driver, a Caribbean American immigrant from Haiti, and his property is located in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans.

75.     Since 2012, Plaintiff Dorce owned the 373 Rockaway Parkway Property free and clear of any mortgage and had substantial equity in the property.

76.     Up until at least 2012, all real property taxes and related charges to the 373 Rockaway Parkway Property were paid to the City.

77.     Sometime after 2012, Plaintiff Dorce incurred water and sewage charges in connection with the 373 Rockaway Parkway Property.  Plaintiff Dorce entered into a written installment agreement with the City to pay the outstanding water and sewage charges, and made all installment payments to the City on time.

78.     Notwithstanding Mr. Dorce staying current on his installment payments, the 373 Rockaway Parkway Property was subsequently taken by the Defendants through the TPT Program when Municipal Defendants seized it and transferred it to Neighborhood Restore.

79.     Specifically, on July 14, 2015, the City commenced the mass action *In Rem 53* against a list of more than 180 properties, including the 373 Rockaway Parkway Property, pursuant to the TPT Program.

80.     On November 27, 2017, New York state court Justice Partnow signed the *In Rem 53* judgment, which was drafted by the City, against 65 properties including the 373 Rockaway Parkway Property.

81.     The *In Rem 53* foreclosure judgment granted the DOF the ability to execute a deed transferring title to either the City or third parties within eight months (plus a 45 day tolling for City Council review) following the judgment.  *See* Code § 11-412.1(c).

82.     The judgment was entered *in rem—i.e.*, against the properties—and the owners of those properties, including Mr. Dorce, were not parties to the proceedings or judgment.

83.     On February 7, 2018, the City recorded the *In Rem 53* judgment in the chain of title of the 373 Rockaway Parkway Property.

84.     On September 21, 2018, the City through the DOF recorded a deed in the chain of title of the 373 Rockaway Parkway Property, taking Mr. Dorce's property and transferring it to Defendant Neighborhood Restore.  Neighborhood Restore paid nothing for the property; the City received nothing in exchange for extinguishing whatever Tax Lien had existed on the property; and Mr. Dorce received nothing in return for losing his property.

85.     At no time leading up to the taking of his property did Mr. Dorce receive actual or constructive notice of the July 2015 *in rem* proceeding or foreclosure judgment, notice reasonably calculated to inform him of the proceeding or judgment, or other notice as required under applicable law.  The City knew that it had not provided proper notice to Mr. Dorce of the *in rem* proceeding.

86.     The City has alleged that it provided a foreclosure notice to Mr. Dorce.  However, the notice that the City claims it provided was not addressed to where Mr. Dorce actually lives (which Municipal Defendants knew or should have known).  Moreover, the claimed notice was addressed to a multi-unit building without any unit number.

87.     This lack of notice deprived Mr. Dorce of an opportunity to redeem the 373 Rockaway Parkway Property as the owner of the "equity of redemption" and caused him to lose his Surplus Equity in the property.

88.     On or about September 24, 2018, Plaintiff Dorce learned that his property had been transferred to Neighborhood Restore.  In other words, Mr. Dorce received no notice of the *in rem* proceeding in the more-than three years since that proceeding was initiated and only received notice of the transfer three days after it occurred (and was irreversible).

89.     The 373 Rockaway Parkway Property was not statutorily "distressed" because it was not subject to Tax Liens (which are a subset of tax charges) in excess of 15% of the property's actual value.

90.     The valuation for the property contained in the DOF's NOPV in 2018 ($226,000) substantially understated the actual value of the 373 Rockaway Parkway Property.

91.     In any event, even under the Municipal Defendants' construction of the facts, Mr. Dorce's Surplus Equity was over $180,000.

92.     In reality, Mr. Dorce's Surplus Equity was worth substantially more than that.

93.     Municipal Defendants conspired with the TPT Defendants to transfer Mr. Dorce's Surplus Equity to Neighborhood Restore.  Neighborhood Restore paid nothing for Mr. Dorce's Surplus Equity and Mr. Dorce received no consideration for Neighborhood Restore's taking of his Surplus Equity.

94.     Even after the transfer, the City continued to issue to Mr. Dorce invoices in connection with charges to the 373 Rockaway Parkway Property, and Mr. Dorce continued to make payments to the City.  The City accepted these payments even though it had knowledge that the title to his property had been taken from Mr. Dorce.  By issuing these invoices and accepting

payments from him, the City deceived Mr. Dorce into believing that tendering these payments would allow him to get the title to his property back.

95.     Neighborhood Restore has not responsibly managed the 373 Rockaway Parkway Property since the transfer.  On April 5, 2021, a representative from Neighborhood Restore sent Mr. Dorce a letter stating that, to date, it had not been able to gain access to the 373 Rockaway Parkway Property and asking for Mr. Dorce's assistance.  In other words, despite owning the 373 Rockaway Parkway Property for more than two years, Neighborhood Restore contended that it could not access the building, suggesting that Neighborhood Restore has not performed any maintenance or otherwise meaningfully managed the building.

96.     Even though Neighborhood Restore has been an absentee landlord, it has nevertheless collected rent from the tenants who love at the 373 Rockaway Parkway Property.

97.     Because Mr. Dorce did not want to see the tenants of the 373 Rockaway Parkway Property suffer as a result of Neighborhood Restore's neglect, he has remained involved with routine upkeep, and has even paid out of his own pocket to renovate two bathrooms in the building since the transfer.

98.     In other words, Neighborhood Restore, in coordination with the Municipal Defendants, has worked to saddle Mr. Dorce with all of the burdens of property ownership (maintenance, taxes, water bills, etc.) with none of the benefits (rent, asset appreciation, etc.).

99.     This is plainly inequitable.

**Plaintiff Cecelia Jones**

100.    Plaintiff Cecelia Jones was a shareholder in 585 Nostrand Avenue HDFC, an HDFC formed to own the 585 Nostrand Avenue Property.  Ms. Jones is an elderly Caribbean American, and her property is located in a community predominantly populated by African Americans,

Caribbean Americans, Hispanic Americans, and Middle Eastern Americans.  Ms. Jones is an elderly, retired home health aide who worked in New York City for 26 years.  Ms. Jones lived in apartment 2A at the 585 Nostrand Avenue Property pursuant to a proprietary lease appurtenant to her shares in 585 Nostrand Avenue HDFC.

101.    585 Nostrand Avenue HDFC had substantial equity in the subject property and, thus, the HDFC shares owned by Ms. Jones, and the appurtenant lease, had substantial value.

102.    At all relevant times, 585 Nostrand Avenue HDFC shareholders and residents at the 585 Nostrand Avenue Property paid maintenance fees to the HDFC, which were used to pay real estate taxes and water/sewage charges assessed by the City.

103.    The 585 Nostrand Avenue Property was first included in the *In Rem 51* mass action, commenced on February 23, 2007.  The foreclosure judgment in that action was entered on October 26, 2011, against 33 properties, including the 585 Nostrand Avenue Property.  However, the City did not enter a deed to transfer the title within eight months following that judgment, so the title and ownership over the property remained with 585 Nostrand Avenue HDFC.

104.    Plaintiff Jones' shareholder title and value was subsequently taken under the TPT Program when the Municipal Defendants effected a seizure and transfer of the 585 Nostrand Avenue Property to Neighborhood Restore.

105.    Specifically, on July 14, 2015 the City commenced the *In Rem 53* mass action, which once again included the 585 Nostrand Avenue Property.

106.    On November 27, 2017 New York state court Justice Partnow signed a proposed judgment drafted by the City against 65 properties including the 585 Nostrand Avenue Property.

107.     The *In Rem 53* foreclosure judgment granted the DOF the ability to execute a deed transferring title to either the City or third parties within eight months (plus a 45 day tolling for City Council review) following the judgment.  *See* Admin. Code § 11-412.1(c).

108.     The judgment was entered *in rem*, and the owners of those properties, including 585 Nostrand Avenue HDFC, were not party to the proceedings or judgment.  Ms. Jones was also not a party.

109.     On February 7, 2018, the City recorded the judgment in the chain of title of the 585 Nostrand Avenue Property.

110.     On September 21, 2018, the City through the DOF recorded a deed in the chain of title of the 585 Nostrand Avenue Property, taking Ms. Jones's home and transferring it to Defendant Neighborhood Restore.  Neighborhood Restore paid nothing for the property; the City received nothing in exchange for extinguishing whatever Tax Lien had existed on the property; and neither Ms. Jones nor 585 Nostrand Avenue HDFC received anything in return for losing their property.

111.     At no time leading up to the taking of the property did Ms. Jones or 585 Nostrand Avenue HDFC receive actual or constructive notice of 2015 *in rem* proceeding or foreclosure judgment, notice reasonably calculated to inform them of the proceeding or judgment, or other notice as required under applicable law.  The City knew that it had not provided proper notice of the *in rem* proceeding to Ms. Jones or to 585 Nostrand Avenue HDFC.

112.     The City has alleged that it provided a foreclosure notice to 585 Nostrand Avenue HDFC.  However, the notice that the City claims it provided (i) was not addressed to any particular person, (ii) was not addressed to any particular unit, and (iii) was addressed to a partial version of the HDFC's name.

113.    This lack of notice deprived Ms. Jones and 585 Nostrand Avenue HDFC of any opportunity to redeem the 585 Nostrand Avenue Property.

114.    Sometime in or around October 2018 (*i.e.,* after the property had been irreversibly transferred), Ms. Jones learned that ownership of the 585 Nostrand Avenue Property had been transferred from the HDFC to Neighborhood Restore.

115.    Ms. Jones learned her property had been transferred when Neighborhood Restore's managing agent informed her that she was being converted into a renter, and her maintenance payments converted into rental payments.

116.    As a result of this transfer under the TPT Program, 585 Nostrand Avenue HDFC's ownership rights to the 585 Nostrand Avenue Property were extinguished, as was all of the value of Ms. Jones' shares and the proprietary lease appurtenant thereto.

117.    Because the 585 Nostrand Avenue Property was the only asset of 585 Nostrand Avenue HDFC, the City was required under New York State's Not-for-Profit Corporation Law to provide notice and obtain approval from New York's Attorney General before taking the property. N-PCL §§ 510, 511, 511-a.

118.    In violation of state law, the City took the 585 Nostrand Avenue Property without providing notice to—or obtaining approval from—the Attorney General.

119.    The 585 Nostrand Avenue Property was not statutorily "distressed" because it was not subject to Tax Liens (which are a subset of tax charges) in excess of 15% of the actual property value.

120.    The valuation for the property contained in the DOF's NOPV in 2018 ($736,000) substantially understated the actual value of the 585 Nostrand Avenue Property.

121.   In any event, even under the Municipal Defendants' construction of the facts, 585 Nostrand Avenue HDFC's Surplus Equity was over $575,000.

122.   In reality, 585 Nostrand Avenue HDFC's Surplus Equity was worth substantially more than that.

123.   As a shareholder in 585 Nostrand Avenue HDFC, Ms. Jones's *pro rata* share of that Surplus Equity was significant.

124.   Municipal Defendants conspired with the TPT Defendants to transfer Ms. Jones's Surplus Equity to Neighborhood Restore.  Neighborhood Restore paid nothing for Ms. Jones's Surplus Equity and Ms. Jones received no consideration for Neighborhood Restore's taking of her Surplus Equity.

125.   As a result of the taking, the HDFC and Ms. Jones' rights to, and value and equity in, the subject property, the related HDFC shares, and the proprietary leases appurtenant thereto were extinguished in their entirety.  Through this process, Ms. Jones' lost her right to reside in her apartment unit at the 585 Nostrand Avenue Property as a shareholder in the 585 Nostrand Avenue HDFC, and Ms. Jones was converted to a renter in her own home.

**Plaintiff Sherlivia Thomas-Murchison**

126.   Plaintiff Thomas-Murchison was a shareholder in 248 Madison Street HDFC, an HDFC that was formed to own the 284 Madison Street Property (Kings County Block #1823, Lot #29).  Ms. Thomas-Murchison is an African American woman, a paralegal and mother, and her property is located in a community predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans.  Ms. Thomas-Murchison's extended family lived in apartment unit 4L at the 248 Madison Street Property pursuant to a proprietary lease appurtenant to her shares in 248 Madison Street HDFC.

127. At all relevant times, Ms. Thomas-Murchison's mother (now deceased) also owned shares in the 248 Madison Street HDFC. Ms. Thomas-Murchison lived in apartment unit 4R pursuant to a proprietary lease appurtenant to the shares in the HDFC owned by her mother, along with her mother before her mother's death. Ms. Thomas-Murchison and her family inherited an equitable estate interest in unit 4R of the 248 Madison Street Property from her mother.

128. 248 Madison Street HDFC had substantial equity in the 248 Madison Street Property and, thus, 248 Madison Street HDFC shares owned by Ms. Thomas-Murchison, and the appurtenant lease, had substantial value.

129. At all relevant times, 248 Madison Street HDFC shareholders and residents at the subject property paid maintenance fees to the HDFC, which were used to pay real estate taxes and water/sewage charges assessed by the City.

130. Plaintiff Thomas-Murchison's shareholder title and value was taken when the Municipal Defendants transferred the 248 Madison Street Property to Neighborhood Restore under the TPT Program.

131. Specifically, the City commenced the action *In Rem 51* mass action against scores of properties, including the 248 Madison Street Property. On October 26, 2011, New York state court Justice Martin signed the proposed judgment, which the City drafted, as to 33 properties including the 248 Madison Street Property.

132. The *In Rem 51* foreclosure judgment granted the DOF the ability to execute a deed transferring title to either the City or third parties within eight months (plus a 45 day tolling for City Council review) following the judgment. *See* Admin. Code § 11-412.1(c).

133. The judgment was entered *in rem*, and the owners of those properties, including 248 Madison Street HDFC, were not party to the proceedings or judgment.

134.    On December 19, 2011, the City recorded the judgment in the chain of title of the 248 Madison Street Property.

135.    On August 24, 2012, the City, acting through the DOF entered a deed in the chain of title of the 248 Madison Street Property transferring the property to Defendant Neighborhood Restore.  This post-judgment deed divested 248 Madison Street HDFC of its sole asset for which it received no compensation and reduced the value of Plaintiff Thomas-Murchison's cooperative shares to zero.  Plaintiff Thomas-Murchison was, as a result, dispossessed from her residency and value of her Surplus Equity in the 248 Madison Street Property, and was, along with her family, dispossessed of inheritance rights to the Surplus Equity in the shares of the cooperative which had been owned by her deceased parents.

136.    On December 10, 2012, the City through the DOF filed a "correction deed" fixing an error whereby the deed was mistakenly dated July 8, 2012, instead of August 24, 2012.

137.    As a result of the TPT Program, 248 Madison Street HDFC's ownership rights to the 248 Madison Street Property were extinguished, as was all of the value of Ms. Thomas-Murchison's shares and the proprietary leases appurtenant thereto.

138.    On February 29, 2016, Neighborhood Restore deeded the 248 Madison Street Property to Defendant Bridge Street, in a transaction that the City approved.

139.    Defendant Bridge Street has since borrowed more than $11 million pursuant to two separate mortgages that are secured, at least in part, by the 248 Madison Street Property.

140.    In other words, Bridge Street "cashed out" the Surplus Equity it took from Plaintiffs and members of the putative class.

141.    Sometime in or about April 2016, Ms. Thomas-Murchison learned that ownership of the subject property had been transferred from the HDFC through an *in rem* proceeding filed by the City pursuant to the TPT Program, and that the property now belonged to Bridge Street.

142.    In or about May 2016, Bridge Street's managing agent informed Ms. Thomas-Murchison that she was being converted into a renter, and her maintenance payments converted into rental payments.

143.    At no time leading up to the taking of her property did Ms. Thomas-Murchison or 248 Madison Street HDFC receive actual or constructive notice of *in rem* proceedings or foreclosure judgment, notice reasonably calculated to inform them of the proceeding or judgment, or such other notice required under applicable law.  The City knew that it had not provided proper notice to Ms. Thomas-Murchison or 248 Madison Street HDFC.

144.    The City has alleged that it provided a foreclosure notice to 248 Madison Street HDFC.  However, the notice that the City claims it provided was not addressed to any particular person or unit.

145.    This lack of notice deprived Ms. Thomas-Murchison and 248 Madison Street HDFC of any opportunity to redeem the 248 Madison Street Property.

146.    As a result of the transfer of this property, 248 Madison Street HDFC's ownership rights to the property were extinguished, as was all of the value of Ms. Thomas-Murchison's shares and the proprietary lease appurtenant thereto.

147.    Because the 248 Madison Street Property was the only asset of 248 Madison Street HDFC, the City was required under New York State's Not-for-Profit Corporation Law to provide notice and obtain approval from New York's Attorney General before taking the property.  N-PCL §§ 510, 511, 511-a.

148.    In violation of state law, the City took the 248 Madison Street Property without providing notice to—or obtaining approval from—the Attorney General.

149.    The 248 Madison Street Property was not statutorily "distressed" because it was not subject to Tax Liens (which are a subset of tax charges) in excess of 15% of the actual property value.

150.    The valuation for the property contained in the DOF's NOPV in 2012 ($398,000) substantially understated the actual value of the 248 Madison Street Property.

151.    Indeed, the valuation for the property contained in the DOF's NOPV for 2010 was $1,350,000 and for 2011 was $796,000.  The most recent NOPV for the property sets the value at $1,723,000.

152.    In any event, even under the Municipal Defendants' construction of the facts, 248 Madison Street HDFC's Surplus Equity was over $285,000.

153.    In reality, 248 Madison Street HDFC's Surplus Equity was worth substantially more than that.

154.    As a shareholder in 248 Madison Street HDFC and the successor to another shareholder (her mother), Ms. Thomas-Murchison's *pro rata* share of that Surplus Equity was significant.

155.    Municipal Defendants conspired with the TPT Defendants to transfer Ms. Thomas-Murchison's Surplus Equity to Neighborhood Restore and Bridge Street.  Neither Neighborhood Restore nor Bridge Street paid anything for Ms. Thomas-Murchison's Surplus Equity and Ms. Thomas-Murchison received no consideration for their taking of her Surplus Equity.

156.    Ms. Thomas-Murchison previously had the right to reside in her apartment unit in that HDFC as a cooperative shareholder, which shareholder title was extinguished or otherwise

taken by the Municipal Defendants and transferred to Neighborhood Restore under the TPT Program (and subsequently transferred to Bridge Street).  Plaintiff Thomas-Murchison was, as a result, dispossessed from her residency at the cooperative apartment, and was, along with her family, dispossessed of inheritance rights to the shares of the cooperative which had been owned by her deceased parents prior to it being conveyed to Neighborhood Restore through the TPT Program.

157.    As a result of the taking of the 248 Madison Street Property by the City, the 248 Madison Street HDFC and Ms. Thomas-Murchison's rights to, and value and equity in, the 248 Madison Street Property, the related cooperative shares, and the proprietary leases appurtenant thereto were extinguished in the entirety, rendering Ms. Thomas-Murchison homeless and without access to her Surplus Equity to secure alternate hosing.

**Defendants' Widespread Abuse of the TPT Program**

158.    Defendants have seized numerous properties pursuant to *in rem* foreclosure proceedings brought under the TPT Program.

159.    By way of example, in 2017 alone, the Municipal Defendants through the TPT Program obtained an in rem foreclosure judgment, *In Rem 53*, upon sixty-five (65) properties in Kings County worth millions of dollars in the aggregate.

160.    All properties seized pursuant to *In Rem 53* were gifted to Neighborhood Restore. At least some of those properties were subsequently transferred to other Third Party Transfer Partners, including Bridge Street.

161.    Municipal Defendants are aware that, in many instances, the buildings subjected to *in rem* proceedings under the TPT Program are long-standing, family-owned, and/or affordable

housing HDFC cooperative properties, with affordable housing tenants residing therein on the date
of entry of the *in rem* judgement dispossessing the owner of the property.

162.    After seizing properties, the TPT Defendants often charge residents more than they
were paying before.  Moreover, because these payments are now "rent" instead of "maintenance,"
the residents no longer accrue any equity and, with respect to HDFCs, the building is transformed
from a cooperative with owner-residents to a rental building with mere tenants.

163.    The widespread misuse of the TPT Program and its effects on communities of color
have come into focus over the past several years.

164.    In March 2019, New York state court Justice Partnow—who had previously
granted Municipal Defendants' request for a default judgment in *In Rem 53*, including the
properties of Plaintiffs Dorce and Jones—subsequently reversed his decision as to six of those
properties.  The Court received evidence that the City had misrepresented the facts underlying the
foreclosure proceedings, describing the City's conduct in a detailed opinion as "unconscionable
and shocking to the conscience of the court."  *In Rem Tax Foreclosure Action No. 53 Borough of
Brooklyn*, Index No. 8700/2015, 2019 WL 1431423, at *23 (Sup. Ct. Kings Cty. Mar. 28, 2019).

165.    Later that year, in July 2019, the City Council's Committee on Oversight and
Investigations and Committee on Housing and Buildings (the "Joint Committee") issued a joint
report confirming the widespread abuse of the TPT Program.  *See* Comms. on Oversight and
Investigations and Housing and Buildings of the New York City Council, *Oversight—Taking
Stock: A Look into the Third Party Transfer Program in Modern Day New York* (July 22, 2019)
(the "City Council Report"), attached hereto as Exhibit A, and *available at*
https://on.nyc.gov/30hWJm7.  The findings and conclusions drawn by Justice Partnow and the
Joint Committee mirror Plaintiffs' own experiences and those of numerous other former

homeowners who lost their homes based upon relatively small purported tax debts, and who were denied any opportunity to prevent the taking of their homes or otherwise recoup the Surplus Equity of their properties.

166.    Justice Partnow's decision and the City Council Report confirm what Plaintiffs and numerous other property owners across New York City have experienced—that Defendants, through the TPT Program, have targeted homes in communities of color; failed to provide notice to owners of foreclosure proceedings involving their property; refused to allow owners to pay amounts due to the City (or allowed owners to make payments but foreclosed upon the properties anyway); and stripped owners of their property rights and any Surplus Equity in the properties without providing any compensation.

*Defendants Work in Concert to Intentionally Target Properties with Significant Surplus Equity, which Results in Property Owners with the Least Tax Debt Suffering the Most Severe Penalties*

167.    Under the TPT Program, Municipal Defendants do not extinguish property owners' rights unless and until one of the City's Third Party Transfer Partners agrees to take title to the property.  If the Municipal Defendants are unable to enter a deed transferring the property within eight months (plus a 45 day tolling for City Council review) following the award of judgment in foreclosure, then the property is not transferred and title remains with the original owner.

168.    Although the Municipal Defendants have the statutory authority to deed the property to City, in practice they only deed properties if the properties can be transferred to the City's Third Party Transfer Partners.  Indeed, Municipal Defendants have argued that one of the purported reasons for creating the TPT Program was that the City had amassed too many properties via foreclosures and was unable to manage them.  For example, in appealing Justice Partnow's decision vacating the foreclosure of numerous properties in *In Rem 53*, the City explained that by

1996, the City had become the largest landlord in the city, holding properties at significant expense, so "the City amended its in rem law in 1996 and 1997 to enable streamlined transfer of certain foreclosed residential properties to qualified third parties"—*i.e.*, the TPT Program.

169.    Because the Municipal Defendants rely on the TPT Defendants to facilitate the TPT Program, they are incentivized to target the types of properties that TPT Defendants are likely to find desirable.  Thus, the Municipal Defendants work hand-in-hand with the TPT Defendants to effectuate the TPT Program seizures.

170.    TPT Defendants, for their part, want to select valuable properties for the obvious reason that they will become the owners of these properties.

171.    Municipal Defendants, on the other hand, want to target homes with relatively small Tax Liens because those liens will be extinguished with no payment to the City.

172.    The result is that Defendants target homes with high values and little tax debt, resulting in the uncompensated taking of massive Surplus Equity.

173.    For example, in the latest round of the TPT Program (*In Rem 53*), **half** of the properties selected for seizure were not statutorily "distressed" and **had an average tax to value ratio of 3%**."  *See* City Council Report at 9.

174.    In other words, on average, for every dollar in taxes owed, owners of non-distressed properties would effectively be penalized **roughly 33 dollars in Surplus Equity** upon the transfer of their properties to the TPT Defendants.

175.    According to the City Council Report, the total market value of the 210 non-statutorily distressed properties selected for the TPT Program in the latest round was nearly $152 million, whereas the total amount of arrears owed on such properties was just over $4.5 million.

176.    In an effort to implement their scheme to seize high value properties with low tax debt, the DOF, in concert with the other Defendants, also assigns the properties temporary "market values" that are  substantially below the properties' actual market values.

177.    This intentional and systematic manipulation of designated property values allows Defendants to foreclose on additional properties, either because Defendants falsely designate a property as "distressed" based on a manipulated property value or they designate the property as "near" (*i.e.,* on the same tax block) a property falsely designated as "distressed" based on manipulated data.

178.    Following a six-month investigation that led to the City Council Report, council member Robert Cornegy concluded that DOF had intentionally assessed properties well below their real market values as part of a "public policy program that strips away intergenerational black and brown wealth."

179.    As one example, the DOF's manipulated valuations of the 248 Madison Street Property are illustrative.  DOF's valuation for the property in 2010 was $1,350,000.  Based on the alleged tax debt of $110,352.44, the tax to value ratio would have been 8%, which is under the 15% threshold for a property to be statutorily "distressed."

180.    The DOF's valuation in 2011 cut the property valuation nearly in half, down to $796,000.  Based on the same alleged tax debt, the tax to value ratio would be 14%--*i.e.* still below the 15% threshold.

181.    The next year, when Municipal Defendants seized the 248 Madison Street Property, DOF *again* cut the assessed market value in half, down to $398,000, making the claimed tax to value ratio jump to 28%.

182.    Not surprisingly, after Defendants seized the 248 Madison Street Property and decided that they wanted it to secure two multi-million dollar mortgages, the DOF's valuations for the property began to rise.  Today, the DOF assigns the property a value of $1,723,000 (which still significantly understates its true market value).

183.    The 248 Madison Street Property is not an outlier.  For example, Defendants also manipulated valuations of the 373 Rockaway Parkway Property owned by Mr. Dorce.

184.    DOF's valuation for the 373 Rockaway Parkway Property in 2010 was $555,000. Based on the alleged tax debt of $45,132.73, the tax to value ratio would have been 8%, which is under the 15% threshold.

185.    The DOF's valuation in 2011 cut the property valuation nearly in half, down to $375,000.  Based on the same alleged tax debt, the tax to value ratio would be 12%--*i.e.* still below the 15% threshold.

186.    By 2015, when Municipal Defendants included the 373 Rockaway Parkway Property in the *In Rem 53* proceeding, the DOF still listed its value at only $134,000 (with a claimed tax to value ratio approximately 34%), and by 2018 when Defendants seized the 373 Rockaway Parkway Property, the DOF listed its value at only $226,000 (with a claimed tax to value ratio of approximately 20%).

187.    Not surprisingly, after Defendants seized the 373 Rockaway Parkway Property, the DOF's valuations for the property began to rise.  Today, the DOF assigns the property a value of $334,800 (which still significantly understates its true market value).

188.    While Defendants admit that they also target non-distressed properties through the TPT Program, they claim that they only do so where those properties are located on the same tax block as a distressed property.

189.     Defendants' assertion is demonstrably untrue.

190.     In Round X alone, the City Council reported that Defendants included 33 non-statutorily distressed properties that were *not* located on the same tax block as another property selected for the Program.  *See* City Council Report at 6.

191.     The City Council noted that "this raises questions as to why they were designated for inclusion."  *Id*.

192.     Defendants have never explained why these 33 properties were included.

193.     The harms caused by Defendants targeting the homes with the highest Surplus Equity is magnified by the fact that there is no mechanism for a property owner to seek compensation for the taking of any of his or her Surplus Equity.

194.     Even if a property owner is alerted to Defendants' plan to seize his or her property (and, as discussed below, they often are not), there is no mechanism for them to request a judicial sale or other public auction of their property.

195.     The *only* options available to a property owner to potentially prevent the seizure of his or her Surplus Equity is to either (i) pay off the claimed taxes in their entirety, or (ii) on their own, engage in a hurried sale of the property.

196.     In reality, both "options" are often illusory.  As a threshold matter, both options require the property owner to receive notice of the pending seizure, which many property owners never receive.

197.     Moreover, many property owners do not have sufficient liquid assets to pay of the entirety of the claimed tax debt in one fell swoop.

198.     Likewise, many property owners are not sufficiently sophisticated to be able to properly market their properties for sale and, even if they were, often do not have the resources to

do so on the expedited and limited timeframe potentially available to them.  Other property owners simply do not want to sell their homes.

199.    Municipal Defendants will sometimes agree to enter into an installment plan for the property owner to pay off the claimed tax debts over time but, egregiously, this does not reliably result in Defendants abstaining from seizing their property.

200.    Indeed, that is exactly what happened to Mr. Dorce.  He agreed to an installment plan to pay the claimed back taxes, he timely paid the installment payments, and Defendants took his property, and his Surplus Equity, anyway.

201.    Shockingly, Defendants continued to collect on Mr. Dorce's installment plan for _over two years_ _even after they had already seized his property_.

202.    Defendants claim that their conduct was appropriate because they later allegedly returned some of the tax payments that Mr. Dorce paid.  They have not, however, offered to return the property or the Surplus Equity that they seized from him through affirmative deceit.

203.    Mr. Dorce's experience is outrageous, but hardly unique.

204.    For example, the Municipal Defendants have admitted that they accepted approximately $72,000 in payments from 19 Kingsland Avenue Housing Development Fund Corporation ("Kingsland HDFC"), which owned property at 19 Kingsland Avenue in Brooklyn for over three decades, after a foreclosure judgment was issued against the HDFC's property in _In Rem 53_.  The $72,000 in payments made by Kingsland HDFC included $21,000 that was paid, over the course of five months, after the HDFC could no longer legally redeem the property.  Moreover, the property did not meet the statutory definition of a distressed property—the building did not have the requisite number of code violations, and Kingsland HDFC's own shareholders upgraded and replaced all of the building-wide systems at that property.

205.    In another case, the owner of a Brooklyn property valued at over $3 million made down payments of approximately $25,000 and $11,000, and nearly two dozen installment payments, under two installment agreements with the City.  Despite making timely installment payments, the City nevertheless foreclosed upon the multi-million dollar property and transferred it—for free—to Neighborhood Restore in *In Rem 53*.  The total outstanding amount due under the installment agreement at the time of foreclosure was approximately $145,000, a fraction of the total value of the building.

206.    Defendants' conduct deceptively led Plaintiffs and those similarly situated to fail to defend their property rights.

207.    In addition, Defendants have also obstructed numerous property owners from paying the alleged Tax Liens so that Defendants can instead take their much-more-valuable properties for free.

208.    For example, Marcia Lewis owned property located at 972 Rutland Road in Brooklyn for over three decades, but she was unable to pay certain taxes because the City incorrectly listed the former owner of her property on the assessment roll, despite numerous attempts on Ms. Lewis's part to resolve the issue.  Despite her repeated attempts to pay delinquent taxes, and despite her property having substantial Surplus Equity, Ms. Lewis's property was foreclosed upon and transferred to Neighborhood Restore in *In Rem 53*, and Ms. Lewis received no compensation in return.

209.    In another similar case, 463 Classon Avenue Housing Development Fund Corporation ("Classon HDFC"), which had owned property in Brooklyn for nearly three decades, was unable to stop Defendants from foreclosing upon its property despite repeated efforts to pay all amounts owed.  Classon HDFC provided the City with certified checks in excess of its unpaid

taxes, but the City refused to accept payment because the HDFC did not provide sufficient proof of its source of funds to show that it was able to pay the tax arrears. In other words, rather than simply accepting and depositing the owner's certified checks, the City refused to allow this HDFC's redemption payment for lack of additional proof (beyond the certified checks) of its ability to pay, and the City instead attempted to transfer the HDFC's valuable property to Neighborhood Restore.

210.    These examples reflect a concerted and intentional scheme by Defendants to exploit working class property owners in New York City by taking their substantial Surplus Equity without just compensation.

211.    At a minimum, these seizures constitute an excessive fine levied against New York City property owners who are alleged to be behind on their taxes.

*Defendants, Acting in Concert, Intentionally Target Homes that Belong to Elderly and Minority Homeowners Located in Communities of Color*

212.    Defendants, working in concert, intentionally target properties that belong to elderly minority homeowners who live in communities of color for multiple reasons.

213.    *First*, Defendants generally want to seize properties that are unencumbered by any mortgage. Mortgage lenders—often banks—are generally more sophisticated and are harder for Defendants to victimize than working class property owners. If Defendants include a property with a mortgage in their planned seizures and the mortgage lender reaches out to object, Defendants will quietly drop that property from their proposed default judgement to try to ensure that the remaining properties can be seized with as little interference as possible. Properties unencumbered by mortgages also, of course, tend to more valuable.

214.    Defendants know and intend that their efforts to target properties unencumbered by mortgages will disproportionately target the elderly, who are more likely to have finished paying

off their mortgages.  Perversely, the elderly will also suffer the most severe consequences from Defendants taking of their Surplus Equity, as they are often retired, on fixed income, and are unable to rebuild the wealth that Defendants seized from them.

215.    In addition, when there is an existing mortgage on a property, the homeowner often makes all payments to the mortgage service provider, which in turn makes the tax payments on behalf of the homeowner.  However, after a mortgage is paid off, a homeowner must pay property taxes directly through the City's byzantine property tax system.  This also results in the TPT Program disproportionately targeting property owners with no mortgage, who are overwhelmingly elderly.

216.    *Second*, Defendants intentionally target communities of color because that is where the City's current Mayor wants to claim credit for providing affordable housing.

217.    *Third,* communities of color are also ripe for exploitation by Defendants as their residents often lack the resources and abilities to fight Defendants' abusive tactics.  For example, many residents in communities of color are immigrants or children of immigrants may not speak English as their primary language.  They are less likely to have the resources to mount legal challenges, even if the face of plainly unconstitutional conduct.

218.    The TPT Program's targeting of racial minorities is virtually indisputable.

219.    Justice Partnow, the judge who initially approved *In Rem 53*, later acknowledged that "[t]he City has particularly targeted properties that are owned by minorities," and that the City's conduct "raises equal protection concerns."  *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*, Index No. 8700/2015, 2019 WL 1431423, at *6 (Sup. Ct. Kings Cty. Mar. 28, 2019).

220.    Similarly, following the six-month investigation that led to the City Council Report, one City council member reported: "[i]t is clear to us that HPD is targeting properties for

Third Party Transfer disproportionately.  It's targeting Brooklyn and the Bronx, it's targeting black and brown neighborhoods."[8]

221.    Public press reporting after the City Council Report also confirm that the TPT Program resulted in the taking of properties "mostly from black, elderly homeowners."[9]

222.    The statistics further confirm the targeting of black and brown communities.  For example, of the properties selected for the latest round of the TPT Program, approximately 50%— 213 of the total 420 properties selected—were in just 11 neighborhoods,[10]  all of which are communities of color, and no property in Staten Island was selected for inclusion.  City Council Report at 14;  *see also* New York City Census Data 2010, NYC Department of Health, https://on.nyc.gov/3i2y3E7 (last accessed July 30, 2021).

223.    Defendants' purported practice of seizing non-distressed properties though the TPT Program when those properties are physically near a distressed property also plainly targets black and brown homeowners, who are more likely to live in now-gentrifying communities of color, where increasing property values create a much higher likelihood that a property owner's neighbor will fall sufficiently behind on his or her taxes such that the property is "distressed."

---

[8] *See* Kelly Mena, *How Changes to a City Housing Program Could Save Vulnerable Homeowners*, Brooklyn Daily Eagle (July 12, 2019), https://brooklyneagle.com/articles/2019/07/12/third-party-transfer-reforms/.

[9] *See* Charles Innis, *City Puts On Hold Controversial Home Seizure Program 'Until Further Analysis,'* BKReader (Sept. 25, 2019), https://bkreader.com/2019/09/25/city-puts-on-hold-controversial-third-party-transfer-program-until-further-analysis/.

[10] These neighborhoods are as follows: Mount Hope, Bronx; University Heights-Morris Heights, Bronx; Bedford, Brooklyn; Bushwick North, Brooklyn; Bushwick South, Brooklyn; Crown Heights North, Brooklyn; East New York, Brooklyn; Stuyvesant Heights, Brooklyn; Central Harlem North-Polo Grounds, Manhattan; Central Harlem South, Manhattan; Hamilton Heights, Manhattan.

224.    Of course, those very same properties—*i.e.*, the ones in gentrifying areas experiencing increases in value—are the most valuable properties for the TPT Defendants and thus are the ones Defendants target for inclusion in the TPT Program.

225.    There can be no rational basis for treating two homeowners differently based on the amount of tax debt owed by their neighbors.

226.    And doing so is particularly insidious when, as here, it is done with the intention of exploiting homeowners who live in communities of color.

227.    Defendants' abuse of racial minorities through the TPT Program continues a long history of race discrimination in tax assessment and collection schemes.  For example, for more than a century, federal, state, and local governments have used various schemes to legalize the seizure of homes from African Americans.  Predatory tax foreclosure systems were used throughout the Jim Crow era to discriminate against African American homeowners, and this practice has continued, in various forms, to this day.  Historian Andrew Kahrl has noted that African American communities have been exploited by such schemes since they gained the ability to purchase property:

> Almost from the moment African Americans ceased to be taxable property and began having their property taxed, they became subject to discriminatory administrative practices and the victim of structural inequities in its levying and enforcement, both of which allow local governments to subtly shift the tax burden onto the backs of racial minorities, and in some states created opportunities for real estate speculators and investors to prey on hard-pressed homeowners through acquiring liens on tax-delinquent properties.[11]

228.    Racist federal, state, and local governmental policies and practices have continued to perpetuate racial gaps in homeownership long after the Jim Crow era.  One example occurred

---

[11] Andrew W. Kahrl, *Unconscionable: Tax Delinquency Sales as a Form of Dignity Taking*, 92 Chicago-Kent L. Rev. 905 (2017).

just outside of New York City, on Long Island.  Levittown, a development of 17,500 homes built

after World War II, was financed by the Federal Housing Administration "on condition that . . . it

be all white."[12]  Similarly, in the 1940s, New York City facilitated the development of Stuyvesant

Town, a housing complex in Manhattan with 9,000 units that were available to "white people

only."[13]  In order to build Stuyvesant Town, New York City condemned and cleared eighteen

square city blocks and transferred the property to the developer, displacing African American and

Puerto Rican residents who were no longer allowed to live in their former neighborhood.

229.    More recently, a nationwide study analyzing sales and tax assessment data for

approximately 118 million homes found that African American and other minority households pay

over 10 percent more in property taxes each year than white residents.[14]  Similarly, lien systems

across the country have a disproportionate impact on minority homeowners.  Numerous studies

demonstrate that liens are disproportionately placed on homes in minority communities.  An

analysis of liens in New York City for one-to-three family homes in 2016 found that the City was

six times more likely to sell a lien in a majority African American neighborhood than in a majority

white neighborhood.[15]

230.    Defendants' intentional and systemic targeting of homes in minority communities

for seizure through the TPT Program has resulted in a redistribution of property ownership and

---

[12] Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America*, at 71 (2017).

[13] *Id.* at 106.

[14] Andrew Van Dam, *Black Families Pay Significantly Higher Property Taxes than White Families, New Analysis Shows*, Wash. Post (July 2, 2020), https://www.washingtonpost.com/business/2020/07/02/black-property-tax/.

[15] Coalition for Affordable Homes, *Compounding Debt: Race, Affordability and NYC's Tax Lien Sale*, 4-5 (2016), https://s28299.pcdn.co/wp-content/uploads/2014/02/CAH-tax-lien-sale-report-final.pdf.

wealth away from individuals that are of African American and/or Hispanic American descent, or buildings that are owned predominantly by individuals that of African American or Hispanic American descent, to private companies and partners of the Municipal Defendants, such as the TPT Defendants.

*Defendants, Acting in Concert, Intentionally Fail to Provide Adequate Notice*

231.   Defendants fail to provide property owners with adequate notice of the impending seizures of their properties and corresponding Surplus Equity.

232.   This is intentional because, otherwise, Defendants' scheme would fail.

233.   No property owner would knowingly and voluntarily allow his or her property to be seized to satisfy a tax debt constitutes a small fraction of the property's value.

234.   Indeed, even if a property owner owed 50% of the value of his property in Tax Liens (which is extremely high relative to the actual properties at issue), it would still make no sense for that property owner to allow Defendants to simply take—for free—his or her Surplus Equity consisting of the other 50%.

235.   The fact that Defendants have transferred Surplus Equity worth hundreds of millions of dollars, if not billions of dollars, from property owners to TPT Defendants effectively proves that the property owners are not getting adequate notice, as no property owner would knowingly and willingly sign up for that.

236.   Defendants also failed to acquire approval from the New York Attorney General, or provide notice to the New York Attorney General with Court approval, when they divested the sole asset of numerous HDFCs, including that of Ms. Jones and Ms. Thomas-Murchison's, as New York Not-For-Profit Corporation Law §§ 510(a)(3) and 511(b) require.

237.     Defendants' failure to provide adequate notice is reinforced by significant anecdotal evidence as well.

238.     None of the Plaintiffs in this case received notice of Defendants' *in rem* foreclosure proceedings, let alone sufficient notice to allow them to appear in and oppose the proceedings.

239.     As explained above, each of Defendants' claimed notices to Plaintiffs are deficient on their face.

240.     Moreover, not a single property owner showed up to object to the *In Rem 53* default judgment authorizing the seizure of 65 properties, many of which are HDFCs consisting of numerous individuals.

241.     However, *after* the properties were transferred to the TPT Defendants, many property owners appeared in court to protest the default judgment that was entered without their knowledge.

242.     For example, six property owners moved to vacate the *In Rem 53* default judgement and all six property owners asserted that they did not receive notice of the foreclosure proceedings.

243.     In one case, Municipal Defendants seized a building at 315 Harman Street in Brooklyn—despite the fact that the owner timely paid all real estate taxes—due to allegedly unpaid emergency repair liens and numerous code violations.  The owner of 315 Harman Street never received notice of the foreclosure action and contested the City's claims that the property was eligible for inclusion in the TPT Program.  Justice Partnow vacated the foreclosure judgment, observing that "it defies logic that [the owner] would willfully ignore notice of an *in rem* foreclosure action based on emergency repair liens while consistently paying all of its real estate taxes."  Indeed, despite Municipal Defendants obtaining a foreclosure judgment against the property in November 2017, the owner of the property first learned about the seizure in July 2018.

Justice Partnow further noted that, although the City alleged that the property had numerous violations, the exhibit the City provided listing the purported violations was actually for a completely different property located three miles away from the building at 315 Harman Street.

244.    In another case, the owner of a 19-unit apartment building lost the property to Neighborhood Restore, and the City opposed the owner's efforts to vacate the foreclosure judgment, despite the fact that the City "d[id] not dispute that it never informed [the owner] of the Judgment of Foreclosure, nor did it inform [the owner] that it did not intend to honor the Installment Agreement" that it entered into with the owner.  As Justice Partnow observed, "[t]he City could have easily ascertained [the owner's] correct address due to its filing of this address with the Secretary of State," but the City failed to do so.

245.    Similarly, 1055 Bergen Street Housing Development Fund Corporation ("Bergen HDFC"), which owned a property worth millions of dollars, with tax debt constituting a small fraction of the total equity, lost its equity when the building was transferred to Neighborhood Restore.   Bergen HDFC asserted that none of its shareholders were served with notice of the in rem foreclosure, the summons and complaint, the notice of delinquent taxes, or any other notice required under the Code.

246.    Municipal Defendants' response to each of those property owners who learned about the foreclosure proceeding only after the fact has been the same:  too late.  For example, in appealing Justice Partnow's decision vacating the foreclosure of several properties, the City's position is that no remedy exists for the property owners who lost their properties without notice, arguing that the "motions to vacate the foreclosures of their properties were time-barred, because they were made after the expiration of the mandatory redemption period for each property."

247.    In these and other cases, homeowners have first learned about the foreclosures of their homes within days, weeks, or months of the transfer of their properties to a third party.  In other words, the City has in numerous cases failed to provide notice at any point over a multi-year foreclosure process, but the Third Party Transfer Partner was able to provide such notice within mere days, weeks, or months after such transfer became irreversible.  Defendants thus clearly knew that the pre-transfer notice procedures were inadequate because, when Defendants wanted to inform the (former) homeowners of the status of their (former) homes, Defendants were able to do so.

248.    Moreover, as for properties owned by HDFCs, Defendants admit that they did not make any attempt to provide notice to the individual HDFC shareholders residing within the HDFC's building (or any other persons for that matter).

249.    It is plainly unreasonable for Defendants to rely on HDFCs that they have reason to know are likely functionally-defunct to distribute notice to individual shareholders.  For example, as set forth in more detail in the "Demand Futility" section below, 585 Nostrand Avenue HDFC and 248 Madison Street HDFC had both failed to comply with the City's filing requirements every year for over twenty years before the City apparently decided that their non-existent officers and directors of these HDFCs could be relied upon to distribute notice to the individual shareholders.

250.    The same is true for many, if not all, of the other HDFC properties seized through the TPT Program.

251.    By providing these sham notices to HDFCs, Municipal Defendants have acted in derogation of their duties to assist HDFCs and their resident shareholders by, among other things,

providing them with advisory and consultative services "as may be necessary for the efficient and harmonious management" of HDFCs' properties.  *See, e.g.* N.Y. Priv. Hous. Fin. Law § 578.

## FED. R. CIV. P. 23 CLASS ALLEGATIONS

252.    Plaintiffs seek to maintain this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of those property owners dispossessed of their properties in connection with an *in rem* foreclosure proceeding filed by the City pursuant Section 11-401 *et seq.* of the Code.

253.    The "*In Rem* Class" which Plaintiffs seek to define includes:

> All current or former owners of property within the five (5) boroughs of New York City who, since 1996 through the final date of disposition of this action, had their properties subjected to *in rem* foreclosure proceedings initiated by the City of New York under Code § 11-401.1 *et seq.*

254.    The number of class members ("Class Members") who have suffered as a result of Defendants' violations of the law, as set forth herein, are too numerous to join in a single action, necessitating class recognition.

255.    Numerous questions of fact and law are common to the entire proposed *In Rem* Class.

256.    Specifically, Justice Partnow found that the City's improperly taking of properties through the TPT program is a "widespread occurrence being experienced by many other property owners, who are being inequitably stripped of their valuable property rights."

257.    None of the aforementioned claims are specific to Plaintiffs or any proposed *In Rem* Class Members, and Plaintiffs' claims are typical of those asserted by the proposed *In Rem* Class.

258.    Plaintiffs will fairly and adequately represent the interests of all members of the proposed *In Rem* Class.

259.     A class action is superior to all other methods of adjudication and is necessary in order to fairly and completely litigate the *In Rem* Class's claims.

260.     The Class Members of the proposed *In Rem* Class are readily discernable and ascertainable.   Contact information for all members of the proposed *In Rem* Class is readily available from Municipal Defendants' records, which they are required to maintain pursuant to sections 11-416 and 11-417 of the Code.   Notice of this class action can be provided by any means permissible under the Fed. R. Civ. P. 23 requirements.

261.     Plaintiffs assert these claims on their own behalf as well as on behalf of the *In Rem* Class through their attorneys who are experienced in class action litigation as well as real property and foreclosure defense litigation.

262.     Plaintiffs are able to fairly represent and properly protect the interests of the absent members of the proposed *In Rem* Class and have no interests conflicting with those of the *In Rem* Class.

263.     The public will benefit from this case being brought as a class action because it serves the interests of judicial economy by saving the Court's time and effort and by reducing a multitude of claims to a single litigation.   Prosecution of separate actions by individual *In Rem* Class Members creates a risk of varying results based on identical fact patterns as well as disposition of the Class's interests without their knowledge or contribution.

264.     The questions of law and fact that are nearly identical for all Class Members make proceeding as a class action ideal.   Without judicial resolution of the claims asserted on behalf of the proposed *In Rem* Class, continued violations—including violations of the United States Constitution, New York State Constitution, NY GBL § 349, and the Code—will undoubtedly continue.

265.     Among other common questions, whether Plaintiffs and members of the *In Rem* Class are entitled to just compensation for their Surplus Equity taken through the TPT Program can readily be resolved through the class action process.

## DEMAND FUTILITY

266.     Plaintiffs Cecelia Jones and Sherlivia Thomas-Murchison are entitled to pursue all of their claims as direct claims because each suffered damages directly from Defendants' actions.

267.     Alternatively, however, Ms. Jones and Ms. Thomas-Murchison bring this action derivatively—on behalf of 585 Nostrand Avenue HDFC and 248 Madison Street HDFC, respectively—to redress injuries to the HDFCs as a result of Defendants' misconduct.

*585 Nostrand Avenue HDFC (Cecelia Jones)*

268.     Any demand by Ms. Jones upon 585 Nostrand Avenue HDFC would be futile for two independent reasons.

269.     First, the failure of 585 Nostrand Avenue HDFC to seek redress for Defendants' appropriation of property is so egregious on its face that it could not have been the product of sound business judgement.  The market value of the 585 Nostrand Avenue Property was well in excess of any Tax Liens that existed when the City foreclosed upon and subsequently transferred the property to Neighborhood Restore.  Because 585 Nostrand Avenue HDFC's sole business purpose was to operate the 585 Nostrand Avenue Property, there can be no business purpose for why 585 Nostrand Avenue HDFC would knowingly allow the sole asset constituting its entire purpose to be taken.  Likewise, there is no reason why 585 Nostrand Avenue HDFC would voluntarily decline to assert claims against Defendants after Defendants misappropriated hundreds of thousands of dollars in Surplus Equity from 585 Nostrand Avenue HDFC's shareholders.

270.     Second, 585 Nostrand Avenue HDFC does not have a functioning board of directors or officers upon whom a demand could be made, or who would be capable of considering whether to cause 585 Nostrand Avenue HDFC to seek redress from Defendants.

271.     From September 6, 2018 until the present, there have been no material operations or other business to address for any officers or directors previously appointed for 585 Nostrand Avenue HDFC.  585 Nostrand Avenue HDFC was created for the purpose of owning the 585 Nostrand Avenue Property.  The 585 Nostrand Avenue Property was foreclosed upon by judgment dated December 14, 2017, and title was transferred to Neighborhood Restore Housing Development Fund Corp by deed dated September 6, 2018.  No officers or directors have been appointed to 585 Nostrand Avenue HDFC in at least three years.

272.     Even before the disposition of the HDFC's only asset, the City's records indicate that 585 Nostrand Avenue HDFC did not have functioning officers or directors.

273.     For example, despite being required to make bi-annual filings with the City, 585 Nostrand Avenue HDFC has not submitted any filings since February 17, 1993.  Defendants thus had actual knowledge that 585 Nostrand Avenue HDFC had not made the required filings for more than 20 years before they purported to provide notice to the HDFC's non-existent directors and/or officers.

274.     The only officer of 585 Nostrand Avenue HDFC listed in any public records is Wilfred Heyliger, who signed several documents on behalf of the HDFC in 1994 and served as its president.  Mr. Heyliger passed away in 2002.

275.     In addition, according to Municipal Defendants, the City sent Notices of Foreclosure to 585 Nostrand Avenue HDFC alerting the HDFC that the 585 Nostrand Avenue Property would be foreclosed upon if the delinquent charges owed to the City were not paid.  The

HDFC did not respond to the Notices of Foreclosure or otherwise attempt to prevent the foreclosure and transfer of the 585 Nostrand Avenue Property.  Given that 585 Nostrand Avenue HDFC was created for the purpose of owning the 585 Nostrand Avenue Property, the failure to intervene in the foreclosure proceedings further supports that the HDFC either did not get such notice or does not have functioning officers or directors.

276.    Because 585 Nostrand Avenue HDFC does not have functioning officers or directors upon whom a demand could be made, any attempt to issue such a demand would be futile.

277.    Ms. Jones will adequately and fairly represent the interests of 585 Nostrand Avenue HDFC in enforcing and prosecuting its rights.

### 248 Madison Street HDFC (Sherlivia Thomas-Murchison)

278.    Any demand by Ms. Thomas-Murchison upon 248 Madison Street HDFC would be futile for two independent reasons.

279.    First, the failure of 248 Madison Street HDFC to seek redress for Defendants' appropriation of property is so egregious on its face that it could not have been the product of sound business judgment.  The market value of the 248 Madison Street Property was well in excess of any Tax Liens that existed when the City foreclosed upon and subsequently transferred the property to Neighborhood Restore.  Because 248 Madison Street HDFC's sole business purpose was to operate the 248 Madison Street Property, there can be no business purpose for why 248 Madison Street HDFC would knowingly allow the sole asset constituting its entire purpose to be taken.  Likewise, there is no reason why 248 Madison Street HDFC would voluntarily decline to assert claims against Defendants after Defendants misappropriated hundreds of thousands of dollars in Surplus Equity from 248 Madison Street HDFC's shareholders.

280.     Second, 248 Madison Street HDFC does not have a functioning board of directors or officers upon whom a demand could be made, or who would be capable of considering whether to cause 248 Madison Street HDFC to seek redress from Defendants.

281.     From August 8, 2012 until the present, there have been no material operations or other business to address for any officers or directors previously appointed for 248 Madison Street HDFC.  248 Madison Street HDFC was created for the purpose of owning the 248 Madison Street Property.  The 248 Madison Street Property was foreclosed upon by judgment dated November 2, 2011, and the deed was transferred to Neighborhood Restore Housing Development Fund on August 8, 2012.[16]  Thus no officers or directors appear to have been appointed to 248 Madison Street HDFC in at least 9 years.

282.     Even before its only asset was transferred, 248 Madison Street HDFC did not have functioning officers or directors.

283.     For example, despite being required to make bi—annual filings with the City, 248 Madison Street HDFC has not submitted any filings since September 12, 1994.  Defendants thus had actual knowledge that 248 Madison Street HDFC had not made the required filings for more than 20 years before they purported to provide notice to the HDFC's non-existent directors and/or officers.

284.     Moreover, the only officer of 248 Madison HDFC appearing in any public records is Margaret Blow, who signed several documents on behalf of the HDFC in 1995 and served as its treasurer.

---

[16] The deed to the 248 Madison Street Property was subsequent transferred to Bridge Street on February 10, 2016.

285.    Margaret Blow is Ms. Thomas-Murchison's mother.  She passed away in April 2011, months before the City foreclosed upon the 248 Madison Street Property.

286.    In addition, according to Municipal Defendants, the City sent Notices of Foreclosure to 248 Madison Street HDFC alerting the HDFC that the 248 Madison Street Property would be foreclosed upon if the delinquent charges owed to the City were not paid.  The HDFC did not respond to the Notices of Foreclosure or otherwise attempt to prevent the foreclosure and transfer of the 248 Madison Street Property.  Given that 248 Madison Street HDFC was created for the purpose of owning the 248 Madison Street Property, the failure to intervene in the foreclosure proceedings further demonstrates that the HDCF either did not receive such notice or does not have functioning officers or directors.

287.    Because 248 Madison Street HDFC does not have functioning officers or directors upon whom demand could be made, any attempt to issue such a demand would be futile.

288.    Ms. Thomas-Murchison will adequately and fairly represent the interests of 248 Madison Street HDFC in enforcing and prosecuting its rights.

## CAUSES OF ACTION

### COUNT I

**VIOLATION OF THE FIFTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983
TAKING**

289.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

290.    In taking the actions described above, Defendants each are "persons" who acted "under color of" state law, and/or conspired with such persons, in violation of 42 U.S.C. §1983.

Defendants have subjected, or caused to be subjected, Plaintiffs to the deprivation of their rights, privileges, and immunities secured to them by the United States Constitution and law, specifically the Fifth and Fourteenth Amendments' prohibition of taking property for public use without the payment of just compensation.

291.    TPT Defendants acted under color of state law in accepting properties transferred to them under the TPT Program.  TPT Defendants and Municipal Defendants' interests are also intimately intertwined.   Municipal Defendants rely on TPT Defendants to implement their affordable housing plan—in fact, one of the purported reasons for creating the TPT Program was precisely because the City was unable to manage all of the foreclosed upon properties that TPT Defendants are now tasked with managing.   Similarly, TPT Defendants rely on Municipal Defendants to provide them with valuable properties free of charge.  Moreover, there is a close nexus between the TPT Defendants and Municipal Defendants, including because Municipal Defendants are effectively subsidizing TPT Defendants, and TPT Defendants purport to perform a public function through providing affordable housing.

292.    Defendants' actions described herein constitute a policy, custom, and/or practice of taking property for public use without paying just compensation.

293.    Plaintiffs have been proximately and directly injured by the unlawful actions of Defendants alleged herein, in violation of clearly established law.

294.    Through the TPT Program, Defendants have taken Plaintiffs' Surplus Equity in their properties and have appropriated this Surplus Equity for public use without the payment of just compensation.

295.    Defendants did not pay any compensation to Plaintiffs in exchange for taking their Surplus Equity.

296.    Defendants' actions violate the rights of Plaintiffs and those similarly situated under the Takings Clause of the Fifth Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment to the United States Constitution.

297.    Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, including the Surplus Equity of their properties seized pursuant to the TPT Program.

298.    Plaintiffs are also entitled to an award of attorneys fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
### EQUAL PROTECTION

299.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

300.    In taking the actions described above, Defendants each are "persons" who acted "under color of" state law, and/or conspired with such persons, in violation of 42 U.S.C. §1983. Defendants have subjected, or caused to be subjected, Plaintiffs to the deprivation of their rights, privileges, and immunities secured to them by the United States Constitution and law, specifically the Fourteenth Amendment and its guarantee of equal protection under the law.

301.    TPT Defendants acted under color of state law in accepting properties transferred to them under the TPT Program.  TPT Defendants and Municipal Defendants' interests are also intimately intertwined.   Municipal Defendants rely on TPT Defendants to implement their affordable housing plan—in fact, one of the purported reasons for creating the TPT Program was precisely because the City was unable to manage all of the foreclosed upon properties that TPT Defendants are now tasked with managing.   Similarly, TPT Defendants rely on Municipal

Defendants to provide them with valuable properties free of charge.  Moreover, there is a close nexus between the TPT Defendants and Municipal Defendants, including because Municipal Defendants are effectively subsidizing TPT Defendants, and TPT Defendants purport to perform a public function through providing affordable housing.

302.    Defendants' actions described herein constitute a policy, custom, and/or practice of taking property in violation of the former property owners' rights to equal protection under the law.

303.    Plaintiffs have been proximately and directly injured by the unlawful actions by Defendants alleged herein, in violation of clearly established law.

304.    Plaintiffs are members of a suspect class because of their race, specifically African American, Caribbean American, and/or Hispanic American descent.

305.    Defendants discriminate against elderly and minority homeowners through their implementation of the TPT Program, taking Surplus Equity from Plaintiffs and other elderly minority homeowner who live in communities of color without any compensation.

306.    Defendants select which properties to include in the TPT Program, and they intentionally select properties in communities of color owned by elderly and minority homeowners.

307.    Defendants' disparate treatment of otherwise similarly-situated property owners is also arbitrary and capricious, as there is no rational basis for treating property owners who own non-distressed properties differently based on whether the properties happen to be on the same tax lot block as a statutorily distressed property.

308.    Defendants' actions violate the rights of Plaintiffs and those similarly situated under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

309.     Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, including the Surplus Equity of their properties seized pursuant to the TPT Program.

310.     Plaintiffs are also entitled to an award of attorneys fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
### DUE PROCESS

311.     Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

312.     In taking the actions described above, Defendants each are "persons" who acted "under color of" state law, and/or conspired with such persons, in violation of 42 U.S.C. § 1983. Defendants have subjected, or caused to be subjected, Plaintiffs to the deprivation of their rights, privileges, and immunities secured to them by the United States Constitution and law, specifically the Fourteenth Amendment's guarantee that Plaintiffs shall not be deprived of property without due process of law.

313.     TPT Defendants acted under color of state law in accepting properties transferred to them under the TPT Program.  TPT Defendants and Municipal Defendants' interests are also intimately intertwined.   Municipal Defendants rely on TPT Defendants to implement their affordable housing plan—in fact, one of the purported reasons for creating the TPT Program was precisely because the City was unable to manage all of the foreclosed upon properties that TPT Defendants are now tasked with managing.   Similarly, TPT Defendants rely on Municipal Defendants to provide them with valuable properties free of charge.  Moreover, there is a close nexus between the TPT Defendants and Municipal Defendants, including because Municipal

Defendants are effectively subsidizing TPT Defendants, and TPT Defendants purport to perform a public function through providing affordable housing.

314.     Defendants' actions described herein constitute a policy, custom, and/or practice of depriving homeowners of their property without due process of law.

315.     Plaintiffs and those similarly situated have been proximately and directly injured by the unlawful action of Defendants alleged herein, in violation of clearly established law.

316.     As codified, the notice provisions of the TPT Program violate the Due Process Clause of the and Fourteenth Amendment to the United States Constitution.

317.     As implemented, the notice provisions of the TPT Program violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

318.     Defendants' actions violate the rights of Plaintiffs and those similarly situated under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

319.     Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity of their properties seized pursuant to the TPT Program.

320.     Plaintiffs are also entitled to an award of attorneys fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV
### VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
### EXCESSIVE FINES

321.     Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

322.     In taking the actions described above, Defendants each are "persons" who acted "under color of" state law, and/or conspired with such persons, in violation of 42 U.S.C. §1983. Defendants have subjected, or caused to be subjected, Plaintiffs to the deprivation of their rights, privileges, and immunities secured to them by the United States Constitution and law, specifically the Eighth Amendment, as applied to the states under the Fourteenth Amendment, and its prohibition of excessive fines.

323.     TPT Defendants acted under color of state law in accepting properties transferred to them under the TPT Program.  TPT Defendants and Municipal Defendants' interests are also intimately intertwined.    Municipal Defendants rely on TPT Defendants to implement their affordable housing plan—in fact, one of the purported reasons for creating the TPT Program was precisely because the City was unable to manage all of the foreclosed upon properties that TPT Defendants are now tasked with managing.  Similarly, TPT Defendants rely on Municipal Defendants to provide them with valuable properties free of charge.  Moreover, there is a close nexus between the TPT Defendants and Municipal Defendants, including because Municipal Defendants are effectively subsidizing TPT Defendants, and TPT Defendants purport to perform a public function through providing affordable housing.

324.     Defendants' actions described herein constitute a policy, custom, and/or practice of imposing excessive fines on homeowners who allegedly owe taxes to the City.

325.     Plaintiffs and those similarly situated have been proximately and directly injured by the unlawful actions by Defendants alleged herein, in violation of clearly established law.

326.     Through the TPT Program, Defendants have imposed excessive fines on Plaintiffs and those similarly situated by taking their Surplus Equity based upon Tax Liens that constitute a

small fraction of the values of the properties Defendants have taken.  Defendants' conduct violates

the Excessive Fines Clause in the Eighth Amendment to the United States Constitution.

327.    Seizure and retention of equity far in excess of any Tax Liens on the property is

punitive in nature because it punishes homeowners for owing Tax Liens.

328.    Seizure and retention of the Surplus Equity cannot be tied to any rational purpose

because it punishes those inversely to the relative amount of their Tax Liens.

329.    These excessive fines violate the Eighth Amendment rights of Plaintiffs and those

similarly situated.

330.    Plaintiffs and those similarly situated have suffered damages in an amount to be

proven at trial, including the Surplus Equity of their properties seized pursuant to the TPT Program.

331.    Plaintiffs are also entitled to an award of attorneys fees and costs pursuant to 42

U.S.C. § 1988.

## COUNT V
### CONSPIRACY TO DEPRIVE PLAINTIFFS OF EQUAL PROTECTION UNDER THE LAW
### 42 U.S.C. § 1985(3)

332.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs

above

333.    Defendants have deprived Plaintiffs and those similarly situated of their rights to

equal protection under the law, among other rights, because of their race, by targeting them to

include their properties in the TPT program and to seize their home equity in excess of any Tax

Lien.

334.    Defendants engaged in a conspiracy with each other for the purpose of depriving

Plaintiffs and those similarly situated of equal protection under the law.

335.    Actions taken by each Defendant in furtherance of the conspiracy deprived Plaintiffs of equal protection of the laws.

336.    For example, each Defendant took actions to select Plaintiffs' properties and the properties of those similarly situated for inclusion in the TPT Program based on their race of the property owners.  Each Defendant also took actions to seize the Surplus Equity from Plaintiffs and those similarly situated without compensation.

337.    Defendants each engaged in other overt acts to further the conspiracy, including the transfer by Municipal Defendants to the TPT Defendants of Plaintiffs' Surplus Equity.

338.    Municipal Defendants have further overtly acted by attempting to conceal the facts of the transfer from Plaintiffs and those similarly situated in furtherance of the agreement by deceiving them into not challenging Defendants' seizures or preventing them from paying off the Tax Liens that constitute the predicate for Defendants' seizures.

339.    Defendants each intentionally participated in the agreement to use the TPT Program in furtherance of the plan and purpose to expropriate Surplus Equity, primarily from minority homeowners with properties in communities of color, to deprive Plaintiffs and those similarly situated of equal protection of the laws.

340.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated. Plaintiffs, and those similarly situated, have been damaged in an amount to be proven at trial, including the Surplus Equity of their properties seized pursuant to the TPT Program.

## COUNT VI

### VIOLATION OF ARTICLE I, SECTION 7 OF THE NEW YORK STATE CONSTITUTION

### TAKING

341.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

342.    Article I, Section 7 of the New York State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation."

343.    For the same reasons why Defendants' actions violate the Takings Clause of the United States Constitution, their conduct also violates Article I, Section 7 of the New York State Constitution.

344.    Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity of their properties seized pursuant to the TPT Program.

## COUNT VII

### VIOLATION OF ARTICLE I, SECTION 11 OF THE NEW YORK STATE CONSTITUTION

### EQUAL PROTECTION

345.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

346.    Article I, Section 11 of the New York State Constitution provides: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof.  No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

347.    For the same reasons why Defendants' actions violate the Equal Protection Clause of the United States Constitution, their conduct also violates Article I, Section 11 of the New York State Constitution.

348.    Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity of their properties seized pursuant to the TPT Program,

## COUNT VIII

### VIOLATION OF ARTICLE I, SECTION 6 OF THE NEW YORK STATE CONSTITUTION

### DUE PROCESS

349.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

350.    Article I, Section 6 of the New York State Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

351.    For the same reasons why Defendants' actions violate the Due Process Clause of the United States Constitution, their conduct also violates Article I, Section 6 of the New York State Constitution.

352.    Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity of their properties seized pursuant to the TPT Program.

## COUNT IX

### VIOLATION OF ARTICLE I, SECTION 5 OF THE NEW YORK STATE CONSTITUTION

### EXCESSIVE FINES

353.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

354.    Article I, Section 5 of the New York State Constitution prohibits the imposition of excessive fines.

355.    For the same reasons why Defendants' actions violate the Excessive Fines Clause of the United States Constitution, their conduct also violates Article I, Section 5 of the New York State Constitution.

356.    Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity of their properties seized pursuant to the TPT Program.

## COUNT X
## CONVERSION

357.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

358.    Plaintiffs, and those similarly situated, held possessory rights or interests in the properties subject to the TPT program and seizure.

359.    Defendants intentionally exercised control over Plaintiffs' properties and the properties of those similarly situated to the exclusion of the owners' rights or interests held in the subject properties.

360.    Defendants exercise of control over Plaintiffs' properties and the properties of those similarly situated is in derogation of their rights to the Surplus Equity of their homes.

361.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated and is likely to continue to cause financial harm to Plaintiffs and those similarly situated.

362.    Plaintiffs, and those similarly situated, have accordingly been damaged in an amount to be proven at trial.

## COUNT XI

## UNJUST ENRICHMENT

363.     Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

364.     Plaintiffs, and those similarly situated, held possessory rights or interests in the Surplus Equity in the properties subject to the TPT Program seizures.

365.     Defendants have been enriched by the Surplus Equity they took from Plaintiffs and those similarly situated.

366.     Defendants' enrichment was at Plaintiffs' expense, as Plaintiffs were deprived of their Surplus Equity.

367.     It is against equity and good conscience to permit Defendants to retain the Surplus Equity.

## COUNT XII

## DECEPTIVE PRACTICES
## VIOLATION OF NY GBL § 349

368.     Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

369.     Defendants' conduct in administering the TPT Program has constituted a deceptive act and practice in violation of NY GBL § 349.

370.     Defendants' conduct in administering the TPT Program has been consumer-oriented because their misleading practices implicate the public interest and constitute repeated, deceptive practices.

371.     Defendants' conduct in administering the TPT Program has been misleading in a material way.  For example, Defendants have, through deceit, acquired Plaintiffs' Surplus Equity

and have not provided Plaintiffs, or those similarly situated, with constitutionally required due process or any mechanism to recover the value of their Surplus Equity.

372.   Plaintiffs, and those similarly situated, have suffered injuries as a result of Defendants' deceptive acts.  For example, Plaintiffs and those similarly situated have lost their Surplus Equity.

373.   Plaintiffs and those similarly situated have suffered damages in an amount to be proven at trial, which damages include the Surplus Equity.

## COUNT XIII

### VIOLATION OF ARTICLE II SECTIONS 10-11 OF THE NEW YORK STATE MUNICIPAL HOME RULE LAW
### (Against the Municipal Defendants)

374.   Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above, with the same force and effect as if more fully set forth at length herein.

375.   As set forth herein, Municipal Defendants' conduct constitutes *ultra vires* activity exceeding the lawful authority expressly, actually, or implicitly granted to the City by New York State's Legislature.

376.   Further, as set forth herein, Municipal Defendants' conduct constitutes *ultra vires* activity because their conduct failed to adhere to the letter and spirit of the Code when it instituted *in rem* proceedings against properties that did not meet the statutory definition of "distressed" under the Code, and by otherwise deviating from the requirements of the Code and other applicable law in their execution and administration of the Third Party Transfer Program.

377.   Plaintiffs, and those similarly situated, have been damaged as a result of Municipal Defendants' misconduct in an amount to be proven at trial.

## COUNT XIV
### CIVIL CONSPIRACY

378.    Plaintiffs repeat and reiterate each and every allegation contained in the paragraphs above.

379.    Defendants have individually committed numerous torts, including each constitutional tort provided herein (conversion, unjust enrichment, deceptive business practices in violation of GBL § 349, and violation of the Municipal Home Rule Law).

380.    TPT Defendants and Municipal Defendants have formed agreements relating to their participation and roles in the TPT Program, including Municipal Defendants' agreement to transfer properties to TPT Defendants, and TPT Defendants' agreement to accept those properties, foreclosed upon pursuant to the TPT Program.  In addition, as described above, TPT Defendants and Municipal Defendants coordinate before foreclosure concerning the selection of properties for inclusion in the TPT Program.  Defendants' agreements include targeting Plaintiffs and other racial minorities to expropriate their Surplus Equity.

381.    Defendants have each committed overt acts in furtherance of this agreement, including the selection of properties for inclusion in the TPT program and the transfer (from Municipal Defendants) and receipt (by the TPT Defendants) of Plaintiffs' properties.

382.    Defendants have further overtly acted by attempting to conceal the facts of the transfer from Plaintiffs and those similarly situated in furtherance of their conspiracy.

383.    Defendants each intentionally participated in the agreement in furtherance of the plan and purpose to expropriate Surplus Equity from Plaintiffs and those similarly situated.

384.    Defendants' conduct has caused financial harm to Plaintiffs and those similarly situated in an amount to be proven at trial, including the amount of their Surplus Equity.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and those similarly situated demand judgment against Defendants as follows:

A.      A finding that, at the earliest possible time, Plaintiffs should be allowed to give notice of this putative Class Action, or the Court should issue such notice, to all members of the putative class defined herein.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to opt out of this lawsuit;

B.      In the event that any claims brought by Ms. Jones are not maintainable as direct claims, a finding that demand on 248 Madison Street HDFC would be futile, and that Ms. Jones may bring such claims derivatively on behalf of 248 Madison Street HDFC.

C.      In the event that any claims brought by Ms. Thomas-Murchison are not maintainable as direct claims, a finding that demand on 585 Nostrand Avenue HDFC would be futile, and that Ms. Thomas-Murchison may bring such claims derivatively on behalf of 585 Nostrand Avenue HDFC.

D.      Designation of Plaintiffs as representatives of the Rule 23 Class defined herein, and Plaintiffs' counsel as Class Counsel;

E.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23 for the purposes of the claims brought on behalf of all proposed Class Members;

F.      Granting Plaintiffs a jury trial on all issues so triable, including to determine liability and damages;

G.      An award of all damages which Plaintiffs and all Class Members have sustained as a result of Defendants' conduct, including compensatory damages—*e.g.*, the value of the seized

properties less the amount of any outstanding Tax Liens—consequential damages, punitive damages, penalties, and general and special damages caused by Defendants' unlawful practices;

H.      An award to Plaintiffs, and all Class Members, of pre-judgment interest at the highest applicable rate;

I.      An award to Plaintiffs, and all Class Members, of post-judgment interest at the highest applicable rate;

J.      An award to Plaintiffs, and all Class Members, of their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other fees and costs;

K.      An award to Plaintiffs, and all Class Members, of any and all other pre-judgment and post-judgment interest, as provided by law; and

L.      Granting Plaintiffs, and all Class Members, such other and further relief as this Court finds just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable, including liability and damages.

Dated: September 20, 2021

                                          Respectfully submitted,

By: /s/ *Matthew L. Berman*
    Matthew L. Berman
    Robert J. Valli, Jr.
    Yolande I. Nicholson, Esq. *Co-Counsel*
    VALLI KANE & VAGNINI LLP
    600 Old Country Road
    Garden City, NY 11530
    (516) 203-7180

*Attorneys for Plaintiffs*

By: /s/ *Keith H. Wofford*
    Keith H. Wofford
    WHITE & CASE LLP
    1221 Avenue of the Americas
    New York, NY  10020-1095
    (212) 819-7595

*Attorney for Plaintiffs McConnell Dorce and
Sherlivia Thomas-Murchison*

By:/s/ *Gregg L. Weiner*
    Gregg L. Weiner
    Alexander B. Simkin
    Phillip Kraft
    ROPES & GRAY LLP
    1211 Avenue of the Americas
    New York, NY 10036
    (212) 596-9000

    Daniel A. Yanofsky (admitted *pro hac vice*)
    ROPES & GRAY LLP
    Prudential Tower, 800 Boylston Street
    Boston, MA 02199-3600
    (617) 508-4600

*Attorneys for Plaintiffs McConnell Dorce and
Sherlivia Thomas-Murchison*