**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

McCONNELL DORCE, CECELIA JONES, and
SHERLIVIA THOMAS-MURCHISON,
individually and on behalf of all others similarly
situated,

                    Plaintiffs,

                v.

CITY OF NEW YORK, LOUISE CARROLL
(Commissioner of the New York City Department
of Housing Preservation and Development),
SHERIF SOLIMAN (Commissioner of the New
York City Department of Finance),
NEIGHBORHOOD RESTORE HOUSING
DEVELOPMENT FUND CORP., and BSDC
KINGS COVENANT HOUSING
DEVELOPMENT FUND COMPANY, INC.,

                    Defendants,

                -and-

585 NOSTRAND AVENUE HOUSING
DEVELOPMENT FUND CORPORATION and
248 MADISON STREET HOUSING
DEVELOPMENT FUND CORPORATION,

                    Nominal Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. 1:19-cv-02216-JGK

**Plaintiffs' Memorandum of Law in
Opposition to Defendants' Motions to
Dismiss the Amended Complaint**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL ALLEGATIONS OF THE COMPLAINT ............................................... 3

ARGUMENT .............................................................................................................. 8

I.      Standard of Review ......................................................................................... 8

II.     Jones and Thomas-Murchison Have Direct and Derivative Standing ............... 9

        A.      Jones and Thomas-Murchison Have Direct Standing.............................. 9

        B.      Jones and Thomas-Murchison Have Derivative Standing..................... 10

III.    The Amended Complaint States a Claim for Relief as to Each Count ............ 11

        A.      Takings without Just Compensation (Counts 1 and 6) ......................... 11

        B.      Equal Protection (Counts 2 and 7)....................................................... 13

        C.      Due Process (Counts 3 and 8)............................................................... 17

        D.      Excessive Fines (Counts 4 and 9) ........................................................ 20

        E.      Conversion and Unjust Enrichment (Counts 10 and 11) ..................... 22

        F.      GBL § 349 (Count 12) ......................................................................... 25

        G.      Municipal Home Rule (Count 13) ........................................................ 26

        H.      Conspiracy (Counts 5 and 14).............................................................. 27

IV.     TPT Defendants Are Liable for The Constitutional Claims ............................ 29

V.      Plaintiffs' Claims and Damages Are Not Barred by *Rooker-Feldman* or the
        Mandate Rule ................................................................................................. 31

        A.      Neither the Mandate Rule nor Rooker-Feldman Bar Plaintiffs' Claims.............. 31

        B.      Plaintiffs' Damages Claims Are Consistent with Their Argument before the
                Second Circuit................................................................................. 33

CONCLUSION.......................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trucking Associations, Inc. v. N.Y. State Thruway Auth.*,
   199 F. Supp. 3d 855 (S.D.N.Y. 2016)......................................................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................8

*Austin v. United States*,
   509 U.S. 602 (1993)...........................................................................................21, 22

*Baldwin Union Free Sch. Dist. v. Cty. of Nassau*,
   9 N.E.3d 351 (N.Y. 2014).......................................................................................27

*Baltazar v. Houslanger & Assocs., PLLC*,
   No. 16-4982, 2018 WL 3941943 (E.D.N.Y. Aug. 16, 2018) ................................19

*Bansbach v. Zinn*,
   1 N.Y.3d 1 (2003) ...........................................................................................10, 11

*Blakely v. Cardozo*,
   No. 07-cv-3951, 2007 WL 2702241 (S.D.N.Y. Sept. 17, 2007) ........................9, 10

*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*,
   3 N.Y.3d 200 (2004) ...............................................................................................25

*Canzoneri v. Inc. Vill. of Rockville Centre*,
   986 F. Supp. 2d 194 (E.D.N.Y. 2013) .....................................................................9

*Ceribelli v. Elghanayan*,
   990 F.2d 62 (2d Cir. 1993).......................................................................................9

*City of Amsterdam v. Helsby*,
   37 N.Y.2d 19 (1975) ...............................................................................................26

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 229 (2d Cir. 1999).....................................................................................27

*Colavito v New York Organ Donor Network*,
   8 N.Y.3d 43 (2006) .................................................................................................23

*Coleman v. District of Columbia*,
   70 F. Supp. 3d 58 (D.D.C. 2014) .......................................................................11, 12

*Cooper v. U.S. Postal Service*,
  577 F.3d 479 (2d Cir. 2009) ................................................................. 30

*Dorce v. City of New York*,
  2 F.4th 82 (2d Cir. 2021) ............................................................ *passim*

*Fabrikant v. French*,
  691 F.3d 193 (2d Cir. 2012) ......................................................... 29, 30

*Freed v. Thomas*,
  No. 17-CV-13519, 2021 WL 942077 (E.D. Mich. Feb. 26, 2021) ................... 12

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
  189 F.3d 268 (2d Cir. 1999) ................................................................. 30

*Global Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006) ............................................................ 8, 18

*Haywood v. Fremont Inv. & Loan*,
  No. 08 CIV. 4961, 2009 WL 706090 (E.D.N.Y. Mar. 16, 2009) ................... 19

*Kamhi v. Town of Yorktown*,
  74 N.Y.2d 423 (1989) ....................................................................... 27

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................... 22

*Kia P. v. McIntyre*,
  235 F.3d 749 (2d Cir. 2000) ................................................................. 30

*Knick v. Township of Scott*,
  139 S. Ct. 2162 (2019) ................................................................ *passim*

*Lee v. Sony BMG Music Entm't, Inc.*,
  557 F. Supp. 2d 418 (S.D.N.Y. 2008) ..................................................... 8

*Lopresti v. Terwilliger*,
  126 F.3d 34 (2d Cir. 1997) ................................................................. 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 9

*Mayle v. Felix*,
  545 U.S. 644 (2005) .......................................................................... 23

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ............................................................ 8, 31

*Melchner v. Town of Carmel*,
   No. 13-cv-8164, 2014 WL 6665755 (S.D.N.Y. Nov. 21, 2014) ......................................24, 28

*Mennonite Bd. of Missions v. Adams*,
   462 U.S. 791 (1983) .................................................................................................................20

*Miner v. Clinton Cnty., N.Y.*,
   541 F.3d 464 (2d Cir. 2008) ....................................................................................................19

*Mullane v. Central Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950) ...........................................................................................................17, 19

*Nassau Ins. Co. v. Murray*,
   46 N.Y.2d 828 (1978) ..............................................................................................................19

*Nelson v. City of New York*,
   352 U.S. 103 (1956) .....................................................................................................12, 13, 16

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
   442 F.3d 101 (2d. Cir. 2006) ...................................................................................................33

*Petrone v. Davidoff Hutcher & Citron, LLP*,
   54 N.Y.S.3d 25 (N.Y. App. Div. 2017) ..................................................................................22

*Pyke v. Cuomo*,
   258 F.3d 107 (2d Cir. 2001) ....................................................................................................14

*Pyke v. Cuomo*,
   567 F.3d 74 (2d Cir. 2009) .................................................................................................14, 17

*Rafaeli, LLC v. Oakland Cty.*,
   505 Mich. 429 (2020) ...............................................................................................................11

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982) .................................................................................................................31

*Ruston v. Town Bd. for Town of Skaneateles*,
   610 F.3d 55 (2d Cir. 2010) ......................................................................................................17

*Rusyniak v. Gensini*,
   629 F. Supp. 2d 203 (N.D.N.Y. 2009) ...............................................................................27, 28

*Schroeder v. City of New York*,
   371 U.S. 208 (1962) .................................................................................................................20

*Securitron Magnalock Corp. v. Schnabolk*,
   65 F.3d 256 (2d Cir. 1995) .................................................................................................25, 26

*Shoreham Hills, LLC v. Sagaponack Dream House, LLC*,
   66 Misc. 3d 1231(A) (N.Y. Sup. Ct. Mar. 4, 2020)....................................................25

*Siegel v. Engelmann*,
   143 N.Y.S.2d 193 (Sup. Ct. 1955)..........................................................................9

*Slayton v. American Exp. Co.*,
   460 F.3d 215 (2d Cir. 2006)...................................................................................23

*Sybalski v. Indep. Grp.*,
   546 F.3d 255 (2d Cir. 2008)...................................................................................29

*Sykes v. Mel S. Harris and Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2014)....................................................................................26

*In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*,
   63 Misc. 3d 1207(A), 2019 WL 1431423 (N.Y. Sup. Ct. Mar. 28, 2019)................... *passim*

*Timbs v. Indiana*,
   139 S. Ct 682 (2019)..............................................................................................20

*United States v. Bajakajian*,
   524 U.S. 321 (1998)...............................................................................................21

*United States v. Viloski*,
   814 F.3d 104 (2d Cir. 2019)...................................................................................20

*Wallace v. State*,
   40 F. Supp. 3d 278 (E.D.N.Y. 2014) ......................................................................24

*Weissman v. Evans*,
   56 N.Y.2d 458 (1982) ...........................................................................................16

*Yip v. Bd. of Trs. of the State Univ. of N.Y.*,
   No. 03-cv-00959, 2004 WL 2202594 (W.D.N.Y. Sept. 29, 2004)...........................25

**Statutes**

42 U.S.C. § 1983 ..................................................................................................29

N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(8) .........................................................26, 27

N.Y. Priv. Hous. Fin. Law §§ 573, 578 .................................................................9

N.Y.C. Admin. Code § 11-406 ..............................................................................18

N.Y.C. Admin. Code § 11-416 ..............................................................................20

N.Y.C. Admin. Code § 11-354(a)..........................................................................16

**Other Authorities**

U.S. Const. amend. V.................................................................................................................3, 11

U.S. Const. amend. VIII.................................................................................................................20

N.Y. Const. art. 1, § 5.................................................................................................................20

N.Y. Const. art. 7...................................................................................................................11

Fed. R. Civ. P. 12(b)(6)..............................................................................................................8

McConnell Dorce, Cecelia Jones, and Sherlivia Thomas-Murchison ("Plaintiffs") on behalf of themselves and all others similarly situated, submit this consolidated opposition to Municipal Defendants'[1] motion to dismiss brief (ECF-113) (hereafter "MDB") and Neighborhood Restore Housing Development Fund Corp., ("Neighborhood Restore") and BSDC Kings Covenant Housing Development Fund Company, Inc.'s ("BSDC") motion to dismiss brief (ECF-118) (hereafter "TPTDB").

## PRELIMINARY STATEMENT

This lawsuit concerns the City's Third Party Transfer program ("TPT Program") whereby Defendants use an unconstitutional, discriminatory, and unfair process to seize private property owned largely by elderly persons of color based on asserted tax debts and, regardless of how much their home is worth in excess of any tax liens (the "Excess Value"), keep it for themselves. Defendants contend that the TPT Program allows them to take a $2 million home with $3,000 in tax debt and give the property owner *nothing* for his or her significant Excess Value.[2]  Defendants also contend that they need not provide property owners with actual notice that they are taking their homes and keeping their Excess Value.  Many homeowners, including Plaintiffs, received no

---

[1] "Municipal Defendants" consist of the City of New York (the "City"); Louise Carroll, Commissioner of the New York City Department of Housing Preservation and Development ("HPD"); and Sherif Soliman, Commissioner of the New York City Department of Finance ("DOF").

[2] This is no mere hypothetical.  *See* AC ¶ 4 n.4 (City Council member stating that "the home of a black senior in my community valued at over $2 million was transferred for outstanding municipal arrears of only $3,000, which turned out to be a record-keeping error on the part of the City.").

notice until Defendants claimed it was too late.  AC ¶¶ 85-86, 111-12, 143-44, 231-51.  Pursuant

to the TPT Program, the City seizes dozens or hundreds of private properties at a time through

mass *in rem* foreclosure proceedings, forgoes collection on the tax liens that formed the basis of

the proceeding, and conveys those properties *for free* to its real estate developer partners such as

BSDC and Neighborhood Restore.   These TPT Partners are hand-picked by the City for

participation in this program in a closed-door process.  These real estate developers promise to use

the property for "affordable housing" which, in practice, often means they simply begin charging

people rent to live in their own homes.

Defendants argue they are entitled to do all of this with impunity, so long as they take

residential property which (1) happens to be in the geographic area of another property that is

"distressed"; and (2) is a property on which *any amount* of taxes are owed to the City.  The taxes

are just a pretext because the City actually collects *no taxes* from the TPT Program.  With respect

to the example of the $2 million property with a $3,000 tax lien, the real estate developer gets the

$2 million property for free, the City simply forgives the taxes, and the (former) homeowner loses

millions in equity in the property.

Defendants first attempted to skirt this lawsuit by claiming that Plaintiffs lacked standing

and that this Court lacked subject matter jurisdiction.   The Second Circuit rejected those

arguments, holding that Plaintiffs have standing and that this is the proper Court to hear Plaintiffs'

claims. *See Dorce v. City of New York,* 2 F.4th 82 (2d Cir. 2021).  Defendants now continue to try

to evade review, claiming the TPT Program is a "modified *in rem* process."  But this "process"

violates fundamental principles of private property, equal protection, due process, and protection

from excessive fines enshrined in the U.S. and New York constitutions.  When presented with

evidence of Defendants' identical misconduct, a New York state court judge described it as

"unconscionable and shocking to the conscience of the court." *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*, 63 Misc. 3d 1207(A), 2019 WL 1431423, at *9 (N.Y. Sup. Ct. Mar. 28, 2019) (hereafter, "*In Rem 53*") (holding Defendants' conduct would have been illegal if not enjoined or reversed by the Court). Defendants try to justify the TPT Program seizures as ordinary-course tax collection, but that could not be further from the truth. The historic cases Defendants' cite concerning their ability to seize property to satisfy tax debt do not address remotely analogous facts or legal claims, let alone under current Supreme Court precedent.

The Amended Complaint states valid constitutional and common law claims for the harms Plaintiffs have suffered by virtue of the TPT Program. Plaintiffs' claims are well-pled and timely, and neither *Rooker-Feldman* nor the Mandate Rule require dismissal of any claim. Indeed, as the U.S. Supreme Court recently confirmed, "[i]f a local government takes private property without paying for it, that government has violated the Fifth Amendment . . . without regard to subsequent state court proceedings. And the property owner may sue the government at that time in federal court . . . ." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019). This is such a lawsuit.

For the reasons set forth herein, Defendants' motions should be denied.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

### *Defendants' Illegal Conduct*

Defendants have seized numerous properties pursuant to the TPT Program. AC ¶ 158. In 2017 alone, Municipal Defendants used the TPT Program to obtain a default *in rem* judgment against sixty-five properties in Kings County worth millions of dollars in the aggregate, all of which were gifted to Neighborhood Restore and some of which were subsequently transferred to BSDC . AC ¶ 159-160. The widespread misuse of the TPT Program and its effects on homeowners of color has come into focus over the past several years. AC ¶ 163. For example, in March 2019,

Justice Partnow—who had previously granted the default judgment resulting in the seizure of these sixty-five properties—received evidence that the City had misrepresented the facts underlying the foreclosure proceedings, describing the City's conduct in a detailed opinion as "unconscionable and shocking to the conscience of the court." AC ¶ 164. Later that year, in July 2019, a joint committee of the City Council issued a report confirming the widespread abuse of the TPT Program. *See* AC ¶ 165 & Ex. A (the "City Council Report").

These findings and conclusions mirror Plaintiffs' own experiences and those of numerous other former homeowners who lost their homes—and all of the Excess Value they had accrued—based upon relatively small purported tax liens. AC ¶ 165. Justice Partnow's decision and the City Council Report confirm what Plaintiffs and others across New York City have experienced—that Defendants have targeted homes in communities of color; failed to provide notice to owners of foreclosure proceedings involving their property; refused to allow owners to pay amounts due to the City (or allowed owners to make payments but foreclosed on the properties anyway); and stripped owners of their property rights without providing any compensation for Excess Value. AC ¶ 166.

Defendants select properties for inclusion in the TPT Program seizures by identifying statutorily "distressed" properties, which means that the property has tax liens that are equal to or greater than fifteen percent of the property's value, and either (i) has an average of five or more housing code violations per dwelling unit, or (ii) is subject to a lien for any expenses incurred by HPD of $1,000 or more for the repair of any dangerous or unlawful conditions on the property. AC ¶ 44. Defendants then seize not only these statutorily distressed properties, but other properties on the same tax block with *any amount* of tax debt. AC ¶ 50. As a result, if a homeowner lives in a neighborhood where one of his or her neighbors is behind on taxes, that homeowner is far more

likely to be included in the TPT Program.  AC ¶ 223.  In the last round of TPT Program seizures, approximately 50%—213 of the 420 properties selected—were in just eleven neighborhoods, all of which are communities of color.  AC ¶ 222.[3]  No property in Staten Island was selected for inclusion.  *Id.*

Municipal Defendants work hand-in-hand with TPT Defendants to effectuate the TPT Program seizures.  AC ¶ 169.  TPT Defendants want to select valuable properties for the obvious reason that they will become the owners.  AC ¶ 170.  Municipal Defendants want to target homes with relatively small tax liens because those liens will be extinguished with no payment.  AC ¶ 171.  The result is that Defendants target homes with high values and low tax debt, resulting in the uncompensated taking of massive Excess Value. AC ¶ 172.  For example, in the latest round of the TPT Program, fully *half* of the properties selected were not statutorily "distressed" and *had an average tax to value ratio of 3%* (meaning 97% of the value of the homes was Excess Value).  AC ¶ 173.  In other words, on average, for every dollar in taxes owed, owners of non-distressed properties would be effectively penalized roughly 33 dollars in Excess Value upon the transfer of their properties to TPT Defendants.  AC ¶ 174.  According to the City Council Report, the total market value of the 210 non-statutorily distressed properties selected for the TPT Program in the

---

[3] These neighborhoods are: Mount Hope, Bronx; University Heights-Morris Heights, Bronx; Bedford, Brooklyn; Bushwick North, Brooklyn; Bushwick South, Brooklyn; Crown Heights North, Brooklyn; East New York, Brooklyn; Stuyvesant Heights, Brooklyn; Central Harlem North-Polo Grounds, Manhattan; Central Harlem South, Manhattan; Hamilton Heights, Manhattan.  AC ¶ 222 n.10.

last round was nearly $152 million, whereas the total amount of arrears owed on such properties was just over $4.5 million.  AC ¶ 175.

Remarkably, Defendants' seizures include properties of owners—like Dorce—who have entered into installment repayment agreements, have made additional lump sum payments demanded to clear their accounts with the City, and/or who have relied on false representations that their "property had been removed from the in rem action."  *In Rem 53* at *5; *see also* AC ¶¶ 67, 77-79, 199-205.  The City has even entered into installment repayment plans after the commencement of the *in rem* proceeding on the affected property *without removing the property from the proceedings*.  AC ¶ 67.

### Plaintiffs and Their Resulting Injuries

As a result of Defendants' constitutional violations and other misconduct, Plaintiffs have each lost significant Excess Value.

McConnell Dorce is an elderly retired machinist and former ambulance driver.  AC ¶ 74. He is a Caribbean-American immigrant who came to the United States from Haiti over four decades ago.  AC ¶ 7.  Since 1977, Dorce has owned a 3,200 square foot multi-family home located in a community known as East New York in Brooklyn.  *Id.*  Since 2012, Dorce owned this property free and clear of any mortgage.  AC ¶ 8.  Dorce received notice that he was behind on certain tax and water charges.  AC ¶ 77.  He entered into an installment agreement with the City and made his installment payments.  *Id.*  In 2015, without telling him, the City nevertheless included his property in one of the mass *in rem* foreclosure lawsuits that resulted in a default judgment against 65 properties, including his, in November 2017.  AC ¶¶ 78-80.  Dorce received no notice of this judgment and kept making his installment and tax payments.  AC ¶¶ 85-86, 88.  In September 2018, the City transferred ownership of Dorce's property to Neighborhood Restore.  AC ¶ 84.

Meanwhile, the City continued to take Dorce's installment payments on his purported tax debt. AC ¶¶ 94, 201.

Cecelia Jones is an elderly Caribbean-American woman who is a shareholder in 585 Nostrand Avenue Housing Development Fund Corporation ("585 Nostrand Avenue HDFC") in a Brooklyn neighborhood predominantly populated by African Americans, Caribbean Americans, Hispanic Americans, and Middle Eastern Americans. AC ¶¶ 12-13. She is a retired home health aide who worked in New York City for 26 years. AC ¶ 12. Defendants took Jones's property in the same default judgment as Dorce's property. AC ¶ 14. Neither Jones nor anybody from her HDFC knew about or participated in any way in the foreclosure proceeding. AC ¶ 111. The City admits that it did not give any notice to Jones, but contends that a notice it addressed to the HDFC entity is sufficient even though the City knew the HDFC had no functioning board or officers. AC ¶¶ 111-12, 270-75. For example, despite being required to make bi-annual filings with the City, the HDFC had not done so since February 1993. AC ¶ 273. The only officer of the HDFC listed in any public records passed away in 2002. AC ¶ 274. Jones has now been dispossessed of her Excess Value and converted to a renter in her own home. AC ¶ 15.

Sherlivia Thomas-Murchison is an African-American woman, a paralegal and mother who is a shareholder in 248 Madison Street Housing Development Fund Corporation ("248 Madison Street HDFC") in another Brooklyn neighborhood. AC ¶ 126. Thomas-Murchison's mother lived in one apartment in the building and Thomas-Murchison lived in another. AC ¶ 127. Using the same type of mass *in rem* proceeding, the City took her property and gave it to Neighborhood Restore. AC ¶¶ 130-31. In May 2016, Neighborhood Restore's managing agent informed Thomas-Murchison that she was being converted into a renter. AC ¶ 142. The only officer of 248 Madison Street HDFC to appear in any public records is Thomas-Murchison's mother, who passed

away in 2011.  AC ¶ 284.  Defendants nevertheless claim that a notice addressed generically to the HDFC entity is sufficient notice to all of the HDFC shareholders.  AC ¶ 144.  Defendant BSDC has since borrowed $11 million secured by a group of properties, including Thomas-Murchison's. AC ¶ 139.

## ARGUMENT

### I.    **Standard of Review**

To survive a motion to dismiss pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[4]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  The standard is "heavily weighted in favor of the plaintiff," and the Court must "read a complaint generously." *Lee v. Sony BMG Music Entm't, Inc.*, 557 F. Supp. 2d 418, 423 (S.D.N.Y. 2008).

Additionally, while a court may take judicial notice of the *existence* of "documents issued by government agencies," it is improper for a court to accept those documents for the truth of the matters asserted. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  Thus, the Court must disregard Defendants' attempt to go beyond the pleadings at the motion to dismiss stage. *Id.*; *see, e.g.*, Feller Declaration (ECF-114).

---

[4] Emphasis has been added and internal citations and quotation marks omitted throughout, unless otherwise noted.

## II.     Jones and Thomas-Murchison Have Direct and Derivative Standing

Defendants do not challenge Dorce's standing.  Defendants also do not dispute that Jones and Thomas-Murchison plead demand futility and can act as representatives of their HDFCs.  TPT Defendants, but not Municipal Defendants, merely contend that Jones and Thomas-Murchison lack direct standing.  That is wrong and, regardless, has no impact on their derivative standing.

### A.     Jones and Thomas-Murchison Have Direct Standing

Article III standing requires: injury-in-fact, causation, and redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  There can be no question that Jones and Thomas-Murchison allege injury-in-fact (loss of their Excess Value), causation (the TPT seizures), and redressability (money damages).  *See Canzoneri v. Inc. Vill. of Rockville Centre*, 986 F. Supp. 2d 194, 200–01 (E.D.N.Y. 2013) (loss of home and related "great distress" is a "concrete, actual injury" sufficient for standing).

Jones and Thomas-Murchison's status as cooperation shareholders does not preclude them from suffering direct injuries.  *See Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir. 1993) (coop shareholders can bring a direct action); *see also Siegel v. Engelmann,* 143 N.Y.S.2d 193, 194–95 (Sup. Ct. 1955) ("stockholders are directly injured and are primarily interested" when the acts of others diminish the value of their stock or otherwise impair their proprietary rights).  Moreover, HPD owes independent fiduciary duties directly to HDFC shareholders (*see, e.g.*, N.Y. Priv. Hous. Fin. Law §§ 573, 578) and Defendants' conduct in violation of such duties gives rise to direct harm to Plaintiffs.

TPT Defendants rely on *Blakely v. Cardozo*, No. 07 Civ. 3951 DLC, 2007 WL 2702241 (S.D.N.Y. Sept. 17, 2007), but that case is inapposite for three reasons.  First, unlike the *Blakely* plaintiff who sought standing to sue solely on the HDFC's behalf, here, Jones and Thomas-Murchison allege separate and distinct personal injuries to themselves.  *Id.* at *3.  Second, the

*Blakely* court addressed whether the plaintiff had standing to review and reverse an *in rem* foreclosure action. *Id.* at *2. That is irrelevant to whether a plaintiff has standing to bring the constitutional and other claims at issue here. Third, the *Blakely* court's reasoning in finding that the plaintiff lacked standing relied in part on the fact that she proceeded *pro se* and was therefore not a capable HDFC representative because a corporation is legally required to be represented by counsel. *Id.* at *3.

B.      Jones and Thomas-Murchison Have Derivative Standing

Even if Jones and Thomas-Murchison lack direct standing, they are still entitled to proceed on behalf of their respective HDFCs because, as Defendants do not contest, they adequately plead demand futility.[5] AC ¶ 267.

First, demand is excused here because the HDFCs were created for the purpose of owning their respective properties, and their failure to prevent, interfere with, or seek redress for the transfer of their only asset—the residential properties—is so egregious on its face that it "could not have been the product of sound business judgment." *See Bansbach v. Zinn*, 1 N.Y.3d 1, 9 (2003).

Second, the HDFCs do not have functioning boards to make a demand upon. Neither HDFC has filed anything with the City, including required bi-annual filings, in over 20 years. AC ¶¶ 273, 283. Notably, the sole officer in any public record for each HDFC has been deceased for a decade or longer. AC ¶¶ 274, 285. Without a functioning board, the non-existent directors could not "fully inform themselves . . . to the extent reasonably appropriate under the

---

[5] Contrary to TPT Defendants' claims, *see* TPTDB 9 n.2, Thomas-Murchison was a shareholder in 248 Madison Street HDFC. AC ¶¶ 17-18.

circumstances," and thus any demand would be futile.  *See Bansbach*, 1 N.Y.3d at 9 (citing *Marx v Akers*, 88 N.Y.2d 189, 200-01 (1996)).

## III.    The Amended Complaint States a Claim for Relief as to Each Count

Plaintiffs' detailed factual allegations of Defendants' misuse of the TPT Program support their claims for violations of the U.S. and New York constitutional provisions prohibiting takings without just compensation; violation of equal protection; violation of due process; and imposition of excessive fines.  These same facts also support Plaintiffs' state law claims for conversion, unjust enrichment, deceptive business practices, and violation of the Municipal Home Rule law and, contrary to TPT Defendants' argument, the conversion and unjust enrichment claims are timely pled.  Plaintiffs' claims for conspiracy are properly supported by both factual allegations and credible inferences and are also timely pled.

### A.    Takings without Just Compensation (Counts 1 and 6)

It is indisputable that (i) Defendants have taken Plaintiff's property (their Excess Value) without compensation, and that (ii) the U.S. and New York constitutions require "just compensation" for any such taking.  *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); N.Y. Const. art. 7 ("Private property shall not be taken for public use without just compensation.").  This is sufficient to state a claim.  *See Knick*, 139 S. Ct. at 2170 ("If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says."); *Rafaeli, LLC v. Oakland Cty.*, 505 Mich. 429, 437 (2020) ("We hold that defendants' retention of those surplus proceeds is an unconstitutional taking . . . ."); *In Rem 53* at *18-19 ("Unquestionably, a taking of property of a value far in excess of a tax lien in satisfaction of the lien without affording the owner an opportunity to recover the excess value would constitute a violation of constitutional rights."); *Coleman v. District of Columbia*, 70 F. Supp. 3d 58, 77 (D.D.C. 2014) (finding plaintiff seeking

surplus equity states takings claim); *Freed v. Thomas*, No. 17-CV-13519, 2021 WL 942077, at *4 (E.D. Mich. Feb. 26, 2021) (granting plaintiff summary judgment on takings claim for surplus equity).

Defendants argue that there has been no taking so long as there is a procedure for Plaintiffs' to recover their Excess Value.  First, that is directly contrary to the *Knick* holding that a property owner may sue the government at the time of the taking "without regard to subsequent state court proceedings."  139 S. Ct. at 2170.  Second, *the TPT Program has no procedure for Plaintiffs to recover their Excess Value*.  AC ¶¶ 4, 10, 16, 21, 54-55, 72, 165, 193.  Municipal Defendants argue there are "many opportunities to redeem," although the only ones they identify are "full payment" or "installment agreement."  MDB 4.  This so-called "process" is entirely illusory where, as here, Plaintiffs had no knowledge of the taking and, furthermore, would provide no relief to a property owner who had substantial Excess Value but lacked the liquidity to pay off the asserted tax lien. AC ¶¶ 195-199.  Nor do "installment agreements" provide an adequate opportunity to prevent foreclosure—for example, Dorce entered into and was current on an installment agreement and Defendants took his property anyway (Municipal Defendants concede that they continued to accept installment payments from Dorce after they seized his property).  AC ¶¶ 200-202; Municipal Defs. Opp. Appellate Br. at 36 n.20, No. 20-1809 (ECF-89) ("MDOAB").

The TPT Program is in stark contrast to the program considered in *Nelson v. City of New York* that provided for a ***court directed sale and distribution of the proceeds***.  352 U.S. 103, 110 (1956); *see Coleman*, 70 F. Supp. 3d at 78 ("because D.C. provides no action to recover any surplus, [plaintiff's] claims, therefore, are not foreclosed by *Nelson*.").  In addition, as Justice Partnow held, *Nelson* has no application where, as here, a property owner had no actual notice of

the *in rem* proceeding. *In Rem 53* at *13.[6] This is because, even if there were a mechanism for Plaintiffs to claim Excess Value, such a mechanism would be purely illusory to someone without knowledge of the proceeding. *Nelson* thus did not decide the precise question presented here. Furthermore, to the extent that *Nelson* might have been read in the past to imply more broadly that no takings claim could arise in this context if the property owner had not first pursued a state claim for Excess Value, *Knick* now makes it clear that reading would be incorrect. *See Knick*, 139 S. Ct. at 2170.

Municipal Defendants also cite the unpublished New York state court opinion *In Rem Tax Foreclosure Action No. 47, Borough of Staten Island*, Index No. 2000/2002 (Sup. Ct. Richmond Co. 2006) ("*Woodbridge*"), but that pre-*Knick* case supports Plaintiffs. In *Woodbridge*, the Court did not grant the City's request to seize a property with substantial Excess Value through the TPT Program and instead appointed a public administrator to sell the property and transfer the Excess Value to the property owner rather than "some unknown stranger," who would get it through the TPT Program. *Woodbridge* at 12.

Municipal Defendants argue that "legions" of decisions have upheld the TPT Program and cite certain New York state court cases, MDB 3, but none of these cherry-picked opinions even mention a federal takings claim for just compensation of Excess Value.

B.    Equal Protection (Counts 2 and 7)

Municipal Defendants argue that Plaintiffs' equal protection claim should be dismissed because "Plaintiffs have not identified individuals whose 'facts and circumstances' were

---

[6] Municipal Defendants try to minimize Justice Partnow's well-reasoned decision by referencing other state court decisions upholding TPT foreclosure judgments on a different factual record, but all of those cases concerned efforts to recover seized properties and none address Defendants' uncompensated taking of Excess Value or the specific constitutional claims at issue here.  MDB 6.  Defendants' failure to compensate Plaintiffs for their Excess Value is an entirely separate issue from whether the foreclosure judgments are valid.  *See* Dorce, 2 F.4th. at 105.

reasonably close to Plaintiffs' but who were treated differently."  MDB 14.  *First*, Municipal

Defendants are applying the wrong test.  *Second*, the Amended Complaint satisfies this test in any

event.

The Second Circuit explained in *Pyke* v. *Cuomo* ("*Pyke I*") that a plaintiff has an equal

protection claim where either  a facially neutral law or policy (i) has been applied in an unlawfully

discriminatory manner, or (ii) has an adverse effect that was motivated by discriminatory animus.

258 F.3d 107, 109-10 (2d Cir. 2001).  The Second Circuit clearly stated that such a plaintiff "is

not obligated to show a better treated, similarly situated group of individuals of a different race."

*Id.* at 110.  In *Pyke II*, the Second Circuit explained that "seemingly neutral geographic distinctions

may in fact be being used as insidious proxies for suspect racial classifications."  *Pyke v. Cuomo*,

567 F.3d 74, 78 (2d Cir. 2009).  That is precisely the circumstance here.  The Amended Complaint

is replete with specific factual allegations about both the reasons Defendants are targeting elderly

property owners in communities of color for the TPT Program and the devastating and disparate

impact it is having on racial minorities such as Plaintiffs.  *See, e.g.,* AC ¶ 212-230.  As Justice

Partnow acknowledged, "[t]he City has particularly targeted properties that are owned by

minorities," and that the City's conduct "raises equal protection concerns."  *In Rem 53* at *6.

Similarly, following the six-month investigation that led to the City Council Report, one City

council member reported: "[i]t is clear to us that HPD is targeting properties for Third Party

Transfer disproportionately.  It's targeting Brooklyn and the Bronx, it's targeting black and brown

neighborhoods."  AC ¶ 220.  The statistics provide further support.  For example, of the properties

selected for the latest round of the TPT Program, approximately 50% were in just 11 neighborhoods, all of which are communities of color.  AC ¶ 222; City Council Report at 14.[7]

In any event, Plaintiffs do adequately allege an appropriate comparator.  For example, consider the following hypothetical properties:

|  | Property Value | Tax Arrears | Location | Seizure Status |
| --- | --- | --- | --- | --- |
| Property A | $1 million | $20,000 | Near a "distressed" property in a community of color | Subject to TPT seizure |
| Property B | $1 million | $20,000 | Not near any "distressed" properties | Not subject to TPT seizure |

As is clear, two identical property owners are being treated differently simply because one lives in a community of color where he or she is more likely to have a neighbor who owns a "distressed" property.  Municipal Defendants' argument that Plaintiffs cannot show "individuals of different races or ages *whose properties were also eligible for foreclosure through TPT* but were not foreclosed" is a red herring.  MDB 14.  The eligibility rules for TPT foreclosures *are themselves equal protection violations*.  Had Dorce been a white man living in Staten Island rather than a black man living in East New York, he would not have been eligible for TPT and would therefore not have lost his Excess Value.  Municipal Defendants concede that, for tax liens enforced through

---

[7] The City Council Report also stated that Defendants included 33 properties in the TPT Program that were <u>not</u> statutorily distressed and were <u>not</u> located within the same tax block as a statutorily distressed property, which contradicts Defendants' supposedly neutral explanation as to how properties are selected for this disparate treatment, and further demonstrates that Defendants' stated reasons for the foreclosures are pretextual.  AC ¶¶ 60, 190, 191; City Council Report at 6. Defendants have never explained why these properties were selected.

lien sales rather than through the TPT Program, "[f]ormer owners may receive surplus."  MDB 13.[8]

In addition, Defendants' conduct cannot even survive rational basis review.  There is no rational reason to treat property owners differently based on whether they own property physically near a statutorily distressed property.  *See Weissman v. Evans*, 56 N.Y.2d 458, 464-65 (1982) ("[W]hile equal protection does not necessarily require territorial uniformity . . . a territorial distinction which has no rational basis will not support a state statute . . . .").  Municipal Defendants' purported rationale—"the elimination of favoritism"—underscores the irrational nature of the program, which is replete with opportunities of "favoritism."  MDB 15-16.  There can be, and is, "favoritism" in which tax blocks are selected for seizure; which properties are removed from the foreclosure list prior to the default judgment; and which foreclosed-upon properties are actually transferred.  Municipal Defendants' argument is basically: "it could be worse," which is not a basis to treat similarly-situated people differently.  Further, Municipal Defendants' reference to 1948 legislative rationale for *in rem* proceedings generally has no bearing on the TPT Program, which did not start until 1996.  AC ¶ 44.  Indeed, in 1948, property owners *were* entitled to their Excess Value in an *in rem* proceeding.  *See Nelson*, 352 U.S. at 110.  This vestige of a prior system cannot supply a rational basis for its continued use on changed facts and circumstances.  *See Weissman*, 56 N.Y.2d at 466 (no rational basis for pay disparity between

---

[8] Municipal Defendants' argument that statutorily distressed properties and HDFC cooperatives "are not permitted" in a tax lien sale, MDB 13, is incorrect.  No provision bars *individual* foreclosure and sale of distressed properties, and HDFCs "notwithstanding any other provision of law" may be foreclosed upon and sold "to the highest responsible bidder."  *See* Code § 11-354(a).

judges in different counties—disparity was vestige of prior system where localities financed judicial salaries, but there was no rational basis for continued pay disparity after creation of state-wide court system).

Municipal Defendants' own cases demonstrate precisely the type of reasoning notably absent from Municipal Defendants' explanation.  For example, the court in *Ruston v. Town Bd. for Town of Skaneateles* found that the defendant-municipality's refusal to grant a permit for the plaintiff's housing development passed rational basis review because the comparator projects were materially different.  *See* 610 F.3d 55, 59-60 (2d Cir. 2010) (plaintiff's proposed 14-home development was distinct from commercial and single-home projects).  In other cases Municipal Defendants cite, the plaintiffs failed to even allege differential treatment.  *See* MDB 15 (citing, *e.g.*, *Tupaz v. Clinton County, New York*, 499 F. Supp. 2d 182, 191 (N.D.N.Y. 2007) (noting, at summary judgment, that "Plaintiffs are unable to cite to any delinquent taxpayers in Clinton County that were treated differently than they were")).  That is not the case here.

C.    <u>Due Process (Counts 3 and 8).</u>

Due Process requires that Defendants provide notice that must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane* v. *Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  As the Supreme Court put it, "when notice is a person's due, process which is a mere gesture is not due process." *Id*. at 115.  As explained in the Amended Complaint, Defendants intentionally failed to provide adequate (or, as to some, *any*) notice.  AC ¶¶ 231-251. Indeed, Defendants' entire scheme is premised on a lack of notice because, even if a homeowner owed 50% of the value of his property in tax liens (which is extremely high relative to the actual properties at issue), it would still make no sense for that property owner to allow Defendants to simply take—for free—his or her Excess Value consisting of the other 50%.  The fact that

Defendants have transferred hundreds of millions of dollars of Excess Value from property owners to TPT Defendants effectively proves that the property owners are not getting adequate notice.

Municipal Defendants' argument that their notice procedures are adequate is irrelevant if Municipal Defendants are not following those procedures, which is a fact issue that cannot be resolved against Plaintiffs.  Indeed, Municipal Defendants make no attempt to argue that they complied with the publication requirement of Administrative Code ("Code") §11-406, which they concede applies.  *See* MDB 17.  Municipal Defendants' affidavit attempting to contradict the allegations in the Amended Complaint is not appropriately considered.  *Global Network*, 458 F.3d at 156–57.  Regardless, it fails to establish compliance with constitutional due process guarantees.

For example, the "notice" the City claims it mailed to Dorce was not addressed to where Dorce lives (an address known to Municipal Defendants) and the claimed notice was addressed to a multi-unit building without any unit number.  AC ¶ 86; *see also id.* ¶ 112 (notice the City claims to have sent to one of the HDFCs "(i) was not addressed to any particular person, (ii) was not addressed to any particular unit, and (iii) was addressed to a partial version of the HDFC's name.").  Defendants do not even attempt to address any of these myriad issues with their putative notices.  Municipal Defendants also concede that, notwithstanding HPD's fiduciary obligations to HDFC shareholders, they did not even attempt to notify individual HDFC shareholders.  MDB 18.  It is plainly unreasonable to rely on notices to HDFCs that the City knows have not filed their required paperwork in decades and do not have functioning (or even living) officers or directors.  AC ¶¶ 249, 270-286.  Municipal Defendants further concede that they accepted installment payments from Dorce after they took his property (but within the redemption period), which put them on actual notice that Dorce did not know about the foreclosure.  AC ¶ 11.

In response, Municipal Defendants repeatedly invoke the presumption of regularity as somehow requiring dismissal of Plaintiffs' claims. *See* MDB 17-18 (citing, *e.g.*, *Miner v. Clinton Cnty., N.Y.*, 541 F.3d 464, 472 (2d Cir. 2008) (presumption that notices were received can apply where government "provides evidence that the notices of foreclosure were *properly addressed* and mailed in accordance with regular post office procedures")).  But this presumption does not apply unless the government's procedures are "geared as to ensure the likelihood that a notice of cancellation is *always properly addressed and mailed*."   *Nassau Ins. Co. v. Murray*, 46 N.Y.2d 828, 830 (1978).  In any event, the presumption that mail was sent to the listed address does not answer the relevant question of whether the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Mullane*, 339 U.S. at 314; *Miner*, 541 F.3d at 472 (courts must examine whether defendant's belief that property owner received notice of foreclosure was objectively reasonable *under the circumstances*).  Here, the notices do not satisfy the constitutional standards, including because Defendants had many reasons to know that their purported notices were not, in fact, being received. AC ¶¶ 231-251; *cf Miner*, 541.3d at 468-69 (defendants reasonably believed their notices were being delivered).  Moreover, this doctrine does not apply to a motion to dismiss because such "evidentiary standards [] are inappropriate for evaluation at the pleadings stage." *See Baltazar v. Houslanger & Assocs., PLLC*, No. 16-4982, 2018 WL 3941943, at *9 (E.D.N.Y. Aug. 16, 2018) ("[I]t is premature to consider, at this early stage, whether Plaintiff may rebut the presumption"); *Haywood v. Fremont Inv. & Loan*, No. 08 CIV. 4961, 2009 WL 706090, at *1 (E.D.N.Y. Mar. 16, 2009) ("[B]y definition, [rebuttable presumptions] involve a weighing of the evidence and thus play no role on a motion directed to the pleadings").

Municipal Defendants argue that Plaintiffs could have done more to "request[] individual notice . . . at a particular address." MDB 18. But "a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation [to provide notice]." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 799 (1983); *see also Schroeder v. City of New York*, 371 U.S. 208, 212-14 (1962) (the right to be heard is "one of the one of the most fundamental requisites of due process . . . [and] has little reality or worth unless one is informed that the matter is pending."). Indeed, none of the cases cited by Municipal Defendants stand for the broad proposition that "notice by request" comports with due process in all circumstances and none are remotely factually analogous to this case.[9]

D.    Excessive Fines (Counts 4 and 9)

A claim for violation of the excessive fines clause of the Eighth Amendment to the United States Constitution[10] lies where the purpose of the fine is partially punitive and the amount of the fine is disproportionate to the prohibited conduct. *See Timbs v. Indiana*, 139 S. Ct 682, 689-90 (2019); *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2019). Defendants do not dispute that the retention of Excess Value is grossly disproportionate. *See* MDB 19-20. Instead, Municipal Defendants argue that "is not sufficient to invoke the excessive fines provisions" because it is "based on the tax lien status and the location of the property" rather than "a finding of culpable conduct." MDB 20. This argument fails.

---

[9] Municipal Defendants also artfully dodge the question of whether any registration cards were, in fact, submitted on the subject properties pursuant to Code §§ 11-416 or 11-417.

[10] Together with Article I, Section 5 of the New York State Constitution, the "Excessive Fines Clause(s)."

Municipal Defendants' denial that the TPT Program is at least partially punitive is belied by their own statements.  For example, Municipal Defendants argued to the Second Circuit that the retention of Excess Value is a tax "penalty" and that it is meant to deter homeowners from becoming delinquent on their taxes.  MDOAB 61-63, 66 (referencing "penalties" nine times); *id.* at 62 ("[C]hallenges to monetary penalties designed to encourage payment of taxes are barred by comity's broad prohibition on federal court interference with state tax administration.").

Likewise, Municipal Defendants repeatedly attempt to justify the TPT seizures by arguing, in substance, that the potential penalty of non-payment (loss of home and Excess Value) is so punitive that it operates as a deterrent to others to avoid falling behind on their taxes.  MDOAB 4 (the foreclosures "create strong incentives for property-holders to resolve tax delinquencies"); *see also* Mun. Defs' MTD Brief 18 (ECF-33) ("The policy and goal of the [TPT Program] is to *encourage prompt payment* of tax arrears"); Mun. Defs' MTD Reply 5 (ECF-51) (TPT Program "*will encourage many taxpayers to pay delinquencies*. [T]he program undoubtedly advances tax collection goals *if for no other reason than incentivizing payment of tax debt*").  This "deterrence" goal fits squarely under the rubric of "punitive" measures.  *See United States v. Bajakajian*, 524 U.S. 321, 329 (1998) (explaining that in the Excessive Fines context, deterrence "has traditionally been viewed as a goal of punishment").  Indeed, Defendants appear to concede that a "deterrence" motive is sufficient to trigger the Excessive Fines Clause.  *See* MDB 19 (citing *Bajakajian* for the proposition that courts "distinguish[] *deterrence* from 'remedial purpose' such as compensating government for loss").  So long as the TPT seizures have a *partial* punitive purpose, the Excessive Fines Clause applies.  *See Austin v. United States*, 509 U.S. 602, 610 (1993) (forfeiture is subject to the Excessive Fines Clause because it serves "in part to punish").  Likewise, the Supreme Court has also held that *in rem* forfeiture is subject to the Excessive Fines Clause because "forfeiture

21

generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment." *Id.* at 618.

E.      Conversion and Unjust Enrichment (Counts 10 and 11)

Plaintiffs state a claim for conversion because Defendants "exercise[d] unauthorized dominion over [their] personal property [their Excess Value] in interference with [their] legal title or superior right of possession." *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (conversion of money occurs where there is an obligation to return or otherwise treat in a particular manner the specific money in question). Plaintiffs state a claim for unjust enrichment because there is (1) a benefit conferred upon Defendants; (2) appreciation or knowledge of the benefit; and (3) acceptance of the benefit by Defendants under circumstances that make such acceptance inequitable. *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig*., 383 F. Supp. 3d 187, 268 (S.D.N.Y. 2019).

Municipal Defendants argue that they are not liable for either claim because their foreclosures were "in full compliance with statutory provisions that are legally and constitutionally sound." MDB 22. But Defendants' use of the TPT Program is *not* legally and constitutionally sound for the reasons discussed above. *See supra* Sections III.A-D. Accordingly, the cases Municipal Defendants rely upon are inapposite. *See* MDB 22 (citing *Key Bank of Cent. New York v. County of Broome*, 116 A.D.2d 90, 92 (3d Dept. 1986) (unjust enrichment claim failed where plaintiff acknowledged that county's notice satisfied statutory *and constitutional requirements*, and where notice of foreclosure was "reasonably calculated" to apprise owner).[11]

---

[11] Municipal Defendants' conversion caselaw is even further afield. *See* MDB 22. One case involved a court *denying* a motion to dismiss. *See Petrone v. Davidoff Hutcher & Citron, LLP*, 54 N.Y.S.3d 25, 28 (N.Y. App. Div. 2017). The other concerned a plaintiff attempting to force an

Next, TPT Defendants (but not Municipal Defendants) contend that the conversion and unjust enrichment claims "accrued[] upon the In Rem 53 Judgment in December 2017" and therefore had to be commenced by December 2020. TPTDB 6. TPT Defendants are mistaken for several reasons.

As an initial matter, the claims for conversion and unjust enrichment "arise[] out of the conduct" alleged in the original complaint and therefore relate back to the indisputably timely March 11, 2019 filing date of the original complaint. *See Slayton v. American Exp. Co*., 460 F.3d 215, 228 (2d Cir. 2006) (relation back for claims based on "the general fact situation alleged" in the original complaint); *Mayle v. Felix*, 545 U.S. 644, 669 (2005) ("relation back is regularly allowed when an amendment raises a separate claim for relief arising out of the same transaction or occurrence, no matter how discretely that claim might be stated"). TPT Defendants argue that relation back does not apply because "the original complaint failed to allege any direct claims as against [TPT Defendants]." This is simply wrong. *See* Compl. (ECF-7) ¶¶ 148-209 (directing every single count contained in original complaint against *all* Defendants); TPT Defs. MTD Brief (ECF-36) at 15-21 (TPT Defendants' brief arguing why Plaintiffs' claims against them from original complaint should be dismissed).

---

organ donor network to provide him with a kidney, and the court held that "there is no common-law property right in a dead body." *Colavito v New York Organ Donor Network*, 8 N.Y.3d 43, 53 (2006).

Moreover, Plaintiffs' claims did not accrue on the date of the foreclosure judgement, which merely gave the City an option to take Plaintiffs' properties.[12]  Plaintiffs' injuries are the result of Defendants' taking of, and refusal to provide just compensation for, Plaintiffs' Excess Value. *Dorce*, 2 F.4th. at 104-05.  The very *earliest* those claims could have accrued was when the deeds were transferred to TPT Defendants.  For Dorce and Jones, this occurred on September 21, 2018, which was less than three years before Plaintiffs' filed the Amended Complaint.  AC ¶¶ 84, 110.

In addition, Plaintiffs' claims do not accrue until the plaintiffs knew or had reason to know of the harm.  *Melchner v. Town of Carmel*, No. 13-cv-8164, 2014 WL 6665755, at *2 (S.D.N.Y. Nov. 21, 2014).  Thomas-Murchison did not learn that ownership of her home had been transferred to Neighborhood Restore until April 2016.  AC ¶ 141-142.  Nor did she have reason to know about the transfer any sooner.  As the Amended Complaint makes clear, Defendants consistently and repeatedly failed to give proper notice.  *See supra* Section III.C.  Thomas-Murchison's claims are thus timely.  *Melchner*, 2014 WL 6665755, at *2.

Finally, Plaintiffs' claims are independently timely under the continuing violations and equitable tolling doctrines.  Under the continuing violations doctrine, Defendants' "continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations," and thus claims that would otherwise fall outside of the limitations period are timely due to the continued violations giving rise to the claim.  *See Wallace v. State*, 40 F. Supp. 3d 278, 302

---

[12] For example, Ms. Jones's property was first included in *In Rem 51*, and a foreclosure judgment was entered against her property on October 26, 2011, but the City did not enter a deed to transfer title within eight months following that judgment, so the title and ownership over the property remained with 585 Nostrand Avenue HDFC.  AC ¶ 103.

(E.D.N.Y. 2014); *see also Am. Trucking Associations, Inc. v. N.Y. State Thruway Auth.*, 199 F.

Supp. 3d 855, 872 (S.D.N.Y. 2016) ("There is nothing equitable about tolerating an ongoing

constitutional violation."); *Yip v. Bd. of Trs. of the State Univ. of N.Y.*, No. 03-cv-00959, 2004 WL

2202594, at *4 (W.D.N.Y. Sept. 29, 2004) (continuing violations doctrine applies "where there is

a pattern of covert conduct such that plaintiff only belatedly recognizes its unlawfulness").  Here,

Defendants have committed continuing violations, both because they have conducted subsequent

rounds of foreclosure under the TPT Program and because they have continued to refuse to provide

former homeowners with any mechanism to recover their Excess Value.  Similarly, under the

doctrine of equitable tolling, Defendants should be estopped from relying on any statutes of

limitation where they have taken actions subsequent to their misconduct that "kept the plaintiff

from timely bringing suit."  *Shoreham Hills, LLC v. Sagaponack Dream House, LLC*, 66 Misc. 3d

1231(A) (N.Y. Sup. Ct. Mar. 4, 2020).  Defendants' failure to provide adequate notice under the

TPT Program (*see supra* Section III.C); their acceptance of installment payments even after seizing

properties (*see* AC ¶¶ 200-202); and their failure to publicly disclose demographic and/or

geographic information concerning the TPT foreclosures effectively delayed Plaintiffs and others

from bringing suit.

     F.     <u>GBL § 349 (Count 12)</u>

Rather than defend their conduct as not deceptive, Defendants argue that the GBL § 349

claim should be dismissed because the statute applies to "consumer-oriented" conduct and

"[g]overnmental action related to tax collection" is not "consumer-oriented."  TPTDB 12; MDB

22-23.

*First*, the Second Circuit has explained that to satisfy the consumer-oriented standard, "the

gravamen of the complaint must be consumer injury *or harm to the public interest*."  *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *see also Blue Cross and Blue*

*Shield of N.J., Inc. v. Philip Morris USA, Inc.*, 3 N.Y.3d 200, 205 (2004) (§ 349 applies to "virtually all economic activity" and is "intentionally broad").  "The critical question is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer . . . ."  *Securitron*, 65 F.3d at 264.  The consumer-oriented requirement can also be satisfied by showing that the conduct "potentially affects similarly situated consumers." *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2014).  Here, Plaintiffs allege that Defendants have used lies and deceit to steal Excess Value.  Clearly this conduct involves "economic activity" and "harm to the public interest."

*Second*, as the Second Circuit held in this case, Defendants' improper retention of the Excess Value (*i.e.*, the amount in excess of the taxes owed), by definition, is not "governmental action related to tax collection."  *See Dorce,* 2 F.4th at 99.  The cases cited by Defendants for the argument that tax collection is not consumer-oriented are thus inapposite.

G.    Municipal Home Rule (Count 13)

Municipal Defendants incorrectly argue that Count 13 must be dismissed because the Constitution and Municipal Home Rule "authorize local laws relating to tax collection that are not inconsistent with a provision of a general law."  MDB 23.

*First*, because the Second Circuit already held that Defendants' seizure and retention of Excess Value is not related to tax collection, *Dorce*, 2 F.4th at 99, Defendants can obtain no protection from the Municipal Home Rule Law's authorization of local laws relating to tax collection.  Home Rule Law § 10(1)(ii)(a)(8).

*Second,* the Municipal Home Rule law does not permit local laws that are inconsistent with the Constitution or any general law, and TPT Program seizures of Excess Value are inconsistent with numerous laws, including the constitutional provisions addressed herein.  *See, e.g.*, *City of Amsterdam v. Helsby*, 37 N.Y.2d 19, 32-33 (1975).

26

*Third*, Municipal Defendants concede that "[t]he State's taxation power may be delegated to political subdivisions *provided delegation is express*." MDB 24. The State did not expressly authorize Defendants to steal people's Excess Value through an illusory process that uses tax collection as a pretext.

Thus, Plaintiffs more than adequately plead a claim for violation of the Municipal Home Rule Law. *See, e.g.*, *Baldwin Union Free Sch. Dist. v. Cty. of Nassau*, 9 N.E.3d 351, 361 (N.Y. 2014) (invalidating county taxing law because "the legislature [did not] specifically authorize[] the County to enact local legislation with [challenged] characteristics"); *Kamhi v. Town of Yorktown*, 74 N.Y.2d 423, 442 (1989) (invalidating town's attempt to require property owner to pay money or contribute parkland as condition of developing condominium project).

H.    Conspiracy (Counts 5 and 14)

Defendants incorrectly argue that Plaintiffs fail to plead (i) an agreement, (ii) overt acts, (iii) intentional participation, and (iv) the corresponding underlying claims for conspiracy. MDB 20; TPTDB 3-5. TPT Defendants also argue that the conspiracy claims are untimely. TPTDB 5-6.

*First*, TPT Defendants have an express agreement with Municipal Defendants to transfer select properties and retain Excess Value. AC ¶¶ 167, 336-339. This establishes an agreement sufficient for civil conspiracy. *See Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 227 (N.D.N.Y. 2009) (allegations of agreement among shareholders to sell assets without notifying or compensating plaintiffs sufficient to allege first element of civil conspiracy); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 240 (2d Cir. 1999) (circumstantial evidence sufficient to establish an agreement for purposes of establishing civil conspiracy).

*Second*, TPT Defendants act overtly in furtherance of the conspiracy. TPT Defendants coordinate with Municipal Defendants to select properties they want and then take title to those

properties.  AC ¶¶ 380-81.  They are necessary participants, and thus their actions further the conspiracy, because Municipal Defendants do not extinguish property owners' rights unless and until one of the TPT partners agrees to take title.  AC ¶ 167.  TPT Defendants' conduct constitutes overt acts in furtherance of the conspiracy.  *See Rusyniak*, 629 F. Supp. 2d at 226-27 (selling assets constitutes an overt act).

*Third*, TPT Defendants intentionally participate in the conspiracy by targeting homes owned by elderly persons of color least likely to have mortgages on their homes (since a bank or other lender is likely to object to the Defendants' seizure of property that serves as collateral for a mortgage) and intentionally keep the Excess Value.  AC ¶¶ 51, 212.  They knowingly, and intentionally, received hundred of properties and the corresponding Excess Value for free.  AC ¶¶ 167, 339, 359, 383.  BSDC's borrowing of $11 million secured by seized properties further evidences the intentional pillaging of Excess Value.  AC ¶ 139.  *See Rusyniak*, 629 F. Supp. 2d at 227 (finding the collection of actions culminating in transfer of assets, without notifying plaintiff, "a sufficient pleading of intentional participation").

*Fourth*, Plaintiffs have adequately plead the corresponding underlying claims for the reasons set forth in each respective section above.

*Fifth*, the conspiracy claims are timely for the reasons explained in Section III.E.  Further, Plaintiffs' section 1985(3) claims accrued later—only when Plaintiffs learned or should have learned about Defendants' discriminatory use of the TPT Program.  *See Melchner*, 2014 WL

6665755, at *2.  The scope of Defendants' discriminatory practices came to light no earlier than July 2019, when the City Council Report was issued.  AC ¶ 165.[13]

## IV.   TPT Defendants Are Liable for The Constitutional Claims

In addition to the conspiracy claims, TPT Defendants are directly liable for violating Plaintiffs' constitutional rights because they acted "under color" of state law.  42 U.S.C. § 1983. While courts consider numerous factors in determining whether conduct occurs "under color of law," the "fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012).  TPT Defendants acted under color of law pursuant to at least two tests consistently applied in the Second Circuit: (i) there is a close nexus and/or joint activity between TPT Defendants and Municipal Defendants (the "joint action" or "close nexus" test), and (ii) they have been delegated a public function by Municipal Defendants (the "public function" test).  *See id.*  Meeting either of these standards is sufficient to bring a private actor's conduct within the ambit of Section 1983. Plaintiffs easily meet both.

First, under the "joint activity/close nexus" test, TPT Defendants are a "willful participant in joint activity with the state." *Sybalski v. Indep. Grp.*, 546 F.3d 255, 257 (2d Cir. 2008).  Under the TPT Program, Municipal Defendants do not extinguish property owners' rights unless and until one of the TPT partners agrees to take title to the property.  AC ¶ 167.  Indeed, Municipal Defendants have argued that one of the purported reasons for creating the TPT Program was that the City had amassed too many properties via foreclosures and was unable to manage them alone.

---

[13] TPT Defendants argue in passing the Amended Complaint should be dismissed because it is based on "conjecture."  TPTDB 3.  This conclusory argument fails in light of the significant direct and circumstantial factual allegations in Plaintiffs' detailed 384-paragraph complaint.

*Id.* ¶ 168.   Municipal Defendants thus rely on TPT Defendants to jointly facilitate the TPT Program.   *Id.* ¶ 169.   Indeed, senior HPD executives sit on the Boards of, and help run, TPT Defendants.   *Id.* ¶ 26.   Further, Municipal Defendants and TPT Defendants coordinate to select properties before foreclosure.   *Id*. ¶ 380.   That Municipal Defendants and TPT Defendants work closely together to carry out the City's goals plainly satisfies the close nexus test.   *See Fabrikant*, 691 F.3d at 211 (close nexus test satisfied where private organization was delegated authority to seize pets by state law to carry out state's purposes).

Second, TPT Defendants have been delegated a public function.   Municipal Defendants assert that the purpose of the TPT Program is to address the problems of abandonment of private property and tax-delinquency and to create and maintain affordable housing.   MDB 2-3, 6.   These qualify as public functions because they are "activities that traditionally have been the exclusive, or near exclusive, function of the State."   *See Fabrikant*, 691 F.3d at 210 (public function test satisfied where conduct of private organization was part of state function); *Cooper v. U.S. Postal Service*, 577 F.3d 479, 492 (2d Cir. 2009) (church-related non-profit was "state actor" under public function test when it performed postal activities under contract with U.S. Postal Service). Moreover, the role of TPT Defendants as part of HPD's enforcement machinery establishes that they are acting under color of law.   *See Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000) (private hospital was state actor where it acted as part of the city's reporting and enforcement machinery for its child welfare administration).

TPT Defendants' rebuttals miss the mark.   They cite *Ginsberg v. Healey Car & Truck Leasing, Inc.*, where the court held that a person did not act under color of law by seeking assistance from the police and benefitting from their work, absent a prearranged plan with the police.   189 F.3d 268, 273 (2d Cir. 1999).   Here, Plaintiffs do allege a prearranged plan.   *See, e.g.*,

*supra* Section III.H.  Moreover, TPT Defendants do not merely "stand to benefit" from Municipal Defendants' assertion of authority—TPT Defendants' own participation is required in order for Municipal Defendants to assert their authority in the first place.  AC ¶¶ 167, 169.

TPT Defendants also cite *Rendell-Baker v. Kohn*, 457 U.S. 830, 841-42 (1982), which held an employment decision by a private school that was not "influenced by any state regulation."  *See* TPTDB 4.  In contrast, the transfer of Plaintiffs' Excess Value is plainly "influenced" by the City's regulations and TPT Defendants directly participate in the taking.  AC ¶¶ 1-2.  Additionally, unlike the putative housing code and tax enforcement functions performed by TPT Defendants, which are "traditionally the exclusive prerogative[s] of the State," *Rendell-Baker* involved "the education of maladjusted high school students," which the state had only recently become involved in.  457 U.S. at 842.

TPT Defendants' argument that they are not specifically referenced in the Code is immaterial since they are nevertheless integral to the TPT Program.  TPTDB 10-11 (citing Code §§ 11-406(a) and 11-412.1(a)-(b)).  Moreover, TPT Defendants' argument that they are not "involved in the process of selection of properties to be included in the In Rem proceedings" is contrary to Plaintiffs' well-pled factual allegations that must be accepted as true.  AC ¶ 26; *McCarthy*, 482 F.3d at 191.

## V.      Plaintiffs' Claims and Damages Are Not Barred by *Rooker-Feldman* or the Mandate Rule

### A.      Neither the Mandate Rule nor *Rooker-Feldman* Bar Plaintiffs' Claims

Municipal Defendants are incorrect that the "Mandate Rule and/or *Rooker-Feldman*" bar any of Plaintiffs' claims.  MDB 7-9.

Plaintiffs' due process claims (Counts 3 and 8) are entirely consistent with the Second Circuit decision in this case, which expressly concluded that *Rooker-Feldman* "does not bar

Plaintiffs' . . . due process claims." *Dorce*, 2 F.4th. at 108. Municipal Defendants appear to be misreading the Second Circuit's decision with respect to Plaintiffs' facial due process challenge. The Second Circuit held that, to the extent Plaintiffs' facial due process challenge seeks monetary relief instead of injunctive relief, the "earlier *Rooker-Feldman* analysis applies"—*i.e.*, the same analysis from Plaintiffs' as-applied due process claim also applies to Plaintiffs' facial claim. *Id.* Because the Court held that Plaintiffs' as-applied claim *was not barred* under *Rooker-Feldman*, *id.* at 106-07, the Court's conclusion was that *both* types of claims (facial and as-applied) are permitted. *Id.* at 108; *see also infra* Section V.B.

Plaintiffs' claims for conversion and unjust enrichment relate to Defendants' misappropriation of their Excess Value. Contrary to Municipal Defendants' argument, and as explained by the Second Circuit, the foreclosure judgment did not address Defendants' misappropriation of the Excess Value, which, by definition, happened *after* the judgment. *See Dorce*, 2 F.4th at 105 (foreclosure judgment "did not address whether the City's actions constituted a taking, or whether Plaintiffs were justly compensated (and indeed, compensation was not necessary prior the transfer, which occurred *after* the foreclosure judgment was entered)"). Thus, neither *Rooker-Feldman* nor the Mandate Rule applies.

Finally, the Home Rule claim is not barred by *Rooker-Feldman* for the same reason the Second Circuit held that Plaintiffs' equal protection claims could proceed—*Rooker-Feldman* "does not bar claims based on an opponent's misconduct that *precedes* the state court proceeding." *Id.* at 104. A violation of the Home Rule is merely another path for Plaintiffs to recover the same quantum of damages.

B.     <u>Plaintiffs′ Damages Claims Are Consistent with Their Argument before the Second Circuit</u>

Plaintiffs' damages claims are the same as what the Second Circuit permitted.  Plaintiffs are not seeking injunctive relief and their claim for compensatory damages is for amounts in excess of the tax liens: the Excess Value.  *Dorce*, 2 F.4th at 102.  Plaintiffs have never waived their right to pursue other forms of damages that would also be in excess of the tax liens, such as punitive or exemplary damages, which are entirely proper.  *See, e.g.*, *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d. Cir. 2006) (punitive damages may be awarded in § 1983 action when defendant's conduct "involves reckless or callous indifference to the federally protected rights of others").

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied.  Alternatively, Plaintiffs should be granted leave to amend to address any purported pleading deficiencies.

Dated:  December 17, 2021

Respectfully submitted,

By: /s/ *Matthew L. Berman*
    Matthew L. Berman
    Robert J. Valli, Jr.
    Yolande I. Nicholson, Esq. *Co-Counsel*
    VALLI KANE & VAGNINI LLP
    600 Old Country Road
    Garden City, NY 11530
    (516) 203-7180

*Attorneys for Plaintiffs*

By: /s/ *Keith H. Wofford*
    Keith H. Wofford
    WHITE & CASE LLP
    1221 Avenue of the Americas
    New York, NY  10020-1095
    (212) 819-7595

*Attorney for Plaintiffs McConnell Dorce and Sherlivia Thomas-Murchison*

By:/s/ *Gregg L. Weiner*
    Gregg L. Weiner
    Alexander B. Simkin
    Phillip Kraft
    ROPES & GRAY LLP
    1211 Avenue of the Americas
    New York, NY 10036
    (212) 596-9000

    Daniel A. Yanofsky (admitted *pro hac vice*)
    ROPES & GRAY LLP
    Prudential Tower, 800 Boylston Street
    Boston, MA 02199-3600
    (617) 508-4600

*Attorneys for Plaintiffs McConnell Dorce and Sherlivia Thomas-Murchison*

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2021, I electronically filed the foregoing with this

Court's CM/ECF system, which will send a notice of filing to all registered users.


Dated: December 17, 2021                  By:*/s/ Alexander B. Simkin*
                                              Alexander B. Simkin


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 9,987 words (not including the cover page,

table of contents, table of authorities, certificate of service, or this certificate of compliance),

calculated using the word count feature in Microsoft Word, and that the brief complies with the

formatting rules contained in the Court's Individual Practices.


Dated: December 17, 2021                  By:*/s/ Alexander B. Simkin*
                                              Alexander B. Simkin