UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MCCONNELL DORCE ET AL.,
                    Plaintiffs,

                                        19-cv-2216 (JGK)

         - against -
                                        OPINION AND ORDER

CITY OF NEW YORK ET AL.,
                    Defendants.

JOHN G. KOELTL, District Judge:

McConnell Dorce, Cecelia Jones, and Sherlivia Thomas-Murchison brought this putative class action against the City of New York (the "City"); Louise Carroll, Commissioner of the New York City Department of Housing Preservation and Development ("HPD"); Sherif Soliman, Commissioner of the New York City Department of Finance ("DOF") (together with the City and Carroll, the "City Defendants"); the Neighborhood Restore Housing Development Fund Co. Inc. ("Neighborhood Restore"); and Bridge Street Kings Covenant Housing Development Fund Company, Inc. ("Bridge Street") (together with Neighborhood Restore, the "TPT Defendants"). Jones and Thomas-Murchison also name 585 Nostrand Avenue Housing Development Fund Corporation and 248 Madison Street Housing Development Fund Corporation, respectively, as nominal parties in the event that their claims cannot be maintained as direct actions.

In brief, the plaintiffs allege that the defendants used and conspired to use in rem proceedings to seize the plaintiffs'

1

properties based on asserted tax debts, and that the defendants have failed to compensate the plaintiffs for the excess value of their properties, in violation of the plaintiffs' rights under the United States Constitution, the New York State Constitution, and New York State law. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the defendants now move to dismiss the plaintiffs' claims for lack of subject matter jurisdiction and for failure to state a claim. For the reasons that follow, the motion to dismiss is **granted in part** and **denied in part.**[1]

I.

The following facts are taken from the Amended Complaint and are accepted as true for the purposes of this motion.

## A. Factual Background

### 1. The TPT Program

In New York State, after a certain period, unpaid property taxes become "tax liens," upon which "tax districts" may collect.[2] Am. Compl. ¶ 36, ECF No. 91.[3] In 1939, the New York State Legislature passed a law ("Tax Law § 165"), granting tax

---

[1] Two separate motions to dismiss were filed in this case — the first by the City Defendants and the second by the TPT Defendants.

[2] A "tax district" includes "a county, city, town, village, school district or special district, having the power to levy, assess and enforce the collection of taxes, special ad valorem levies, special assessments or other charges imposed upon real property by or on behalf of a municipal corporation or special district." N.Y. Real Prop. Tax Law § 910.

[3] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, emphases, and internal quotation marks in quoted text.

districts the power to collect tax liens using in rem proceedings. Id. ¶ 35.[4] In 1948, the City enacted its own in rem foreclosure procedures to collect on tax liens within New York City. Id. ¶ 37.

In 1996, the New York City Council enacted Local Law No. 37, which created the Third Party Transfer Program (the "TPT Program"). Id. ¶¶ 43-44. Pursuant to the TPT Program, when the City obtains a judgment of foreclosure and sale, the DOF may transfer title to the foreclosed-upon property to the City or to a third party designated by the HPD to participate in the TPT Program (a "TPT Partner"). See id. ¶¶ 2, 43, 54. Under § 11-412.1(c) of the New York City Administrative Code (the "Administrative Code"), a TPT Partner may receive title to the property in fee simple absolute after the expiration of a statutory four-month redemption period following the award of judgment. Id. ¶ 52. The TPT Partner does not pay the City anything in exchange for this transfer of ownership, and makes no payment towards the underlying tax lien for which the City initiated the in rem proceeding. Id. ¶ 53. The original owner of the property receives nothing for the value of the transferred property in excess of the value of the tax lien (the "surplus equity"). Id. ¶ 54. The City's authority to use such in rem

---

[4] Tax Law § 165 is codified as § 1120 of the Real Property Tax Law of New York Consolidated Laws. See Am. Compl. ¶ 35.

proceedings to collect tax liens and to administer the TPT

Program is codified in Title 11, Chapter 4 of the Administrative

Code. Id. ¶ 37; N.Y.C. Admin. Code § 11-401 et seq.

Today, the City includes in the TPT Program both (1)

properties that meet the statutory definition of "distressed,"

and (2) properties that are located near distressed properties

and that are tax delinquent but that do not themselves meet the

statutory definition of "distressed." Am. Compl. ¶¶ 3, 47, 50,

65. "Distressed properties" are defined in Local Law No. 37 as

> [a]ny parcel of class one or class two real property
> that is subject to a tax lien or liens with a lien or
> liens to value ratio, as determined by the commissioner
> of [the DOF], equal to or greater than fifteen percent
> and that meets one of the following two criteria:
>
> i.   such parcel has an average of five or more hazardous
>      or immediately hazardous violations of record of
>      the housing maintenance code per dwelling unit; or
> ii.  such parcel is subject to a lien or liens for any
>      expenses incurred by the [HPD] for the repair or
>      the elimination of any dangerous or unlawful
>      conditions therein, pursuant to section 27-2144 of
>      this code, in an amount equal to or greater than
>      one thousand dollars.

Id. ¶ 44; N.Y.C. Admin. Code § 11-401.

The plaintiffs allege that, in recent years, the City

Defendants, working in concert with the TPT Defendants, have

used the City's in rem powers and the TPT Program to deprive

owners — and, in particular, elderly owners of color[5] — of their

---

[5] The plaintiffs define a community of color as "a community
predominantly populated by African Americans, Caribbean Americans, Hispanic
Americans and Middle Eastern Americans." See Am. Compl. ¶¶ 7, 12, 17, 74,

property rights in order to advance the housing agenda of the City and the Mayor and to "reward political allies" among the TPT Partners. See Am. Coml. ¶¶ 1, 26, 61, 169. According to the plaintiffs, the City and TPT Defendants have systematically targeted properties with little tax debt relative to their property value within communities of color for seizure through the TPT Program. See id. ¶¶ 170-71, 306. The plaintiffs allege that homeowners of color are targeted because, among other reasons, the defendants believe that such homeowners are "less likely to have the resources to mount legal challenges" and to have the abilities to fight the defendants' tactics. Id. ¶ 217. As evidence of this scheme, the plaintiffs allege that in the latest round of the TPT Program, the total market value of the 210 non-statutorily distressed properties selected for the TPT Program was nearly $152 million, whereas the total amount of arears owed on such properties was just over $4.5 million. Id. ¶ 175. Moreover, of the properties selected in this latest round of the TPT Program, the plaintiffs allege that approximately 50% were located in just 11 neighborhoods, all of which the plaintiffs characterize as communities of color. Id. ¶ 222. The plaintiffs further allege that, as part of the City and TPT Defendants' scheme, the DOF intentionally and systematically

---

100, 126. This Court accepts this definition for the purposes of this motion. See Dorce v. City of New York, 2 F.4th 82, 88 n.1 (2d Cir. 2021).

manipulated property values so as to be able to designate a targeted property as "distressed," or else to designate a targeted property as "near" a distressed property, in order eventually to foreclose upon and transfer such property under the TPT Program. Id. ¶ 177; see, e.g., id. ¶¶ 179–87.

The plaintiffs claim that there is no real mechanism for a former owner to seek or regain their surplus equity after the property has been transferred under the TPT Program. Id. ¶ 193. The two apparent means by which the foreclosed-upon owners may redeem their properties — through instalment agreement or full payment, see N.Y.C. Admin. Code § 11-412.1(d) — are, according to the plaintiffs, illusory.[6] As Dorce experienced, the instalment agreement avenue is not always respected, Am. Compl. ¶¶ 199–206, and the defendants do not always accept former homeowners' attempts to redeem their property through full payment, id. ¶ 209.

According to the plaintiffs, this alleged misuse of the TPT Program has stripped away "intergenerational black and brown wealth" and has contributed to steep racial disparities in homeownership. Id.  ¶¶ 178, 227–28.

---

[6] The Amended Complaint suggests that there is a third option: engaging in a hurried sale of the property. Am. Compl. ¶ 195. Neither the plaintiffs nor the defendants refer to this option in their briefs. Moreover, there is no apparent support for this option in the relevant statute.

## 2. The Named Plaintiffs

The named plaintiffs are people of color whose properties were transferred to one of the TPT Defendants pursuant to the TPT Program. All three plaintiffs allege that the TPT Defendants consulted with the City Defendants concerning the selection and targeting of their properties for inclusion in the TPT Program. See id. ¶¶ 26-28, 51, 93, 124, 155, 212.

McConnell Dorce is an elderly Caribbean-American immigrant. Id. ¶ 74. Between 1977 and 2018, Dorce was the owner of property located at 373 Rockaway Parkway (the "Rockaway Property"), in Brooklyn, New York, a community of color. Id.; see id. ¶ 84. Since 2012, Dorce owned the Rockaway Property free and clear of any mortgage. Id. ¶ 75. Sometime after 2012, Dorce incurred water and sewage charges for the Rockaway Property and entered into a written instalment agreement with the City to pay the outstanding charges. Id. ¶ 77. Dorce made all of the instalment payments to the City on time. Id. Notwithstanding this, and unbeknownst to Dorce, on July 14, 2015, the City commenced in rem proceedings against more than 180 properties, including the Rockaway Property, pursuant to the TPT Program. Id. ¶¶ 78-79, 85. On November 27, 2017, Justice Partnow of the New York State Supreme Court signed the foreclosure judgment against 65 properties, including the Rockaway Property. Id. ¶ 80. On September 21, 2018, the City, through DOF, recorded a deed in

7

the Rockaway Property's chain of title, transferring the
Rockaway Property to Neighborhood Restore. Id. ¶ 84. Following
the entry of the foreclosure judgment, and even after the
transfer, Dorce continued to tender instalment payments to the
City, and the City accepted those payments without notifying
Dorce that the Rockaway Property had been foreclosed upon or
that ownership of Rockaway Property had been transferred to
Neighborhood Restore. Id. ¶ 94. On or about September 24, 2018,
Dorce finally learned that his ownership of the Rockaway
Property had been extinguished. Id. ¶ 88. According to the DOF,
the value of the Rockaway Property at the time of its transfer
was approximately $226,000, whereas Dorce's tax liability was
$45,132.73 as of June 2015. Id. ¶ 9. Dorce has since lost all of
his equity in the Rockaway Property. Id. ¶ 93.

Cecelia Jones is an elderly Caribbean-American woman. Id.
¶ 100. Since 1997, Jones owned shares in a housing development
fund corporation ("HDFC"), located at 1197 Dean Street in
Brooklyn — also known as 585 Nostrand Avenue (the "Nostrand
Avenue Property" or the "Nostrand Avenue HDFC") — and lived in
an apartment unit pursuant to a proprietary lease appurtenant to
her shares in the HDFC. Id. ¶¶ 13, 100. An HDFC is a co-
operative corporation organized under New York State law to
improve housing and homeownership and to keep units affordable
to working families. Id. ¶ 40. Shareholders like Jones paid

maintenance fees to the HDFC, which used those fees to pay real estate taxes and water and sewage charges assessed by the City. Id. ¶ 102. By June 2015, the Nostrand Avenue HDFC had incurred various tax and water charges worth approximately $160,760.20. Id. ¶ 16. However, by this time, the Nostrand Avenue HDFC had no functioning board or board members. Id. ¶¶ 272-74.

On July 14, 2015, in the same action taken against the Rockaway Property, the City commenced in rem proceedings against the Nostrand Avenue Property. Id. ¶ 105. The foreclosure judgment included the Nostrand Avenue Property, id. ¶ 106, and on September 21, 2018, the City, through the DOF, recorded a deed in the chain of title of the Nostrand Avenue Property, transferring it to Neighborhood Restore, id. ¶ 110. Jones was subsequently converted into a renter of her apartment, and her maintenance payments were converted to rental payments. Id. ¶ 115. Sometime in around October 2018, Jones learned for the first time that ownership of the Nostrand Avenue Property had been transferred to Neighborhood Restore. Id. ¶¶ 111, 114. The DOF's valuation of the Nostrand Avenue Property at this time was $736,000. Id. ¶ 120. Jones has lost all of her equity in the Nostrand Avenue HDFC. Id. ¶¶ 15, 124.

Sherlivia Thomas-Murchison is an African-American woman. Id. ¶ 126. Thomas-Murchison owned shares in an HDFC located at 248 Madison Street (the "Madison Street Property" or the

9

"Madison Street HDFC"), in Brooklyn. Id. ¶ 126. Thomas-Murchison's extended family lived in an apartment unit at the Madison Street Property pursuant to a proprietary lease appurtenant to her shares in the Madison Street HDFC. Id. Thomas-Murchison's mother also owned shares in the Madison Street HDFC, and Thomas-Murchison and her mother lived at the Madison Street Property together pursuant to a proprietary lease appurtenant to the mother's shares in the HDFC. Id. ¶ 127. Upon her mother's death, Thomas-Murchison and her family inherited an equitable estate interest in the Madison Street Property. Id. Shareholders of the Madison Street HDFC paid maintenance fees to the HDFC, which used those fees to pay real estate taxes and water and sewage charges assessed by the City. Id. ¶ 129. By 2007, the Madison Street HDFC had incurred $110,352.44 in water, property tax, and emergency repair charges. Id. ¶ 21. Like the Nostrand Avenue HDFC, the Madison Street HDFC had also long lacked a functioning board or board members. Id. ¶¶ 282-85.

On October 26, 2011, Justice Martin of the New York State Supreme Court signed a foreclosure judgment against the Madison Street Property after the City had commenced in rem proceedings against it. Id. ¶ 131. On August 24, 2012, the City, through DOF, entered a deed in the chain of title of the Madison Street Property, and transferred the Madison Street Property to Neighborhood Restore. Id. ¶ 135. On February 29, 2016,

Neighborhood Restore deeded the Madison Street Property to Bridge Street with the City's approval. Id. ¶ 138. Sometime in or around April 2016, Thomas-Murchison learned for the first time that ownership of the Madison Street Property had been transferred from the HDFC. Id. ¶ 141. In May 2016, Bridge Street's managing agent informed Thomas-Murchison that she was being converted into a renter, and that her maintenance payments would be converted into rental payments. Id. ¶ 142.

The DOF's valuation of the Madison Street Property in 2012 was $398,000. Id. ¶ 150. Thomas-Murchison has since lost all of her equity in the Madison Street HDFC, and has additionally been dispossessed from residency at the Madison Street Property. Id. ¶ 157. Meanwhile, Bridge Street has since borrowed more than $11 million pursuant to two separate mortgages that were secured, at least in part, by the Madison Street Property. Id. ¶ 139.

All three plaintiffs allege that they did not receive notice of the in rem proceedings against their properties. Id. ¶¶ 88, 111, 143. While the City alleges in each case that it provided notice of the foreclosure to the plaintiffs or to the relevant HDFC, the plaintiffs allege that they did not receive such notice and, in any event, that the claimed notice in each case was deficient. Id. ¶¶ 86, 112, 144. In Dorce's case, the claimed notice was not sent to his current residence — which he claims the City Defendants knew or should have known — and was

11

addressed to a multi-unit building without any unit number. Id.
¶ 86. In Jones' case, the claimed notice sent to the Nostrand
Avenue HDFC was not addressed to any particular person or unit,
and was addressed to a partial version of the HDFC's name. Id. ¶
112. And in Thomas-Murchison's case, the notice allegedly
provided to the Madison Street HDFC was not addressed to any
particular person or unit. Id. ¶ 144. As a result of this, the
plaintiffs each allege that that they were deprived of the
opportunity to redeem their properties by exercising their right
to the "equity of redemption." Id. ¶¶ 87, 113, 145. The
plaintiffs allege in each case that the defendants were aware
that notice was deficient. Id. ¶¶ 85, 111, 143.

None of the plaintiffs received any compensation from the
Municipal or TPT Defendants for the surplus equity they owned in
their respective properties. Id. ¶ 73. Dorce alleges that he was
deprived of at least $180,000 in surplus equity, id. ¶ 91; Jones
alleges that she was deprived of her pro rata share of over
$575,000 in surplus equity, id. ¶¶ 121, 123; and Thomas-
Murchison alleges that she was deprived of her pro rata share of
over $285,000, id. ¶¶ 152, 154. Given the plaintiffs' claim that
the defendants manipulate the market value of targeted
properties, the plaintiffs allege that the amount of surplus
equity of which they were deprived in reality is substantially
higher. Id. ¶¶ 90-92, 120-22, 150-53.

## B. Procedural History

On March 11, 2019, the plaintiffs filed a putative class action against the defendants, seeking prospective equitable relief and various types of damages arising from the defendants' conduct. ECF Nos. 1. On May 15, 2019, the defendants moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. ECF No. 35. On May 17, 2020, this Court granted the defendants' motions to dismiss on the grounds that the Court lacked subject matter jurisdiction over the plaintiffs' federal claims (1) under the Rooker-Feldman doctrine, (2) under the Tax Injunction Act ("TIA") and the doctrine of comity, and (3) because the plaintiffs lacked standing to seek prospective equitable relief. Dorce v. City of New York, 460 F. Supp. 3d 327 (S.D.N.Y. 2020). The Court also declined to exercise supplemental jurisdiction over the plaintiffs' nonfederal claims. Id. at 345. The plaintiffs appealed, and, on June 23, 2021, the court of appeals affirmed in part and reversed in part. Dorce v. City of New York, 2 F.4th 82 (2d Cir. 2021). The court of appeals agreed that the plaintiffs lacked standing to seek declaratory and injunctive relief, but reversed this Court's finding that the TIA and comity barred all of the plaintiffs' claims. See id. at 95-101. The court of appeals also held that Rooker-Feldman did not bar the plaintiffs' equal protection and due process claims, or

13

their second takings claim — that their properties were taken
for a public purpose without just compensation — "to the extent
that for each of those claims, [the plaintiffs] seek only the
value of their lost property in excess of the amount owed in
taxes." Id. at 104-05; see also id. at 101-08. However, Rooker-
Feldman barred the plaintiffs from asserting their first takings
claim — that their properties were taken in violation of the
administrative regulations governing the TPT program. Id. at
105-06. The court of appeals remanded the case for further
proceedings. Id. at 108.

On September 15, 2021, the plaintiffs filed the Amended
Complaint. ECF No. 81; see also ECF No. 91. The plaintiffs
brought the following claims against all of the defendants: (1)
violation of the Takings Clause of both the United States and
New York State Constitutions; (2) violation of the Equal
Protection Clause of both the United States and New York State
Constitutions; (3) violation of the Due Process Clause of both
the United States and New York State Constitutions; (4)
violation of the Excessive Fines Clause of both the United
States and New York State Constitutions; (5) conspiracy to
deprive the plaintiffs of their constitutional rights to equal
protection under the law in violation of 42 U.S.C. § 1985(3);
(6) conversion under New York State law; (7) unjust enrichment
under New York State law; (8) deceptive practices in violation

14

of New York State General Business Law § 349; and (9) civil conspiracy in violation of New York State law. The plaintiffs also bring a claim for (10) violation of Article II of New York State's Municipal Home Rule Law against the City Defendants only.

Neither Jones nor Thomas-Murchison made a demand to pursue this action on their respective HDFCs prior to filing the Amended Complaint. See Am. Compl. ¶¶ 268, 278. Both allege that such demand would have been futile, id., because, among other things, neither HDFC had a functioning board upon which demand could have been made, id. ¶¶ 269-76, 279-87.

The defendants now move to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. ECF Nos. 112, 118.

## II.

### A.

When presented with motions under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court should consider the jurisdictional challenge first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

To prevail against a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving

the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in the plaintiff's favor. Id. Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings to determine whether jurisdiction exists. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by that body of decisional law that has developed under Rule 56. See id.

**B.**

**1.**

The defendants first move to dismiss the plaintiffs' Municipal Home Rule, due process, conversion, and unjust enrichment claims for lack of subject matter jurisdiction under the Rooker-Feldman doctrine. The Rooker-Feldman doctrine provides that "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The doctrine applies if four requirements are met:

16

> (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced.

Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 426 (2d Cir. 2014). The first and fourth requirements are procedural, while the second and third are substantive. Hoblock, 422 F.3d at 85. The second requirement is the "core requirement" from which the other requirements derive. Id. at 87. "[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Id. at 88.

In this case, the Rooker-Feldman doctrine does not affect the Court's subject matter jurisdiction over the plaintiffs' claims, because Rooker-Feldman's substantive requirements are not met for any of the challenged claims.

### a. Municipal Home Rule Claim

The plaintiffs allege that the City Defendants' conduct in administering the TPT Program exceeded the City's powers under the Municipal Home Rule Law. The Municipal Home Rule Law sets forth the general powers of local New York governments to "adopt and amend local laws not inconsistent with the provisions of the

constitution or not inconsistent with any general law." N.Y. Mun. Home R. Law § 10(1)(i). A law violates the Municipal Home Rule Law if it is inconsistent with the New York State Constitution.

The plaintiffs' claim pursuant to the Municipal Home Rule Law is premised on the City Defendants' alleged seizure and retention of the plaintiffs' surplus equity.[7] So construed, the plaintiffs' Municipal Home Rule claim is not barred by Rooker-Feldman. The second Rooker-Feldman requirement is not met, because the City Defendants' failure to return the plaintiffs' surplus equity, or else to compensate the plaintiffs therefor, was not caused by the state court foreclosure judgment, "but by the City's decision to include the properties in the TPT Program and transfer them to a third party, and by the TPT Program's allegedly inadequate mechanism for seeking compensation for the excess value of the property following foreclosure." See Dorce, 2 F.4th at 105. Moreover, through this claim, the plaintiffs

---

[7] In the Amended Complaint, the plaintiffs appear also to challenge the foreclosures of their properties pursuant to the Municipal Home Rule Law, because their properties allegedly did not meet the statutory definition of "distressed" or because the City allegedly deviated from the administrative requirements governing the TPT Program in foreclosing upon their properties. See Am. Compl. ¶¶ 375-76. However, the plaintiffs have abandoned this claim in their opposition brief. Moreover, the Court lacks subject matter jurisdiction over this claim pursuant to the Rooker-Feldman doctrine. First, the injury complained of in such a claim "is the loss of their property, which was caused by the state court judgments that divested them of that property." See Dorce, 2 F.4th at 105. Second, this claim would require the Court to analyze whether the foreclosure proceeding was initiated properly under the Administrative Code's provisions, and therefore invites the Court to determine whether the state court's entry of judgment was valid. See id. This satisfies Rooker-Feldman's substantive requirements.

seek "compensation only for the excess value of their property above the taxes and fees that they owed, not the return of their property or the full value of their property." See id.; see Am. Compl. 76-77 (prayer for relief). "That injury was caused not by the judgment of forfeiture, but by the [City Defendants'] actions following upon the forfeiture, by transferring the foreclosed-on property to the [TPT Defendants] while failing to provide a mechanism for limiting [the plaintiffs'] losses to the amount owed in taxes." See Dorce, 2 F.4th at 105.

Nor is the third Rooker-Feldman requirement met. The Court need not review the state court judgment to determine whether the City Defendants' conduct in "seizing and retaining" the plaintiffs' surplus equity exceeded the City's authority under the Municipal Home Rule Law. The state court judgment did not address whether the plaintiffs were compensated for their surplus equity or whether the City's seizure and retention of such equity would be unlawful. See id. Indeed, the alleged seizure and retention of the plaintiffs' surplus equity would have occurred, if at all, only after the foreclosure judgment was entered. See id. Accordingly, the third Rooker-Feldman requirement is unmet as to the plaintiffs' Municipal Home Rule claim, and Rooker-Feldman does not deprive the Court of subject matter jurisdiction over this claim.

### b. Due Process Claim

The plaintiffs allege that the defendants violated the plaintiffs' rights to procedural due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the New York State Constitution. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012). The plaintiffs in this case allege both that the notice provisions of the TPT Program fall short of those required under the United States and New York State Constitutions, and that the City failed to provide the plaintiffs in this case with adequate notice of the in rem proceedings against them. The court of appeals affirmed this Court's prior ruling that Rooker-Feldman was no bar to the latter challenge. See Dorce, 2 F.4th at 106-08. As to the former, facial challenge, the court of appeals stated that, "[t]o the extent that [the plaintiffs] seek monetary relief for the past injury of being subjected to the allegedly unconstitutional provisions, that claim overlaps with their first claim that they were not given adequate notice, and the earlier Rooker-Feldman analysis applies." Id. at 108.

While the defendants interpret the court of appeals'
statement as meaning that Rooker-Feldman bars the plaintiffs'
facial challenge, that is not a fair reading of the court of
appeals' statement. Fairly read, the court of appeals' statement
permits the plaintiffs' claim to proceed to the extent that the
plaintiffs seek monetary relief, which they plainly do. See Am.
Compl. ¶¶ 319, 352; see also id. at 76-77. In any event, Rooker-
Feldman does not bar the plaintiffs' facial due process
challenge. The Court need not review the state court judgment to
determine whether the provisions of the Administrative Code are
facially unconstitutional for lack of proper notice. Cf. Nelson
v. City of New York, 352 U.S. 103, 110 (1956) (analyzing the
constitutionality of the Administrative Code's provisions
without relying on the state court's entry of a foreclosure
judgment). Accordingly, the third requirement of Rooker-Feldman
is not met, and the plaintiffs' facial challenge, to the extent
it seeks only monetary relief, is not foreclosed by the Rooker-
Feldman doctrine.

### c. Conversion and Unjust Enrichment Claims

The plaintiffs also allege that the defendants unlawfully
converted their surplus equity and were unjustly enriched at the
plaintiffs' expense by the defendants' taking of the plaintiffs'
surplus equity. To state a claim for conversion, a plaintiff
must allege "(1) the property subject to conversion is a

21

specific identifiable thing; (2) plaintiff had ownership,
possession or control over the property before its conversion;
and (3) defendant exercised an unauthorized dominion over the
thing in question, to the alteration of its condition or to the
exclusion of the plaintiff's rights." Kirschner v. Bennett, 648
F. Supp. 2d 525, 540 (S.D.N.Y. 2009). To state a claim for
unjust enrichment, a plaintiff must allege that "(1) the other
party was enriched, (2) at that party's expense, and (3) that it
is against equity and good conscience to permit the other party
to retain what is sought to be recovered." City of Almaty v.
Sater, 503 F. Supp. 3d 51, 59 (S.D.N.Y. 2020).

In this case, the Rooker-Feldman doctrine does not deprive
the Court of subject matter jurisdiction over the plaintiffs'
claims for conversion and unjust enrichment. First, the injuries
of which the plaintiffs complain in their conversion and unjust
enrichment claims were not caused by the state court judgment.
The defendants' control of the plaintiffs' surplus equity, and
their failure to compensate the plaintiffs therefor, was caused
instead — like the injury complained of in their Municipal Home
Rule claim — "by the City's decision to include the properties
in the TPT Program and transfer them to a third party, and by
the TPT Program's allegedly inadequate mechanism for seeking
compensation for the excess value of the property following
foreclosure." See Dorce, 2 F.4th at 105. Moreover, and similar

22

again to the plaintiffs' Municipal Home Rule claim, the plaintiffs do not through these claims seek to void the state court foreclosure judgment, but seek compensation only for their surplus equity. And this injury, too, was caused by the City's actions following upon the forfeiture, as opposed to the forfeiture itself. The second Rooker-Feldman requirement is therefore unmet as to the plaintiffs' claims for conversion and unjust enrichment.

Adjudicating the conversion and unjust enrichment claims also does not require the Court to review the state court judgment, and Rooker-Feldman's third requirement is therefore unmet. The state court judgment foreclosing upon the plaintiffs' properties did not address whether the defendants' control of the plaintiffs' surplus equity was unlawful, and again, "compensation was not necessary prior to the transfer, which occurred after the foreclosure judgment was entered." See id. In all, the plaintiffs' conversion and unjust enrichment claims are not barred by Rooker-Feldman. Cf. Gordon v. First Franklin Fin. Corp., No. 15-cv-0775, 2016 WL 792412, at *5 (E.D.N.Y. Feb. 29, 2016).

Accordingly, the motion to dismiss for lack of subject matter jurisdiction is **denied** to the extent it seeks to dismiss the plaintiffs' Municipal Home Rule, due process, conversion,

and unjust enrichment claims as barred under the Rooker-Feldman
doctrine.

2.

The defendants also argue that the claims asserted by Jones
and Thomas-Murchison must be dismissed for lack of standing. To
satisfy the constitutional requirement of Article III standing,
a plaintiff must show that (1) the plaintiff "suffered an injury
in fact that is concrete, particularized, and actual or
imminent;" (2) "the injury was likely caused by the defendant;"
and (3) "the injury would likely be redressed by judicial
relief." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203
(2021). Where a plaintiff seeks to bring a claim derivatively on
behalf of a corporation of which he is a shareholder, as opposed
to directly on behalf of himself, the plaintiff must satisfy two
additional requirements. See Donoghue v. Bulldog Invs. Gen.
P'ship, 696 F.3d 170, 175 (2d Cir. 2012). "First, because a
derivative action generally is a mere procedural device to
enforce substantive rights belonging to the [corporation], there
must be injury in fact to that real party in interest." Id. at
175-76. Second, the shareholder must maintain a personal
financial interest in the outcome of the litigation. Id. at 176.

In this case, Jones and Thomas-Murchison bring their claims
directly, and in the alternative, derivatively on behalf of the
HDFCs of which they are shareholders. In either case, they have

standing to bring the claims in this matter. To the extent that the plaintiffs assert claims personal to themselves — such as the transfer of their personally owned shares in the corporation — these injuries are sufficiently "personal and individual" to them to constitute injury-in-fact. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 n.1 (1992); Bingham v. Zolt, 66 F.3d 553, 562 (2d Cir. 1995).

Moreover, to the extent that the plaintiffs assert claims on behalf of the HDFC, they have satisfied the requirements to bring a derivative action. First, the HDFC on whose basis the action is asserted plainly suffered an injury-in-fact in the form of the foreclosure and transfer of its property. Second, the plaintiffs, as shareholders, continue to have a personal financial interest in the outcome of the litigation, in that the award of damages to the HDFC as a result of the constitutional and statutory violations alleged would inure to the benefit of shareholders. While the defendants dispute that Thomas-Murchison was in fact a shareholder of her HDFC, a plaintiff must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. Thus, at the pleading stage, a plaintiff need only allege the elements of standing, and as on a motion to dismiss for failure to state a claim, the

Court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008). Thomas-Murchison has adequately pleaded that she was a shareholder of the HDFC in the Amended Complaint, and this suffices at this stage.

The statutory requirements of derivative standing are also met. Federal Rule of Civil Procedure 23.1 requires that the plaintiff "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association," Fed. R. Civ. P. 23.1(a), and that the complaint allege (1) "that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;" (2) "that the action is not a collusive one to confer jurisdiction that the court would otherwise lack;" and (3) state with sufficient particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and . . . the reasons for not obtaining the action or not making the effort," Fed. R. Civ. P. 23.1(b). The defendants dispute only the last element.

Because the plaintiffs concede that they did not make a demand on the relevant HDFCs, they must assert that demand on the HDFC would have been be futile under New York State law. See

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991)
(noting that pre-suit demand requirements, and the futility
exceptions thereto, are governed by the law of the state of
incorporation). In New York, "[d]emand is excused because of
futility when a complaint alleges with particularity that the
board of directors did not fully inform themselves about the
challenged transaction to the extent reasonably appropriate
under the circumstances." Bansbach v. Zinn, 801 N.E.2d 395, 401
(N.Y. 2003). Accordingly, by alleging that the relevant HDFCs
lacked functioning boards, and otherwise failed to challenge the
foreclosure, the plaintiffs have plausibly alleged demand
futility. See id.; In re Comverse Tech., Inc., 866 N.Y.S.2d 10,
16 (App. Div. 2008) (finding that the plaintiffs had
sufficiently alleged that the board of directors had failed to
stay informed of the challenged transaction where they did not
even do a "cursory check or inquiry" into the transaction). The
plaintiffs have therefore adequately pleaded derivative standing
sufficient to withstand a motion to dismiss.

The motion to dismiss is **denied** to the extent it is based
on lack of constitutional standing, or for failure to meet the
requirements of derivative standing.

## III.

### A.

The Court therefore proceeds to the merits of the plaintiffs' claims. In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### B.

The defendants move to dismiss each of the plaintiffs' claims for failure to state a claim. The plaintiffs allege that the defendants violated four constitutional provisions: the Takings Clause, the Due Process Clause, the Equal Protection Clause, and the Excessive Fines Clause. In addition, the plaintiffs allege that the defendants conspired against the plaintiffs to violate the plaintiffs' constitutional rights in violation of both federal and state law, converted their rights

to surplus equity in violation of state law, were unjustly enriched at the plaintiffs' expense in violation of state law, and — as to the City Defendants only — violated the Municipal Home Rule Law by exceeding the City's authority in seizing and retaining the plaintiffs' surplus equity. All of the plaintiffs' claims except for their facial due process challenge and their claim for conspiracy under New York State law are sufficient to withstand the motion to dismiss.

### 1. Constitutional Claims

#### a. State Action

The plaintiffs bring their federal constitutional claims pursuant to 42 U.S.C. § 1983, and their state constitutional claims pursuant to the New York State Constitution. Both generally require that "a litigant claiming that his constitutional rights have been violated . . . first establish that the challenged conduct constitutes state action." Fabrikant v. French, 691 F.3d 193, 206 (2d Cir. 2012) (United States Constitution); see Under 21 v. City of New York, 482 N.E.2d 1, 7 n.6 (N.Y. 1985) (New York State Constitution). The state action requirement under the New York State Constitution is consonant with, if not more flexible than, the state action requirement under the United States Constitution. See id.; Sharrock v. Dell Buick-Cadillac, 379 N.E.2d 1169, 1173 (N.Y. 1978). Accordingly, because the plaintiffs satisfy the state action requirement

29

under § 1983, the plaintiffs have also alleged state action for
purposes of their state constitutional claims.

In the Second Circuit, three main tests are considered to
determine whether the "actions of a nominally private entity are
attributable to the state":

> (1) when the entity acts pursuant to the coercive power
> of the state or is controlled by the state ("the
> compulsion test"); (2) when the state provides
> significant encouragement to the entity, the entity is
> a willful participant in joint activity with the state,
> or the entity's functions are entwined with state
> policies ("the joint action test" or "close nexus
> test"); or (3) when the entity has been delegated a
> public function by the state ("the public function
> test").

Fabrikant, 691 F.3d at 207. "The fundamental question under each
test is whether the private entity's challenged actions are
fairly attributable to the state." Id.

In this case, the defendants do not dispute that the City
Defendants are state actors, and the plaintiffs have
sufficiently alleged that the TPT Defendants engaged in state
action under the "joint action" test. "In analyzing whether a
private entity acts under color of state law for purposes of
§ 1983," the Court begins "by identifying the specific conduct
of which the plaintiff complains, rather than the general
characteristics of the entity." Id. The plaintiffs here allege
that the TPT Defendants violated their constitutional rights by
(1) taking and retaining the plaintiffs' surplus equity without

compensation, (2) targeting the plaintiffs on the basis of their race for inclusion in the TPT Program and for seizure of their surplus equity, (3) failing to provide the plaintiffs with proper process in regard to the defendants' taking of their surplus equity, and (4) excessively fining the plaintiffs for their tax liability by seizing their surplus equity. Taking the plaintiffs' allegations as true, these actions by the TPT Defendants constitute state action. These actions were produced, if at all, only jointly with the City Defendants, and pursuant to a plan — in which the TPT Defendants were not passive participants — between the defendants to violate the plaintiffs' rights. See Anilao v. Spota, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (stating that "[t]he touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the [state actor]," and noting that the private actor must take an active role in the challenged action), aff'd, 27 F.4th 855 (2d Cir. 2022). Specifically, the plaintiffs allege, among other things, that the City and TPT Defendants worked jointly in choosing which properties to target for foreclosure, and conspired together to deprive the plaintiffs of the surplus equity in the plaintiffs' properties to advance the City's housing goals and to enrich the TPT Defendants. These allegations suffice to allege plausibly that the TPT Defendants' conduct constitutes state action within the

meaning of § 1983. Cf. Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982) ("[A] private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a state actor for purposes of the Fourteenth Amendment."). The defendants' motion to dismiss the federal and state constitutional claims against them, to the extent the motion is based on the alleged lack of state action, is accordingly **denied**.

### b. Takings

The plaintiffs allege that the defendants' actions in seizing their surplus equity constituted unconstitutional takings under both the United States and New York State Constitutions. Because the guarantees under the Takings Clause of the United States Constitution and the New York State Constitution are generally coextensive, the Court considers them together. See Our Wicked Lady LLC v. Cuomo, No. 21-cv-165, 2021 WL 915033, at *3 n.5 (S.D.N.Y. Mar. 9, 2021).

The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; see Phillips v. Wash. Legal Found., 524 U.S. 156, 163-64 (1998); see also N.Y. Const. art. I, § 7. A property owner states a claim for a violation of the Takings Clause when

the plaintiff adequately alleges that the government took the plaintiff's property for public use without paying for it. See Knick v. Twp. of Scott, Pa., 139 S. Ct. 2162, 2170 (2019).

The defendants' main argument in support of their motion to dismiss the plaintiffs' takings claims is that the withholding of surplus equity following an in rem foreclosure does not constitute a "taking" within the meaning of the Takings Clause so long as an opportunity to obtain such surplus is provided, and that such an opportunity was in fact provided to each of the plaintiffs in this case. The plaintiffs do not dispute the basic premise of the defendants' argument that, where the foreclose-upon owner had an adequate avenue for recovering the surplus equity, a state actor's withholding of such surplus equity does not violate the Takings Clause. Cf. Nelson, 352 U.S. at 110. The crux of the parties' dispute as to the plaintiffs' takings claims is whether there is, in fact, a process provided to enable foreclosed-upon landowners to recover their surplus equity in this case. See Coleman ex rel. Bunn v. District of Columbia, 70 F. Supp. 3d 58, 80 (D.D.C. 2014) (stating that while "a Takings Clause violation regarding the retention of equity will not arise when a tax-sale statute provides an avenue for recovery of the surplus equity," a Takings Clause violation may arise where "the tax-sale statute does not provide a right to the surplus and the statute provides no avenue for recovery

of any surplus"); Rafaeli, LLC v. Oakland Cnty., 952 N.W.2d 434, 453 (Mich. 2020).

In this case, the plaintiffs adequately allege that no such process for the recovery of their surplus equity exists, and therefore they have adequately pleaded a violation of the Takings Clause at this stage. The two apparent means by which the foreclosed-upon owners may redeem their properties — through instalment agreement or full payment, see N.Y.C. Admin. Code § 11-412.1(d) — are, according to the plaintiffs, illusory. First, the plaintiffs allege, the instalment agreement process is illusory, because — as happened with Dorce — an owner may enter into an instalment agreement, timely provide the payments, and still have the property and surplus equity seized without redemption. Second, the plaintiffs allege that the defendants will often reject former owners' attempts to redeem their properties and surplus equity through full payment. Taking these allegations as true — and given the fact that the plaintiffs dispute that foreclosed-upon owners even receive notice of the foreclosures — the plaintiffs' allegations suffice to demonstrate that there is no real process for former owners to recover their surplus equity. Accordingly, the defendants' motion to dismiss, to the extent it seek dismissal of the plaintiffs' takings claims, is **denied**.

34

### c. Equal Protection

The plaintiffs also allege that the defendants' actions violated their rights to equal protection under both the United States and New York State Constitutions. Because the equal protection guarantees of both Constitutions are similar, the Court considers the federal and state claims together. See Our Wicked Lady, 2021 WL 915033, at *3 n.5.

The Equal Protection Clause of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; see also N.Y. Const. art. I, § 11. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). To establish a violation of equal protection by intentional discrimination, a plaintiff may "proceed in several ways, including by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001). In order to state a claim, the plaintiff generally need not allege the "existence of better treated, similarly situated persons of a different race." Id.

In this case, the plaintiffs allege that the TPT Program —
an otherwise facially neutral law — has been discriminatorily
applied against homeowners of color. They support this charge
with statistics showing that homeowners in communities of color
are more likely to experience in rem foreclosures under the TPT
Program than homeowners in predominantly white communities, and
that homeowners of color are the frequent targets of the TPT
Program. These allegations are sufficient at this stage.

The plaintiffs have also carried their burden of
demonstrating that the defendants' unequal application of the
TPT Program was motivated by racial discrimination. The
plaintiffs allege that the defendants specifically targeted
homeowners of color because of racial biases, including
perceptions that people of color are "less likely to have the
resources to mount legal challenges" and to have the abilities
to fight the defendants' tactics. Am. Compl. ¶ 217. This is
sufficient to show discriminatory motivation, because — drawing
all reasonable inferences in the plaintiffs' favor — the
plaintiffs have demonstrated that the defendants intended for
the TPT Program to fall upon the shoulders of homeowners of
color, who, the defendants believed, would not be able to bear
the weight. See Glover v. City of New York, No. 15-cv-4899, 2018
WL 4906253, at *16 (E.D.N.Y. Oct. 9, 2018) (noting that, to show
discriminatory motivation, the plaintiff must allege that

"decisionmakers selected or reaffirmed a particular course of
action at least in part because of, not merely in spite of, its
adverse effects upon an identifiable group," and that "the
plaintiff need begin only by showing that race was a motivating
factor"). In all, the plaintiffs' allegations state a claim for
a violation of their equal protection rights at this stage in
the litigation.[8]

### d. Due Process

The plaintiffs also allege that the defendants' actions
violated their rights to due process under both the United
States and New York State Constitutions. The plaintiffs bring
both as-applied and facial claims, and the Court considers the
federal and state claims together. See Our Wicked Lady, 2021 WL
915033, at *3 n.5.

The Due Process Clause of the United States Constitution
provides that no state shall "deprive any person of . . .
property, without due process of law." U.S. Const. amend. XIV,
§ 1; see also N.Y. Const. art. I, § 6. "An essential principle
of due process is that a deprivation of life, liberty, or
property be preceded by notice and opportunity for hearing

---

[8] Because the Court finds that the plaintiffs state an equal protection
claim based on their discriminatory application theory, the Court does not
consider the plaintiffs' alternative arguments in support of their claim. The
Court also does not consider the plaintiffs' argument that the TPT Program is
discriminatorily enforced on the basis of age, because it is not clear that
the plaintiffs bring an equal protection claim on this basis, much less that
that claim would succeed.

appropriate to the nature of the case." Cleveland Bd. of Educ.
v. Loudermill, 470 U.S. 532, 542 (1985). Where the taking of
property is concerned, due process "does not require that a
property owner receive actual notice before the government may
take his property." Jones v. Flowers, 547 U.S. 220, 226 (2006).
But the notice must be "reasonably calculated to reach the
intended recipient when sent," and "the means employed must be
such as one desirous of actually informing the absentee might
reasonably adopt to accomplish it." Id. at 226, 229; see also
id. at 239 (stating that, where "the State is exerting
extraordinary power against a property owner — taking and
selling a house he owns" — "[i]t is not too much to insist that
the State do a bit more to attempt to let him know about it when
the notice letter addressed to him is returned unclaimed"). In
determining whether notice was adequate, the Court must ask
whether the defendant thought that the plaintiff had received
notice, using a standard of objective reasonableness. Miner v.
Clinton Cnty., N.Y., 541 F.3d 464, 472 (2d Cir. 2008).

     In this case, the plaintiffs allege that they never
received notice that their properties were being foreclosed
upon, and that they therefore lacked notice that their surplus
equity was being seized. Dorce claims that the notice allegedly
sent to him was not addressed to where he lived, and was not
even addressed to any unit in the multi-unit building to which

it was sent. Dorce claims that the City knew, or should have known, that the address was not where he lived, and moreover knew or should have known that Dorce did not receive notice of the foreclosure because he continued to pay the City instalment payments contemporaneously. Jones also claims that neither she nor the HDFC received notice of the foreclosure. Jones claims that the notice allegedly sent was not addressed to any person or any unit, and did not even include the HDFC's full name. She, too, claims that the City was aware that the notice it sent was deficient, because, among other things, the City's records made plain that the Nostrand Avenue HDFC had no functioning officers or board at that time. Thomas-Murchison also claims that she never received notice of the foreclosure proceeding, because, among other things, the notice sent to the Madison Street HDFC was not addressed to any particular person or unit, and the City knew that the HDFC had no functioning officers or board. These allegations state a claim for a violation of the plaintiffs' due process rights. See Luessenhop v. Clinton Cnty., N.Y., 466 F.3d 259, 271-72 (2d Cir. 2006) (stating that notice might be inadequate where "(i) the [plaintiffs] did not receive the notice (sent by certified mail) informing them that the government was about to take their property, (ii) the government was aware that the letter was not received, and (iii) the

government took no additional steps where it was practicable to do so").[9]

It is true, as the defendants argue, that "plaintiffs do not have a due process right to actual notice of foreclosure." Miner, 541 F.3d at 467. It is also true that a number of courts have found notices of foreclosure, even where not actually received by the plaintiff, sufficient. See, e.g., id. But these cases, and the principle for which they stand, are not dispositive here. When a plaintiff brings an as-applied challenge, whether notice is sufficient in a particular case is a context-specific analysis, and depends on what the specific defendants knew about the plaintiffs' unique circumstances, when they knew it, and what additional steps they took — if any — in response to such knowledge. More information is needed at this stage before the Court could conclude that the plaintiffs' due process rights were not violated. See Luessenhop, 466 F.3d at 272. The defendants' motion to dismiss, to the extent it seeks to dismiss the plaintiffs' as-applied due process challenge, is **denied.**

---

[9] The defendants' proffered evidence that the plaintiffs in fact received the notices is not properly considered on this motion. The Court also declines to consider the presumption of regularity at the motion to dismiss stage — despite the fact that it is set forth in N.Y. Admin. Code. § 11-411 — "since presumptions are evidentiary standards that are inappropriate for evaluation at the pleadings stage." See Haywood v. Fremont Inv. & Loan, No. 08-cv-4961, 2009 WL 706090, at *1 (E.D.N.Y. Mar. 16, 2009).

However, the plaintiffs' facial challenge must be dismissed. The provision requires that notice be provided and that owners have an opportunity to be heard. It is well settled that "[o]nce taxpayers are provided with notice and an opportunity to be heard on the adjudicative facts concerning the valuation of properties subject to tax . . . they have received all the process that is due." Sheehan v. Suffolk Cnty., 490 N.E.2d 523, 525 (N.Y. 1986); see also Miner, 541 F.3d at 474 ("[D]ue process only requires notice of the pendency of the action and an opportunity to respond and does not require municipalities to send additional notices as each step in the foreclosure proceedings is completed."). While there remain questions as to whether this process was in fact followed in the plaintiffs' cases, there is nothing facially unconstitutional about the TPT Program's notice provisions. Accordingly, the motion to dismiss is **granted** to the extent it seeks dismissal of the plaintiffs' facial due process challenge.

### e. Excessive Fines

The plaintiffs' final constitutional claim alleges that the defendants' seizure and retention of their surplus equity constituted an unconstitutionally excessive fine. The plaintiffs' state and federal constitutional claims are considered together. Cf. Ese A. O'Diah v. TBTA-Triborough Bridge

& Tunnel Auth., No. 19-cv-7586, 2021 WL 2581446, at *7 (S.D.N.Y.
June 23, 2021).

    The Eighth Amendment of the United States Constitution
protects against the imposition of "excessive fines." U.S.
Const. amend. VIII; see also N.Y. Const. art. I, § 5. "The
Eighth Amendment checks the government's power to punish," von
Hofe v. United States, 492 F.3d 175, 181 (2d Cir. 2007), and
applies to the states through the Fourteenth Amendment, Timbs v.
Indiana, 139 S. Ct. 682, 689 (2019). To determine whether a
financial penalty is excessive under the Eighth Amendment,
courts in the Second Circuit use a two-step inquiry. See Farina
v. Metro. Transp. Auth., 409 F. Supp. 3d 173, 194 (S.D.N.Y.
2019) (citing United States v. Viloski, 814 F.3d 104, 108 (2d
Cir. 2016)). "First, a court must consider whether the payment
or forfeiture at issue constitutes a 'fine,' meaning that it is
punitive in nature and not purely 'remedial.'" Id. (quoting
Viloski, 814 F.3d at 109). A fine may be punitive where it
imposes an economic penalty on the person for that person's
actions, and seeks to deter future wrongdoing. See Austin v.
United States, 509 U.S. 602, 610, 618 (1993). By contrast, a
fine is remedial if it is "intended only to compensate the
government for lost revenue." Farina, 409 F. Supp. 3d at 198
(quoting Viloski, 814 F.3d at 109). "Second, a court weighs four
factors to determine whether the fine is 'grossly

disproportional' to the underlying offense." Id. at 194 (quoting

Viloski, 814 F.3d at 110). This analysis is guided by four non-

exhaustive factors:

> (1) the essence of the [underlying offense] of the
> [complainant] and its relation to other criminal
> activity, (2) whether the [complainant] fits into the
> class of persons for whom the statute was principally
> designed, (3) the maximum sentence and fine that could
> have been imposed, and (4) the nature of the harm caused
> by the [complainant's] conduct.

Id. at 199. "Ultimately, whether a fine is excessive

involves solely a proportionality determination." Id. at 194.

In this case, the plaintiffs have stated a plausible claim

for violation of the Excessive Fines Clause. First, the

plaintiffs have plausibly alleged that the retention of their

surplus equity is a fine, because its purpose is at least partly

punitive. The plaintiffs allege that the purpose of the

defendants' retention of the surplus equity is to punish

citizens for not paying their taxes. The plaintiffs substantiate

this allegation by pointing to the discrepancy between the taxes

owed on the properties seized in the TPT Program, and the amount

of equity the owners had in those properties. The plaintiffs

argue that, because the amount of equity in the properties often

far exceeds the amount of tax liability owed, the retention

cannot merely be compensatory to the government for its loss,

but serves a retributive or deterrent function. These

allegations are sufficient at this stage. See Timbs, 139 S. Ct.

at 690 ("[C]ivil in rem forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive."); cf. Farina, 409 F. Supp. 3d at 198 ("The Complaint alleges that defendants administer fees and penalties that are multiples of the actual toll, and that the fees far exceed the costs of locating and contacting the driver to collect an unpaid toll. These are non-conclusory factual allegations that, if accepted as true, would support a deterrent or retributive purpose, as opposed to an exclusively remedial one.").[10]

Second, the "fine" constituting the retention of a former homeowner's entire surplus equity, as alleged, is disproportionate to the tax offense. In Dorce's case, he is alleged to have owed approximately $45,132.73 in taxes, but his property worth approximately $226,000 was taken in its entirety. In Jones' case, the Nostrand Avenue HDFC owed $160,760.20 in taxes, but the property was worth $736,000 when seized. And in the case of Thomas-Murchison, the Madison Street HDFC owed $110,352.44 in charges, but was worth approximately $398,000 when taken. In each case, the plaintiffs allege that the value of the property taken — and therefore the amount of the fine

---

[10] The defendants argue in opposition that the retention is not punitive or deterrent, but merely serves as an "incentive to encourage prompt payment of taxes." City Defs.' Reply 7, ECF No. 128. But incentivizing prompt payment is merely another way of saying deterring late payment, which "reflects a purpose that is deterrent in part, and therefore punitive, as opposed to furthering the sole goal of compensating for lost revenue." See Farina, 409 F. Supp. 3d at 198.

imposed — was substantially more than the taxes owed.
Considering the amount of the fine in light of the "essence" of
the underlying  offense and its relation to other criminal
activities, the fine is disproportionate, and the first factor
therefore weighs in favor of the plaintiffs. Indeed, "there is
no indication that [the plaintiffs'] fines were paid to address
any civil or criminal violations" beyond the non-payment of
certain taxes, "or that [the plaintiffs'] conduct threatened
public safety": the plaintiffs' underlying offenses are
"unrelated to any other illegal activities." See Ese A. O'Diah,
2021 WL 2581446, at *6. The fourth factor also weighs in the
plaintiffs' favor, because the defendants have identified no
harms caused by the plaintiffs' underlying offenses, and the
harms plausibly caused by the plaintiffs' conduct likely
"affected only one party, the [g]overnment, and in a relatively
minor way." See id. While the second factor weighs in the
defendants' favor because the plaintiffs are within the class of
people that the fines are meant to regulate, and the third
factor is at best neutral because it is not clear what other
penalties could have been imposed on the plaintiffs, the balance
of the factors show that the plaintiffs have stated a claim that
the seizure of the surplus equity was a disproportionate fine.
The defendants' motion to dismiss, to the extent it seeks to

dismiss the plaintiffs' excessive fines claims, is accordingly **denied.**

### 2. New York State Law Claims

### a. Conversion and Unjust Enrichment

The plaintiffs also bring claims under New York State law, including for conversion and unjust enrichment. The defendants dispute only the timeliness of the plaintiffs' claims and whether the defendants' exercise of control over the plaintiffs' surplus equity is "unauthorized" or inequitable so as to constitute conversion and unjust enrichment, respectively. But neither of these arguments are persuasive at this stage.

First, the statute of limitations does not require dismissal of the plaintiffs' claims. The statute of limitations for conversion is three years, N.Y. C.P.L.R. § 214(3), and the three-year period ordinarily runs from the date of the conversion. Wei Su v. Sotheby's, Inc., 490 F. Supp. 3d 725, 729 (S.D.N.Y. 2020). The parties appear to agree that the same limitations period applies to the plaintiffs' unjust enrichment claim, and the Court accepts that a three-year limitations period should apply. See Sater, 503 F. Supp. 3d at 64-66. However, a pre-answer motion to dismiss on the ground of untimeliness "may be granted only if it is clear on the face of the complaint that the statute of limitations has run." Fargas

v. Cincinnati Mach., LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013).

In this case, the earliest date on which the plaintiffs' properties, together with their surplus equity, were converted was the date on which the properties were transferred to the TPT Defendants. For Dorce and Jones, this transfer occurred in September 2018; their claims for conversion and unjust enrichment are therefore timely. While Thomas-Murchison's property was first transferred in August 2012, and her claims may therefore be untimely, it is not sufficiently clear that this is so. See id. In particular, Thomas-Murchison alleges that she had no reason to know of the transfer of her HDFC until April 2016, and she suggests that equitable tolling might also salvage her claims. Because it is not clear on the face of the complaint whether these defenses apply, it is premature to determine that the claim is untimely. See Sater, 503 F. Supp. 3d at 64.

Second, the plaintiffs have adequately alleged that the defendants exercised "unauthorized" dominion over their surplus equity, and that this dominion is also inequitable. Specifically, the plaintiffs allege that the defendants had no authority to retain the plaintiffs' surplus equity, which is sufficient at this stage. Cf. Hinds v. Option One Mortg. Corp., No. 11-cv-06149, 2012 WL 6827477, at *7 (E.D.N.Y. Dec. 6, 2012)

(dismissing claim for unjust enrichment because the plaintiff "made no allegations that [the defendants] ha[d] improperly retained any surplus from the sale beyond the loan funds and additional out-of-pocket expenses to which they [were] entitled"), report and recommendation adopted, 2013 WL 132719 (E.D.N.Y. Jan. 10, 2013). The defendants cite to no case that immunizes defendants from conversion and unjust enrichment claims based on the alleged wrongful withholding of surplus equity simply because there was a lawful underlying taking. See Ese A. O'Diah, 2021 WL 2581446, at *8 (rejecting claim that "conduct sanctioned by law cannot be the subject of an unjust enrichment claim"). Because the plaintiffs have adequately alleged that the defendants converted the plaintiffs' surplus equity, and that the defendants were thereby unjustly enriched, the defendants' motion to dismiss, to the extent it seeks dismissal of these claims, is **denied**.

### c. Deceptive Practice

The plaintiffs additionally allege that the defendants' conduct constituted a deceptive practice in violation of New York General Business Law § 349 ("GBL § 349"). The plaintiffs allege that the defendants' conduct in administering the TPT Program misled homeowners like themselves.

GBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce," and creates a

private right of action under which a litigant may recover damages. See N.Y. Gen. Bus. Law § 349(a), (h). To state a claim under this statute, "a plaintiff must allege (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result." Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014). An act is consumer oriented where it has the "potential to affect the public at large, as distinguished from merely a private contractual dispute." Elacqua v. Physicians' Reciprocal Insurers, 860 N.Y.S.2d 229, 231 (App. Div. 2008); see also Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) ("The critical question, then, is whether the matter affects the public interest in New York[.]"). "Based on this standard, courts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals." New York v. Feldman, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (collecting cases).

In this case, the plaintiffs have stated a claim for violation of GBL § 349. The defendants dispute only whether the defendants' actions in conducting the TPT Program were consumer oriented. However, the acts alleged here — targeting homeowners of color in order to seize their properties and surplus equity

49

in an attempt to manipulate the public housing market — affect the public interest, and are therefore cognizable under § 349. See id. The plaintiffs allege that the defendants' unlawful administration of the TPT Program has affected homeowners of color across New York, and has resulted in injury to the public at large — "perpetuat[ing] racial gaps in homeownership," see Am. Compl. ¶ 228 — and to the plaintiffs in particular. These allegations are sufficient at this stage. See Feldman, 210 F. Supp. 2d at 301-02. Because the defendants do not otherwise dispute the plaintiffs' allegations under GBL § 349, the plaintiffs have satisfied their burden of pleading a violation of § 349. The motion to dismiss, to the extent it seeks to dismiss the plaintiffs' claim pursuant to GBL § 349, is **denied.**

### d. Municipal Home Rule Law

As to the City Defendants only, the plaintiffs additionally claim that the administration of the TPT Program is ultra vires because it violates the Municipal Home Rule Law. The plaintiffs allege that the City's seizure and retention of surplus equity through the TPT Program exceeds the City's powers as delegated by New York State.

Taking the plaintiffs' allegations as true, the plaintiffs state a claim for violation of the Municipal Home Rule Law, because they allege that Local Law No. 37, and the TPT Program that it created, are inconsistent with the New York State

Constitution for the reasons described above. See Kamhi v. Town of Yorktown, 547 N.E.2d 346, 348 (N.Y. 1989). Accordingly, the motion to dismiss, to the extent it seeks dismissal of the plaintiffs' Municipal Home Rule Law claim, is **denied**.[11]

### 3. Conspiracy

Finally, complementary to their direct constitutional and state law claims, the plaintiffs allege that the defendants unlawfully conspired against them in violation of both 42 U.S.C. § 1985 and New York State law.

### a. Federal Claim

Section 1985(3) creates a cause of action where "two or more persons in any State . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a claim under § 1985(3), a plaintiff must allege

> (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities of the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or deprivation of a right or privilege of a citizen of the United States.

Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). In addition, § 1985(3) requires a plaintiff to allege that he or she is a

---

[11] It is unnecessary to reach the plaintiffs' alternative argument that the City Defendants violated the Municipal Home Rule Law because they acted without express delegation from the State Legislature.

member of a protected class and that the conspirators acted with racial or otherwise class-based "invidiously discriminatory motivation." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

In this case, the plaintiffs adequately allege a conspiracy pursuant to § 1985(3). The plaintiffs adequately allege an agreement between the TPT Defendants and the City Defendants to deprive communities of color of their homes and their surplus equity. Specifically, the plaintiffs allege that the defendants have an express agreement whereby the TPT Defendants agree to accept properties foreclosed upon by the City Defendants, and the defendants coordinate in advance concerning the selection of properties for inclusion in the TPT Program. The plaintiffs have also adequately alleged overt acts in the furtherance of this conspiracy — at the least, the alleged takings of the named plaintiffs' homes and their surplus equity — and resulting injuries to the plaintiffs in the form of the loss of their properties and surplus equity. Finally, the plaintiffs have alleged that they are members of a protected class — namely, racial minorities — and that the conspirators acted with racial motivation for the reasons explained in their equal protection claim. These allegations suffice at this stage to carry the plaintiffs' burden. See Cent. UTA of Monsey v. Vill. of Airmont, N.Y., No. 18-cv-11103, 2020 WL 377706, at *20-21 (S.D.N.Y. Jan. 23, 2020). The defendants' motion to dismiss, to the extent it

seeks to dismiss the plaintiffs' conspiracy claim pursuant
§ 1985(3), is therefore **denied**.[12]

### b. State Claim

"It is a well-settled and often repeated principle of New
York law that no cause of action lies for civil conspiracy."
Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 591
(2d Cir. 2005). While a conspiracy may be alleged "to connect a
defendant to an otherwise actionable tort," a plaintiff may not
"reallege a tort asserted elsewhere in the complaint in the
guise of a separate conspiracy claim." Id. "As this is precisely
what [the plaintiffs have] attempted to do, and as the purported
purpose of [their] conspiracy claim is already advanced by the
allegations of conspiracy set forth elsewhere in [their]
complaint, this claim is dismissed as to all defendants." Id.
The motion to dismiss, to the extent it seeks to dismiss the
plaintiffs' civil conspiracy claim, is accordingly **granted**.

### IV.

The defendants finally argue that the plaintiffs may only
seek damages for their surplus equity given their express
limitation of claims for compensation to the amount of their
surplus equity before the court of appeals. Based on the court
of appeals' holdings with respect to the Rooker-Feldman doctrine

---

[12] To the extent that the defendants seek to dismiss the plaintiffs'
claim as untimely, this argument is rejected for the same reason it was
rejected as to the plaintiffs' unjust enrichment and conversion claims.

and otherwise, it is plain that the plaintiffs are limited to damages in the amount of the excess of the value of the property over the taxes due.

While it is not clear what other damages the plaintiffs seek, the plaintiffs would be entitled to nominal damages if they could prove a constitutional violation and no actual damages. See Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984) ("[E]ven when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right."). However, punitive or exemplary damages are barred against the City. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981); Morris v. Lindau, 196 F.3d 102, 112 (2d Cir. 1999). Moreover, to the extent that the plaintiffs seek to collect punitive or exemplary damages from the individual City Defendants in their official capacities, as opposed to their individual capacities, those claims are also barred. See Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 262 (2d Cir. 1997).

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit.

For the foreging reasons, the defendants' motion to dismiss is **granted in part** and **denied in part**. The Clerk is directed to close Docket Nos. 112 and 118.


**SO ORDERED.**

Dated:    New York, New York
              June 24, 2022

                                     John G. Koeltl
                       United States District Judge