**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

McCONNELL DORCE, CECELIA JONES, and
SHERLIVIA THOMAS-MURCHISON,
individually and on behalf of all others similarly
situated,

                              Plaintiffs,

                              v.

CITY OF NEW YORK, LOUISE CARROLL
(Commissioner of the New York City Department
of Housing Preservation and Development),
SHERIF SOLIMAN (Commissioner of the New
York City Department of Finance),
NEIGHBORHOOD RESTORE HOUSING
DEVELOPMENT FUND CORP., and BSDC
KINGS COVENANT HOUSING
DEVELOPMENT FUND COMPANY, INC.,

                              Defendants,

                            -and-

585 NOSTRAND AVENUE HOUSING
DEVELOPMENT FUND CORPORATION and
248 MADISON STREET HOUSING
DEVELOPMENT FUND CORPORATION,

                          Nominal Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. 1:19-cv-02216-JLR

**PLAINTIFFS' MEMORANDUM
OF LAW IN SUPPORT OF
THEIR MOTION FOR CLASS
CERTIFICATION**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 4

I.     The TPT Program ................................................................................................... 4

II.    Defendants' Operation of the TPT Program ......................................................... 6

    A.    Defendants Did Not Provide Any Compensation ..................................... 6

    B.    Defendants Adversely and Disproportionately Impacted Minority Property Owners ....................................................................................................... 7

    C.    Defendants Lacked a System for Providing Adequate Notice to Property Owners 8

ARGUMENT ........................................................................................................................ 9

I.     The Court Should Certify the Proposed Round 10 Class ...................................... 9

    A.    The Requirements of Rule 23(a) Are Satisfied ...................................... 10

        1.    Numerosity ................................................................................. 10

        2.    Commonality ............................................................................... 12

        3.    Typicality .................................................................................... 14

        4.    Adequacy .................................................................................... 15

        5.    Ascertainability .......................................................................... 16

    B.    The Requirements of Rule 23(b)(3) Are Satisfied ................................. 17

        1.    Predominance .............................................................................. 17

        2.    Superiority ................................................................................... 20

II.    The Court Should Certify the Proposed Rounds 1-9 Class ................................. 21

    A.    The Requirements of Rule 23(a) Are Satisfied ...................................... 22

        1.    Numerosity ................................................................................. 22

        2.    Commonality ............................................................................... 23

        3.    Typicality .................................................................................... 23

        4.    Adequacy .................................................................................... 23

        5.    Ascertainability .......................................................................... 24

    B.    The Requirements of Rule 23(b)(3) Are Satisfied ................................. 24

        1.    Predominance .............................................................................. 24

        2.    Superiority ................................................................................... 24

    C.    Claims of the Proposed Rounds 1-9 Class Are Timely ......................... 25

        1.    Class claims were not ripe and did not accrue until this litigation .......... 25

2.    Class claims were equitably tolled until Knick............................................. 27

CONCLUSION.................................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. Morgan Stanley*,
  2013 WL 3835198 (S.D.N.Y. July 25, 2013) ...................................................26, 27

*In re Allergan PLC Sec. Litig.*,
  2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ...........................................................17

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................................22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013).................................................................................................26

*Anaen Goyburu Corp. v. Village of Port Chester*,
  2010 WL 11712794 (S.D.N.Y. June 14, 2010) ......................................................19

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*,
  238 F.R.D. 82 (S.D.N.Y. 2006) ..............................................................................10

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ..............................................................................18

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022) ....................................................................................13

*Basso v. New York Univ.*,
  2020 WL 7027589 (S.D.N.Y. Nov. 30, 2020) ........................................................23

*Bruce v. Christian*,
  113 F.R.D. 554 (S.D.N.Y. 1986) ............................................................................12

*Buffington v. Progressive Advanced Ins.*,
  342 F.R.D. 66 (S.D.N.Y. 2022) ..............................................................................18

*Coleman ex rel. Bunn v. Distrct of Columbia*,
  306 F.R.D. 68 (D.D.C. 2015).......................................................................... *passim*

*Caufield v. Colgate-Palmolive Co.*,
  2017 WL 3206339 (S.D.N.Y. July 27, 2017) .........................................................24

*Chalmers v. City of New York*,
  2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022).............................................. *passim*

*Collins v. Olin Corp.*,
248 F.R.D 95 (D. Conn. 2008)........................................................................24

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995)............................................................................11

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ..................................................................22

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015) ..................................................................16

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ..................................................................16

*Doe 1 v. JPMorgan Chase Bank, N.A.*,
2023 WL 3945773 (S.D.N.Y. June 12, 2023) ..........................................23, 24

*Dorce v. City of New York*,
2 F.4th 82 (2d Cir. 2021) ..............................................................................17

*Douglin v. GreatBanc Tr. Co.*,
115 F. Supp. 3d 404 (S.D.N.Y. 2015).............................................................17

*Eng-Hatcher v. Sprint Nextel Corp.*,
2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009).................................................12

*Floyd v. City of New York*,
283 F.R.D. 153 (S.D.N.Y. 2012) .......................................................13, 14, 15

*Fraticelli v. MSG Holdings, L.P.*,
2015 WL 8491038 (S.D.N.Y. Dec. 10, 2015) ................................................21

*George v. Shamrock Saloon II, LLC*,
2019 WL 8106153 (S.D.N.Y. Aug. 7, 2019)..................................................21

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
317 F.R.D. 374 (S.D.N.Y. 2016) ..................................................................16

*Hargroves v. City of New York*,
694 F. Supp. 2d 198 (E.D.N.Y. 2010) ...........................................................28

*Horne v. Dep't of Agric.*,
569 U.S. 513 (2013).......................................................................................26

*In rem Tax Foreclosure Action No. 53*,
189 N.Y.S.3d 686 (App. Div. 2023) ................................................................8

iv

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
    2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) .......................................................................25

*Kleinknecht v. Ritter*,
    2024 WL 896999 (E.D.N.Y. Mar. 1, 2024) ...........................................................................28

*Knick v. Township of Scott*,
    588 U.S. 180 (2019) ............................................................................................................3, 28

*In re: Magnetic Audiotape Antitrust Litig.*,
    2001 WL 619305 (S.D.N.Y. June 6, 2001) ...........................................................................10

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ..................................................................................................10

*Martinek v. AmTrust Fin. Servs., Inc.*,
    2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) ...........................................................................17

*Martinenko v. 212 Steakhouses, Inc.*,
    2023 WL 2919766 (S.D.N.Y. Apr. 12, 2023) .......................................................11, 12, 13, 21

*Mazzanti v. Gen. Elec. Co.*,
    2017 WL 923905 (D. Conn. Mar. 7, 2017) ...........................................................................25

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ..............................................................................................18, 20

*Partee v. City of Marietta*,
    2008 WL 11407220 (N.D. Ga. Feb. 15, 2008) .....................................................................20

*Phillips v. Better Homes Depot, Inc.*,
    2003 WL 25867736 (E.D.N.Y. Nov. 12, 2003) ....................................................................27

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ..........................................................................................11, 12, 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*,
    559 U.S. 393 (2010) ..............................................................................................................10

*Stensrud v. Rochester Genesee Reg'l Transp. Auth.*,
    507 F. Supp. 3d 444 (E.D.N.Y. 2020) .........................................................................26, 27, 28

*Stinson v. City of New York*,
    282 F.R.D. 360 (S.D.N.Y. 2012) ................................................................................ *passim*

*Sykes v. Mel Harris & Assocs., LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015)............................. *passim*

*Trinidad v. Breakaway Courier Sys., Inc.*,
  2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ............................................................13

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
  283 F.R.D. 199 (S.D.N.Y. 2012) ....................................................................14, 15

*Tyler v. Hennepin County*,
  598 U.S. 631 (2023)........................................................................... *passim*

*Tyler v. Hennepin County*,
  No. 62-CV-19-6012 (Minn. Dist. Ct. June 28, 2024) ............................................2

*Wharton v. County of Nassau*,
  2010 WL 3749077 (E.D.N.Y. Sept. 20, 2010) ....................................................28

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ......................................................................26

*Xia v. 65 W. 87th St. Hous. Dev. Fund. Corp.*,
  2020 WL 7230961 (S.D.N.Y. Dec. 8, 2020) ......................................................12

**Statutes**

N.Y.C. Admin. Code §§ 11-401 *et seq.* ..........................................................1, 5, 6, 7

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................. *passim*

vi

Pursuant to Fed. R. Civ. P. 23, named Plaintiffs McConnell Dorce, Cecelia Jones, and Sherlivia Thomas-Murchison ("Named Plaintiffs") hereby move to certify the following proposed classes on Counts I-XIII of the Amended Complaint (ECF No. 91):

1.  All persons whose properties Defendants transferred during Round 10 of the Third Party Transfer Program (the "TPT Program") under New York City (the "City") Admin. Code §§ 11-401 *et seq.* that had value in excess of the tax liens thereon ("Surplus Equity") (the "Round 10 Class").

2.  All persons whose properties Defendants transferred during Rounds 1-9 of the TPT Program under City Admin. Code §§ 11-401 *et seq.* that had Surplus Equity (the "Rounds 1-9 Class").

Named Plaintiffs also request appointment of their attorneys as class counsel to the proposed classes.

## <u>INTRODUCTION</u>

This action concerns the City's Third Party Transfer Program ("TPT Program"), by which Defendants seized real estate belonging primarily to minority property owners based on asserted tax liens, regardless of the amount of Surplus Equity, and without providing any compensation to the original property owners. Since enactment in 1996, Defendants have used the TPT Program to conduct ten rounds of mass property seizures, taking 593 properties with hundreds of millions of dollars of Surplus Equity. During the most recent wave of property transfers under the TPT Program known as Round 10, Defendants seized over 50 properties with more than $88 million of Surplus Equity that they continue to wrongfully retain. Defendants' seizures under the TPT Program stand in stark contrast to the City's traditional tax lien sales process where "former owners may receive [the] surplus," ECF No. 110 at 13, and as the U.S. Supreme Court last year unanimously held, are in contravention of the Takings clause of the U.S. Constitution, *see Tyler v. Hennepin County*, 598 U.S. 631, 639, 642 (2023) (holding that "a government may not take more from a taxpayer than she owes" and accordingly that "a taxpayer is entitled to the surplus in excess

of the debt owed").  Notably, courts have certified classes of homeowners like the *Tyler* petitioner and others alleging similar unconstitutional Takings by local governments.  *See* Order Preliminarily Approving Settlement, *Tyler v. Hennepin County*, No. 62-CV-19-6012 (Minn. Dist. Ct. June 28, 2024); *Coleman ex rel. Bunn v. D.C.*, 306 F.R.D. 68 (D.D.C. 2015).

As record evidence makes clear and as TPT Program executives have testified, including Municipal Defendants'[1] 30(b)(6) designee, since inception, the "*same set*" of coordinated governmental actors administered the program for the "*same purpose*," with "*consistent[]*" "*conduct*," "*for every round*."  Ex. 13 at 23:16-24:13; Ex. 12 at 118:21-24; Ex. 16 at 47:16-48:11.[2] Defendants "*[were] doing nothing different in [Round 10] than in the previous 9 rounds*."  Ex. 20. For example, "the same [selection] criteria were used in all rounds to the TPT [Program]."  Ex. 7 at 62:23-63:12, 112:20-24.  In light of the uniform purposes, operation, and consequences of the TPT Program, a class-wide proceeding affords the most fair and efficient method of securing redress for hundreds of property owners' Takings and other claims.  The only distinguishing characteristic between the two classes is the time period when class members' Surplus Equity was seized, on account of Defendants' contention that claims of homeowners whose properties were transferred in Rounds 1-9 are untimely.  But a statute of limitations defense that is either commonly applicable or not to members of the Rounds 1-9 Class cannot serve to defeat class certification and, indeed, this common issue supports certification.  In any event, Rounds 1-9 Class members'

---

[1] "Municipal Defendants" and "MDs" refer to defendants the City of New York, Louise Carroll, Commissioner of the City's Department of Housing Preservation and Development ("HPD"), and Sherif Soliman, Commissioner of the City's Department of Finance ("DOF")

[2] Unless otherwise indicated: emphases have been added; internal alteration, citation, and quotation marks have been omitted; and references to "Ex." are to those exhibits appended to the accompanying Declaration of Alexander B. Simkin in Support of Plaintiffs' Motion for Class Certification and Putative Round 10 Class's Motion for Summary Judgment on Takings Claims ("Simkin Decl.").

claims are timely because, among other reasons explained herein, their claims did not accrue and were equitably tolled until 2019, when the disparate impact of the TPT Program on minority homeowners became publicly known and the Supreme Court, in *Knick v. Township of Scott*, 588 U.S. 180, 206 (2019), changed the law for commencement of § 1983 Takings actions in federal court by eliminating the long-standing state-litigation requirement.

All Rule 23 requirements are satisfied and certification is warranted. The two classes are presumptively numerous because Defendants' own records compiled in the course of administering the TPT Program show that they seized more than 40 properties with Surplus Value during each of the respective classes—56 in Round 10 and hundreds in Rounds 1-9 (with at least 47 in Rounds 8-9 alone). Numerosity is also satisfied because putative class members have limited means with which to pursue individual actions, making joinder impracticable. Common issues of fact and law pervade the litigation, including a central question of whether *Tyler* mandates Defendants' liability for unconstitutional Takings by their failure to provide any compensation for seized Surplus Equity. Named Plaintiffs' claims are typical of their respective classes because, just like other class members, their claims arose from Defendants' uniform conduct under the TPT Program of seizing Surplus Equity without compensation. Named Plaintiffs are also adequate class representatives because they fully share their fellow class members' interests in establishing Defendants' liability and have been litigating this matter for more than five years during which they have participated in discovery and, through qualified and experienced counsel, successfully defeated Defendants' multiple efforts to dismiss the litigation. Surplus Equity delimits class membership and is readily ascertainable by comparing the values of transferred properties with the tax liens on those properties to determine Surplus Equity. Common issues raised by Named Plaintiffs regarding Defendants' uncompensated seizures, disproportionate and deceptive targeting

of minority property owners, excessive penalties, and a deficient notification system resulting in lack of notice to homeowners predominate across the classes, will be established through generalized proof, and outweigh any individualized considerations. Finally, class-wide adjudication is the superior method of fairly and efficiently litigating the Takings and other claims of the Amended Complaint due to the limited financial resources of putative class members to vindicate their constitutional rights through independent litigation and the Court's familiarity with Defendants' unlawful operation of the TPT Program.

## **FACTUAL BACKGROUND**

### I.    **The TPT Program**

In 1996, the City Council enacted Local Law 37, which created the TPT Program and a tax lien sale process. Ex. 18. One of the City Council's purposes in enacting the program was "to have . . . more efficient tax enforcement." Ex. 13 at 295:12-19. As a "tax enforcement program," it incentivized payment (or, in other words, deterred non-payment) of outstanding tax liens by prospect of property foreclosure and transfer, Ex. 12 at 262:4-264:10.

Throughout the entire duration of the ten rounds of the TPT Program, "there ha[ve] been no significant changes to the goals and purpose of the program." Ex. 16 at 47:16-48:11. The same set of coordinated governmental entities—HPD, DOF, and Neighborhood Restore—"played the same role . . . for all the rounds of the TPT [Program]." Ex. 13 at 22:19-24:4, 26:18-21 (confirming same for HPD); Ex. 12 at 118:21-24 (confirming same for DOF); Ex. 15 at 97:14-19 (confirming same for Neighborhood Restore). There were no "ways in which the program . . . was different," Ex. 11 at 34:25-35:12, including that, for selecting properties, "the same criteria were used in all rounds to the TPT [Program]," Ex. 7 at 112:20-24; *see also* Ex. 17 at 259:2-11 ("[T]he process regarding how the Third-Party Transfer Program works has remained consistent across all ten

rounds").  In sum, Defendants "*[were] doing nothing different in [Round 10] than in the previous 9 rounds*."  Ex. 20.

TPT-eligible properties are residential properties with outstanding tax liens of at least one year, or at least three years for condominiums, cooperatives, and Housing Development Fund Corporations ("HDFCs").[3]  Ex. 13 at 60:25-61:4; Ex. 16 at 106:20-25; Admin. Code § 11-404. There is no statutory minimum tax lien threshold for a property's inclusion in the TPT Program. Ex. 13 at 98:4-15.

During each round, HPD identified blocks of properties that it determined to be distressed, such as those "statutorily distressed" under Admin. Code §§ 11-401(4), 11-401.1.  Ex. 13 at 29:12-30:19, 61:10-18; Ex. 18; Ex. 23.  Acting pursuant to a self-imposed "block pickup requirement," HPD then coordinated with DOF to "pick up" (*i.e.*, include in the TPT Program) properties with any tax liens for the minimally requisite time that were located on the same tax blocks as selected properties.  Ex. 13 at 30:18-31:1, 106:8-25; Ex. 14 at 210:18-23; Ex. 12 at 112:4-21, 119:7-120:10; [NYC_DORCE_0152928 at 2; NYC_DORCE_0004890 at 7].  Consequently, although the TPT Program was "designed to address . . . buildings with very high lien-to-value ratios," Ex. 19, Municipal Defendants selected and ultimately transferred properties with minimal lien-to-value ratios, *see* Ex. 27 at 9-11.  During Round 10, for example, half of the properties that Municipal Defendants selected were not statutorily distressed, with an average lien-to-value ratio of only 3%. *Id.* at 9.

Following selection, Municipal Defendants commenced mass *in rem* state court proceedings against subject properties, obtained putative default judgments in those actions, and

---

[3] HDFCs are housing cooperatives providing affordable housing for low-income individuals and families.  NYS PHFL Art. XI.

executed deeds conveying full and complete title to the foreclosed properties from the original owners, including Named Plaintiffs, to Neighborhood Restore. Ex. 18; Ex. 25. All told, Defendants used the TPT Program to transfer 593 residential properties consisting of over 7,300 dwelling units, Ex. 38; Ex. 41, including Thomas-Murchison's 284 Madison during Round 8, Thomas-Murchison Decl. ¶¶ 5-11, and Dorce's 373 Rockaway and Jones's 585 Nostrand during Round 10, Dorce Decl. ¶¶ 3, 8-10; Jones Decl. ¶¶ 3, 6-8.

## II.    Defendants' Operation of the TPT Program

### A.    Defendants Did Not Provide Any Compensation

Prior to title transfer under the TPT Program, a property owner may seek to enter into an installment agreement, Ex. 18; Ex. 25, or make a "demand" for "additional time in which to pay the taxes and interest or to have the property sold with all taxes and interest to be paid out of the proceeds of such sale," Admin. Code § 11-409(d). But the TPT Program contains no provision for a property owner to initiate a court-directed sale of a selected property or to otherwise receive the Surplus Equity. *See* Admin. Code §§ 11-401 *et seq.*

Defendants did not provide any compensation for the Surplus Equity that they seized pursuant to TPT Program transfers, *id.*, including to Named Plaintiffs, Dorce Decl. ¶ 12; Jones Decl. ¶ 10; Thomas-Murchison Decl. ¶ 13. Defendants' administration of the TPT Program stands in stark contrast to the City's standard Tax Lien Sales process by which the City does not seize owners' excess value in their properties. Ex. 13 at 181:18-182:7; Ex. 12 at 11:20-25. Therefore, "from a property owner's perspective, it's worse to have your property seized through the TPT [Program] than through a traditional tax lien sale." Ex. 12 at 12:2-6.

During Round 10, Defendants seized 56 properties, including Jones's and Dorce's, consisting of approximately 719 dwelling units, with Surplus Equity, Ex. 1. These 56 properties had a cumulative appraised market value of $118,635,000 based on Defendants'

contemporaneously-prepared "as is" fee simple market value appraisals of transferred properties, Ex. 47, and bore only $29,851,700.74 in tax liens, resulting in Defendants' seizure of $88,783,299.26 of Surplus Equity, Ex. 1. The cumulative lien-to-value ratio of these 56 properties is approximately 25%, meaning the other 75% is uncompensated Surplus Equity. *Id.*

Similarly, during Rounds 8-9 alone, Defendants transferred over 47 properties, including Thomas-Murchison's, with Surplus Equity. Ex. 3. Based on understated DOF valuations,[4] these 47 properties had a cumulative valuation of more than $29,283,130 and bore only $11,620,020.45 in tax liens, resulting in seizure likely far in excess of $17,663,109.55 of Surplus Equity. *Id.* Based on these understated DOF valuations, the cumulative lien-to-value ratio of these 47 properties is roughly 40%, meaning that Defendants seized likely far in excess of 60% of property value. *Id.*

B.      Defendants Adversely and Disproportionately Impacted Minority Property Owners

While the TPT Program authorized foreclosure of properties within all five City boroughs, *see generally* Admin. Code §§ 11-401 *et seq.*, Municipal Defendants selectively and disparately targeted neighborhoods comprising ethnic and racial minority groups and virtually excluded from TPT Program seizures the entire borough of Staten Island, a historically majority White area.[5] Of the 3,317 properties that Municipal Defendants included in the ten rounds of mass *in rem* foreclosure proceedings, only 43, or just 1.3%, were located in Staten Island. Ex. 34; 27 at 13-14. And of the 593 properties that Defendants transferred, only 9, or just 1.5%, were located in Staten Island. Ex. 38. During Rounds 8-10, Municipal Defendants did not transfer a single Staten Island

---

[4] DOF's property valuations are used by the City to assess taxes and substantially understate market values. Ex. 8 at 126:7-20; Ex. 46 ("[DOF] market values are much lower than the appraisal values"). Named Plaintiffs cite these DOF valuations to show that, even assuming such understated property values, the Rounds 1-9 Class is presumptively numerous.

[5] Staten Island's White population ranged from an estimated 73% to 77% between 2010 and 2019, the years in which Defendants seized properties in Rounds 8-10 of the TPT Program. *See* Simkin Decl. ¶ 91.

property.  *Id.*  Instead, "[t]he City selected properties in every borough other than Staten Island." Ex. 27 at 13-14.  Municipal Defendants have attempted to justify the near total absence of seized properties from Staten Island because it purportedly "has mostly . . . very small properties," Ex. 13 at 169:6-16, but not because of anything relating to the Program's tax enforcement purpose.

Conversely, Defendants selected and transferred properties of minority homeowners like Named Plaintiffs, including "very small" properties and "vacant land" located in predominantly ethnic and racial minority neighborhoods.  Dorce Decl. ¶ 3; Jones Decl. ¶ 5; Thomas-Murchison Decl. ¶¶ 4-6; Ex. 74; *see also In rem Tax Foreclosure Action No. 53*, 189 N.Y.S.3d 686, 690 (App. Div. 2023) (observing that TPT Program "often affect[ed] properties that [were] owned by minorities").  According to the July 22, 2019 City Council investigation report on the TPT Program, Municipal Defendants selected properties during Round 10 that were heavily concentrated in 11 historically minority neighborhoods in Harlem, Brooklyn, and the Bronx.  Ex. 27 at 13-14.  Similarly, 42 of the at least 47 properties with Surplus Equity that Defendants seized in Rounds 8-9 were located in neighborhoods with higher percentage non-White populations than in New York City overall.  Simkin Decl. ¶¶ 90-92.  Almost all TPT Program properties managed by MHANY—one of Defendants' principal TPT Program property managers—were taken from African Americans.  Ex. 17 at 188:5-189:16, 190:23-191:12.

During the nearly three decades of the TPT Program's operation, Municipal Defendants never undertook any effort to assess, let alone address, the scope of the disparate impact of the program on communities of color and minority property owners.  Ex. 87 Nos. 150-53; Ex. 13 at 114:22-115:2.

C.     Defendants Lacked a System for Providing Adequate Notice to Property Owners

Municipal Defendants did not verify that their TPT Program notices—whether statutorily required or otherwise—were reasonably calculated to reach the owners of properties included in

the TPT Program.  DOF relied on an automated system for populating notices with addresses from its property tax records, Ex. 8 at 103:3-18, but did not have a process or staff to verify the accuracy of those addresses, *id.* at 101:11-102:3; Ex. 12 at 183:8-185:3; Ex. 7 at 39:18-25, 207:2-6, 209:5-19.  HPD received addresses of property owners from DOF and also had no independent process to verify their accuracy.  Ex. 10 at 132:15-133:11, 144:12-145:25.  Moreover, HPD did not conduct any systematic audit or evaluation of the effectiveness of its noticing or other outreach efforts to owners whose properties were included in the TPT Program.  Ex. 9 at 247:11-18; Ex. 7 at 91:13-16, 92:23-93:5.  Regarding HDFCs, it is undisputed that Defendants made no effort to notify HDFC shareholders of property transfer; indeed, Defendants admit they are not aware of who the HDFC shareholders are.  Ex. 90 No. 15; Ex. 89 No. 13.

As a result, property owners did not receive notice of inclusion of their properties in the TPT Program or seizure of their Surplus Equity.  Ex. 11 at 135:4-13; Ex. 5 at 116:18-117:20; Ex. 15 at 397:3-13.  This is further evidenced by the fact that *none* of the property owners whose properties were seized in Round 10 participated in the foreclosure proceedings.  Municipal Defendants were aware that their notification of property owners was deficient, Ex. 11 at 135:4-13, and they did not take action to ensure that TPT Program notices were reasonably calculated to reach their intended recipients, *id.* at 139:9-18.  Municipal Defendants' notification process was the same throughout the duration of the TPT Program.  Ex. 8 at 103:19-104:4; Ex. 5 at 342:13-15; Ex. 7 at 112:20-113:18.

## ARGUMENT

## I.    The Court Should Certify the Proposed Round 10 Class

Plaintiffs who satisfy the requirements of Rule 23(a) and fit into one of the types of classes enumerated in Rule 23(b) have a "categorical" right entitling them "to pursue [their] claim as a class action."  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010).

While plaintiffs "bear[] the burden of showing, by a preponderance of the evidence, that the requirements of Rule 23 are met," *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 286 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015), they "are not required to make an extensive evidentiary showing," *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 93 (S.D.N.Y. 2006). Pursuant to these standards, the Court is to "adopt a standard of flexibility," *see Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997), and "should resolve doubts about whether a class should be created in favor of certification," *see In re: Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *1 (S.D.N.Y. June 6, 2001). The Round 10 Class readily meets the Rule 23 requirements for certification—just like property owners in similar class actions seeking monetary damages against local governments for unconstitutional seizures of their surplus equity in foreclosed properties (including in the seminal *Tyler* case). *See Coleman*, 306 F.R.D. at 88; Order Preliminarily Approving Settlement, *Tyler*, No. 62-CV-19-6012, slip op. at 4 (finding prerequisites of state court's analogue to Fed. R. Civ. P. 23(a) and 23(b)(3) satisfied).

A.    The Requirements of Rule 23(a) Are Satisfied

Each of the four prerequisites for class certification under Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as the Second Circuit's implied requirement of ascertainability—is "not demanding" and is satisfied for the Round 10 Class. *See, e.g.*, *Stinson v. City of N.Y.*, 282 F.R.D. 360, 368, 382 (S.D.N.Y. 2012) (finding all Rule 23(a) prerequisites satisfied); *Coleman*, 306 F.R.D. at 75-84 (same).

1.    *Numerosity*

"For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable." *Stinson*, 282 F.R.D. at 368. "Numerosity is presumed when a class consists of forty members or more." *Id.* at 369; *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (same). "[E]vidence

of exact class size or identity of class members" is "not required." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Rather, "[p]laintiffs must show some evidence of or reasonably estimate the number of class members." *Id.* "The court may also draw reasonable inference from that evidence and rely on those inferences when making its determination." *Martinenko v. 212 Steakhouses, Inc.*, 2023 WL 2919766, at *5 (S.D.N.Y. Apr. 12, 2023), *adopted by* 2023 WL 3160118 (Apr. 27, 2023). Where numerosity is not presumed, "[d]etermination of practicability depends on all the circumstances surrounding the case," with "[r]elevant considerations includ[ing] judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, [and] the ability of claimants to institute individual suits." *Robidoux*, 987 F.2d at 936.

The Round 10 Class is presumptively numerous. During Round 10 of the TPT Program, Defendants transferred 56 properties, consisting of approximately 719 dwelling units, with Surplus Equity as determined by comparing property values from Defendants' contemporaneous appraisals and the tax liens on the properties at the time of seizure. Ex. 1.[6] And of these 56 properties, 23 were HDFCs, *id.*, whose multiple shareholders, like Jones, Jones Decl. ¶¶ 3-4, are effectively co-owners of the buildings owned in the name of the HDFCs. *See Xia v. 65 W. 87th St. Hous. Dev. Fund. Corp.*, 2020 WL 7230961, at *1 (S.D.N.Y. Dec. 8, 2020). Therefore, the Round 10 Class consists of well over forty property owners who lost Surplus Equity. *See Martinenko*, 2023 WL 2919766, at *5 ("infer[ring]" numerosity based on supporting facts including purported class list consisting of 24 tipped employees for unpaid wages claims); *Eng-Hatcher v. Sprint Nextel Corp.*,

---

[6] Alternatively, should the Court calculate Surplus Equity by netting out tax liens *and* municipal charges, then during Round 10, Defendants seized Surplus Equity of 50 properties, consisting of approximately 652 dwelling units and 19 HDFCs, Ex. 2, such that this Round 10 Class is also presumptively numerous.

2009 WL 7311383, at *6 (S.D.N.Y. Nov. 13, 2009) (ruling numerosity was satisfied based on "simple google search reveal[ing] over 40 Sprint stores in New York").

Even if numerosity is not presumed, joinder of the individual members of the Round 10 Class would be abundantly impracticable, including due to class members' financial difficulties. *See Robidoux*, 987 F.2d at 935-36; *Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986). A class action arising from Defendants' unlawful and unconstitutional seizure of Surplus Equity pursuant to the same City program during the same round of property transfers will achieve "[j]udicial economy." *See Martinenko*, 2023 WL 2919766, at *6. Moreover, since Defendants targeted elderly individuals and foreclosed upon properties whose owners were unable to pay property taxes, *see* Ex. 28 at 3, "[t]he members of the proposed class[] in this case are, by definition, uniquely vulnerable," *see Coleman*, 306 F.R.D. at 80-81. They have limited resources with which to secure separate counsel and are "unlikely to commence individual suits" to vindicate violation of their constitutional rights against a well-resourced group of Defendants. *See Martinenko*, 2023 WL 2919766, at *6; *see also Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *4 (S.D.N.Y. Jan. 12, 2007).

### 2. *Commonality*

"[W]hat matters to class certification is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (emphasis in original). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Id.*; *see also Sykes*, 780 F.3d at 80 (observing commonality is satisfied where "class members have suffered the same injury").

"[T]here can be no dispute that the [City] has a single [TPT] [P]rogram." *See Floyd v. City of N.Y.*, 283 F.R.D. 153, 173 (S.D.N.Y. 2012) (concluding same regarding police department's

stop and frisk program).  The TPT Program is the product of a single legislative enactment, *see* Ex. 18, that is administered jointly by the same set of governmental entities, *see id.* at 4, pursuant to a uniform process of property selection and transfer, *see* Ex. 23; Ex. 25.  "[T]he process regarding how the Third-Party Transfer Program works has remained consistent across all ten rounds."  Ex. 17 at 259:6-11; *see also* Ex. 16 at 47:16-48:11; Ex. 11 at 34:25-35:12; Ex. 13 at 22:19-24:4, 26:18-21; Ex. 12 at 118:21-24; Ex. 15 at 97:14-19; Ex. 7 at 112:20-24; Ex. 20.  Such a "centralized and hierarchical" program supports a finding of commonality.  *See Floyd*, 283 F.R.D. at 173; *see also Stinson*, 282 F.R.D. at 370.

Moreover, claims of the Round 10 Class "boil down to a series of common legal questions" that will generate common answers—in the class's favor—on a class-wide basis.  *See Coleman*, 306 F.R.D. at 82-83.  These questions include whether Defendants effected unconstitutional and unlawful seizures when they took, and were unjustly enriched by, Surplus Equity without paying any compensation to the prior property owners.  As discussed in the putative Round 10 Class's contemporaneously-filed summary judgment motion, *Tyler* controls these questions and demands finding Defendants liable on the Takings claims to the Round 10 Class.  *See* 598 U.S. at 638-39. Additional common questions include whether Defendants' seizures: disproportionately impacted minority property owners; failed to provide property owners with adequate notice by virtue of a deficient notification system; and were partially punitive and substantially in excess of the outstanding tax liens that served as the basis for seizure.  These questions are similarly "susceptible to class-wide answers because their resolution does not depend upon the particular circumstances of any individual's loss," but upon "the same set of facts and the same course of conduct" by Defendants in operating the TPT Program.  *See Coleman*, 306 F.R.D. at 83.  And since class members were all "aggrieved by a single policy of the defendants, and there is strong commonality

of the violation and the harm, this is precisely the type of situation for which the class action device is suited." *See Floyd*, 283 F.R.D. at 173.

### 3. Typicality

"Typicality is satisfied when the lead plaintiffs' claims arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members." *Chalmers v. City of N.Y.*, 2022 WL 4330119, at *16 (S.D.N.Y. Sept. 19, 2022). "Courts finding typicality generally look . . . at the defendant's actions," *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012), such that "the typicality requirement may be satisfied where injuries derive from a unitary course of conduct by a single system," *Floyd*, 283 F.R.D. at 161. "So long as plaintiffs assert . . . that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish the necessary typicality." *Tsereteli*, 283 F.R.D. at 208. "[M]inor variations in the fact patterns underlying individual claims" will not defeat typicality. *Robidoux*, 987 F.2d at 936-37.

Just like absent class members, Named Plaintiffs' claims stem from Defendants' "unitary course of conduct by a single system," *see Floyd*, 283 F.R.D. at 161—the TPT Program—by which Defendants conspired to transfer properties and failed to provide any compensation for the Surplus Equity seized. And just like absent class members, Named Plaintiffs have additional claims arising from Defendants' operation of the TPT Program, including the disparate impact of the TPT Program on minority property owners like themselves, an inadequate notification system that failed to apprise them of property seizure, and seizure of Surplus Equity far in excess of what they had owed in tax liens at the time of seizure. Indeed, Defendants' misconduct is a "unifying thread that warrants class treatment." *See Sykes*, 285 F.R.D. at 290 (ruling typicality was satisfied for same reason). Since Named Plaintiffs' claims "ar[o]se from [Defendants'] same course of conduct," typicality is satisfied. *See Floyd*, 283 F.R.D. at 175 (holding typicality prong was

satisfied where "named plaintiffs' stops ar[o]se from the same course of conduct—*i.e.*, the NYPD's centralized program of stops and frisks—and their legal arguments [were] precisely the typical ones that [were] made by others who bring or could bring claims for Fourth and Fourteenth Amendment violations by defendants"); *see also Stinson*, 282 F.R.D. at 371 (similar); *Chalmers*, 2022 WL 4330119, at *16 (similar); *Coleman*, 306 F.R.D. at 83 (finding typicality satisfied because "plaintiffs' claims all ar[o]se from a common statutory background and raise[d] identical legal questions" "regarding whether D.C. law creates a property interest in equity; whether the District's tax-sale statutes effect a 'taking' of that property . . . and whether the plaintiffs were granted just compensation for any such taking"). Moreover, as discussed above, "there are common questions of law and fact affecting all class members" that "are central to the claims of all members of the [Round 10] Class," which underscores the typicality of Named Plaintiffs' claims. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267-68 (S.D.N.Y. 2014).

### 4. Adequacy

"Adequacy requires courts to inquire whether (1) plaintiffs' interests are antagonistic to the interest of other members of the class, and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *Chalmers*, 2022 WL 4330119, at *16. "Where the class representatives are prepared to prosecute fully the action and have no known conflicts with any class member, the adequacy requirements are met." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 401 (S.D.N.Y. 2016).

As Named Plaintiffs "have been allegedly injured by the same unconstitutional actions on the part of Defendants" to seize Surplus Equity, their "interests are identical to those of the putative class." *See Stinson*, 282 F.R.D. at 371 (concluding same); *see also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) (ruling typicality "is strong evidence that [plaintiffs'] interests are not antagonistic to those of the class"). Named Plaintiffs fully share their class members'

interests in establishing the unconstitutionality of those seizures and securing monetary damages, which the Supreme Court in *Tyler* confirmed they are owed on the Takings Claims. *See* 598 U.S. at 638-39. Further, Named Plaintiffs "have shown their commitment to the case by answering interrogatories, responding to requests for production, and sitting for depositions." *See* Dorce Decl. ¶¶ 15-17; Jones Decl. ¶¶ 13-15; *Chalmers*, 2022 WL 4330119, at *16.

Named Plaintiffs' counsel also satisfy the second prong of the adequacy test and the considerations of Rule 23(g). Ropes & Gray LLP, Valli Kane & Vagnini LLP, and White & Case LLP individually and collectively possess demonstrated competence and experience relevant to vindicating absent class members' constitutional rights. These firms have deep benches that routinely litigate complex civil rights cases, real estate disputes, and class actions. Weiner Decl. ¶¶ 2, 4-10; Berman Decl. ¶¶ 2-25; Wofford Decl. ¶¶ 3-6. These lawyers have diligently litigated this matter for more than five years and in that span have protected and advanced the interests of the Round 10 Class by securing favorable decisions in the Second Circuit, *see Dorce v. City of N.Y.*, 2 F.4th 82 (2d Cir. 2021), and this Court, *see* ECF No. 166. Counsel have also amassed deep knowledge of Defendants' operation of the TPT Program that is at the heart of this action by reviewing voluminous document discovery and taking seventeen depositions. *See* Weiner Decl. ¶ 11; Berman Decl. ¶¶ 26-28; Wofford Decl. ¶ 7; *see also Douglin v. GreatBanc Tr. Co.*, 115 F. Supp. 3d 404, 415 (S.D.N.Y. 2015) (appointing class counsel).

                    5.    *Ascertainability*

The "implicit 'ascertainability' requirement . . . commands that the proposed class be defined using objective criteria that establish a membership with definite boundaries." *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022). A proposed class "does not necessarily have to be determined prior to class certification" as long as it is ascertainable "at some point in the case." *Sykes*, 285 F.R.D. at 287.

"The class here is ascertainable" based on objective criteria. *See In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*5, \*7 (S.D.N.Y. Sept. 8, 2021). Members of the Round 10 Class are those who had Surplus Equity in their properties that Defendants seized during Round 10 of the TPT Program. Surplus Equity can be ascertained by comparing the property value at the time of transfer with the tax liens that served as the basis for seizure. Here, Round 10 market value appraisals of transferred properties and the corresponding tax liens show that the proposed Round 10 Class consists of the owners of 56 properties, Ex. 1, who can be determined based on publicly-available records, including deeds maintained on the City's Automated City Register Information System. Ex. 91. Because "[t]he City's records allow the ascertainment of all members of the proposed class," *see Chalmers*, 2022 WL 4330119, at \*20, and "determining class membership would be simple," *see In re Nassau County Strip Search Cases*, 461 F.3d 219, 229 (2d Cir. 2006), this requirement is satisfied, *see Buffington v. Progressive Advanced Ins.*, 342 F.R.D. 66, 73 (S.D.N.Y. 2022) (finding ascertainability satisfied upon plaintiff's contention that putative class members can be identified via defendants' data).

    B.    <u>The Requirements of Rule 23(b)(3) Are Satisfied</u>

The Round 10 Class also satisfies Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See, e.g.*, *Stinson*, 282 F.R.D. at 382-84 (certifying class pursuant to Fed. R. Civ. P. 23(b)(3)); *Coleman*, 306 F.R.D. at 84-88 (same).

    1.    *Predominance*

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to

individualized proof." *Stinson*, 282 F.R.D. at 382. This entails assessing "whether issues susceptible to generalized proof 'outweigh' individual issues." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 100 (S.D.N.Y. 2016). "[S]atisfaction of the typicality requirement of Rule 23(a)," as here, "goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality." *See Stinson*, 282 F.R.D. at 382. As in other cases involving defendants' "unitary course of conduct by a single system," "[t]he common issues of law and fact presented in this litigation predominate over any individual ones." *See Sykes*, 285 F.R.D. at 287, 293.

The common issues discussed above that support a finding of commonality and typicality also support a finding of predominance. *See id.* at 293 (assessing predominance in terms of common issues of law and fact as well as typicality of "[e]very potential class member's claim [that] ar[o]se[] out of defendants' uniform, widespread practice"). Whether Defendants unlawfully seized putative class members' Surplus Equity is a question to be settled through generalized proof that is the same for the entire Round 10 Class and is at the very heart of this litigation. Municipal Defendants' appraisals of Round 10 properties and DOF tax lien data identify the 56 properties transferred during that round from which Defendants seized Surplus Equity. Simkin Decl. ¶ 2; Ex. 1. The TPT Program's statutory scheme, of which the Court may take judicial notice, *see, e.g.*, *Anaen Goyburu Corp. v. Village of Port Chester*, 2010 WL 11712794, at *2 n.2 (S.D.N.Y. June 14, 2010), and record evidence show that the TPT Program contains no mechanism by which Municipal Defendants provide, and that Municipal Defendants did not provide, any compensation for the Surplus Equity of any property transferred during Round 10, Ex. 11 at 119:24-120:22; Ex. 14 at 223:3-16. Thus, the same general, programmatic evidence regarding Defendants' seizure of Surplus Equity during Round 10 will establish their liability to the Round 10 Class for unconstitutional Takings under *Tyler*, as well as unlawful conversion and unjust enrichment in

violation of state law. *See Coleman*, 306 F.R.D. at 86 (ruling predominance was satisfied where "[property] valuation . . . may be provable by [city's] own existing property valuations, making it subject to efficient proof of a more common nature (i.e. proof based upon a preexisting record that was compiled pursuant to a common methodology)").

Additionally, demographic data of locations where Surplus Equity was seized in Round 10 will establish that Defendants' operation of the TPT Program was discriminatory, *see Chalmers*, 2022 WL 4330119, at *13-16 (ruling plaintiffs provided generalized proof relating to discrimination claims sufficient for predominance inquiry), and deceived the public regarding implementation of the TPT Program, *see Sykes*, 285 F.R.D. at 282-83, 293-94 (ruling "defendants' unitary course of conduct purportedly to obtain default judgments in a fraudulent manner" in violation of NY GBL § 349 and other protections "d[id] not depend on individualized considerations" and satisfied predominance). The tax enforcement purpose of the TPT Program by which Defendants sought to deter non-payment of taxes, Ex. 12 at 262:4-264:10, coupled with Defendants' own data showing seizure of Surplus Equity substantially greater than the amounts of tax liens on the transferred properties, will establish that Defendants effected unconstitutional Excessive Fines, *see Partee v. City of Marietta*, 2008 WL 11407220 (N.D. Ga. Feb. 15, 2008) (certifying class of individuals charged for traffic violations on substantive due process and excessive fines claims). And property owners' uniform absence from appearing in state court to challenge Municipal Defendants' entry of putative default judgments or to seek compensation for wrongfully seized and retained Surplus Equity, particularly of substantial amounts in excess of underlying tax liens, will demonstrate Defendants' operation of a deficient notification system in violation of Due Process protections. *See* Ex. 12 at 183:8-185:3; Ex. 7 at 39:18-25, 91:13-16, 92:23-93:5, 207:2-6, 209:5-19; Ex. 10 at 132:15-133:11, 144:12-145:25; Ex. 9 at 247:11-18; Ex.

13 at 202:4-11.  All told, "[i]n light of the pervasive character of the common liability issues," predominance is satisfied and certification of the proposed Round 10 Class will be consistent with the purposes of this element to achieve a fair and efficient proceeding.  *See In re Nassau*, 461 F.3d at 230; *see also Chalmers*, 2022 WL 4330119, at *17.

### 2. Superiority

"Rule 23(b)(3) requires consideration of several factors to make the superiority determination; namely, (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Martinenko*, 2023 WL 2919766, at *9.  Here, "[t]hese factors all weigh in favor of superiority."  *See George v. Shamrock Saloon II, LLC*, 2019 WL 8106153, at *10 (S.D.N.Y. Aug. 7, 2019), *adopted by* 2020 WL 133621 (Jan. 13, 2020).

First, absent class members have minimal financial resources with which to prosecute, much less control, individual actions.  Properties transferred under the TPT Program included those whose owners could not afford to pay taxes along with elderly and other disadvantaged individuals.  Ex. 28.  Therefore, "requiring each putative class member to proceed individually would be costly and inefficient," *see Martinenko*, 2023 WL 2919766, at *9, and would likely mean "that the constitutional violations Plaintiffs allege would go unadjudicated," *see Stinson*, 282 F.R.D. at 383.  Moreover, "because all members of the proposed class would have the same injury" arising from Defendants' unconstitutional seizure of Surplus Equity, "it does not appear that any class member would have a unique reason to individually control the prosecution of his or her case."  *See George*, 2019 WL 8106153, at *10.  Second, Named Plaintiffs have been litigating the matter for more than five years and during that time have substantially advanced interests of their

class. They are not aware "of any individual actions asserting the same claims," which "implies that the class members have little interest, if any, in prosecuting and controlling individual actions." *See Fraticelli v. MSG Holdings, L.P.*, 2015 WL 8491038, at *10 (S.D.N.Y. Dec. 10, 2015). "Third, concentrating this litigation in the Southern District of New York is appropriate because the allegedly wrongful conduct occurred," and Defendants are "located in," this jurisdiction. *See George*, 2019 WL 8106153, at *10. The Court has also gained significant familiarity with the parties, the factual contentions regarding the TPT Program, and the claims of the Round 10 Class, such that it will be a "significant waste of judicial resources" to forgo that expertise in favor of a multiplicity of individual actions. *See In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 386 (S.D.N.Y. 2010). Fourth and "[f]inally, managing this litigation as a class action will not pose any substantial difficulties for the Court," *see id.*, because, for example, "the precise amount of damages each class member suffered" is ascertainable and "do[es] not pose a specter preventing certification," *see In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010). Indeed, here, "a class action represents a superior method for adjudicating this dispute" by "promot[ing] judicial economy" and avoiding "individual lawsuits [that] could lead to inconsistent results." *See Stinson*, 282 F.R.D. at 383.

## II.    The Court Should Certify the Proposed Rounds 1-9 Class

Defendants have indicated that, notwithstanding the Supreme Court's unanimous holding in *Tyler* that it is unconstitutional for a governmental entity to seize property value in excess of the taxes owed, Defendants would oppose class certification in connection with the Takings Claims because "most of the putative claims were barred by the statute of limitations." ECF No. 271, at 3 n.4; *accord* ECF No. 272, at 2 ("[Q]uestions as to the period of limitations as to the class representatives exist"). Defendants' position appears to be that a three-year limitations period is applicable to the Takings claims, and possibly the other causes of action of the Amended

21

Complaint, *see* ECF No. 236 ¶ 386; ECF No. 178 ¶ 208, such that the claims of property owners, including Thomas-Murchison, whose properties were transferred in the first nine rounds—nearly all in 2014 or earlier—are untimely because they accrued more than three years before filing of the Original Complaint on March 11, 2019.

Defendants' position, however, is no impediment to certification of a class consisting of property owners whose properties were transferred during Rounds 1-9 of the TPT Program.  First, this class meets the certification requirements of Rule 23 for the reasons discussed above, which are incorporated by reference herein, as well as for the additional class-specific reasons that are addressed below, including that timeliness issues are common to, typical of, and predominant across the members of the class.  Second and in any event, claims of the Rounds 1-9 Class are timely.

    A.    <u>The Requirements of Rule 23(a) Are Satisfied</u>

        *1.    Numerosity*

The class is presumptively numerous because, during Rounds 8-9 alone, Defendants transferred over 47 properties, including 29 HDFCs owned by tenant shareholders, with Surplus Equity likely totaling far in excess of $17,663,109.55.  Ex. 3.[7]  Defendants also transferred 451 other residential properties during the preceding seven rounds, Ex. 41, which underscores the presumptively numerous nature of the Rounds 1-9 Class and highlights the impracticability of joinder of hundreds of property owners.  Where, as here, Defendants "put at issue whether certain members of the proposed class have viable claims," the court need not "decide . . . issues bearing on the viability of their claims."  *See Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773,

---

[7] Alternatively, should the Court calculate Surplus Equity by netting out tax liens *and* municipal charges, then during Rounds 8-9, Defendants seized Surplus Equity of 36 properties, consisting of approximately 346 dwelling units and 18 HDFCs, Ex. 4, such that this Rounds 1-9 Class is also presumptively numerous.

at *3 (S.D.N.Y. June 12, 2023); *see also Basso v. N.Y. Univ.*, 2020 WL 7027589, at *11 (S.D.N.Y. Nov. 30, 2020) (declining to rule on statute of limitations defense raised by defendant against numerosity requirement in opposing class certification and considering issue on summary judgment). In any event, for the reasons discussed below, claims of the Rounds 1-9 Class are viable such that Defendants' anticipated timeliness "arguments [do not] undermine[] the numerosity of the proposed class." *See JPMorgan*, 2023 WL 3945773, at *4.

### 2.  Commonality

In addition to the common questions of the Round 10 Class, *see supra* Section I.A.2, Defendants' likely "argu[ment] that all of the [putative class members'] claims . . . are time-barred . . . implies that this is actually a common issue" supporting certification, *see Collins v. Olin Corp.*, 248 F.R.D 95, 105 (D. Conn. 2008).

### 3.  Typicality

Like other class members—including shareholders of numerous HDFCs whose properties Defendants transferred, *see* Thomas-Murchison Decl. ¶¶ 5-11—Thomas-Murchison's claims arise from Defendants' uniform administration of the TPT Program, *see supra* Section I.A.3, including seizure without compensation of her share of $510,122.94 in Surplus Equity for 248 Madison during Round 8, *see* Ex. 3. Moreover, since Defendants appear to contend that the statute of limitations bars all Rounds 1-9 claims for the same reason—date of property transfer—this defense "is not a unique defense that warrants denial of class certification." *See Caufield v. Colgate-Palmolive Co.*, 2017 WL 3206339, at *4-5 (S.D.N.Y. July 27, 2017).

### 4.  Adequacy

Like the other Named Plaintiffs, Thomas-Murchison's interests are identical to those of her class members. *See supra* Section I.A.4. Thomas-Murchison has also "shown [her] commitment to the case by answering interrogatories, responding to requests for production, and sitting for

deposition," *see* Thomas-Murchison Decl. ¶¶ 16-18; *Chalmers*, 2022 WL 4330119, at \*16, and is represented by the same qualified, experienced, and capable counsel that is representing the Round 10 Class, *see* Weiner Decl. ¶¶ 2-11; Berman Decl. ¶¶ 2-28; Wofford Decl. ¶¶ 3-7.  Moreover, "Defendants' purported statute of limitations defense . . . can be decided in one stroke," by certification of a Rounds 1-9 Class that is distinct from a Round 10 Class such that "there are [no] conflicts of interest between [Thomas-Murchison] and the class [she] seek[s] to represent."  *See In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at \*9, \*11 (S.D.N.Y. Mar. 31, 2017).

> ### 5. *Ascertainability*

Owners who lost Surplus Equity during Rounds 1-9 are ascertainable based on Defendants' own records.  *See supra* Section I.A.5.

> ### B. The Requirements of Rule 23(b)(3) Are Satisfied

> #### 1. *Predominance*

In addition to the generalized proof that will resolve common questions of the Round 10 Class, *see supra* Section I.B.1, questions of timeliness are common to all class members and further support finding predominance satisfied, *see Mazzanti v. Gen. Elec. Co.*, 2017 WL 923905, at \*6 (D. Conn. Mar. 7, 2017).  Moreover, demographic data will show the discriminatory impact of the TPT Program including because, during Rounds 8-9 alone, almost all properties with seized Surplus Equity were located in neighborhoods that were more non-White than New York City overall.  Simkin Decl. ¶¶ 90-92.

> #### 2. *Superiority*

A class-wide proceeding is the most fair and efficient process to adjudicate the rights of the Rounds 1-9 Class, which consists of hundreds of property owners, many of whom lack the means to pursue individual actions.  *See supra* Section I.B.2.

C.    Claims of the Proposed Rounds 1-9 Class Are Timely

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage" such that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "[T]he existence of even a meritorious statute of limitations defense does not necessarily defeat certification." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303 (S.D.N.Y. 2003). Even if considered by the Court in connection with the Rule 23 requirements discussed above, Defendants' alleged statute of limitations defense cannot defeat certification of the Rounds 1-9 Class because the class's claims are timely.

### 1.    Class claims were not ripe and did not accrue until this litigation

The monetary damages claims of the Rounds 1-9 Class typically accrue "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *See Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, 507 F. Supp. 3d 444, 450 (E.D.N.Y. 2020). With respect to Takings claims specifically, they ripen and accrue only when "it is clear that the Government has both taken property *and* denied just compensation." *Horne v. Dep't of Agric.*, 569 U.S. 513, 525-26 (2013) (emphasis in original).[8]

---

[8] While Defendants seized class members' Surplus Equity on the date of title transfer, Defendants did not make "clear" until this litigation that they would not be providing any compensation for the seized Surplus Equity that they continue to wrongfully retain. Foreclosure and transfer-related notices that Defendants purportedly addressed to owners whose properties were included in the TPT Program made no mention whatsoever of Defendants' wrongful seizure or retention of Surplus Equity, much less Defendants' position that no compensation would be provided. *See, e.g.*, Ex. 88. As a result, the Takings claims of the Rounds 1-9 Class could not and did not accrue until the start of this litigation, when Defendants "clear[ly]" indicated, *see Horne*, 569 U.S. at 525-26, that "there is no requirement that a former owner receive surplus funds following *in rem* tax foreclosure," *see* ECF No. 33 at 16.

And with respect to Equal Protection claims, "the disparate impact of a facially neutral policy," as with Defendants' application of the TPT Program, "may not become immediately apparent upon its adoption." *See Adkins v. Morgan Stanley*, 2013 WL 3835198, at *6 (S.D.N.Y. July 25, 2013). Accordingly, "[u]nder the discovery rule, [class members'] claims did not accrue—and the statute did not begin to run—until [class members] knew or had reason to know of the injury that serves as the basis for the action." *See id.* at *5. Since "[t]here is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systematic fashion," class members must be given time to "put the pieces together" of possible discrimination. *See Phillips v. Better Homes Depot, Inc.*, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003).

Rounds 1-9 property owners could not have known that Defendants were operating the facially neutral TPT Program in a discriminatory manner when their properties were seized. Instead, the first time these individuals could have known about the discriminatory administration of the program was in 2019 when a City Council investigation revealed that Municipal Defendants had been selecting properties that were heavily concentrated in historically minority neighborhoods. *See* Ex. 27 at 13-14. Indeed, the public outcry associated with these disclosures, *see* Ex. 29 at 3 (noting "voiced concern[s]" about the TPT Program in 2018-19)], demonstrates that Rounds 1-9 Class members could not have previously known that Defendants were using the TPT Program to target racial minorities. Thus, Thomas-Murchison and her fellow class members' Equal Protection claims did not accrue until 2019 when evidence of the discriminatory impact of the TPT Program surfaced publicly. *See, e.g.*, *Phillips*, 2003 WL 25867736, at *22-25 (beginning to run statute of limitations on unlawful "reverse redlining" claim from when plaintiff met with her attorney, who "put the pieces together" of possible discrimination).

2. *Class claims were equitably tolled until* Knick

"Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations" upon "establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Stensrud*, 507 F. Supp. 3d at 453. "[E]xtraordinary circumstance for which equitable tolling . . . applies" include plaintiffs' reliance "through no fault of their own . . . on then-authoritative . . . precedent to their detriment." *Wharton v. County of Nassau*, 2010 WL 3749077, at \*4 (E.D.N.Y. Sept. 20, 2010).

First, Thomas-Murchison "acted with reasonable diligence to pursue [her] claims" by commencing this action within a year of learning of the discriminatory effects of the TPT Program. *See id.* at \*4. Second, "prior to the issuance" of *Knick*, "[p]laintiffs faced extraordinary circumstances in trying to commence a § 1983 action in federal court—they could not have done so until the Supreme Court overturned 34-year-old precedent that materially changed the ripeness of their claim" by "eliminat[ing] the state-exhaustion requirement." *Stensrud*, 507 F. Supp. 3d at 451, 454. "[I]t is only due to a change in the law that the instant suit is actionable." *See Kleinknecht v. Ritter*, 2024 WL 896999, at \*3 (E.D.N.Y. Mar. 1, 2024). Thus, at the time of seizure, neither Thomas-Murchison nor her fellow class members "could . . . have predicted the still-years-away change in the law" occasioned by *Knick*, which "constitutes precisely the sort of extraordinary circumstances in which equitable tolling should operate to save [their] claims. *See Hargroves v. City of N.Y.*, 694 F. Supp. 2d 198, 211-12 (E.D.N.Y. 2010).

## CONCLUSION

For the foregoing reasons, the Court should certify the proposed classes.

Dated: October 30, 2024                    Respectfully submitted,

/s/ Matthew L. Berman                       /s/ Gregg L. Weiner
Matthew L. Berman                           Gregg L. Weiner
Robert J. Valli, Jr.                        Alexander B. Simkin
Yolande I. Nicholson, Esq., Of Counsel      Leon Kotlyar
VALLI KANE & VAGNINI LLP                    Ethan M. Weinberg
600 Old Country Road                        Mohammed S. Hassan
Garden City, NY 11530                       Casey M. Berger (admitted *pro hac vice*)
(516) 203-7180                              ROPES & GRAY LLP
mberman@vkvlawyers.com                      1211 Avenue of the Americas
rvalli@vkvlawyers.com                       New York, NY 10036
attorneynicholson@gmail.com                 (212) 596-9000
                                            Gregg.Weiner@ropesgray.com
                                            Alexander.Simkin@ropesgray.com
*Attorneys for Plaintiffs McConnell Dorce,* Leon.Kotlyar@ropesgray.com
*Cecelia Jones, and Sherlivia Thomas-*      Ethan.Weinberg@ropesgray.com
*Murchison*                                 Mohammed.Hassan@ropesgray.com
                                            Casey.Berger@ropesgray.com

/s/ Keith H. Wofford                        Daniel Yanofsky (admitted *pro hac vice*)
Keith H. Wofford                            ROPES & GRAY LLP
WHITE & CASE LLP                            Prudential Tower
200 South Biscayne Blvd, Suite 4900         800 Boylston Street
Miami, FL 33131                             Boston, MA 02199
kwofford@whitecase.com                      (617) 951-7000
                                            Daniel.Yanofsky@ropesgray.com
*Attorney for Plaintiffs McConnell Dorce and*
*Sherlivia Thomas-Murchison*                *Attorneys for Plaintiffs McConnell Dorce and*
                                            *Sherlivia Thomas-Murchison*

28

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that the foregoing contains 8,712 words excluding the parts of the brief exempted from the word-count limitation by Rochon Indiv. R. Prac. 3(C).

Dated:  October 30, 2024                                      */s/ Alexander B. Simkin*
                                                                           Alexander B. Simkin

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with this Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated: October 30, 2024                    <u>*/s/ Alexander B. Simkin*            </u>
                                           Alexander B. Simkin