**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

McCONNELL DORCE, CECELIA JONES, and
SHERLIVIA THOMAS-MURCHISON,
individually and on behalf of all others similarly
situated,

                              Plaintiffs,

                            v.

CITY OF NEW YORK, LOUISE CARROLL
(Commissioner of the New York City Department
of Housing Preservation and Development),
SHERIF SOLIMAN (Commissioner of the New
York City Department of Finance),
NEIGHBORHOOD RESTORE HOUSING
DEVELOPMENT FUND CORP., and BSDC
KINGS COVENANT HOUSING
DEVELOPMENT FUND COMPANY, INC.,

                              Defendants,

                      -and-

585 NOSTRAND AVENUE HOUSING
DEVELOPMENT FUND CORPORATION and
248 MADISON STREET HOUSING
DEVELOPMENT FUND CORPORATION,

                         Nominal Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. 1:19-cv-02216-JLR

**MEMORANDUM OF LAW IN
SUPPORT OF PUTATIVE
ROUND 10 CLASS MOTION
FOR SUMMARY JUDGMENT
ON TAKINGS CLAIMS**

**ORAL ARGUMENT REQUESTED**

**<u>TABLE OF CONTENTS</u>**

**Page**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

I.      TPT Program Seizures..............................................................................................4

II.     Defendants Seized Surplus Equity of the Round 10 Class Without Providing Any Compensation .........................................................................................................5

III.    Defendants Seized More Than $88 Million of Surplus Equity from the Round 10 Class Without Paying Any Compensation ...........................................................6

IV.   Role of Neighborhood Restore ................................................................................8

ARGUMENT .......................................................................................................................9

I.      Legal Standard.........................................................................................................9

II.     The Round 10 Class Is Entitled to Summary Judgment on the Takings Claims.................9

     A.   Defendants' Seizure of the Round 10 Class's Surplus Equity Constitutes an Unlawful Taking.............................................................................10

     B.   TPT Did Not Provide a Pathway for Round 10 Class Members to Obtain Surplus Equity ..................................................................................11

III.    Defendants Acted under Color of State Law...........................................................13

IV.   Defendants Are Liable for $88,783,299.26 in Damages and  $47,475,951.00  in Prejudgment Interest .............................................................................................16

     A.   The Round 10 Class Should Be Compensated $88,783,299.26 for Unconstitutionally Seized Surplus Equity.........................................................16

          1.   Market Value is the Appropriate Measure of Property Value..................17

          2.   Defendants' Property Appraisals Evidence Market Value.......................17

          3.   Tax Lien Amounts are Ascertainable from Defendants' Records............20

          4.   Surplus Equity for Round 10 is Readily Calculable..................................20

     B.   The Round 10 Class Is Entitled to  $47,475,951.00  in Prejudgment Interest. .........21

          1.   A Prejudgment Interest Rate of 9% Simple Interest Would Provide Just Compensation...................................................................22

          2.   In the Alternative, the Court Should Award 6% Compound Interest........25

CONCLUSION ...................................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States. v. 50 Acres of Land*,
   469 U.S. 24 (1984) ........................................................................................ 17, 21

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
   626 F.3d 699 (2d Cir. 2010) ................................................................................ 21

*Alfano v. CIGNA Life Ins. Co. of New York*,
   2009 WL 890626 (S.D.N.Y. Apr. 2, 2009) ............................................................ 22

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ........................................................................................ 14, 15

*Ciambrello v. Cty. of Nassau*,
   292 F.3d 307 (2d Cir. 2002) ................................................................................ 15

*Coleman v. District of Columbia*,
   70 F. Supp. 3d 58 (D.D.C. 2014) ...................................................................... 11, 12

*Constitution Pipeline Co., LLC v. Permanent Easement for 1.06 Acres*,
   2022 WL 61316 (N.D.N.Y. Jan. 6, 2022) .............................................................. 21

*Doe v. Unum Life Ins. Co. of Am.*,
   2016 WL 749886 (S.D.N.Y. Feb. 23, 2016) .......................................................... 23

*Fabrikant v. French*,
   691 F.3d 193 (2d Cir. 2012) .............................................................................. 13, 14

*In re Fortune Smooth (U.S.) Ltd.*,
   1993 WL 261478 (S.D.N.Y. July 6, 1993) ............................................................ 17

*Freed v. Thomas*,
   2021 WL 942077 (E.D. Mich. Feb. 26, 2021) ...................................................... 11

*Frommert v. Becker*,
   216 F. Supp. 3d 309 (W.D.N.Y. 2016), *aff'd*, 913 F.3d 101 (2d Cir. 2019) ............ 25

*Frommert v. Conkright*,
   913 F.3d 101 (2d Cir. 2019) ................................................................................ 22

*Garcia v. JonJon Deli Grocery Corp.*,
   2015 WL 4940107 (S.D.N.Y. Aug. 11, 2015) ........................................................ 9

*Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*,
   979 F. Supp. 2d 385 (S.D.N.Y. 2013) .................................................................. 25

*Jacobs v. United States*,
   290 U.S. 13 (1933) .................................................................................... 22, 23

*Knick v. Township. of Scott*,
   588 U.S. 180 (2019) ....................................................................................... 9

*United States v. Lawton*,
   110 U.S. 146 (1884) ...................................................................................... 11

*Levitian v. Sun Life & Health Ins. Co. (U.S.)*,
   2013 WL 3829623 (S.D.N.Y. July 24, 2013) ................................................ 23, 24

*United States v. Miller*,
   317 U.S. 369 (1943) ...................................................................................... 17

*Mizrahi v. City of New York*,
   2018 WL 3848917 (E.D.N.Y. Aug. 13, 2018) ..................................................... 15

*Monell v. Dep't of Social Servs.*,
   436 U.S. 658 (1987) ...................................................................................... 13

*Nat'l R.R. Passenger Corp. v. 10,178 Square Feet of Land More or Less*,
   781 F. Supp. 234 (S.D.N.Y. 1991) .................................................................... 18

*Nelson v. City of New York*,
   352 U.S. 103 (1956) ............................................................................ 9, 12, 13

*Olson v. United States*,
   292 U.S. 246 (1934) ...................................................................................... 17

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
   2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ..................................................... 27

*Peter J. Solomon Co., L.P. v. ADC Prod. (UK) Ltd.*,
   2017 WL 4350571 (S.D.N.Y. May 10, 2017) ...................................................... 25

*Rafaeli, LLC v. Oakland Cty.*,
   505 Mich. 429 (2020) ..................................................................................... 11

*Rao v. N.Y.C. Health & Hosps. Corp.*,
   882 F. Supp. 321 (S.D.N.Y. 1995) .................................................................... 22

*Saulpaugh v. Monroe Cmty. Hosp.*,
   4 F.3d 134 (2d Cir. 1993) ............................................................................... 26

*Schipani v. McLeod*,
    541 F.3d 158 (2d Cir. 2008) .................................................................27

*In re Sept. 11 Litig.*,
    802 F.3d 314 (2d Cir. 2015) .................................................................18

*Sill Corp. v. United States*,
    343 F.2d 411 (10th Cir. 1965) ..............................................................17

*Suitum v. Tahoe Reg'l Planning Agency*,
    520 U.S. 725 (1997) .............................................................................17

*Taaffe v. Life Ins. Co. of N. Am.*,
    769 F. Supp. 2d 530 (S.D.N.Y. 2011) ..................................................23

*United States v. Taylor*,
    104 U.S. 216 (1881) .............................................................................11

*Tyler v. Hennepin Cnty., Minnesota*,
    598 U.S. 631 (2023) .......................................................................*passim*

*Tyll v. Stanley Black & Decker Life Ins. Program*,
    403 F. Supp. 3d 27 (D. Conn. 2019) ....................................................25

*Under 21 v. City of New York*,
    482 N.E.2d 1 (N.Y. 1985) ...................................................................13

*Wickham Contracting Co. v. Loc. Union No. 3, IBEW*,
    955 F.2d 831 (2d Cir. 1992) .................................................................22

*Wright v. Smith*,
    21 F.3d 496 (2d Cir. 1994) ...................................................................13

**Statutes**

28 U.S.C. § 1961 ...........................................................................................27

42 U.S.C. § 1983 ....................................................................................13, 26

N.Y.C. Admin. Code §§ 11-401 *et seq* ...................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................1, 9

N.Y. C.P.L.R. §§ 5001, 5004(a) ...................................................................22

Pursuant to Fed. R. Civ. P. 56(a), the putative Round 10 Class, if certified by the Court in connection with the contemporaneously-filed Motion for Class Certification (and as defined therein)[1] request summary judgment against the Municipal Defendants[2] and Neighborhood Restore Housing Development Fund Corporation ("Neighborhood Restore")  on Counts I and VI of the Amended Complaint (ECF No. 91) and an award of damages to equal to the value in their transferred properties in excess of the tax liens thereon plus prejudgment interest.

## **INTRODUCTION**

This action concerns the City's Third Party Transfer Program ("TPT Program" or "TPT"), whereby Defendants seize and transfer private property owned largely by elderly persons of color based on asserted tax debts and, regardless of how much a property is worth in excess of any tax liens thereon, seize the excess or surplus value of that property for themselves ("Surplus Equity"). Defendants' TPT Program seizures differ from the City's traditional tax lien sales process where "former owners may receive [the] surplus."  *See* MDs.' MTD Mem., ECF No. 110 at 13.[3]  Last year, the Supreme Court in *Tyler v. Hennepin County* unanimously held that seizures of Surplus Equity violated the Takings Clause of the United States Constitution.  *See* 598 U.S. 631, 638-39 (2023).

---

[1] The Motion for Class Certification defines the putative Round 10 Class as: "[a]ll persons whose properties Defendants transferred during Round 10 of the Third Party Transfer Program (the "TPT Program") under New York City (the "City") Admin. Code §§ 11-401 et seq. that had value in excess of the tax liens thereon ("Surplus Equity") (the "Round 10 Class")."

[2] "Municipal Defendants" and "MDs" refer to defendants the New York City (the "City"), Louise Carroll, Commissioner of the City's Department of Housing Preservation and Development ("HPD"), and Sherif Soliman, Commissioner of the City's Department of Finance ("DOF"). The term Defendants refers collectively to Municipal Defendants and Neighborhood Restore.

[3] Unless otherwise indicated, emphases have been added and internal alteration, citation, and quotation marks have been omitted.

Under the TPT Program, the City seizes dozens or hundreds of private properties at a time through mass *in rem* foreclosure proceedings, forgoes collection of the tax liens that precipitated them, and conveys those properties for free to its real estate developer partners. These developers promise to provide "affordable housing" which, in practice, often means charging people rent to live in their own homes.

During Round 10, the most recent TPT Program round of property transfers, Municipal Defendants transferred 67 residential properties consisting of more than 850 individual units to Defendant Neighborhood Restore. In Round 10 alone, Defendants seized and continue to wrongfully retain more than $88 million of Surplus Equity.

In *Tyler*, while considering a nearly identical municipal seizure program, the Supreme Court held 9-0 that Surplus Equity constitutes property "protected from uncompensated appropriation by the State." *Id.* The Court found that "a taxpayer is entitled to the surplus in excess of the debt owed." *Id.* at 642. The holding explicitly applies whether the government sells the seized property or, as here, uses it for another purpose. *Id.* at 643.

*Tyler* is dispositive of the Takings Claims and warrants summary judgment for the Round 10 Class. There can be no genuine dispute that Defendants effected unconstitutional takings through the TPT Program when they seized properties valued more than the tax liens owed. *Id.* at 639. The record reflects that, like the scheme at issue in *Tyler*, the TPT Program provides no opportunity for property owners "to recover the excess value" after the City's seizure and transfer of title. *Id.* at 644–45. The amount of damages is readily calculable based upon appraisals of Round 10 properties performed close in time to their transfer and the tax liens owed on those properties. These appraisals were conducted by HPD employees (majority of which) decades of appraisal experience, requested by Neighborhood Restore to assess valuation for title insurance

2

purposes, and submitted to the City Council by Defendants as part of applications to receive real estate tax exemptions. The tax liens for each property can also be readily determined using Defendants' own records. Using these figures, Defendants seized $88,783,299.26 of Surplus Equity.

Moreover, the Round 10 Class has been deprived of the use and value of its Surplus Equity for over five years and is entitled to prejudgment interest to make it whole. The New York statutory rate of 9% simple interest accurately reflects the time value of money in New York and compensates the Round 10 Class for the loss of its Surplus Equity. This rate is also commensurate with amounts the Round 10 Class would require purchasing comparable real estate today considering historical real estate appreciation, which is a scenario resulting solely from Defendants' unconstitutional delay in delivering the Surplus Equity owed to the Round 10 Class. Thus, the Round 10 Class is entitled to $47,475,951.00[4] in prejudgment interest. Simkin Decl., Ex. 1.[5]

To the extent the Court is inclined to consider a rate lower than 9% simple interest, a rate of 6% compound interest, which approximately tracks the average federal prime rate for the relevant time, should serve as the floor in the Court's consideration. The prime rate is consistent with the rate offered by financial institutions for consumer loans including mortgages. And 6% compounded interest is lower than the returns the Round 10 Class could have received from

---

[4] Prejudgment interest amounts referenced throughout this memorandum have been calculated as of October 30, 2024, the date of this filing. Additional interest accrues on such amounts daily until the date judgment is entered.

[5] References to "Ex." are to those exhibits appended to the accompanying Declaration of Alexander B. Simkin in Support of Plaintiffs' Motion for Class Certification and Putative Round 10 Class's Motion for Summary Judgment on Takings Claims ("Simkin Decl.").

relatively risk-free investments like a fund keyed to the Standard and Poor's 500 ("S&P 500"), which would have provided a yearly gain of approximately 12% from September 2018 to September 2024. Under a 6% compounded interest rate, the Round 10 Class should receive $36,910,724.37 in prejudgment interest. Simkin Decl., Ex. 2.

For these reasons and those that follow, the Court should grant summary judgment on the Takings Claims and award damages and prejudgment interest in the amount of $134,482,367.33.[6]

## FACTUAL BACKGROUND

### I.    TPT Program Seizures

Since 1996, Defendants have concluded 10 TPT Program rounds, and transferred over 590 residential properties, consisting of over 7,300 units. Plaintiffs' Statement of Undisputed Material Facts ("PSOF") ¶ 1; Ex. 36; Ex. 21 at -4892; Ex. 20 at -6572.    During "Round 10," the most recent round which began in 2015, as in all other TPT rounds, Municipal Defendants foreclosed upon numerous residential properties through a mass state court *in rem* proceeding.    PSOF ¶ 4. Municipal Defendants then transferred title of the properties to Neighborhood Restore, providing no compensation to the property owners for their Surplus Equity. PSOF ¶¶ 5-6.

Neighborhood Restore was integral to this scheme to deprive Round 10 property owners of Surplus Equity. The statute authorizing the TPT Program requires that title transfer only to a qualified third-party following foreclosure on the property in the *in rem* action. PSOF ¶ 7. To comply with this third-party requirement, the Municipal Defendants created Neighborhood Restore as an entity to whom they could transfer the seized property, but whom they also controlled. PSOF ¶¶ 18-33. Municipal Defendants used Neighborhood Restore to take and hold title to TPT Program properties for an interim period, which it has done for the 25 years. PSOF

---

[6] *See supra* n.4.

¶¶ 8, 22, 33. Neighborhood Restore's filings with the Internal Revenue Service ("IRS") confirm that it was "created specifically to lessen the burdens of government" and that all its activities are "supervised and controlled by HPD," and the IRS has accordingly ruled that Neighborhood Restore is an "affiliate of a government unit." PSOF ¶¶ 28-30.

## II.    Defendants Seized Surplus Equity of the Round 10 Class Without Paying Compensation

HPD is supposed to identify "distressed properties" for seizure, which consist of certain residential properties with outstanding tax liens that constitute at least 15% of the value of the property and that have either: (i) five or more housing code violations, or (ii) an unpaid lien of at least $1,000 for work to repair or eliminate a dangerous condition. Admin. Code §§ 11-401(4), 11-401.1. In HPD's view, it was then "obligated by law to pick up"—*i.e.*, include in the TPT Program—any non-distressed properties that are on the same tax block as a selected distressed property if the non-distressed property "has $1,000 of arrears, outstanding for at least 1 or 3 years depending on the type of property." *See* Ex. 19 at -2929; *see also* Ex. XX at -1762; Ex. 21 at -4897.

In 2015, Municipal Defendants initially selected 420 properties for TPT Round 10. PSOF ¶ 9. Half of the properties that Municipal Defendants initially selected were not statutorily distressed, with an average lien to value ratio of only 3%. *See* Ex. 23 at -0604.

Municipal Defendants commenced four mass *in rem* actions (one per borough) in New York Supreme Court against the selected properties. PSOF ¶ 11. Based on putative default judgments in the *in rem* proceedings, Municipal Defendants executed deeds conveying full and complete title of Round 10 foreclosed properties to Neighborhood Restore, nearly all of which were conveyed in September 2018. PSOF ¶ 12. The 67 transferred properties consisted of a total

of 847 units and including 26 cooperative buildings owned by Housing Development Fund Corporations ("HDFCs")[7] and one non-HDFC cooperative building. PSOF ¶ 55.

*Prior* to title transfer, a property owner may seek to enter into an installment agreement to pay outstanding taxes, PSOF ¶ 15, or, make a "demand" for "additional time in which to pay the taxes and interest or to have the property sold with all taxes and interest to be paid out of the proceeds of such sale," Admin. Code § 11-409(d). But the TPT Program contains no provision for, and there is no statutory or other mechanism by which, the property owner may receive the Surplus Equity— including by requesting a court-directed sale of the selected property. PSOF ¶ 16; *see generally* Admin. Code §§ 11-401 *et seq.* And *after* title transfer (*i.e.*, after the taking), the TPT Program has no provision at all that allows the property owner to recoup Surplus Equity that Defendants seized upon property transfer. PSOF ¶ 17.

## III. Defendants Seized More Than $88 Million of Surplus Equity from the Round 10 Class Without Paying Compensation

From March to May 2018, Municipal Defendants conducted appraisals of each of the properties slated to be transferred during TPT Round 10. PSOF ¶ 34. According to Defendants, the appraisals were done to allow Neighborhood Restore to acquire title insurance on the Round 10 properties. PSOF ¶ 50. The stated objective of the appraisals was "[t]o identify [the] market values of [the] properties." *See* Ex. 42 at -9984; Ex. 15 at 363:16-365:14. These appraisals were all conducted by New York State certified general real estate appraisers with decades of experience, employed by HPD itself, who prepared reports appraising each of the Round 10 properties. PSOF ¶ 41. Defendants had every incentive to ensure these valuations were accurate—

---

[7] HDFCs are not-for-profit or charitable corporations organized pursuant to Section 573 of Article XI of the New York State Housing Finance Law for maintaining the affordability of apartment units for the working families residing therein. PSOF ¶ 13.

if the appraisal underestimated the value of the property, the insurance would not provide appropriate protection; if the appraisal overestimated the value of the property, Defendants would pay higher premiums for unnecessary coverage.

Moreover, these appraisals also were submitted by HPD to City Council in applications under Urban Development Action Area Program ("UDAAP"), a City program that provides tax incentives for developing certain types of properties—which is subject to approval by City Council and provides a 20-year tax exemption based upon the assessed value of the properties. PSOF ¶ 49. Appraisals conducted by HPD's Acquisition and Land Valuation Unit are also subject to the quality oversight process, noted in the unit's Internal Quality Control Policy, under which any appraisal signed solely by one appraiser receives a mandatory "second read" by a review appraiser that otherwise is not part of the appraisal assignment. PSOF ¶ 48.

Additionally, the appraisals were prepared in accordance with and within the guidelines of the Uniform Standards of Professional Appraisal Practice and provided "as is" leased or fee simple market values for Municipal Defendants' "In-Rem Taking purposes." PSOF ¶ 40. The appraisals defined market value as "[t]he most probable price which a property should bring in competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." PSOF ¶ 38. Value estimates were based on information that HPD and DOF provided to appraisers, including "existing rent rolls where available and comparable sales where appropriate." PSOF ¶ 39. Some of the appraisals utilized the income capitalization approach, which anticipates the price an investor would pay in accordance with their expected return on the investment and involves an analysis of a property's potential to generate a net income, and other appraisals utilized the comparable sales approach, which sets market value at the cost of acquiring an equally desirable

substitute property as adjusted to reflect various differences in characteristics that affect value, PSOF ¶¶ 35-36. No hypothetical conditions were utilized. PSOF ¶ 37.

In Round 10, per Defendants' own appraised values, Defendants seized, and transferred to Neighborhood Restore, approximately $127 million of real property value. *See* Simkin Decl. Ex. 1 (Surplus Equity Table). Of the 67 properties transferred, 56 properties consisting of 719 separate units, including 23 HDFCs, had Surplus Equity. PSOF ¶ 55. The Surplus Equity totaled $88,783,299.26, yet the Round 10 class received no compensation from Defendants. PSOF ¶ 58.

## IV.    Role of Neighborhood Restore

Neighborhood Restore is "a quasi-governmental entity" that was created "at HPD's behest," whose board of directors contains HPD employees, whose sole business function is to "operate[] the Third-Party Transfer Program," and that receives 100% of its funding from the City or through its operation of the TPT Program. PSOF ¶ 21. Neighborhood Restore was created because "the City was looking for a third party to take title to properties that were foreclosed on through [TPT] to act as an interim owner" before transfer to an actual third-party developer. PSOF ¶ 22. This is because, in City-run programs pre-dating the TPT Program, properties intended to be transferred to private parties would "wind up sitting in the City's ownership for many years, and the City didn't necessarily have … the ability to manage those properties and be the landlord of those properties." PSOF ¶ 25. According to Neighborhood Restore, "the existence of [Neighborhood Restore] and the focus on moving these properties to that next level are what is essential" to the final transfer to third-party developers under TPT Program. PSOF ¶ 26.

In fact, Neighborhood Restore obtained an IRS ruling that it is "an affiliat[e] of a governmental unit." PSOF ¶ 30. In its IRS submission, Neighborhood Restore asserted that "*[a]ll of [its] activities are supervised and controlled by HPD*" and all of Neighborhood Restore's assets are overseen, monitored, controlled by, and returnable or repayable to HPD. PSOF ¶¶ 28-29.

8

## ARGUMENT

### I.  Legal Standard

"Summary judgment is appropriate" where "the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Garcia v. JonJon Deli Grocery Corp.*, 2015 WL 4940107, at *1 (S.D.N.Y. Aug. 11, 2015) (citing Rule 56(a)). "Material facts" are those that can "affect the outcome of a case." *Id.* "If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of fact." *Id.* at *2. "The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by facts," but instead "must set forth specific facts showing that there is a genuine issue for trial." *Id.* There can be no genuine dispute that Defendants seized Surplus Equity of the Round 10 Class without providing compensation.

### II.  The Round 10 Class Is Entitled to Summary Judgment on the Takings Claims

Round 10 Class is entitled to summary judgment for the on the I and VI claims in the Amended Complaint (together, "Takings Claims") and an award of $134,482,367.33 in damages and prejudgment interest. Simkin Decl. Ex. 1.

A takings claim under the U.S. and New York Constitutions contains three elements. Plaintiffs must show (1) they were owners of the property at issue, (2) the government took the property, and (3) they were not compensated. *Knick v. Township. of Scott*, 588 U.S. 180, 191 (2019); N.Y. CONST. art. 7 ("Private property shall not be taken for public use without just compensation.").

Prior to the Court's ruling in *Knick*, certain courts further required plaintiffs to demonstrate that they had no adequate mechanism for recovering the Surplus Equity. *See Nelson v. City of New York,* 352 U.S. 103, 110 (1956). Here, the record is clear. Defendants took the

class members' property—Surplus Equity—without compensation, and no pathway existed for the class members to recover the Surplus Equity. This is sufficient to establish liability as a matter of law.

A.    Defendants' Seizure of Surplus Equity Constitutes an Unlawful Taking

Prior to TPT Round 10, the class members had Surplus Equity in the properties at issue in this litigation (the "Subject Properties"). There is no dispute that Municipal Defendants seized the Subject Properties through TPT Round 10, which were transferred to Neighborhood Restore. PSOF ¶¶ 5, 8, 12. With these transfers, each class member lost title. *Id*. Many even lost physical access. Defendants took not only the physical properties, but the Surplus Equity as well by keeping the remaining value of the properties for themselves. PSOF ¶ 6.

Courts have repeatedly held that such actions constitute unlawful takings under the U.S. and state constitutions. Dispositively, in *Tyler,* the U.S. Supreme Court struck down an *in rem* procedure substantially identical to the TPT Program. *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 639 (2023). There, as here, the government defendant seized the petitioner's property to satisfy a tax bill. The home was valued at $40,000, and the tax bill was $15,000. The defendant county took the remaining $25,000 for itself without compensating the plaintiffs. The *Tyler* court unanimously held that the surplus value of a property above the amount of taxes owed is "property protected from uncompensated appropriation by the State"; that a governmental entity may not take or retain such surplus without providing compensation; and that "*a taxpayer is entitled to the surplus in excess of the debt owed*." *Id*. at 638-39. In "us[ing] the toehold of the tax debt to confiscate more property than [is] due," the government "effect[s] a classic taking in which the government directly appropriates private property for its own use" that "entitle[s] [the property owner] to just compensation." *Id.* The Supreme Court was also explicit that the outcome is the

same whether the government sells the seized property or, as here, uses it for another purpose.  *Id.* at 643.

*Tyler* follows a long line of precedent prohibiting governments from retaining Surplus Equity.  For example, in *United States v. Taylor*, 104 U.S. 216, (1881), the Court held that a taxpayer whose property had been sold to satisfy a tax debt could recover the surplus from the sale.  Similarly, in *United States v. Lawton*, 110 U.S. 146, 149 (1884), the Supreme Court upheld a judgment in favor of a foreclosed landowner for the surplus proceeds from the sale of his land.  *Id.* at 150 ("To withhold the surplus from the owner would be to violate the fifth amendment to the constitution[.]").  Numerous other courts have rejected substantially identical efforts to keep Surplus Equity without compensation.  *See, e.g.*, *Rafaeli, LLC v. Oakland Cty.*, 505 Mich. 429, 480 (2020) (county could not retain the surplus proceeds from the tax sales because "[t]he purpose of taxation is to assess and collect taxes *owed*, not appropriate property *in excess of what is owed*") (emphasis in original); *Coleman v. District of Columbia*, 70 F. Supp. 3d 58, 77 (D.D.C. 2014) (plaintiff seeking surplus equity states Takings claim); *Freed v. Thomas*, 2021 WL 942077, at *4 (E.D. Mich. Feb. 26, 2021) (granting judgment on Takings claim for surplus equity).

The law is settled: *i.e.*, it is unlawful for the government to take Surplus Equity without compensation.  Defendants took the class members' Surplus Equity without compensation.  It is black letter law that this constitutes an unlawful taking and the Round 10 Class is entitled to summary judgment.

B.    TPT Did Not Provide a Pathway for Round 10 Class Members to Obtain Surplus Equity

Even if it were still a relevant inquiry post-*Knick*, the Round 10 Class did not have a mechanism to obtain compensation for their Surplus Equity.  Under the TPT Program, property owners can (theoretically) redeem their properties by paying their tax liens in full or entering into

an installment agreement.  N.Y.C. Admin. Code § 11-412.1(d); PSOF ¶ 14.  A property owner

may also "demand additional time" prior to foreclosure so that the property owner can sell the

property "with all taxes and interest to be paid out of the proceeds of such sale."  *Id.* § 11-409(d);

PSOF ¶ 15.  Defendants have pointed to these provisions to suggest that the TPT Program does

provide an adequate mechanism for property owners to obtain Surplus Equity such that, under the

Supreme Court's decision in *Nelson*, Defendants' failure to pay for this Surplus Equity does not

amount to a Takings Clause violation.  *See, e.g.*, MDs' MTD Memo., ECF No. 33 at 16.

    *Nelson* provides no support for Defendants here.  In *Nelson*, the statute at issue provided

for a ***court directed sale*** of the subject property and for ***distribution of the resulting proceeds***.  352

U.S. at 110.  Allowing a property owner more time to pay off tax liens or to conduct a sale of

property (as the TPT Program does here) is not equivalent to providing a mechanism for a court

directed sale of the property (as the ordinance provided for in *Nelson*).  The Supreme Court (and

other courts) have addressed this precise issue and rejected the argument that Defendants have

asserted here:

> Unlike in *Nelson*, Minnesota's scheme provides no opportunity for the taxpayer to
> recover the excess value; once absolute title has transferred to the State, any excess
> value always remains with the State.  The County argues that the delinquent
> taxpayer could sell her house to pay her tax debt before the County itself seizes and
> sells the house. ***But requiring a taxpayer to sell her house to avoid a taking is not
> the same as providing her an opportunity to recover the excess value of her house
> once the State has sold it***.

*Tyler*, 598 U.S. at 644-45 (distinguishing *Nelson* where no Takings Clause violation occurred

because statute "did not absolutely preclude an owner from obtaining the surplus proceeds of a

***judicial sale***"); *see also Coleman*, 70 F. Supp. 3d at 78 ("[B]ecause D.C. provides no action to

recover any surplus, [plaintiff's] claims, therefore, are not foreclosed by *Nelson*.").

    Here, there is no dispute of any material fact concerning the redemption procedures

available under the TPT Program.  There is no mechanism under TPT for a court-directed sale to

occur after the property is taken.  PSOF ¶ 16.  The **pre-transfer** procedures that are available—paying off the tax liens, entering installment agreements, or having owner-directed property sales—are not mechanisms for providing the taxpayer with the Surplus Equity from the seized property, and thus are inadequate as a matter of law under *Nelson*.  PSOF ¶¶ 14-17.  *Nelson* is thus not a basis to deny summary judgment as to the Takings Claims.

## III.  Defendants Acted under Color of State Law

To prevail on their section 1983 constitutional claims, the Round 10 Class must show that Defendants deprived them of their constitutional rights while acting under color of state law.  *See Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (citing 42 U.S.C. § 1983).[8]  Local governing bodies "can be sued directly under § 1983" for monetary relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1987).  Additionally, "[i]t is well settled in this [c]ircuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

There can be no question that these requisite showings are satisfied for Municipal Defendants.  The City Council enacted the TPT Program in 1996 and, since then, Municipal Defendants, including the named Defendant Commissioners of HPD and DOF, administered the TPT Program to transfer more than 590 properties to the City's TPT Program partners.  Simkin Decl. Ex. 36.

---

[8] New York state constitutional claims against private entities are subject to this same requirement. *Under 21 v. City of New York*, 482 N.E.2d 1, 7 n.6 (N.Y. 1985).

Neighborhood Restore, also acted under the color of law. Pursuant to the "compulsion test," "the actions of a nominally private entity are attributable to the state . . . when the entity acts pursuant to the coercive power of the state or is controlled by the state." *Fabrikant*, 691 F.3d at 207. As Neighborhood Restore has represented in statements to the IRS that "all of [its] activities are supervised and controlled by HPD," PSOF ¶¶ 28-29, it is properly considered a state actor under the compulsion test, as Neighborhood Restore's decision to take title to the Plaintiffs' properties was an activity "controlled by HPD." *See Fabrikant*, 691 F.3d at 207.

Neighborhood Restore also acted under color of state law according to the "joint action" or "close nexus" test. The Second Circuit has held that "the actions of a nominally private entity are attributable to the state" when "the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies." *Fabrikant*, 691 F.3d at 207.

Neighborhood Restore's coordination with Municipal Defendants easily qualifies as state action. To start, Neighborhood Restore's *only* business operations consist of the management and ownership of TPT Program properties—which it receives for free from Municipal Defendants— and collaboration with Municipal Defendants on the TPT Program. PSOF ¶ 31. Neighborhood Restore's external financial support comes entirely from Municipal Defendants. PSOF ¶ 32; *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 299 (2001) (high school athletic association was a state actor, including because "public schools have largely provided for the Association's financial support").

Moreover, Defendants have explicitly agreed that Neighborhood Restore's joint participation with Municipal Defendants in the TPT Program is required for Defendants to effectuate the seizures. *See Mizrahi v. City of N.Y.*, 2018 WL 3848917, at *7 (E.D.N.Y. Aug. 13,

14

2018) ("[T]he touchstone of joint action is often a plan, prearrangement, conspiracy, custom or policy."); PSOF ¶ 23.  Specifically, Neighborhood Restore is required to take interim title to the properties in order to ensure that Municipal Defendants do not run afoul of Administrative Code provisions that authorize the TPT Program (PSOF ¶¶ 7, 24), and Neighborhood Restore has in fact taken title to every single property transferred through the TPT Program.  PSOF ¶¶ 5, 8, 12; *see Ciambrello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents.").  Indeed, in seeking to obtain tax status as an "affiliate of a governmental entity," Neighborhood Restore has represented to the IRS that it was "created specifically to lessen the burdens of government" by holding title to the TPT Properties on HPD's behalf, "acting as an agent for HPD in administering the TPT Program."  PSOF ¶ 28 (explaining that Neighborhood Restore is HPD's agent, was created to lessen the burdens of government, and that its interim ownership of TPT properties "was required" to execute the City's plans to seize properties through the TPT Program).

Taken together, Neighborhood Restore's activities and its own binding admissions illustrate that it "actively engage[d] with [Municipal Defendants] to achieve desired ends" of the TPT Program.  *See Mizrahi*, 2018 WL 3848917, at *7–9 (jury could find that defendants acted jointly with police by confining plaintiff and directing her to perform acts together).  Summary judgment against Neighborhood Restore thus also is warranted.  *See Brentwood Acad.*, 531 U.S. at 294.

IV.    **Defendants Are Liable for $88,783,299.26 in Damages and $47,475,951.00 in Prejudgment Interest[9]**

      A.    <u>The Round 10 Class Should Be Compensated $88,783,299.26 for Unconstitutionally Seized Surplus Equity</u>

Defendants are required to compensate the Round 10 Class for their Surplus Equity in the transferred properties.  *See Tyler*, 598 U.S. at 638–39.   Here, Surplus Equity consists of the property value in excess of the tax liens that served as the basis for Defendants' transfers of properties under the TPT Program.  *See* Admin. Code § 11-402 ("The provisions of [the TPT Program] shall be applicable *only to tax liens owned by the city*."), § 11-404 ("Whenever it shall appear that a tax lien or tax liens has or have been due and unpaid for a period of at least one year from the date on which the tax, assessment or other legal charge represented thereby *became a lien*, such tax lien or tax liens . . . may be summarily foreclosed in the manner provided [under TPT Program]").[10]  Both figures required to determine damages for Round 10—the property value and the amount of tax liens at the time of transfer—are readily calculable from Defendants' own documents.

---

[9] While Plaintiffs previously contemplated moving for a "liability" determination in the middle of fact discovery, ECF No. 270, Plaintiffs heeded the Court's warning and waited until nearly the end of fact discovery to file their motion and now seek a damages determination as well.  Plaintiffs believe this falls within the scope of the Court's order approving a summary judgment motion on "Takings claims," ECF No. 280, but to the extent further permission is required, Plaintiffs hereby seek it and would be happy to participate in a further conference with the Court to discuss.  In all events, a determination on liability is warranted.

[10] Defendants might argue that Surplus Equity should be calculated as the property value in excess of tax liens as well as other "municipal charges" (*e.g.*, water and sewer charges).  These charges should not be included in calculating Surplus Equity because they do not provide any basis to seize properties under the TPT Program (*see* Admin. Code §§ 11-402, 11-404).  If the Court were to nevertheless conclude that municipal charges should be deducted from Surplus Equity, damages would still be readily calculable.  Simkin Decl. ¶ 3; Simkin Decl. Ex. 2.

16

1. *Market Value is the Appropriate Measure of Property Value*

With respect to federal Takings claims, "just compensation normally is to be measured by the market value of the property at the time of the taking contemporaneously paid in money." *United States. v. 50 Acres of Land*, 469 U.S. 24, 29 (1984). Market value "may be deemed to be the sum which, considering all the circumstances, could have been obtained for [the seized property]; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy." *Olson v. United States*, 292 U.S. 246, 257 (1934). "[D]eterminations of market value are routinely made in judicial proceedings without the benefit of a market transaction in the subject property." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 742 (1997). "[T]he law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation" and "[i]t may be based upon comparable sales, reproduction costs, capitalization of net income, or an interaction of these determinants." *Sill Corp. v. United States*, 343 F.2d 411, 416 (10th Cir. 1965) (citing *United States v. Miller*, 317 U.S. 369 (1943)). Accordingly, market value is the appropriate measure of value of the properties transferred in Round 10 of the TPT Program, which is readily calculable for the Round 10 properties as explained below.

2. *Defendants' Property Appraisals Evidence Market Value*

Defendants appraised every Round 10 property seized that they intended to use in connection with the TPT Program at a time when they had every incentive to obtain fair market values of those properties. The appraisal reports the state that they measure the "as is" market values of the properties, which were determined based on either sales comparison or income capitalization approaches. *See*, *e.g.*, PSOF ¶¶ 35-36. No hypothetical conditions were utilized. *Id.* Courts routinely accept each of these approaches for purposes of determining fair market value of real property. *See*, *e.g.*, *In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478, at *2 (S.D.N.Y. July

6, 1993) ("The three principal methods for appraising real  property are the cost approach, the sales comparison approach and the income capitalization approach."); *Accord In re Sept. 11 Litig.*, 802 F.3d 314, 335 (2d Cir. 2015) (value of leasehold estate could be measured through, *inter alia*, sales comparison approach or income capitalization approach); *see also Nat'l R.R. Passenger Corp. v. 10,178 Square Feet of Land More or Less*, 781 F. Supp. 234, 236–37, 241 (S.D.N.Y. 1991) (determining value of property taken in condemnation action based upon "appraisers [who had] used the market approach, basing their conclusions on comparable sales of property in the area" and finding plaintiffs "entitled to a judgment for the taking of the fee").

These appraisals are a reliable measure of market value in this case.  <u>First</u>, these appraisals were conducted by six well-credentialed and certified appraisers, all of whom were employed by HPD, in accordance with widely accepted and congressionally adopted appraising principles. PSOF ¶¶ 35-40.  Five out of six appraisers had decades of experience working in HPD's appraisal unit at the time the appraisals were conducted, and five of them were licensed New York State Certified General Real Estate Appraisers (which requires "3,000 hours of qualifying real estate appraisal experience" to obtain).  PSOF ¶ 41.  Mr. Indiviglio was the Director of HPD's Acquisition and Land Valuation Unit and had been with HPD since 1986.  PSOF ¶ 42.  Mr. Byrnes was the Deputy Director of HPD's Acquisition and Land Valuation Unit starting from 2005, employed by HPD since 1989, and had "been actively involved in real estate appraisal and consulting services since 1984."  PSOF ¶ 43.  Mr. Farre was an Appraiser, employed by HPD since 2003, with "more than twenty years" of appraisal experience.  PSOF ¶ 44.  Mr. Gotkin was an Appraiser, originally licensed in 1993, employed by HPD since 1987, with experience appraising "residential, commercial, and industrial real estate for over twenty five years."  PSOF ¶ 45.  Ms. Doscher was an Appraiser, employed by HPD since 2015.  Ms. Habib was an Appraiser, employed

by HPD since 1992, and previously worked as a "Real Estate Tax Lawyer."  PSOF ¶ 46.  All three of Ms. Habib's appraisals of Round 10 properties with Surplus Equity were reviewed by Mr. Indivigilio, a New York State Certified General Real Estate Appraiser.  PSOF ¶ 47.

Additionally, HPD's Acquisition and Land Valuation Unit's Internal Quality Control Policy contains a quality oversight process for appraisals, pursuant to which, any appraisal signed solely by one appraiser receives a mandatory "second read" by a review appraiser that otherwise is not part of the appraisal assignment.  PSOF ¶ 48.

Second, these appraisals were conducted between March and May of 2018, shortly prior to the transfer of most of the properties to Neighborhood Restore in September 2018.  PSOF ¶ 34. Accordingly, the appraisals occurred prior to any transfer, let alone prior to any post-transfer construction rehabilitation efforts and would have considered market conditions at the approximate time of transfer.

Third, HPD had every incentive to ensure that the appraised values were accurate.  These certified appraisals were ordered by HPD and were included in applications under the UDAAP PSOF ¶ 49.  Thus, Defendants deemed these appraisals to be accurate enough to present to City Council as a measure of assessed value.

Fourth, the accuracy of these appraisals is further bolstered by the fact that they were conducted at the request of Neighborhood Restore in order to acquire "insurance quotes" for purposes of ascertaining title insurance premiums on the properties slated for transfer during Round 10 of the TPT Program.  PSOF ¶ 50.  Thus, at the time the appraisals were requested, their accuracy was important to ensure Defendants' interests in the properties were adequately safeguarded through title insurance.  PSOF ¶ 51 (agreeing that it was "important to provide accurate valuation information to the company that's providing the [title] insurance").

The appraised valuations of the properties seized from the Round 10 Class are therefore determinative of the market values of the seized properties for the purpose of calculating damages.

3.     *Tax Lien Amounts are Clear from Defendants' Records*

Plaintiffs' Surplus Equity consists of the property value in excess of the tax liens that served as the basis for Defendants' transfers of properties under the TPT Program.  *See* Admin. Code § 11-402 ("The provisions of [the TPT Program] shall be applicable *only to tax liens owned by the city*." (emphasis added)), § 11-404 ("Whenever it shall appear that a tax lien or tax liens has or have been due and unpaid for a period of at least one year from the date on which the tax, assessment or other legal charge represented thereby became a lien, such tax lien or tax liens . . . may be summarily foreclosed in the manner provided [under the TPT Program]" (emphasis added)).

There is dispute regarding the amount of tax liens that existed at the time the properties were taken.  The City maintained its own spreadsheet, titled the TPT Round X Masterfile ("Round 10 Masterfile"), that listed the total of past due taxes for every Round 10 property every month from October 2017 through January 2019.  *See* PSOF ¶ 52.  The Round 10 Masterfile was updated regularly and shared widely with HPD and Neighborhood Restore staff as a reliable document for record-keeping purposes.  PSOF ¶ 53.  The City also provided records identifying when each Round 10 property was transferred.  *See* PSOF ¶ 54.  Because the City's Round 10 Masterfile listed tax liens by month, it is easy and straightforward to identify the amount of tax liens at the time of each taking.  Simkin Decl. ¶ 2.  Indeed, the parties agree on the outstanding amounts owed at the time of transfer.  *See* PSOF ¶¶ 60-227.

4.     *Surplus Equity for Round 10 is Readily Calculable*

Here, the market values of the properties minus the tax liens are subject to mechanical calculation and courts "routinely award damages that are readily calculable based on the

undisputed facts on summary judgment." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir. 2010) (collecting cases). Thus, as a matter of law, the Round 10 Class is entitled $88,783,299.26 in damages. PSOF ¶ 58; Simkin Decl. ¶ 2; *see also 50 Acres of Land*, 469 U.S. at 30 (holding real estate "is not one in which . . . fair market value is not ascertainable"). Based on the contemporaneous, certified appraisals, 56 of the Round 10 properties had $88,783,299.26 in Surplus Equity. PSOF ¶ 58. Defendants provided no compensation for this excess value. PSOF ¶ 6; *see generally* Admin. Code §§ 11-401 *et seq.*

Accordingly, the Round 10 Class is entitled to $88,783,299.26 in damages as compensation for the seized Surplus Equity. *See AEP Energy*, 626 F.3d at 718, 740–42 ("conclud[ing] that the district court did not err in calculating the value of the [converted property] on summary judgment" in connection with conversion counterclaims and "properly awarded damages to [counterclaimant] in the amount of $345,675,000 plus prejudgment interest," and "therefore affirm[ing] the district court's judgment in each of these respects"); *Constitution Pipeline Co., LLC v. Permanent Easement for 1.06 Acres*, 2022 WL 61316, at *2 (N.D.N.Y. Jan. 6, 2022) (plaintiff "entitled to judgement as a matter of law as to the measure and amount of just compensation owed" in condemnation action based upon "appraised fair rental value" of property).[11]

B.    The Round 10 Class Is Entitled to $47,475,951.00 in Prejudgment Interest.

Round 10 Plaintiffs request an award of prejudgment interest on damages at the New York statutory rate of 9% simple interest from the date that title was transferred. *See Jacobs v. United States*, 290 U.S. 13, 16 (1933) (interest from time of taking required for adequate compensation). Prejudgment interest is part and parcel of "just compensation" for an unconstitutional taking. *See*

---

[11] Should the Court decide that damages should be reduced by other municipal charges, that figure is also readily calculable, and the Round 10 class would be owed $77,734,302.82. PSOF ¶ 59; Simkin Decl. ¶ 3; Simkin Decl. Ex. 2.

*Wickham Contracting Co. v. Loc. Union No. 3, IBEW*, 955 F.2d 831, 833 (2d Cir. 1992); *Rao v. N.Y.C. Health & Hosps. Corp.*, 882 F. Supp. 321, 326 (S.D.N.Y. 1995) (prejudgment interest is "generally appropriate in § 1983 actions" and "usually a necessary component of any award intended to make a plaintiff whole, because it compensates a plaintiff for delay in the receipt of relief").

Given § 1983's silence on the matter, the proper prejudgment interest rate is left to the Court's discretion and involves balancing the following factors: (i) "the need to fully compensate the wronged party for actual damages suffered," (ii) "fairness and the relative equities of the award," (iii) "the remedial purpose of the statute involved, and/or" (iv) "such other general principles as are deemed relevant by the court." *Frommert v. Conkright*, 913 F.3d 101, 109 (2d Cir. 2019). These factors all favor an award of prejudgment interest at rate of 9% simple interest in the amount of $47,475,951.00. Simkin Decl. Ex. 1.

1.  *A Prejudgment Interest Rate of 9% Simple Interest Would Provide Just Compensation*

A 9% simple interest rate is appropriate for two main reasons. <u>First</u>, 9% is the appropriate rate under New York Law for property-related actions. *See* N.Y. C.P.L.R. §§ 5001, 5004(a). The New York property-related rate of 9% is most appropriate for property situated within the state, particularly because this case involves concurrent federal and state Takings claims. Moreover, several courts have found the 9% rate to be generally appropriate in federal cases. *See Alfano v. CIGNA Life Ins. Co. of New York*, 2009 WL 890626, at *7 (S.D.N.Y. Apr. 2, 2009) (concluding that 9% "is an appropriate rate" for prejudgment interest); *Taaffe v. Life Ins. Co. of N. Am.*, 769 F. Supp. 2d 530, 538 (S.D.N.Y. 2011) (same); *Levitian v. Sun Life & Health Ins. Co. (U.S.)*, 2013 WL 3829623, at *12 (S.D.N.Y. July 24, 2013) (recommending 9% interest), *report and recommendation adopted*, 2013 WL 4399026 (S.D.N.Y. Aug. 15, 2013) (adopting 9% rate given

New York legislature's "objective legislative judgment" that the rate is appropriate); *Doe v. Unum Life Ins. Co. of Am.*, 2016 WL 749886, at *1 (S.D.N.Y. Feb. 23, 2016) (awarding 9% interest).

Second, Round 10 Plaintiffs ask the Court to award 9% simple interest because that rate most accurately captures the economic realities of this case. This rate considers the state's "objective legislative judgment" and "accurately captures the time value of money in New York." *Taaffe*, 769 F. Supp. 2d at 538. It also more accurately captures the unique nature of the injury to the Round 10 Class—the loss of Surplus Equity resulting from the seizure of real property. The Round 10 Class is "entitled to such addition [to property value] as will produce the full equivalent of that value paid contemporaneously with the taking" and "[i]nterest at a proper rate is a good measure by which to ascertain the amount so to be added." *Jacobs*, 290 U.S. at 17.

To make the Round 10 Class whole, the proper rate should consider the lost time value of money, lost value of money (*i.e.*, inflation), and what Round 10 Class members would have used their compensation for if it was timely provided, viewed through the economic realities of the relevant market. *See River Oaks Marine*, 1992 WL 373533, at *8 (considering the higher yields plaintiff could have received if invested money back into its business at time of unconstitutional taking rather than "if plaintiff had merely placed the proceeds in a bank or invested them in relatively risk free ventures as those embodied by the Treasury Bill rate").

A majority of Round 10 Class members' properties were transferred in September 2018. *See* PSOF ¶¶ 34, 60-227. Given historical annual average real estate appreciation, Round 10 Class members would likely need 9.7% more per year to purchase a comparable property today in New York than they would have needed had they timely received compensation in September 2018.

*See* Simkin Decl. ¶ 104.[12] Moreover, some courts that have taken the investor rationale into account have awarded comparable rates. *See Tyll v. Stanley Black & Decker Life Ins. Program*, 403 F. Supp. 3d 27, 41 n.6 (D. Conn. 2019) (awarding 8% compounded interest after finding average federal postjudgment rate of 2.05% too low and noting "the Dow Jones Industrial Average saw an increase of approximately 11 percent per year" during the relevant time period). That is unsurprising considering that if Round 10 Class members had invested their Surplus Equity in a fund that tracks the S&P 500, a relatively risk-free investment, between September 2018 and September 2024, they would have achieved an annual compounded return of 12%, or, if reflected as simple interest, a 16% return. *See* Simkin Decl. ¶¶ 237-238.[13]

In addition to the economic realities, the equities of this case strongly weigh in favor of a 9% simple interest rate as well. Defendants effectively stole private property owned largely by elderly persons of color based on asserted tax liens. Irrespective of how much a property is worth in excess of any tax liens, Defendants wholly disregarded compensating these homeowners, and brazenly seized the Surplus Equity. Defendants then transferred those properties to developers after extinguishing the very tax liens that the seizures were based on in the first place. As a result of Defendants' constitutional violations, these homeowners were often not only stripped of a common vehicle for creating generational wealth but were converted to renters in the very properties they previously owned. Others were left homeless. A rate of 9% interest is appropriate given these extraordinary circumstances.

---

[12] 231. The S&P CoreLogic Case-Shiller NY-New York Home Price Index ("Index") reflects an observation of 312.41 in July 2024 from 199.46 in September 2018. This is the equivalent of a rate of 9.7% growth, if reflected as simple interest. *See* Simkin Decl. ¶¶ 104.

[13] The S&P 500 closed at 2,913.98 on September 28, 2018, and 5,762.48 on September 30, 2024. *Id*. The compounded annual growth rate for that time period is approximately 12%, which reflected as simple interest, is approximately 16%. *See* Simkin Decl. ¶¶ 103.

Accordingly, the Round 10 Class should receive prejudgment interest at an annual rate of 9% simple interest calculated from the date of transfer of each of the properties with Surplus Equity. As of this filing, total prejudgment interest amounts to $47,475,951.00, *see* Simkin Decl. Ex. 1, which the Court should order paid to the Round 10 Class in addition to the damages award. *See, e.g.*, *Peter J. Solomon Co., L.P. v. ADC Prod. (UK) Ltd.*, 2017 WL 4350571, at *2 (S.D.N.Y. May 10, 2017) (granting summary judgment and awarding damages plus prejudgment interest); *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 387 (S.D.N.Y. 2013) (same).

### 2. *In the Alternative, the Court Should Award 6% Compound Interest*

In the alternative, should the Court find a lower rate more appropriate, it should award prejudgment interest, compounded annually, at a rate of 6%, which approximately tracks the average federal prime rate for the relevant time period (September 2018 to October 2024) of approximately 5.4%.[14] Since the prime rate is an indicator of the rates financial institutions use for consumer loans (*e.g.*, mortgages), it serves as a proper floor for the prejudgment interest rate in this case. *See Frommert v. Becker*, 216 F. Supp. 3d 309, 315 (W.D.N.Y. 2016) ("It would be well within the discretion of the district court to take into account the rate at which such a plaintiff would have paid to borrow money rather than the rate at which [the plaintiff] would have lent it to the government."), *aff'd*, 913 F.3d 101, 109-10 (2d Cir. 2019); *see also River Oaks*, 1992 WL 373533, at *8–9 (W.D.N.Y. Nov. 24, 1992) (compounding federal prime rate in takings case). For example, if a Round 10 Class member sought financing to purchase a new property, that individual

---

[14] The monthly average of the Federal Prime Rate from September 2018 to October 2024 is 5.4%. *See* Federal Reserve Statistical Release, Selected Interest Rates ("Federal Reserve Statistics") (available at http://www.federalreserve.gov/releases/h15/data.htm) (Historical Data, Monthly Averages, Format Package, Review Package: Average majority prime rate charged by banks on short-term loans to business, quoted on an investment basis, Dates: Sept. 2018–Oct. 2024, File Type: Excel).

would have had to borrow money at an average rate of 4.73% compounded given the 30-year fixed rate mortgage national monthly average during the relevant time period. *See* Simkin Decl. ¶ 236.[15] *See Levitian*, 2013 WL 3829623, at *12 (considering 4.5% 30-year fixed mortgage national monthly average in awarding 9% simple interest).

Additionally, given the purpose behind just compensation, the remedial scheme of Section 1983, and prejudgment interest generally, is to make a plaintiff whole, compounding interest is appropriate if the Court elects a rate lower than 9% simple interest. *Cf. Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (finding an abuse of discretion in failure to compound 7.22% interest rate and noting "the purpose of backpay [] to make [a] plaintiff whole" can "only be achieved if interest is compounded").

Accordingly, to the extent the Court is inclined to award prejudgment interest at a rate lower than 9% simple interest, a rate of 6% compound interest should be the floor, which would result in an award of $36,910,724.37 in prejudgment interest. *See* Simkin Decl. Ex. 1.

## CONCLUSION

For the foregoing reasons, the Court should grant Round 10 Class motion for summary judgment on the Takings claims, and award them $88,783,299.26 in damages for Defendants' unconstitutional seizure of Surplus Equity, plus 9% simple prejudgment interest. The Court should also award reasonable attorneys' fees, and post-judgment interest.

---

[15] The monthly average from September 2018 to September 2024 is 4.73% compounded. *See* Simkin Decl. Ex. 2.

Dated:  October 30, 2024

Respectfully submitted,

/s/ Matthew L. Berman
Matthew L. Berman
Robert J. Valli, Jr.
Yolande I. Nicholson, Esq., Of Counsel
VALLI KANE & VAGNINI LLP
600 Old Country Road
Garden City, NY 11530
(516) 203-7180
mberman@vkvlawyers.com
rvalli@vkvlawyers.com
attorneynicholson@gmail.com

*Attorneys for Plaintiffs McConnell Dorce, Cecelia Jones, and Sherlivia Thomas-Murchison*

/s/ Keith H. Wofford
Keith H. Wofford
WHITE & CASE LLP
200 South Biscayne Blvd, Suite 4900
Miami, FL 33131
kwofford@whitecase.com

*Attorney for Plaintiffs McConnell Dorce and Sherlivia Thomas-Murchison*

/s/ Gregg L. Weiner
Gregg L. Weiner
Alexander B. Simkin
Leon Kotlyar
Ethan M. Weinberg
Mohammed S. Hassan
Casey M. Berger (admitted *pro hac vice*)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
Gregg.Weiner@ropesgray.com
Alexander.Simkin@ropesgray.com
Leon.Kotlyar@ropesgray.com
Ethan.Weinberg@ropesgray.com
Mohammed.Hassan@ropesgray.com
Casey.Berger@ropesgray.com

Daniel Yanofsky (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Daniel.Yanofsky@ropesgray.com

*Attorneys for Plaintiffs McConnell Dorce and Sherlivia Thomas-Murchison*

27

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that the foregoing contains 8,506 words excluding the parts of the brief exempted from the word-count limitation by Rochon Indiv. R. Prac. 3(C).

Dated:  October 30, 2024                         */s/ Alexander B. Simkin*
                                                               Alexander B. Simkin